# Exhibit A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| META PLATFORMS, INC., | |
| Plaintiff, | |
| v. | |
| THE FEDERAL TRADE COMMISSION, | Case No. _____ |
| – and – | |
| LINA M. KHAN, REBECCA KELLY SLAUGHTER, and ALVARO BEDOYA, in their official capacities as Commissioners of the Federal Trade Commission, | |
| Defendants. | |

## DECLARATION OF JAMES P. ROUHANDEH IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Pursuant to 28 U.S.C. § 1746, I, James P. Rouhandeh, declare as follows:

1.     I am a partner with the law firm of Davis Polk & Wardwell LLP, counsel for Plaintiff Meta Platforms, Inc. ("Meta").  I am an attorney admitted to practice law in the State of New York and am a member of the Bar of the United States District Court for the District of Columbia.  I submit this declaration in support of Plaintiff's Motion for Preliminary Injunction to enjoin Defendants from taking further action in the FTC administrative proceeding *In the Matter of Facebook, Inc.*, FTC File No. C-4365 (the "FTC Proceeding" or "Proceeding") pending resolution of the constitutional challenges asserted by Meta in this action.  I have personal knowledge of the facts set forth herein and am competent to testify thereto if called as a witness.

2.     Following entry of the Stipulated Order in *United States v. Facebook, Inc.*, 19-cv-02184-TJK (D.D.C. July 24, 2019), the FTC entered the 2020 Order in the FTC Proceeding on April 27, 2020.  Meta promptly began implementing its obligations under the 2020 Order,

including by instituting compliance programs and retaining the Assessor to conduct assessments of Meta's programs.

3.     Meta invested billions of dollars in designing and implementing the compliance programs required by the 2020 Order, and in facilitating the oversight of the Independent Assessor required by the 2020 Order.

4.     The Initial Assessment, covering the first six months of the privacy program, was submitted to the FTC and DOJ on July 1, 2021.

5.     Between August 2021 and May 2022, Meta responded to numerous requests from the FTC under Part XV of the 2020 Order relating to the Assessor's findings.  Its responses included multiple depositions, hundreds of pages of narrative responses, and nearly 30,000 pages of underlying source material concerning its extensive efforts to design and implement a new privacy program.  After completing its responses in May 2022, Meta did not hear further from the FTC concerning these issues for nearly a year.

6.     On March 13, 2023, FTC Staff sent letters to Meta stating that the Commission was "considering initiating a proceeding" against Meta and identifying documents that "may be disclosed" in such a proceeding.  In subsequent discussions, FTC Staff declined to provide any further details about the proceeding the Commission was considering or to discuss any concerns with Meta.

7.     On March 20, 2023, Meta sent a letter to FTC Staff requesting that the Commission follow its typical process and afford Meta an opportunity to engage with senior staff and Commissioners to understand any concerns.  FTC Staff declined to do so.

8.     On April 6, 2023, Meta sent another letter to the Commission's Associate Director of the Division for Enforcement reiterating its request for "the same opportunity the Commission

routinely provides to companies to engage with senior staff and Commissioners prior to initiating any proceeding."

9.      On April 10, 2023, FTC Staff responded by stating that, "[a]t the present time, we have no further information to share with you."

10.     On May 31, 2023, Meta filed a motion to enforce the Stipulated Order in *United States v. Facebook*.  Pursuant to the agreement of the parties on a briefing schedule for that motion, on June 13, 2023, Meta filed a second unopposed motion to extend its time to respond to the OTSC in the FTC Proceeding through November 30, 2023.

11.     On November 21, 2023, Meta filed an unopposed expedited motion to extend its time to respond to the OTSC in the FTC Proceeding, which the Commission granted on November 22, 2023.  The Commission ordered that, if the District Court in *United States v. Facebook* ruled on Meta's motion to enforce the Stipulated Order on or before November 30, 2023, Meta would have 14 days after such ruling to respond to the OTSC.

12.     On October 17, 2023, the District Court held an oral argument on Meta's motion to enforce the Stipulated Order.  A true and correct copy of the transcript is attached hereto as Exhibit 1.

13.     The District Court denied Meta's motion to enforce the Stipulated Order on November 27, 2023.  *See United States v. Facebook, Inc.*, 2023 WL 8190858, at *1 (D.D.C. Nov. 27, 2023).  Meta now has until December 11, 2023, to respond to the OTSC.

I declare under penalty of perjury that the foregoing is true and correct.

DATED:        November 29, 2023                    Respectfully submitted,

                                                   /s/ James P. Rouhandeh
                                                   James P. Rouhandeh
                                                   (D.C. Bar No. NY0390)
                                                   DAVIS POLK & WARDWELL LLP
                                                   450 Lexington Avenue
                                                   New York, New York 10017
                                                   Tel. (212) 450-4835
                                                   rouhandeh@davispolk.com

                                                   *Counsel for Plaintiff Meta Platforms, Inc.*

Exhibit 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,             CV No. 1:19-cv-02184-TJK
                        Plaintiff,
v.                                    Washington, D.C.
                                      Tuesday, October 17, 2023
FACEBOOK, INC.,                       9:30 a.m.
                        Defendant.
- - - - - - - - - - - - - - - - - - x
_____

TRANSCRIPT OF MOTION HEARING
HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

For the United States:   Katherine M. Ho, Esq.
                         Zachary Cowan, Esq.
                         Lisa K. Hsiao, Esq.
                         DEPARTMENT OF JUSTICE
                         450 5th Street, NW
                         Washington, DC 20001
                         (202) 353-7835


For the Defendant:       James P. Rouhandeh, Esq.
                         Michael S. Scheinkman, Esq.
                         DAVIS POLK & WARDWELL LLP
                         450 Lexington Avenue
                         New York, NY 10017
                         (212) 450-4000


Court Reporter:          Timothy R. Miller, RPR, CRR, NJ-CCR
                         Official Court Reporter
                         U.S. Courthouse, Room 6722
                         333 Constitution Avenue, NW
                         Washington, DC 20001
                         (202) 354-3111


Proceedings recorded by machine shorthand; transcript produced
by computer-aided transcription.

1              **P R O C E E D I N G S**

2              THE DEPUTY CLERK:  This is Civil Matter 19-2184,

3      United States of America v. Facebook, Incorporated.

4              Present for the plaintiff are Katherine Ho,

5      Zachary Cowan, and Lisa Hsiao; present for the defendant are

6      James Rouhandeh and Michael Scheinkman.

7              THE COURT:  All right.  Well, good morning to

8      everyone, counsel and everyone else alike.

9              We are here for a hearing on Meta's motion to

10     enforce.

11             The way I would like to handle things is simply

12     I've got a bunch of questions.  It's, obviously, Meta's

13     motion, and so I'll hear from you all first.  I have some

14     questions I want to ask and then I'll give counsel for both

15     sides, frankly, the opportunity to hit any topics we haven't

16     hit.

17             Some of my questions are going to be of the -- oh,

18     how to put this -- just, sort of, the -- almost the -- of

19     the decision tree variety, because the dispute here between

20     the parties, I think, has a number of different places where

21     things -- I could go one way or the other and then the

22     downstream effect of that on your dispute could be

23     dramatically different.

24             So let me invite counsel for -- first of all, is

25     there anything preliminary from either side before we begin?

1    You all have resolved your dispute and we can all go home?

2    No.

3            MR. COWAN:  No, Your Honor.

4            MR. ROUHANDEH:  No, Your Honor.

5            THE COURT:  All right, then.  Let me invite

6    counsel for Facebook or Meta to the podium.

7            Very well.  So look, I think the -- I think the

8    first -- it's no secret.  The question right off the bat

9    that you -- that both sides are going back and forth on, and

10    then I really have to address as a threshold matter, is

11    whether the administrative order, or Attachment A to the

12    stipulated order that I entered -- whether I have

13    jurisdiction over what -- the subsequent administrative

14    order that the FTC entered.  If I do, all sorts of things

15    flow from that that are in your favor; if I don't, then my

16    jurisdiction may well end there and that's the end of the

17    question, although I have some additional questions, but my

18    role may be -- may end.

19            So let me start with that.  I think we're going to

20    spend a lot of our time on that today.  And let me just

21    offer some thoughts after reading all the briefing on that

22    and have you, Counsel, just address these points.

23            As I looked at it closely, you know, what I

24    ordered as far as that Attachment A was simply that your

25    client consent to its entry.  I didn't order it -- I didn't,

1    sort of, substantively order the contents of Attachment A.

2    That's number one.

3         Number two, the FTC, as the parties have laid out,

4    had to undertake a -- sort of, a separate process with even

5    some commissioners dissenting and taking the position that

6    they shouldn't enter that order.  So it's, sort of -- I

7    think that, to me, suggests that I -- how it could have been

8    part of my order or at least, for purposes of this, how it

9    could have been substantively part of my order, when the

10   FTC's position -- and, I guess, both sides' anticipated

11   position -- was that the FTC would go through its normal

12   process and enter the order if they made the requisite

13   foundings [sic].  Obviously, I think, clearly, both sides

14   envisioned that happening, but the FTC -- a number of

15   commissioners felt, no, this wasn't an appropriate order.

16   So that, to me, also suggests that it wasn't part of my

17   order for jurisdictional purposes.

18        And, number three, I -- assuming you're right --

19   Meta's right that, in fact, it was part of my order, I think

20   an implicit part of your position, then, would be that the

21   FTC, sort of, bargained away their ability to make any

22   changes.  This is all before we get to whether this is an

23   appropriate modification.  Totally separate question.  But

24   if Meta -- if the FTC negotiated away its ability to make

25   changes to one of its own administrative orders, it seemed

1    to me that that would likely have been more clearly spelled

2    out.

3              So -- I don't know.  Can you address those three

4    points.  And, you know, so I'll just -- I think it's,

5    frankly -- these things are more helpful if the judge lays

6    his cards on the table, his or her, and says, "Here's where

7    I am on this.  Tell me why I'm wrong or tell me why I'm

8    right."  And on that threshold question, look, both sides

9    leverage the facts and the law well in their briefing, and

10   I'm not -- you all have an argument here, obviously, but

11   those types of things -- the points I just laid out are

12   things that make me skeptical of the idea that I have --

13   that for jurisdictional purposes, Attachment A was -- or the

14   administrative order was something that I ordered as opposed

15   to just your client's consent to the FTC entering it.

16             So with that long soliloquy, please proceed.

17             MR. ROUHANDEH:  Thank you, Your Honor.  Jim

18   Rouhandeh from Davis Polk & Wardwell on behalf of Meta.

19             And thank you for those questions.  I think they

20   go right to the heart of this dispute.  I think, clearly,

21   the Court can -- reserved jurisdiction in the stipulated

22   order here --

23             THE COURT:  Over something.

24             MR. ROUHANDEH:  -- of something, and it's clear

25   that the parties and the FTC consented to that.  Even in

1    Attachment A, they said "this Court" has jurisdiction.

2              THE COURT:  Well, okay.  I mean, I know you all go

3    back and forth about that.  I'm a little skeptical about

4    whether -- I lay that to the side only because I think

5    it's -- I understand your argument on that.  It's a document

6    that was entitled to -- or that was envisioned -- both

7    parties envisioned that would be entered by the FTC.  I

8    think it's a little strange to say "this Court."  I don't

9    know what to make of that, frankly.  I'm not sure it points

10   strongly in either direction, but I take --

11             MR. ROUHANDEH:  Well, we --

12             THE COURT:  -- your argument --

13             MR. ROUHANDEH:  We -- it makes no sense to say

14   "this Court" when they mean themselves.  It doesn't --

15   textually and otherwise.  And, in fact, the fact that the

16   DOJ is standing here in -- going to stand here in front of

17   Your Honor and say "the Court" means "Commission" is, kind

18   of, stunning.  I mean, are -- is the DOJ going to come in

19   this court and every time say they say "this Court," federal

20   district courts are going to have to say, "Now, do you --

21   when you say 'this Court' are you referring to me or some

22   federal agency?"  I mean, it's not a -- it doesn't pass the

23   smell test.

24             THE COURT:  I don't know that either

25   interpretations make much sense.  So I don't know -- I agree

```
 1    with you -- I agree with what you're saying.  I also don't
 2    know that the other way of interpreting it makes much sense
 3    either, but okay.
 4              MR. ROUHANDEH:  Well, I can come back to that.
 5    Let me -- the heart of the question, I think, is they
 6    consented to jurisdiction.  And that's important in
 7    Attachment A because they consented to jurisdiction.  We
 8    think, when read in light of the other provisions in that
 9    agreement, they consented to it.  It's not what they usually
10    say.  They usually say -- they always say "the Commission."
11    In 2012 -- and it's not -- it's not just a statement about
12    subject matter jurisdiction.  The 2012 order said "the
13    Commission" has subject matter jurisdiction.  This said "the
14    Court" has jurisdiction.  So it's very important, in answer
15    to Your Honor's questions, that there's also an agreement
16    here in addition to a federal order -- federal district
17    court order.  But in terms of the federal district court
18    order, the Court did, in fact, say multiple times in the
19    memorandum opinion that the stipulated order was imposing
20    the injunctive relief.  And that's very important because
21    the FTC couldn't impose the injunctive relief.  So if
22    they're saying Your Honor didn't impose the relief set
23    forward in an administrative order, then there's no valid
24    injunction against Meta.
25              THE COURT:  That was going to be another -- my
```

1    next layer of question.  But -- so is it -- and this is

2    something, really, that is beyond my expertise, I suppose

3    you might say.  So the FTC is not -- would not have been

4    able to -- let me put it this way.  What part of the -- what

5    portion of the provisions in the administrative order do you

6    think the FTC would have been -- it would have been unlawful

7    for them to order Meta without my -- the stipulated order?

8               MR. ROUHANDEH:  I haven't looked at it for that

9    purpose, but I think, essentially, there is no -- nothing in

10   there they could order because it is, in effect, an

11   injunction, and the stipulated -- it's -- order that

12   contains Attachment A ordered the monetary relief.  The

13   injunctive relief is contained in this Attachment A which is

14   the same thing filed.  It's part of Your Honor's order, just

15   to state it plainly.  It's the same document.  It's the same

16   docket entry.  It's the way -- under 65(d), I think, it has

17   to be considered Your Honor's order because you can't refer

18   to -- under 65(d), to other documents as containing

19   injunctive relief.  So it is the Court's order.  It's part

20   of the Court's order.  And it also -- the Court specifically

21   retained jurisdiction.  And we know that from the face of

22   the document that we just talked about, but we also know

23   that from your memorandum opinion.  In conclusion, Your

24   Honor said "in the event that the parties return to this

25   Court because the United States alleges, once again, that

1        Facebook has reneged on its promises and continued to

2        violate the law or the terms of the amended administrative

3        order, the Court may not apply the -- quite the same

4        deference" --

5                THE COURT:  But --

6                MR. ROUHANDEH:  -- "in terms of the proposed" --

7                THE COURT:  I did --

8                MR. ROUHANDEH:  -- "resolution."

9                THE COURT:  I did say that.

10               MR. ROUHANDEH:  That's pretty clear that if you

11       come back and say that the administrative order is to be

12       violated, you've got to come back to this Court.

13               THE COURT:  Sure.  Well, you could.  I mean, I

14       think -- and that's the point, is that certainly one way for

15       the Government to proceed is to -- if they thought -- any --

16       it seems to me just based on how they proceeded the first

17       time and how they proceeded in the past, they could have

18       approached Meta and said, "We think you violated parts of

19       our administrative order, the renewed one, and we think --

20       we need -- we want to strike a new bargain and go back to

21       the Court and agree on changes to it."  So I guess by

22       leaving open the possibility, as I did, that the Government

23       might proceed in that way, the question is -- you're

24       suggesting, for your position to be right, they would have

25       to have proceeded in that way, and I'm not -- I certainly

```
 1        didn't say that or mean to imply it.
 2                 MR. ROUHANDEH:  But there are two reasons why they
 3        have to.  One is this court's jurisdiction.  The federal
 4        district court's jurisdiction is exclusive.  It doesn't
 5        share it with any other body.  It certainly doesn't share it
 6        with a federal agency.
 7                 THE COURT:  I agree with you.  To the extent I
 8        have jurisdiction, it has to be exclusive.  I don't -- I --
 9        I mean, I don't see a world in which -- if that is part of
10        my order -- the question is, is it?  But if it is, I don't
11        see how I could amend it and we can have a part of the
12        federal branch -- federal -- the executive branch amending
13        it, as well.  I agree with you.
14                 MR. ROUHANDEH:  Well -- but the second reason
15        why -- the only -- the second issue is that the only place
16        the FTC could come back to enforce that order is this court,
17        the federal district court, and that's because they don't
18        have power.  Congress didn't give the Federal Trade
19        Commission the power to both, you know, make that order and
20        then authority to determine whether there's been a violation
21        and impose relief as a result of that violation, because as
22        the Second Circuit has said in -- quoting a United States
23        Supreme Court case -- this is the J.B. Williams case --
24        ordering enforcement, that's the role of the courts.  And,
25        as I said, that's -- and, in fact, if you look at Attachment
```

1    A, it says it, as well; that you've got to come back to this

2    Court.  They don't have the authority because it says -- it

3    keys the termination date in Attachment A.  It keys it off

4    of the date that the United States or the Commission files a

5    complaint in federal court alleging any violation of this

6    order.  It is simply revisionist history to somehow say,

7    "It's our order; it's not the Court's order."

8            And the other overarching point, even if there is

9    any doubt -- and we don't think there is in light of what we

10   said in the briefs and what I've said here today, but we

11   don't think there's any doubt -- but if there was, it's

12   important that this is also an agreement, a settlement, and

13   Your Honor said that it was a finding that Your Honor found

14   that the parties consented to the order and unilateral

15   modification of that order is not permitted.  And if they

16   wanted to freely modify it, it should -- the document should

17   have said it, and it didn't say it, so there's no agreement

18   by Meta that it can be unilaterally modified by the FTC on

19   its own initiative, which is what they're doing, because if

20   they were permitted to do that, it would, in effect, deny

21   the benefit of the bargain to Meta.  And there's a case in

22   the D.C. Circuit that's very on point, the Salazar case.

23   There, the court actually did modify an order and -- under

24   60(b), and it imposed injunctive relief as a result of that

25   modification under 60(b), which is really where they should

1    have come.  They should have come back to this federal court

2    and argued for modification.  But the D.C. Circuit reversed,

3    and they reversed because they said that this would -- that

4    imposing new injunctive relief in the guise of modification,

5    that would also deny the enjoined party the contractual

6    bargain it struck in agreeing to the consent decree in the

7    first place which is just another reason why it cannot be

8    that they can unilaterally modify this order.

9            And those two points that this Court has

10   jurisdiction, stated its jurisdiction, the Attachment A

11   states very clearly that this Court has jurisdiction.  It

12   doesn't say subject -- the Commission has subject matter

13   jurisdiction.  That's what they said in 2012.  Now, they're

14   saying -- in 2012, they said "the Commission" has subject

15   matter jurisdiction.  This Court -- this one said "this

16   Court" has jurisdiction.

17           THE COURT:  But it's so strange -- look, I agree

18   with you.  I don't find either reading of the "this Court"

19   super satisfactory, but, you know, to say "this Court" in a

20   document to be filed before the FTC with a caption, right --

21   with the FTC's administrative caption on it, I don't know

22   what to make of that.  It's not a, you know -- it's -- it

23   would be strange to refer to another court in a document

24   like that.

25           MR. ROUHANDEH:  Well, I --

1          THE COURT:  I guess your point is, like, that

2     strangeness is what helps -- is what helps your argument,

3     and I think that's fair, but --

4          MR. ROUHANDEH:  Oh, it is unique.  I mean, they

5     don't do it very often.  In fact, the same day this order

6     was entered on the FTC administrative docket, there were two

7     others that didn't say that --

8          THE COURT REPORTER:  Can you please speak into the

9     microphone.

10          MR. ROUHANDEH:  Sorry.

11          -- there were two others that didn't say that.

12     But the important point on that is that it must be read -- I

13     mean, it wasn't just filed on the administrative docket.  It

14     was filed in this court.  So when they filed it in this

15     court -- of -- part of the Court's order, it said "this

16     Court."  That made sense.  When they filed it into the -- in

17     the FTC proceeding, they didn't change that.  That has to be

18     deemed an intentional act.  They didn't change that.  And it

19     made sense because "this Court," in the context in which

20     this was filed and done -- they couldn't file in their own

21     administrative proceeding until this Court entered that

22     order, and the Court entered that order with them consenting

23     to jurisdiction.  And it's more important that that

24     statement, in some ways, appears in Attachment A to this

25     Court's order and it forms part of that -- this Court's

1    order.

2           But the suggestion that it's not part of the

3    Court's order, it really -- it -- that argument by them, it

4    directly conflicts with what the Government said in the

5    consent motion themselves.  I mentioned what Your Honor

6    said.  They said it, too.  They said the stipulated order

7    imposes significant injunctive relief.  And, as I said, it

8    directly conflicts with the -- what the Court said.  It's

9    how the document was filed.  It's one document.  It

10   conflicts, by the way -- and this is very important -- that

11   reading conflicts with what the FTC and the DOJ have said to

12   Meta in June of 2022.  There, they said that -- they defined

13   "the stipulated order" as "the order" in that letter.  And

14   then they said that the mandatory -- and -- that the

15   mandatory provisions of the mandatory privacy program were

16   part of that order.  And those orders were found -- that

17   provision is only found in Attachment A.  And so the letter

18   makes clear that the injunctive relief is part of the

19   Court's stipulated order, and it was sent on behalf of the

20   DOJ and the FTC.

21          Now, you know, something -- and I would say, also,

22   that this also directly conflicts with how contracts are

23   interpreted.  I mean, it's not incorporated by reference.

24   It's an attachment.  It forms part of the same thing.  And

25   their argument also conflicts with 65(d).  It has all of

```
1    those problems.  But what, apparently, happened after June

2    of 2022 when they clearly said that the mandatory privacy

3    program -- which is what Attachment A largely is -- is part

4    of the stipulated order, they had a change of heart, but

5    they have no change in law or facts to change their

6    argument, you know?  There's nothing wrong with coming up

7    with creative arguments as long as you have support for

8    them, but there is no support for this.  And, as I said,

9    there's no legally binding injunction if it's not part of

10   the Court's order.  And why is it part -- why is it not a

11   part of this Court's order?  Because it says "Attachment A."

12   But it's part of the FTC's order?  It's "Attachment A"

13   there, too, to their order entering this administrative

14   order --

15              THE COURT:  And --

16              MR. ROUHANDEH:  -- at Attachment A.

17              THE COURT:  You know, to be clear, we're all --

18   this is, to some degree, a semantic argument in the sense

19   that we all understand it was attached -- at a minimum, it

20   was an attachment to my order.  There's no -- I mean, I --

21   for whatever that means.  And both parties anticipated the

22   fact that the FTC would enter it.  I -- my -- as a technical

23   matter, I ordered Meta to consent to that document's entry

24   and, clearly, the parties expected that to happen.  The

25   question is just whether, for jurisdictional purposes, it is
```

```
 1      part of my order such that the FTC can't alter it in the way

 2      you're suggesting.  So I guess, you know, again -- I guess I

 3      don't -- I mean, it was attached to the order.  We all can

 4      see that.  But I don't know that that really answers the

 5      ultimate question.  But proceed.

 6              MR. ROUHANDEH:  Well, simply because it's --

 7      appears on the FTC docket that it's called an administrative

 8      order, that alone says nothing about whether they have a

 9      right to modify it, and they don't have the right to modify

10      it, and we didn't agree to the modification of it.  And it

11      doesn't mean, by entering it, that it imposed the relief in

12      it.  They couldn't impose the relief.  The difference

13      between Attachment A when attached to Your Honor's order and

14      Attachment A when it's attached to the FTC's covering order

15      is that only Your Honor, only a federal district court can

16      impose the relief that's contained in it.  They can't.  And

17      there was a reason for them to do it, but I see Your

18      Honor's --

19              THE COURT:  And so -- no.  And so they don't have

20      the ability to order any injunctive relief?

21              MR. ROUHANDEH:  No.  They have to come to federal

22      court for that.  And there was a reason.  The reason -- I

23      mean, I think -- Your Honor may have asked this.  I may have

24      missed it.  But there was a reason for the administrative

25      order to be filed on the FTC docket.  And it's -- there's
```

1    really two reasons.  The first is the 2012 order was being

2    modified and needed to be replaced.  And, in fact, these are

3    words right out of the FTC's and the Government's mouth.

4    They said -- when they were seeking Court approval in their

5    consent motion, they said the stipulated order requires

6    Facebook to consent, as Your Honor just said, to the

7    reopening of the FTC's earlier administrative proceeding

8    against it so the FTC -- these are the words -- so that the

9    FTC can replace the 2012 order.  So otherwise, we would have

10   a Court order and we'd have an FTC order, and their FTC

11   order would still be on the docket in the FTC.  It was never

12   on the docket here.  And it had to be replaced.  That was

13   one of the two reasons.

14           THE COURT:  Why couldn't -- I mean, again, this

15   is -- I don't know how much this weighs in the balance in

16   terms of trying to figure out the answer to the legal

17   question.  But why couldn't the parties have just proceeded

18   by saying the FTC was free to vacate that earlier order;

19   right?  The 2012 order.  You all -- in theory, you all could

20   have put all those -- that injunctive relief in the

21   stipulated order and just had the FTC vacate their prior

22   order; right?  I mean, there was no reason why that path

23   wasn't available to the parties; is that fair?

24           MR. ROUHANDEH:  Well, I --

25           THE COURT:  I mean --

```
 1                    MR. ROUHANDEH:  You're a step ahead of me --
 2                    THE COURT:  Okay.
 3                    MR. ROUHANDEH:  -- because that's the second
 4          reason.  The second reason, apart from it replacing -- okay.
 5          You could say, "Well, maybe, couldn't have just vacated,"
 6          but there's a second reason which is if it's not an
 7          administrative order -- well, by filing that as an
 8          administrative order, it arguably gave them a remedy they
 9          wouldn't have, and that's the remedy that Your Honor talked
10          about where they could come back to this Court to allege
11          violations of the consent decree, and that is these 5(l)
12          powers, and 5(l) -- Section 5(l) says you can come to the
13          court, federal court, and seek civil penalties for an
14          injunctive relief for an alleged violation of that order, in
15          effect.  So arguably, it gave the FTC -- and I say
16          "arguably" because I don't want to pre-judge any later thing
17          that they might do -- but it gave the FTC arguably a
18          potential enforcement right that they wouldn't have if it
19          was just a court order.  So they could -- it would be a
20          claim that they would bring pursuant to 5(l) and say --
21          which was contemplated by everybody.  It was contemplated by
22          them.  It was in the Court's memorandum opinion because
23          that's what they argued; that if there was going to be a
24          violation alleged here, they come back to Your Honor and
25          Your Honor would have the power to consider a claim that --
```

1    for civil money penalties or for an injunction.  And

2    otherwise, if they don't have that power, their remedies are

3    extremely limited.  So they had every incentive to want to

4    have an administrative order so that they could come back to

5    Your Honor.  That's the irony of it.  The administrative

6    order was not so that they could proceed unilaterally

7    through an order to show cause process without the consent

8    of the defendant and without Your Honor's consent.  It was

9    to -- in order to come back to Your Honor.  That was the

10   point of them making it an administrative order, is, "We

11   want to come back," because otherwise their remedies would

12   have been things like 60(b), you know?  Very limited

13   potential modification.

14          THE COURT:  Well, I don't know that -- so you

15   think proceeding that way would have given them more

16   authority rather than --

17          MR. ROUHANDEH:  Oh, yes.

18          THE COURT:  -- having all of it before me and

19   coming back to me?  Because -- I mean, 60(b) -- well, I

20   haven't --

21          MR. ROUHANDEH:  Well --

22          THE COURT:  I haven't thought about this, but go

23   ahead.

24          MR. ROUHANDEH:  Well, if you think about it,

25   the -- Your Honor's order -- and it's a judgment.  It's a

1    final judgment.  It's res judicata.  You have very limited

2    authority to be able to modify that under 60(b),

3    extraordinary circumstances.  And what they said at the

4    time, what Your Honor said at the time is there's a reason

5    why this -- in effect, that this is being filed in an

6    administrative order and that is so that they could come

7    back to this Court and allege violations of it.  Otherwise,

8    you can't -- they couldn't come back to this Court.  And,

9    maybe, they can't because of res judicata anyway.  But

10   that's what they said at the time, and that's what Your

11   Honor said at the time.  There was a reason to enter it in

12   order to come back here.

13          The -- I did want to just --

14          THE COURT:  I want to --

15          MR. ROUHANDEH:  Yeah.

16          THE COURT:  Make any other argument you want to on

17   this point, because I do want to move to, sort of, the

18   question of what happens if I -- let's just say -- and I

19   hear you.  You've made some points I'm going to go back and

20   look at and strongly consider.  But I do want to move to,

21   also, the question of what happens if you think -- if --

22   well, if I think that I don't have jurisdiction over

23   Exhibit-A or the administrative order, however we want to

24   call it.  I think the parties seem to suggest -- so we'll

25   get to that in a moment.  But any other points you want to

1    make on --

2            MR. ROUHANDEH:  Yes.

3            THE COURT:  -- convincing me that I do have that

4    jurisdiction?

5            MR. ROUHANDEH:  Well, yes.  I'm -- and you're

6    saying, then, we would move on to --

7            THE COURT:  Yeah, I --

8            MR. ROUHANDEH:  -- what?  The next step?  Okay.

9    Because I --

10           THE COURT:  Right.

11           MR. ROUHANDEH:  I do want to --

12           THE COURT:  Right.

13           MR. ROUHANDEH:  -- address that next step --

14           THE COURT:  I don't want to move -- but I don't

15   want to move on until you've made any other point you want

16   to on this.

17           MR. ROUHANDEH:  Yeah.  I think the only other

18   point that I would make is, you know, this Court was very

19   clear in its order -- memorandum opinion about the various

20   roles of the federal judiciary and the executive branch and

21   essentially said, you know, its role is limited to consider

22   this and it's not going to go investigate this.  It's going

23   to take what the parties have said and what the agency has

24   alleged and what the parties have settled and take it from

25   there.  It's not going to interfere with the executive

1    branch.  The -- it's not a favor.  It hasn't been returned,

2    let me just say.  They're refusing to stay in their lane.

3    And those are lanes -- I don't mean that, you know, as a

4    joke.  They refuse to stay in their lane.  Those lanes are

5    set forth in the Constitution.  And they can't, on their

6    own, enforce a federal court order.  It is a federal court

7    order.  They have no jurisdiction.  Your Honor's

8    jurisdiction -- the federal -- I mean, in some ways, this is

9    a much broader issue than this particular case because it

10   goes to the heart of whether federal jurisdiction is

11   exclusive.  And there's no way they get around the fact that

12   they consented to jurisdiction in the stipulated order and

13   that they said that the mandatory privacy program in

14   Attachment A was part of the stipulated order.  They said

15   that very clearly in their consent motion and Your Honor

16   made that clear.  So I think there's a broader principle at

17   play here that really implicates the protection of federal

18   court jurisdiction.

19              THE COURT:  Fair point.

20              MR. ROUHANDEH:  But even beyond that, I think, to

21   Your Honor's -- if you move to the next step, it certainly

22   wouldn't --

23              THE COURT:  Well, let me just frame the next step

24   as I see it.  I -- it wasn't 100 percent clear to me from

25   the briefing, but as I see things, if I don't have that

```
1    jurisdiction, the question -- I think the next point in the
2    decision tree or the next issue is whether you all have to
3    file -- whether you get to argue this issue about Axon
4    jurisdiction and all the rest before me or whether you have
5    to go file another lawsuit.  I -- because it seems to me
6    there's at least a colorable -- there's a case that no --
7    neither party -- I don't think was included in either
8    party's briefing, Kokkonen v. Guardian Life Insurance
9    Company of America.  It's a Supreme Court case from 1994
10   that, I think, at least stands for the proposition that if I
11   don't have -- in that case, it was, again, an issue of -- it
12   was a question of whether a settlement agreement that hadn't
13   been specifically referenced in a judge's order was
14   enforceable through an action -- an action through that
15   original -- the original case in which -- I think it was
16   a -- some sort of consent decree was entered by the court.
17   But the -- putting aside the question of whether the
18   settlement agreement had been, sort of, subsumed into the
19   court's order such that it was enforceable, the court said,
20   "Look, if it's not and if the Court doesn't have
21   jurisdiction that way, it doesn't have any kind of roving
22   ancillary jurisdiction."  The cite for that case, by the
23   way, is 511 U.S. 375, a 1994 case.
24            But the point is -- so if I don't have
25   jurisdiction by virtue of -- and I know you're arguing to
```

1    the contrary, so -- clearly.  But if I don't have

2    jurisdiction by virtue of Exhibit-A being my order -- again,

3    I know you disagree and, maybe, I'll be persuaded -- but

4    then it seems to me these other arguments and the question

5    of whether you get to jump ahead and not wait for the

6    administrative process to play out and you get to -- I mean,

7    Axon seems pretty clear to me that at least some of your

8    claims are Axon jurisdiction claims.  But the question is

9    that -- is it something you can come to me for or do you

10   have to just go to the courthouse steps and get assigned a

11   random judge and file a new complaint and go that method?

12   So that's my question to you, is what's --

13                MR. ROUHANDEH:  We would come to you.  But I want

14   to just preface that by one other point which is, if I might

15   make a suggestion, there's one other step before you get

16   from exclusive jurisdiction to the Axon issue, and that is

17   even if Your Honor has doubts about what was intended --

18   and we think it's clear from the record here -- about its

19   own jurisdiction, it -- the second point -- the second

20   threshold point before you even get to the Axon issue is

21   that this is an agreement of -- between the parties and they

22   don't -- they can't establish that they have the unilateral

23   right to make changes on their own initiative.  And what

24   they cite is they cite two provisions that allow Meta to

25   seek modification, you know?  The parties agreed and the

```
1    Court allowed Meta to seek modification in two very limited
2    circumstances.  There's nothing in there that says the FTC
3    can use their order to show cause process.  It's something
4    that they said in the 2012 order.  They didn't say it here,
5    and they don't have that right.  And if we're going to --
6    just from a contract point of view -- from a contract point
7    of view, benefit of the bargain, we never gave them that
8    right.  And, you know, there are thousands of orders --
9    administrative orders that they enter and they all basically
10   say that, because there's a C.F.R. provision that says that
11   respondents must submit -- it's at 2.- -- 16 C.F.R. 2.32 --
12   that respondents must submit -- must agree that a -- the
13   order can be modified by the agency.  And here, there's no
14   such agreement.  It's not in there.  And the only thing they
15   cite to is, ironically, two provisions that say not that
16   respondent could make changes but they --
17             THE COURT:  Right.
18             MR. ROUHANDEH:  -- can seek changes.  So just the
19   benefit of the bargain would be the next analysis, because
20   even if there was a doubt about jurisdiction, there's
21   res judicata.  It was agreement.  It was a settlement.  It
22   was approved.  There's a rule, 60(b), as to modifications.
23   And there's federal law that doesn't permit them to enforce
24   it.  So I think they're stuck anyway if you look at it under
25   that rubric.
```

1              THE COURT:  Well, don't those -- so the contract

2     argument, it seems to me, is a separate argument than one

3     you've made on the papers; is that fair or not fair?

4              MR. ROUHANDEH:  No, I think we made it on the

5     papers.

6              THE COURT:  Okay.

7              MR. ROUHANDEH:  I think the unilateral

8     modification point, we made it on the papers.  I think it's

9     probably because it's more -- a lot of it is in the reply

10    brief because they raised this argument that they could

11    unilaterally modify it and gave some textual arguments.  A

12    lot of the discussion is there in the -- is in the reply.

13             THE COURT:  Okay.

14             MR. ROUHANDEH:  But I think it's really important

15    that these three arguments that they made -- just before you

16    get to Axon, they made three arguments that we don't think

17    have any basis.  And the first argument, as we talked about,

18    is, you know, that the Court didn't retain jurisdiction.

19    They basically say, "We didn't" -- they didn't retain -- the

20    Court didn't retain jurisdiction over this dispute because

21    Attachment A is not part of the order.  That's the first

22    thing that they say.  And then they say "the Court" means

23    "Commission."  And then they say that they expressly had the

24    right to modify.  Those three issues.  They have to win

25    every one of those to survive here.  And they made them, and

1    they made them about four pages in their brief, and they

2    just don't hold water.  If any one of those fails, their

3    argument fails.  If Attachment A is part of the Court's

4    order -- which we think it is; has to be -- they -- their

5    argument fails.  If "Court" means "Commission," then they

6    consented to this Court's jurisdiction, again, in the very

7    document that they're saying they have authority over --

8    jurisdiction over.  And then if they -- even if they -- they

9    also would have to show -- they also would have to show that

10   they have the right to modify it, and they don't.  They

11   don't have -- they -- sometimes they call this an

12   enforcement action.  They don't have any right to --

13           THE COURT REPORTER:  Speak into the microphone,

14   please.

15           MR. ROUHANDEH:  They don't have any right to

16   enforce, nor do they have a right to modify.  So -- and

17   unilaterally.  So that's where that unilateral modification

18   comes in.  They can't do it.

19           But in terms of -- let me just turn to Axon.  I --

20   although I know -- forgive me, but I wasn't sure if Your

21   Honor was following me at one point.  There was something

22   to --

23           THE COURT:  No, no.  I --

24           MR. ROUHANDEH:  -- suggest -- okay.  I just wanted

25   to make sure --

1              THE COURT:  I've got you.

2              MR. ROUHANDEH:  -- I wasn't going too fast or, you

3       know --

4              THE COURT:  No.  I think the question of

5       "Court" -- it's a side point.  I mean, I think the question

6       of "Court" means "Commission," you can argue, is, sort of, a

7       flavor of the first point or a -- it's evidence one way or

8       the other of the first point, but it's -- I take your point.

9       It's an argument.

10              MR. ROUHANDEH:  I mean, we would just urge -- I

11       don't need to spend time on it here -- we would just urge

12       the Court to look at some of the provisions that we've

13       pointed to like the provision that says the Commission is

14       authorized -- the Commission, not the Court, obviously --

15       says the Commission, in Attachment A, is authorized, without

16       further leave of Court, to use the federal discovery --

17       Rules of Civil Procedure.  I mean, that -- I know Your Honor

18       said it's not clear, but that's just word salad.  It's just

19       word salad if "the Court" means "Commission."  What are they

20       saying?  The Commission -- if -- is authorized to obtain

21       discovery under the federal rules without further leave of

22       the Commission.  It makes no sense, their reading.

23              But in terms of the constitutional arguments, I

24       think there is one that -- well, first, we think, under

25       Axon, we have the -- Your Honor should, in this proceeding,

 1   address the constitutional arguments.

 2          THE COURT:  But -- so address my --

 3          MR. ROUHANDEH:  Yeah.

 4          THE COURT:  -- point before we get to those

 5   arguments a little bit.  Why should it be -- again, just for

 6   purposes of argument; I know it's painful -- assuming, for

 7   whatever reason, I think I don't have exclusive -- or I

 8   don't have jurisdiction in the way you're arguing, it seems

 9   to me just at that point, then, why aren't you -- and it --

10   for either way -- even if I think of the right to modify --

11   the contractual, kind of, sounding argument you make --

12   let's just say I don't buy that for whatever reason and we

13   get to Axon.  It seems to me, at that point -- I'm not sure

14   I do have jurisdiction to just bootstrap on and, sort of --

15   and address your Axon arguments without that hook into the

16   agreement or the order one way or the other.  Is that fair

17   or -- I mean, neither party really talked about this, but it

18   seemed to me that there's -- there is a decision point where

19   I've got to conclude I have jurisdiction one way or the

20   other before I get to Axon.

21          MR. ROUHANDEH:  Well --

22          THE COURT:  Well, I shouldn't say that.  I mean,

23   Axon is a jurisdictional concept, obviously.  But whether I,

24   as opposed to any of my colleagues down the hall -- whether

25   I have some sort of reason to have jurisdiction through this

1    suit or whether, you know, you all just have to -- I mean, I

2    know it's not what everyone wants to hear, but it -- a

3    possible outcome is you all just have to go file a new case

4    down the hall and you're going to get an Article III

5    judge -- a district judge, not a circuit judge, to evaluate

6    whether that judge has Axon jurisdiction and whether you can

7    get an injunction through that method.

8              MR. ROUHANDEH:  Yeah.  I mean, we shouldn't -- I

9    would say that Your Honor does have that jurisdiction.

10   It's -- even -- in some ways, it's both a separate and

11   intertwined point, but there is a separate point under Axon

12   which is that even a -- that the Court has the power to

13   determine whether the agency proceeded in an

14   unconstitutional way and that that -- we've suffered a

15   here-and-now injury by being subjected to an

16   unconstitutional process, an unconstitutionally structured

17   FTC.  And that, we think, Your Honor can address and has

18   jurisdiction to address quite apart from the modification

19   issue that they're trying to pursue in the order to show

20   cause process.  In some ways, you could say the fundamental

21   question is, can they even, you know, use that

22   unconstitutionally structured process?

23             And I would say that there is one -- there

24   certainly is one argument that, kind of, stands out because

25   it is so intertwined with the facts here and the

1   proceedings, and that is that they are -- and is unique,

2   Your Honor.  I understand there's this constitutional

3   avoidance doctrine, but there's also, you know, the thought

4   that you should decide cases where the issue might escape

5   judicial review.  And here, there is one that's really, kind

6   of, unique to this case, and that is the Commission's

7   role -- dual role as both prosecutor and judge because of

8   this particular order to show cause process in the

9   particular context that it's in.  They have filed -- they've

10  acted as a prosecutor in making allegations of -- about the

11  facts and violations of -- alleged violations of the order

12  and they're acting as -- in the same breath in their

13  adjudicative capacity by find- -- making findings of fact or

14  preliminary findings of fact.  I mean, that just means they

15  can make more or change them, but they are findings of fact

16  and that is an adjudicative process and that is, you know --

17  that is sufficient.  That's -- that argument that in this

18  case -- you don't have to show actual bias, but in this case

19  you could show actual bias because they are, in fact, acting

20  in both of those two capacities.  But in any event, there's

21  a structural bias, as well.  But the order to show cause

22  process at well -- as -- in and of itself demonstrate

23  there's actual bias because they're acting as both the

24  prosecutor and adjudicator, and they can't do that.  But --

25  and one argument they make is a waiver argument which,

```
 1    clearly, it just does not pass the smell --
 2              THE COURT:  Yeah.
 3              MR. ROUHANDEH:  -- test here.
 4              THE COURT:  I'm -- I've said a lot of things that
 5    I said that I've -- that I seem -- I've indicated I thought
 6    you had an uphill climb at least on some of this, but
 7    I'll -- I don't think that's an uphill climb for you.  I'll
 8    just say that.
 9              MR. ROUHANDEH:  Okay.  The one other point I
10    wanted to make -- and I would like to reserve some time for
11    a rebuttal, unless Your Honor has other questions now --
12    is --
13              THE COURT:  I do, and I will give you -- and I
14    would give you time anyway to respond to anything the
15    Government said.  The one other question I wanted to raise
16    is irreparable harm, you know?  I think there's a fine line
17    here on -- reading Axon -- Axon was a case in which it --
18    the court found that the district court had jurisdiction.
19    It didn't say there was a -- it didn't reach the issue of
20    whether there was irreparable harm, but it said a lot of
21    things that seemed to suggest that, talking about how it
22    wouldn't -- how the harm couldn't be remedied on the back
23    end of the -- of being subject to an unconstitutional
24    proceeding.  On the other hand, you know, it's not just --
25    in order for harm to be irreparable, one of the -- at least
```

1    in this Circuit, one of the, sort of, aspects of that is

2    that the harm has to be great.  And I know there's some case

3    law that says often a constitutional injury is enough to get

4    over the hump, and you'll probably cite that to me, but I,

5    you know -- that is -- I don't know that in a case -- in a

6    situation where we're talking about a procedural injury

7    which is, sort of, like, what you would be arguing here, you

8    find many occasions where courts have found irreparable

9    harm.  So I thought -- if you can address that a little bit.

10                MR. ROUHANDEH:  I think that is one form.  I think

11   there are three forms of irreparable harm.  We've talked

12   about all of them, you know?  The one is being subjected to

13   this unconstitutional administrative proceeding.  Another is

14   that, you know, forcing a party to relitigate a finally

15   decided matter constitutes irreparable harm.  I can't

16   emphasize enough that this was an agreement and a court

17   order approving that agreement, and there's res judicata,

18   and having to relitigate those issues, I think, constitutes

19   irreparable harm.  And it's also irreparable harm that we'd

20   be -- would be denied the benefit of our bargain.  I think

21   that's irreparable harm, as well.  So I think we meet the

22   test of irreparable harm for all of the, sort of,

23   substantive arguments or a number of them that we have made.

24                THE COURT:  But I guess I would just say as far as

25   relitigating, fair enough, but in terms of the "benefit of

1    the bargain" point, we don't know where that's going to -- I

2    mean, my -- I guess my point is that is something, it seems

3    to me, is totally reparable.  In other words, if you're

4    subject to, you know -- we get all the way down this part of

5    the analysis and you all are subject to this proceeding,

6    there's some sort of amended order entered by the FTC.  At

7    that point, you can come back and -- you could, in theory,

8    come back and say, "Well, look at what they're subjecting us

9    to.  That's so much more onerous.  We have now irreparable

10   harm," as opposed to at the beginning of the process where

11   the outcome may not be as certain.

12            MR. ROUHANDEH:  Well, I guess what I would say on

13   that is that the irreparable harm comes from failing to

14   enforce, in effect, the agreed-upon bargain that we had.

15   And it can't really be remedied that we would go through

16   this process.  I mean, going through the process almost

17   suggests that we don't have that.  That's why I say you'd

18   have to establish all three of these things.  And they don't

19   have a leg to stand on here where they say they have the

20   right to unilaterally modify this without the involvement of

21   the Court.  They can't do that unless they point to some

22   language.  That language is there by C.F.R. provision.

23   That's a requirement that they force people to do that.

24   It's not here.  It's not what was in the 2012 order.  And so

25   denying that, we think, would also be irreparable harm

1     because we wouldn't get the benefit of the bargain; we

2     wouldn't get the benefits of res judicata; and we wouldn't

3     get the benefits of 60(b) which says modifications, you

4     know, should be only given in extraordinary circumstances.

5     We also would -- it would be irreparable harm that, you

6     know, we're subject to an enforcement proceeding that they

7     have no power to engage in, certainly, absent consent, which

8     we didn't provide.  And so we're also subject to irreparable

9     harm for that.

10              But on these points, I think I would just say, you

11    know, the clincher here in many respects is what they said.

12    If you look at it from a contract point of view but just

13    also from a point of view of what is actually meant by the

14    agreements, the clincher is what they said to us on June 30

15    of 2022 in that letter to us which essentially said that the

16    stipulated order includes the provisions in the -- of the

17    mandatory privacy program.  They treated them as one order.

18    They treated them as your Court -- as Your Honor's order.

19    They defined it as the order and included Attachment A --

20    not just the provisions.  Attachment A is defined and is --

21    they use it -- they cite to Attachment A as part of the

22    order, the order's provisions concerning a mandatory privacy

23    program.  And then they cite the Attachment A, Sections 1,

24    7, and 15.  I mean, it couldn't be any clearer that they are

25    saying that's part of this Court's order, and what they're

1    saying now is completely at odds with that.

2              THE COURT:  All right.  Thank you.  Let me --

3              MR. ROUHANDEH:  Thank you.

4              THE COURT:  -- give the Government a word in

5    edgewise, and I will give you time to rebut in the opposite

6    direction.

7              MR. ROUHANDEH:  Thank you, Your Honor.

8              THE COURT:  Thank you.  Absolutely.

9              MR. COWAN:  Good morning, again.

10             THE COURT:  Good morning, Counsel.

11             And, you know, I think we'll just start, again,

12   you know, with the core threshold issue.  I laid out some

13   things that I thought tilted the field, sort of, in the

14   Government's favor, at least on first blush, with regard to

15   the question of whether the attachment is -- whether I have

16   jurisdiction over the order entered -- the administrative

17   order, as Meta suggests.  But counsel raised some good

18   points -- and I don't need you to address the points I

19   raised with them to just say, "Yes, Judge, you're so

20   right" -- but they raised some points in the other

21   direction, I think, that are worth you addressing, and

22   particularly whether, as a practical matter -- look, all

23   sides thought -- whether, technically, it was part of the

24   order or not, it was clearly part of the parties'

25   expectation that administrative -- that that order would be

1   entered by the FTC and that that was something both parties,

2   you know, bargained for and expected.  Why isn't that at

3   least -- even if not technically, functionally, part of my

4   order, what do you make of the great "Commission" versus

5   "Court" debate about the line in that -- in the

6   administrative order?  And how would you say I should

7   consider, kind of, how the parties have discussed the effect

8   of the order since then as whether -- when I say "the

9   order," I mean the administrative order -- about why that

10  isn't part -- something -- part of what I ordered?

11          MR. COWAN:  Yes, Your Honor.

12          So I think it probably starts to make some sense

13  of why we chose the pathway that we actually did in terms of

14  drafting out the order.  So the language in Section 2 says

15  that Meta shall -- well, the defendant shall consent to

16  entry of the stipulated order as attached -- as

17  Attachment A.  And, Your Honor, that makes a lot of sense

18  because Section 5(b) of the FTC Act authorizes the Federal

19  Commission -- Trade Commission to enter cease and desist

20  orders and then, again, under section 5(l), just as we did

21  in this lawsuit, we could bring a civil penalties lawsuit to

22  enforce that.  So it certainly makes sense -- while Your

23  Honor correctly noted that perhaps we could have included

24  all of the language in the stipulated order itself rather

25  than putting it in an administrative order, by laying it out

1     in an administrative order, I think it authorized the

2     Commission to seek civil penalties under Section 5(l) to the

3     extent that there were some knowing violations in the

4     future.  So just wanted to start by giving that bit of

5     context.

6             Your Honor asked about the expectations of the

7     parties.

8             THE COURT:  So let me --

9             MR. COWAN:  Sure.

10           THE COURT:  -- press pause on that, though.  So

11    what would be the scenario by which -- so your point is by

12    structuring it this way, you all envisioned the possibility

13    of seeking -- you could seek certain types of penalties

14    through the administrative process if some portion of that

15    administrative order was violated; correct?

16           MR. COWAN:  We would come back to the district

17    court.

18           THE COURT:  You would come back --

19           MR. COWAN:  Under Section 5(l), it would be -- if

20    there were a violation, the United States could seek

21    penalties before the U.S. District Court, is what the FTC

22    Act says.

23           THE COURT:  Okay.  And that would be the case,

24    though, regardless of whether the case before me existed;

25    right?  I mean, in a world in which just -- this is just

1    educating me about your process --

2              MR. COWAN:  Sure.

3              THE COURT:  -- clearly.  Let's say, you know,

4    Company A, you end up having an administrative order before

5    the FTC that lays out what it has to do, and that company --

6    you want to seek those kind of penalties.  You -- even if

7    you had no case pending before me or any judge, you would

8    march into federal court and seek those penalties?

9              MR. COWAN:  Yes, Your Honor.  That's exactly what

10   we did in 2019.  There was the 2012 administrative order and

11   the violation, so we came to the District Court to seek

12   civil penalties.

13             THE COURT:  Okay.  What are you -- what is the

14   Commission permitted to do without seeking -- without the --

15   without the authority of an Article III court?

16             MR. COWAN:  So Section -- I mean, the FTC Act, of

17   course, encompasses a lot of rights, but just to be

18   particularly clear here, Section 5(b) of the FTC Act does

19   authorize the Commission, upon notice and opportunity for

20   hearing, to issue an administrative cease and desist order

21   commanding a corporation to refrain from engaging in some

22   practices -- unfair and deceptive trade practices.  It also

23   expressly provides that -- under Section 5(b), that the

24   Commission may alter, modify, or set aside, in whole or in

25   part, one of those administrative orders to the extent that

1    it was necessary for changed circumstances or for the public

2    interest.

3              THE COURT:  All right.  Very well.  Continue.

4              MR. COWAN:  So essentially, Your Honor, as I

5    understand Meta's position here, it is, essentially, that

6    the parties have hidden, essentially, an elephant in a mouse

7    hole.  "This Court has jurisdiction," in its view,

8    essentially means that the Commission has given up any right

9    it has to ever exercise a statutory authority under Section

10   5(b) to alter or modify its order in the future.  This --

11   that argument is essentially inconsistent with other parts

12   of the administrative order which expressly recognize that

13   the Commission can modify the order again under certain

14   circumstances.  It --

15             THE COURT:  And this is all -- just for both

16   parties, this is all before -- in being somewhat skeptical

17   that the Commission can't do this -- I want to, I guess,

18   underscore the fact that that's entirely separate -- when I

19   say "do this," I mean make some amendment -- that's entirely

20   separate from the question of whether, in this case -- what

21   the FTC purports -- is purporting to do is appropriate under

22   the limitations that are placed on their ability to modify

23   the order; right?  I just want to make that clear.  I'm

24   not -- I mean, I know that's part of the arguments you all

25   have before me, but there are many decision points I would

1    have to pass before I would get to that.  And by being

2    skeptical here, I just want to make clear I'm not

3    necessarily suggesting either way that the FTC has the

4    ability to do the specific things it's trying to do here.

5            MR. COWAN:  Sure, Your Honor.  And to decide

6    whether the Commission would have to do that, they should be

7    given the opportunity to develop a record associated with

8    that, and that gets into Axon and we can --

9            THE COURT:  Right.

10           MR. COWAN:  -- leave those aside.  I think there's

11   a few more questions, I mean, really focusing on this

12   jurisdiction matter which is where I see the Court's

13   interest.  Counsel's made a few more points that I want to

14   address.

15           THE COURT:  Please.

16           MR. COWAN:  He makes much of the 20-year filing

17   point that, essentially -- that the 20 years would

18   recommence if there was a filing of the complaint.  I also

19   want to point out that same language was in the original

20   2012 administrative order, as well.  And at that time, there

21   was no federal court case involved.  So I'm not sure that

22   really points one way or another except to say that the

23   parties had negotiated an extension of time to the extent

24   that the FTC were to file another case in federal court for

25   the -- how long the administrative order would apply.

 1                THE COURT:  Where is that language?  Oh, that's in

 2      the administrative order.

 3                MR. COWAN:  That's right.  It was in the 20- -- so

 4      the language is part 14 of the 2020 administrative order and

 5      it's also, I believe, the last section of the 2012

 6      administrative order, as well.

 7                There's also this point about 65 -- Federal Rule

 8      65(d) and whether that has been violated in some way.  Rule

 9      65(d)(1) requires that the injunction specify in reasonable

10      detail exactly the acts that are restrained or enjoined or

11      required of the party.

12                That actually makes a lot of sense in terms of

13      including Attachment A.  If Meta was going to be ordered to

14      consent to an administrative order, it makes sense for the

15      Court to be very clear precisely what Meta is being ordered

16      to consent to.  So by including Attachment A, as Your Honor

17      recognized already -- I mean, Attachment A is serving a

18      purpose to the stipulated order -- is making very clear

19      precisely what Meta is being ordered to consent to by the

20      Court in connection with this civil penalties lawsuit.

21                THE COURT:  Right.  I think -- I agree that it --

22      just because it was attached doesn't necessarily mean -- I'm

23      not saying who's right, but it's -- as you say, it serves a

24      purpose even if it's not part of my order in a formal sense,

25      because they'd have to know what they're -- what I'm

```
 1      ordering them to consent to.
 2              MR. COWAN:  And I think the last point that they
 3      made -- this came up on reply, and I think Your Honor
 4      touched on it, but just for the point of clarity -- there is
 5      injunctive relief in the stipulated order, as well.  And the
 6      injunctive relief, most importantly for this hearing, is
 7      that Meta shall consent to entry of the administrative
 8      order.  That is the injunction.
 9              So I think those are the main points that counsel
10      hit.  I don't know if Your Honor has more questions in this
11      first tier.
12              THE COURT:  Well, I mean, I think -- I guess
13      you -- we haven't discussed the -- or, maybe, we did, but I
14      don't know -- I don't think you raised the issue of how --
15      what -- that language in the administrative order about the
16      court having jurisdiction, what should I make of that?
17              MR. COWAN:  So I would say, Your Honor, I think
18      we've laid an argument out.  It sounds like Your Honor may
19      be skeptical about "this Court."  I mean, it --
20              THE COURT:  I don't -- I -- as I said to Meta's
21      counsel, I don't find either side's explanation that
22      understandable or that -- frankly, that -- not --
23      "understandable" is not the right word.  I don't know that
24      either one of them is a very satisfying explanation for what
25      the parties meant by that, but --
```

 1              MR. COWAN:  Well, so Your Honor could even, if you

 2      wanted to -- for the same reasons we discussed, you could

 3      find it to be a scrivener's error if you find that to be

 4      more persuasive.  I mean, what's clear from the stipulated

 5      order is that it's the first finding, and the sentence is

 6      immediately preceded by "the Commission makes the following

 7      findings and issues the order."  So you know, on reply,

 8      co-counsel -- my friend also mentions several other orders

 9      that were issued that say "the Commission has jurisdiction

10      that day."  I mean, if those orders were to even have said

11      "this Court has jurisdiction," there would be no question

12      what that would have meant.  I think it's -- essentially,

13      Meta is recognizing that there was a judicial action using

14      that as a way to advance the argument here, but all

15      together, I just don't think that language can accomplish

16      essential- -- what Meta is alleging is a complete ceding of

17      authority to modify any administrative order in one sentence

18      which has plenty of other possible readings.

19              THE COURT:  What about the argument -- maybe you

20      were about to get to this; I'm not sure -- but before we get

21      to the question of what you think I should do -- what the

22      next step is if I think I don't have jurisdiction, but for

23      the -- let's stick on the last point that counsel raised

24      about, kind of -- the, sort of, quasi-contractual argument

25      that this was really an agreement between the parties; it

1      resolved certain claims, you know, et cetera, et cetera; and

2      that, yes, they agreed to -- I ordered them, as part of that

3      agreement, to stipulate to -- to consent to the entry of

4      that administrative order, and yet -- and now, you all are,

5      sort of, changing the bargain in some way that is unfair to

6      them.  It's not what they bargained for.

7               MR. COWAN:  Well, Your Honor, I think it's

8      important to recognize there, is that the statute always

9      allowed for the administrative order to be modified.  Meta

10     has sophisticated counsel and has had sophisticated counsel

11     throughout the history of these negotiations.  To the extent

12     they wanted to try to have the Commission bargain away its

13     right to exercise its statutory authority, they should have

14     done that in a way that was express and clear, not by trying

15     to point to one line that says this Court has jurisdiction

16     to do that.  And my last point, again, just to emphasize,

17     again, Your Honor, the authority to modify is actually laid

18     out in the administrative order in Part 2 and Part 3.  So

19     it's clear that counsel was aware of that.

20               THE COURT:  Well, at least one of those, as I

21     recall the parties going back and forth about, in part -- I

22     marked it up on another copy.  At least one of them was

23     talking about Meta's right --

24               MR. COWAN:  That's correct.

25               THE COURT:  -- to modify; correct?

1                MR. COWAN:  Well, Your Honor, I think it's talking

2       about particular -- both Part 2 and Part 3, one talks about

3       Meta's -- certain obligations with respect to sharing of

4       information, and one talks about obligations with respect to

5       deletion of information.  I think there could be a question

6       about whether or not those sorts of factual circumstances

7       would be sufficient to modify an administrative order

8       without some language of clarity to that -- in that way.  So

9       I certainly would understand if Meta wanted to include

10      language to that nature to be clear that this might be a

11      factual circumstance in which it could seek modification.

12      That doesn't change the statute, and that doesn't change the

13      Supreme Court's or the D.C. Circuit's explanations that we

14      just presume that statutes are built into contracts --

15                THE COURT:  Okay.

16                MR. COWAN:  -- and stipulated orders.

17                THE COURT:  Okay.  So let's move to the next

18      point, which is --

19                MR. COWAN:  Sure.

20                THE COURT:  Again, I'm not sure this was super

21      clear from either side's briefing.  But what's the

22      Government's position on -- again, if I agree with you on

23      the -- at least the issue of whether I have jurisdiction in

24      the sense that I have jurisdiction over the administrative

25      order or over Attachment A, however you want to put it, if I

1   agree with you on that point, do I move right to an Axon

2   analysis or is there some intermediate step by which I have

3   to say, "Actually, I think I don't really have any kind of

4   ancillary or pendent jurisdiction" -- or I'm not even sure

5   how you would phrase it, but, basically -- and this would

6   be, I'm sure, frustrating to all the parties if it is the

7   right answer -- but that really what happens -- what has to

8   happen is Meta has to go and file another lawsuit and,

9   maybe, it will be assigned to me, but, maybe, it will be

10  assigned to one of my colleagues, and that -- whoever it's

11  assigned to would go through the issue of whether there's

12  Axon jurisdiction at this point.

13              MR. COWAN:  Thank you, Your Honor.

14              The Government, essentially, in its brief, laid

15  out two different ways that addressed that exact question.

16  So the first one, I think, is Section 3(c)(1) of the

17  Government's opposition.  And, essentially, the point that

18  we're making there, to just really summarize for you, is

19  that this case is about the particular pleadings that were

20  filed in this matter.  There's not been any pleadings that

21  have challenged the agency's actions.  And it doesn't seem

22  appropriate to seek an injunction about unrelated conduct in

23  a civil penalties lawsuit that resolved in 2019.  So I think

24  that's the first way we would frame it.

25              THE COURT:  Well, isn't that -- that's a --

1    that's, kind of, the waiver argument; right?

2           MR. COWAN:  Well, so I think there's different

3    ways you could look at it.  So the question they -- could

4    they file a new lawsuit and raise these same actions, I

5    think we would argue at that point -- and we could -- and we

6    argued here as well -- that that would be waiver.  But even

7    putting that aside -- putting the waiver argument aside, the

8    first question here is, is this the appropriate lawsuit to

9    be filing this -- in the first place?  And the pleadings

10   here were about Meta's actions in 2019 and before.  It's not

11   about the Commission's actions or its decision to modify

12   now.  It just seems outside the scope of what this lawsuit

13   was about.  And so, for those reasons, I -- in our briefing,

14   we framed it two different ways:  One that it just -- an

15   injunction would not be appropriate because it would be

16   outside the scope of the pleadings; and another way that we

17   framed it is it's a -- you could even move to -- you could

18   strike those arguments as a failure to follow the normal

19   chain of briefing.  It, essentially, has nothing to do with

20   this lawsuit.

21          THE COURT:  Right.  Isn't -- okay.  So isn't --

22   flowing from "this has nothing to do with this lawsuit" is

23   they need to file another lawsuit.  I know you're not in the

24   business of giving opposing counsel, you know, legal advice.

25   But isn't that the implication of what you're saying?

```
 1            MR. COWAN:  That is the first argument we made.

 2    Yes --

 3            THE COURT:  Okay.

 4            MR. COWAN:  -- Your Honor.  And, to my knowledge,

 5    I didn't really see a response to that except to say it was

 6    a formalism.  But the other argument we did make, Your

 7    Honor, about Axon is Axon is fundamentally a question about,

 8    when can you invoke a District Court's federal question

 9    jurisdiction to hear certain challenges?  And we made very

10    clear in a slightly different way of framing it that they

11    never invoked the Court's federal question jurisdiction at

12    all.  It was the Government that invoked the Court's

13    jurisdiction to deal with Meta's action.  It wasn't Meta.

14            THE COURT:  Yeah.  I'm not sure -- okay.  But --

15    okay.  I mean, I guess these are different -- again, we're

16    in a world, for purposes of our discussion here, in which I

17    don't have jurisdiction over that administrative order, or

18    it's not part of my order, however you want to frame it.

19    And I guess these are different ways of saying -- I mean,

20    there's a whole line of case law I don't think either side

21    cited also where, you know, when you're talking about coming

22    in, asking for a preliminary injunction, you're talking

23    about, what is the likelihood of success on the merits?  The

24    merits are the merits of the lawsuit.  And so that's

25    another, kind of, disconnect -- however you want to put
```

1    it -- between -- because you don't get to say "the merits of

2    my motion."  It's the merits of the lawsuit.  And there

3    really aren't -- I mean, that's another disconnect that

4    suggests it has to be through a different lawsuit.

5              MR. COWAN:  That's right, Your Honor.  And we did

6    cite a few cases towards the end of our brief.  This

7    particular circumstance doesn't come up very often.  But

8    there are a few instances where District Courts have

9    considered this and say, "Well, you can't have a -- merits

10   on a closed case.  You can't be successful on those merits."

11   So we would -- the Government would also agree with that.

12             THE COURT:  I mean, I had it come up in another --

13   a different kind of -- it was an open case recently, but

14   long story short -- and it was the plaintiff -- it was also

15   the plaintiff in the case.  So again, that's a little bit of

16   a different situation here.  It was the plaintiff.  The

17   plaintiff came in and said, "I want this" -- lack of a -- "I

18   want this other relief," that really was pretty far

19   disconnected to the merits and -- so I had occasion to wade

20   into this.

21             All right.  So tell me about -- so that's your

22   position on where things are.  Tell me on -- tell me

23   about -- I mean, the two other things I think it's worth you

24   addressing are the Axon issue, because I do think whatever

25   you want to say -- I mean, they -- Meta throws a lot of

1     arguments at you here and I don't, you know -- and I -- it

2     seems hard for me to accept that at least some of them

3     aren't of the Axon variety.  That's number one.

4          And number two is your position on the irreparable

5     harm point I mentioned earlier which is, you know, it's just

6     interesting, reading Axon.  They say some things that are

7     certainly suggestive of there being harm that is literally

8     irreparable in the sense that the proceeding can't be undone

9     when you're arguing being subject to the proceeding is

10    harmful.  That, I think, was more along the lines of, like,

11    injury for jurisdictional purposes is what they meant, but

12    they, I think, may have used the word "irreparable" or

13    something close to that.  But on the other hand, that's not

14    the kind of injury typically that courts will find

15    irreparable harm for purposes of an injunction.

16          MR. COWAN:  And, Your Honor, I'll start with the

17    irreparable harm, if that's okay, because it's a little bit

18    more straightforward.  I completely agree with the Court's

19    analysis and, in fact, the D.C. Circuit said in Morgan

20    Drexen, dealing with a very similar case that predated Axon

21    Free Enterprise that was essentially a question about

22    resolving the question of jurisdiction, not a question about

23    the Court's equitable power and whether something would

24    constitute the need to issue an injunction.  So I think the

25    D.C. Circuit is completely in line with the Court's reading

1    there.

2         THE COURT:  How would you distinguish -- I mean,

3    there is a line of cases that say a constitutional violation

4    is irreparable harm in some circumstances.  And some of

5    these arguments are arguments about constitutional

6    violations.  So how would you distinguish that line of

7    cases?

8         MR. COWAN:  Well, I think, Your Honor, the answer

9    to that would be a lot of these cases actually, on this

10   irreparable harm analysis, predated Axon.  This isn't the

11   first type of question about whether you get to immediately

12   go to court and seek an injunction.  And there's just always

13   been a slight heightened standard in terms of, you know --

14   the question is exactly what, you know, will happen in front

15   of the agency proceedings, and courts just haven't always,

16   as a matter of right, issued injunctions every time it's

17   possible that someone could allege some form of irreparable

18   harm and --

19        THE COURT:  Well --

20        MR. COWAN:  And, of course, there's Winter as

21   well, Your Honor, which stands for the proposition that an

22   injunction is never granted as a matter of right, also.

23        THE COURT:  Well, obviously, all those things are

24   true, but -- I mean, okay.  All right.  Fair enough.  I

25   mean, I think -- I, you know -- if I get to this -- if I get

1    down the road this far, there are cases that suggest that

2    irreparable harm -- that a deprivation of a constitutional

3    right can be irreparable harm.  I don't think -- to me, just

4    from memory, a lot of them are -- because the parties didn't

5    go super deep into this in their briefing -- a lot of those

6    are -- the -- I don't recall that ever being the case in a,

7    kind of, procedural -- where the injury was procedural, and

8    that may be, kind of, the difference.

9              MR. COWAN:  You're right, Your Honor, and it was a

10   very short discussion in the briefing.  It wasn't a focus of

11   Meta's argument.  And so we -- essentially, their main point

12   was that this here-and-now injury would be sufficient to

13   constitute irreparable harm, and the D.C. Circuit

14   essentially said, no.  And so we responded to that.

15             THE COURT:  Okay.

16             MR. COWAN:  So I mean, perhaps they could make

17   other arguments, but they failed to do so in their briefing.

18             THE COURT:  Okay.  And backpedal to where you --

19             MR. COWAN:  Sure.

20             THE COURT:  -- wanted to --

21             MR. COWAN:  Sure.

22             THE COURT:  -- end up.

23             MR. COWAN:  Yes.  In terms of Axon, Your Honor, as

24   we, sort of, have grouped them, there are, in fact, a lot of

25   arguments.  We, sort of, bucketed them in three categories.

```
 1                    THE COURT REPORTER:  Speak into the microphone,

 2        please.

 3                    MR. COWAN:  Of course.  Yes.

 4                    There are essentially three types of arguments.  I

 5        think what I would -- we've qualified them as the scope

 6        arguments; so whether these scope modifications are

 7        sufficient on the -- or justifiable on the record or based

 8        on the statutory authority to do that.  There are the

 9        procedural arguments essentially claiming that the

10        Commission is going to deprive Meta of all of its procedural

11        rights, make it carry the burden of proof, not give it an

12        opportunity for discovery.  And then there are a third

13        bucket which are the more -- claims that we have qualified

14        as structural claims.  And I think the structural claims,

15        Your Honor, we sought leave from you to have my colleague,

16        Ms. Ho, argue those.  But dealing with, first -- to the

17        extent that you have any questions on those, we could

18        certainly have Ms. Ho address those.  But to deal with the

19        scope and the procedural arguments, the statute as to the

20        scope, Section 5(b) is very clear that the Commission can

21        alter, modify, or set aside, in whole or in part, its order.

22                    THE COURT:  Let me just ask you this.  You agree

23        that the only -- or let me ask you if you agree.  The scope

24        and procedural -- would you characterize those -- the first

25        two of those buckets as, sort of, non-Axon buckets and the
```

1    third as one that is an Axon or is it not so clean?

2          MR. COWAN:  Well, I think there's a bit more

3    nuance when it comes to the structural arguments, but I

4    think it's very clear that the scope and procedural

5    arguments, just sticking to Axon, then, for Your Honor, are

6    not the type of Axon challenges.  And the Axon opinion is

7    very clear that courts are continuing -- that the -- they're

8    not seeking a new-found desire to bring every case

9    immediately into court.  And there's this discussion that it

10    says those procedural decisions and evidentiary decisions,

11    those sorts of questions are the kind of questions that

12    courts favor reviewing alongside the final decision.  And

13    that makes sense, Your Honor, because these are fact-bound

14    questions.  These are the kind of questions that the

15    Commission should have the opportunity to apply its

16    expertise to determine whether, you know -- what, you

17    know -- it -- the Commission runs proceedings all the time.

18    It has its own administrative proceedings.  It certainly is

19    familiar with its rules and how they should apply in

20    different circumstances.

21          And so it seems that it would be -- applying Axon,

22    the Court would want to give the agency an opportunity to

23    apply its expertise and to make those fact-bound decisions,

24    and also to have the benefit of some discussion from Meta

25    and to determine what's appropriate in light of what -- how

1     Meta responds, for example, to the order to show cause.

2               THE COURT:  All right.  I don't need to hear -- I

3     mean, I think where we are in this, I don't need to hear the

4     merits of the structural arguments or, frankly, even the

5     merits of the scope or procedural arguments.  I mean, I'm

6     more interested in just hearing -- which you just laid

7     out -- kind of, which seemed to fall into which -- whether

8     they seem like an Axon argument or not an Axon argument for

9     the time being.

10              MR. COWAN:  Sure.

11              THE COURT:  Very well.  Thank you.

12              MR. COWAN:  Thank you, Your Honor.

13              THE COURT:  Let me have counsel for Meta with

14    anything you'd like to say in rebuttal.  You will -- this

15    will be a question-free period from me.

16              MR. ROUHANDEH:  Okay.  Thank you, Your Honor.

17              THE COURT:  Well, maybe I shouldn't promise that,

18    but at least at the outset.

19              MR. ROUHANDEH:  Maybe I shouldn't say thank you,

20    because I like -- I -- certainly, it's helpful to get

21    questions from Your Honor so we know what to focus on.

22              If the party -- if the FTC could have come back to

23    Your Honor -- and they most assuredly could, and I think

24    that's been recognized in the memorandum opinion and I think

25    Your Honor said it here today -- and if the Court has

 1    jurisdiction -- if the Court's jurisdiction is exclusive, we

 2    would submit that that's the end of the inquiry.  If the

 3    Court has any jurisdiction, it's exclusive.

 4         And it's also important just to note here that the

 5    FTC could not have ordered any injunctive relief to resolve

 6    the complaint that they wanted to bring.

 7         THE COURT:  When they said -- they said earlier --

 8    counsel said earlier they could order -- they can order a

 9    company to cease and desist.

10         MR. ROUHANDEH:  Yes.

11         THE COURT:  Okay.  So that's -- I mean, whether

12    you count that as injunctive or not -- but in any event,

13    they can do that.

14         MR. ROUHANDEH:  They can do that.

15         THE COURT:  They can't do anything else --

16         MR. ROUHANDEH:  They can't do anything else.

17    Anything else would have to be by agreement of the parties,

18    including the other thing that they mentioned which is

19    modification.

20         But it is 13(b) and 5(l) that --

21         THE COURT:  Well, hold on.  Modification -- I

22    don't -- I want to make sure --

23         MR. ROUHANDEH:  Well, there -- the injunctive

24    relief -- oh, I'm sorry.

25         THE COURT:  I just want to make sure I didn't

 1   misunderstand you.  They don't need consent to modify?

 2            MR. ROUHANDEH:  Oh, no.  They do need consent to

 3   modify.  They require, in effect -- in this case, because

 4   this is a contract, they need consent to modify --

 5            THE COURT:  Okay.

 6            MR. ROUHANDEH:  -- certainly --

 7            THE COURT:  It --

 8            MR. ROUHANDEH:  -- and because they --

 9            THE COURT:  To the extent --

10            MR. ROUHANDEH:  -- didn't insist in the agreement

11   that we mod- -- that we agree to modification.

12            THE COURT:  Sorry.  I didn't mean that.  And I

13   understand, to the extent it's an order before me, they

14   would need that, but -- or some other way of proceeding.  In

15   a typical case in which you only had an FTC -- an

16   administrative order, they've laid out the process they

17   would go through in which -- in another case, saying -- not

18   your client -- they wouldn't need consent; is that -- that's

19   fair; right?

20            MR. ROUHANDEH:  Well, I'm not sure about that.

21   I'm not sure it's presented here.  But actually, there is a

22   C.F.R. provision that suggests that they believe they need

23   consent because they say that the respondent shall agree.

24   Like, they won't settle unless the respondent agrees to

25   modification.  And that's a critical point because we did

```
 1     not agree to that.  That provision is not in this order.

 2     It's in the 2012 order.  On its face, it's plain as day in

 3     the 2012 order that there was -- modification was agreed to.

 4     It said on Page -- I guess, in Paragraph 6, "When so

 5     entered, the order shall have the same force and effect and

 6     may be altered, modified, or set aside in the same manner

 7     and within the same time provided by statute for other

 8     orders."  And that is part of the agreement, and it was not

 9     part of this agreement.  They need to -- I guess the one way

10     to look at it is they need to find a source of the ability

11     to modify on their own --

12               THE COURT:  Well, their --

13               MR. ROUHANDEH:  -- because they don't have a --

14               THE COURT:  Their argument is -- however far it

15     gets them -- is that they -- I mean, I guess that's why I

16     just asked you that prior question -- is that they can do

17     that -- that they have procedures to modify and that, I

18     guess -- and this -- I'm glad we hit on this -- is, I

19     think -- I don't know what they'd say about whether they can

20     do it unilaterally, but they have, by statute, by

21     regulation, whatever, a process by which they can modify an

22     administrative order.  I understand you -- in this case,

23     it's different.  Your arguments relate back to the order

24     before me and all the rest.  But they picked up on what --

25     where -- one of the places I started, which is -- and,
```

1    maybe, your argument here is showing me that, maybe, this

2    is -- it's not so cut and dry -- but it does seem like a

3    pretty big item for them to bargain away without any

4    explicit knowledge of it that we cannot modify this.

5              MR. ROUHANDEH:  Well, I -- Your Honor, I would say

6    that, both on a contract level and otherwise, it's not our

7    burden to negotiate it away.  It's their burden to find

8    authority for the illegal action that they're taking which

9    is unilateral modification.  And it's interesting.  What

10   they argued in their brief was this argument that because we

11   could seek modification, that gave them a right to

12   unilaterally modify on its own initiative.

13             THE COURT:  I --

14             MR. ROUHANDEH:  That doesn't work.  The other

15   argument they make -- the other argument they make is they

16   cite two cases.  They cite Dolcin -- I believe it's Dolcin

17   and Ruberoid.  And they say inherent in the authority of the

18   FTC is the power to modify its own orders.  Those cases --

19   D.C. Circuit -- I think it was a D.C. Circuit and a Supreme

20   Court case, but those cases, the Ruberoid and Dolcin cases,

21   what they actually say is a respondent came in and said this

22   order is invalid because what it does is it doesn't permit

23   me to engage in lawful pricing -- you know, I think one was

24   for medical services and one was for something else -- and

25   the courts there said, no, no, the order doesn't have to

1    spell out everything that you're permitted to do.  That's

2    the case they rely on to say it's in their inherent

3    authority to modify.  And they don't have -- and also, the

4    language of C.F.R. 2.32 -- it would be totally superfluous

5    to say, "You've got to agree to modification."  If they have

6    that right, they wouldn't need that agreement, and they

7    certainly didn't get that agreement.  And that's -- it's

8    very interesting.  The cease and desist and the

9    modification, that's what they listed.  If you look at 5(l)

10   and 13(b), injunctive relief, civil money penalties have to

11   come through those provisions, and those provisions require

12   the federal court.  So I think that that was an admission,

13   in fact, when counsel for the Government said their powers

14   are cease and desist, and they can also modify orders, and

15   we would agree under certain circumstances this is just not

16   one of them which is also a contract.

17           And, you know, it's interesting that the view of

18   Your Honor's order that we have put forth was actually, in

19   part, at issue in the Northern District of California in a

20   case a couple of years ago, this BrandTotal case, and there

21   the court had reason to say that -- I won't bore you with

22   the details of the case, but it basically said that it was

23   looking at the 2012 version of the order and it said that

24   version, while the original 2012 version of the FTC order

25   was issued unilaterally, the operative version issued on

1    April 27, 2020, reflects a stipulation between the FTC and

2    Facebook in a judicial enforcement proceeding.  And I think

3    that's the reading that -- that squares with our view of

4    Your Honor's order that it was -- and, in fact, the case --

5    the complaint that they filed in front of Your Honor was

6    pursuant to 5(l) and 13(b).  They couldn't seek that in the

7    form of an administrative order.  I mean, basically, what

8    they're saying is, you know, we'd -- we, you know -- we came

9    here after 17 months of negotiation and we said we're coming

10   to federal court because we need a federal district court

11   order to get this relief and that we don't have the ability

12   to enforce orders on their own.  That's, in essence, what

13   they did and why they came here.  And they want to forget

14   all that and say, "We'll take it from here," and that's just

15   not permitted, and especially if this Court has

16   jurisdiction, that jurisdiction is exclusive, and they could

17   have come to this Court; that should end the inquiry.

18          But I wanted -- I did want to just -- also,

19   modifying the administrative order would put it at war with

20   this Court's order, because the modification says that the

21   FTC has the unilateral right to select the assessor.  Your

22   Honor's order --

23          THE COURT:  I -- so we hadn't -- tell me what you

24   think -- I understand this argument.  What does it --

25   like -- so let's just assume I -- it's only an interesting

1    thing to think about if I disagree with you on the other

2    point.  So if that's all I was left with, right, is that

3    there is -- I think you pointed out two different ways in

4    which, even if -- if I considered only my order, you know --

5    the only thing to be my order, the actual text of the

6    stipulated order as opposed to the -- you do have -- I think

7    it was two different ways: choosing the assessor and --

8    there was one other thing.  What's the downstream, you

9    know -- what is the impact of that?

10              MR. ROUHANDEH:  I think the order should be

11   vacated.

12              THE COURT:  The show-cause order?

13              MR. ROUHANDEH:  I think the order should be -- I

14   think Your Honor's order would be vacated and the FTC's

15   order would be vacated, because absent Your Honor there's no

16   power to enter any injunctive relief, and what we're saying

17   is that that's a separate order -- there had to be a

18   statutory, legal, constitutional basis for them to do what

19   they did, and they imposed -- with our consent, they imposed

20   injunctive relief improperly.  They're not permitted to do

21   that.  They can't impose judicial -- they can't enforce it

22   and they can't impose injunctive relief.  I think the upshot

23   of that is there is no valid order binding Meta, and if we

24   did not get the benefit of the bargain, then the deal should

25   be unwound.  It's a contract.  It's a deal.  It's a

1       settlement.  That's a key component of -- every piece of it

2       was a key component as negotiated.  You know, they're big

3       boys in the government.  They know how to say when you can

4       modify an agreement, and they didn't say it.  That's why

5       they're so -- that's why they say -- that's the reason they

6       point to --

7              THE COURT:  We'll stipulate that both sides are

8       sophisticated parties in this proceeding.  You may proceed.

9              MR. ROUHANDEH:  They could have, you know -- they

10      could have brought a -- they -- they are desperate to find

11      some source of modification and they haven't found it yet.

12      That's why they say it's inherent and they cite these two

13      cases, inherent in the -- every FTC order, and that's why

14      they make this argument that, "Well, it says Meta can ask

15      for modification and that must mean we can modify it, too."

16      And they don't include the language on modification that

17      they include in every other order.  This language doesn't

18      have it.  And they know what that means.  They know what

19      that means if they can't get past that argument and they can

20      unilaterally modify -- and the -- that would allow them to

21      unilaterally modify it, then it's dead in the water and they

22      have to come back to Your Honor.

23             THE COURT:  All right.

24             MR. ROUHANDEH:  One wonders -- and also, one

25      wonders why they don't come back to Your Honor.  What Meta

1    is entitled to here is -- they've never proven the

2    allegations of their complaint.  And we've never admitted

3    them.  And they haven't proven anything.  And they are

4    slapping one attempt on top of the other to now use that

5    prior order, which was a settlement and an agreement and the

6    four corners of a document that included Attachment A, to

7    say they can do whatever they want.  They can order changes

8    in the structure of the board.  They can seriously limit its

9    business.  That's -- that is illegal, contrary to federal

10   law, and violates this Court's order.  It's also

11   unprecedented.  This, you know -- that -- I just would

12   continue to point out here that the settlement is a contract

13   and that -- and we're entitled to res judicata on it and

14   they can't modify it on their own.

15           And I would also argue that -- and I'll come to

16   the Axon point.  Just one other -- two points.  The heart of

17   the argument here, in addition to unilateral modification,

18   is that this is the only forum for enforcement.  They have

19   no ability to enforce and it's the only forum for

20   modification.  And that's what they're trying to escape.

21   And unilateral modification, we say, would do two things.

22   This was a three-part -- there were three parties involved:

23   the federal district court, Meta, and the Government.  And

24   what they're trying to do would usurp -- at the same time

25   usurp this Court's jurisdiction and it would deny Meta the

1      benefit of the -- of its bargain.

2              And as to this -- as to the Axon issue, the D.C.

3      Circuit's decision in Alpine addressed -- this was the case

4      that I -- on irreparable harm.  I think I said cases support

5      that the -- our reading that an unconstitutionally

6      structured adjudication is -- subjecting one to that is

7      irreparable harm.  And the case is Alpine, D.C. Circuit,

8      2023 WL 4703307.

9              And as to the Kokkonen case, there's no question

10     that -- this goes to your -- the jurisdictional issue.

11     There's really no question that there's -- that the Court

12     has original federal question jurisdiction over an Axon

13     issue.  That's not a matter of --

14             THE COURT:  Right.

15             MR. ROUHANDEH:  Right.

16             THE COURT:  No, no.  Right.  That's why I said

17     it -- yes, I understand that --

18             MR. ROUHANDEH:  Okay.

19             THE COURT:  -- obviously.

20             MR. ROUHANDEH:  Finally, Your Honor -- unless Your

21     Honor has other questions, there's one final point I wanted

22     to raise, and that is this -- currently, Meta is under a

23     November 30th deadline to respond to what we've said is an

24     improper procedure.  And, I guess -- obviously, we have no

25     interest in Your Honor rushing itself to render a decision.

1    And so if there's not going to be a decision by November

2    30th, we would request, you know, some injunction while

3    that -- while your court -- while Your Honor is considering

4    the issues here.

5              THE COURT:  So -- very well.  Here's what I'll

6    say.  I do -- you raised two points that, I think, I want to

7    hear the Government address, but on this last point, look, I

8    think, it's -- first of all, let me just say, I appreciate

9    that -- I guess it's really the Government, in whatever

10   form, has pushed off that deadline a few times.  We've had a

11   busy few months around this courthouse, and a busy year.

12   And so it's very helpful for me to get up to speed and be

13   able to hear you all out here today that this didn't ripen

14   whenever it originally was scheduled to ripen, I think,

15   earlier in the summer.  I -- look, I think there's every

16   likelihood that I'll have you a decision, I think, well

17   before that date.  If, for some reason, something comes up

18   that might prevent that, I would reach out to the parties to

19   see what the possibilities are as far as extending that

20   further or whatnot, but I appreciate -- again, I think it

21   was the -- I appreciate the set of circumstances that

22   allowed me to consider this on the schedule I have, but I --

23   and I will let you all know if, for some reason,

24   November 30th seems like a date that's unrealistic.

25              MR. ROUHANDEH:  Thank you, Your Honor.

1          THE COURT:  Okay.  Let me just hear -- can I hear

2     counsel for the Government respond to two points that Meta

3     made.

4          One was just this issue about modification

5     language.  I think what was represented was that in -- and

6     you'll -- someone can correct me if I'm wrong, but that

7     typically there is modification -- and, maybe, even in the

8     2012 order, but there's typical language in some of these

9     administrative orders that, basically, I think, as I heard

10    it, suggests that, you know -- that more specifically

11    recognize the FTC's modification authority and that that

12    language was not in this particular -- was not negotiated in

13    this particular order.  So I guess that -- that's the first

14    thing.  Is that correct?  Did I have that right?

15         MR. COWAN:  So there is a regulation, Your Honor,

16    that says something to the effect of you would include

17    language of that nature, but that particular provision, to

18    my recollection, is connected with issuing an administrative

19    order in the first instance.  It's not necessarily having to

20    have -- get that recommitment every single time that the

21    modification -- there's a modification that's done.  So yes,

22    Your Honor, that language was, in fact, in the original 2012

23    administrative order that was issued.  At that time, Meta

24    did agree that the order could be modified.  It's unclear to

25    me why Meta thinks that the fact that that language wasn't

1    included in the modification, that that's now -- the FTC's

2    relinquished that right when it has already agreed and

3    consented to the fact that the Commission can modify the

4    order.

5              THE COURT:  Well, I don't know.  That's -- if --

6    to the extent I came out of the box with the argument

7    that -- or to the extent one might say that, gee, it --

8    there would have to be something more explicit to suggest

9    that the Commission had bargained away this power, if indeed

10   it did, that strikes me as a thing for them to rely on and

11   at least argue to me; isn't that fair?

12             MR. COWAN:  So I think there are three more

13   responses, Your Honor.

14             THE COURT:  Okay.

15             MR. COWAN:  You know, the first, I would say this

16   argument wasn't raised in their opening brief.  The second

17   that I would say is it would be troubling if every time

18   there was an order that was entered, you would have to cite

19   every particular regulation or statute that would be

20   required for enforcement purposes.  I mean, presumably, a

21   litigant could, then, try to take that and make an argument

22   that they are not subject to any other things besides what's

23   precisely in there.  And I think that's what's really

24   animating the Supreme Court and the D.C. Circuit's reasoning

25   in Dolcin and Ruberoid, which is, you know, we're going to

1    presume the statutes are built into every order.

2         THE COURT:  Okay.

3         MR. COWAN:  And I would think, you know -- again,

4    just, once more, I would say that if they wanted to build

5    that right in, they had sophisticated counsel; they could

6    have done more than simply relied on the fact that that

7    language was omitted.

8         THE COURT:  I mean, okay.  I mean, they're making

9    that point, you know -- they're aiming that argument

10   directly at you on this point and so -- but I hear you.  I

11   hear you.  Both parties are sophisticated.  Both parties

12   could have been clearer.  Sometimes sophisticated parties

13   decide -- on one side or the other -- decide that lack of

14   clarity is what they want.

15        MR. COWAN:  Sure.

16        THE COURT:  Anyway, the second point is this issue

17   of -- that, again, didn't come up until I heard from counsel

18   in rebuttal, which is there are, I think, two things that

19   were raised in the briefs that, even if you assume, right --

20   you know where I'm going here.  Even if you assume that the

21   attachment is not what I ordered --

22        MR. COWAN:  Sure.

23        THE COURT:  -- that the proposed modification

24   would make it inconsistent with the other parts of my

25   core -- the stipulated order.  What should I make of that?

1        MR. COWAN:  So a couple of things, Your Honor.

2  Again, that was raised in the procedural history section of

3  their brief.  It wasn't raised in argument.  But to --

4        THE COURT:  Not sure -- okay.  But --

5        MR. COWAN:  But regardless, Your Honor, what's --

6  that's pointing to Section 3 which talks about the rights of

7  a -- the assessor.  And so essentially, the way that

8  language was crafted, it says that the DOJ shall have,

9  quote, the same rights as the FTC would have under the

10  administrative order.  And it's worth pointing out until the

11  FTC actually entered the administrative order, neither party

12  had any rights whatsoever.  Neither the FTC nor the DOJ had

13  any rights.  In fact, Meta recognized the same thing at

14  ECF 29 at 7 -- specifically says that the administrative

15  order would become effective upon the date of the

16  publication on the Commission's website as a final order.

17        So up until that point, there were no rights

18  whatsoever under the administrative order and, therefore,

19  the same rights for the DOJ would be no rights.  To the

20  extent that there's some modification at some point or

21  another, it could go back to the pre-administrative order

22  status quo.  Now, exactly what that might look like could

23  depend upon what the modifications look like, and I think

24  that would be a fact-specific question that ultimately would

25  depend on how the Commission approaches modifying the

 1     administrative order.

 2          THE COURT:  But it does create a situation where,

 3     at least if I buy a certain -- well, either way, it is one

 4     party to the proceeding here acting to create a situation

 5     that would be -- that could be and is proposed to be

 6     inconsistent with -- I mean, undeniably, inconsistent with

 7     my order.  That's -- there's no running from that; correct?

 8          MR. COWAN:  I actually don't think it's

 9     inconsistent, Your Honor, because it says it would be the

10     same rights.  And, again, before the FTC actually enacted

11     for itself the administrative order, there were no rights.

12     So it's a parity provision to make sure whatever rights the

13     FTC would have under the administrative order the DOJ would

14     also have.

15          THE COURT:  I see.

16          MR. COWAN:  And so --

17          THE COURT:  Okay.

18          MR. COWAN:  I mean, the other reason, just to be

19     clear, why that language would be included and it would make

20     sense to include that at Section 3 in the stipulated order

21     rather than the administrative order, Your Honor, the DOJ is

22     not typically a party to the FTC's administrative --

23          THE COURT:  Right.

24          MR. COWAN:  -- proceedings.  And so --

25          THE COURT:  I get why it --

1          MR. COWAN:  Sure.

2          THE COURT:  -- originated, but there is a -- I

3    guess there's two different things.  One of them, as I

4    recall -- look for it in the briefing here -- was about

5    whether -- it was -- it seemed -- it was about whether a

6    particular party had exclusive -- oh, let me find it.  I

7    thought there was an issue about who would have, for

8    example, exclusive authority to choose the assessor and

9    that --

10         MR. COWAN:  That's right.

11         THE COURT:  -- that -- and that -- so -- and that

12   the -- I don't see it here.  And any rate, you think for

13   both of those -- look, I'll look at it and I'll figure out

14   whatever I think about it.  But the point is, you think

15   it -- you don't think it would create anything different

16   because it's simply -- it's a -- as you say, it's a parity

17   provision.

18         MR. COWAN:  I think that's right.  And I would

19   also say, even to the extent that Your Honor has found some

20   inconsistency there and thought a stipulated order required

21   DOJ to have some say in the assessor, it's not clear why

22   that one requirement would, then, mean that the FTC could

23   not the change its administrative order in any way, shape,

24   or form based on that one affirmative obligation.

25         THE COURT:  I take your point on that.

1           Is there any -- let me just conclude by saying --

2     remind me the procedural mechanism by which the -- which

3     the -- I guess the -- the -- Meta's obligation to respond to

4     the show-cause order -- that's something that the FTC simply

5     put off a number of times; is that right?

6           MR. COWAN:  I think -- if my recollection is

7     correct, the regulation requires a response in some period

8     of time, and they've asked for a continuance, and the

9     Commission --

10          THE COURT:  Has granted it.

11          MR. COWAN:  That's right.

12          THE COURT:  Okay.  So I'll say, again -- you heard

13    me -- what I said to Meta.  I think I should be able to get

14    an opinion out to you all before -- well before

15    November 30th.  If I think that's not going to happen, I'd

16    have you all get on a conference call and talk about

17    whether -- the possibility that could be extended once more.

18    I don't anticipate it now, but I will let you all know if I

19    think that's appropriate.  And, again, I thank the

20    Government for extending that --

21          MR. ROUHANDEH:  Your Honor -- for just a moment --

22    there were two representations --

23          THE COURT REPORTER:  I can't hear you.

24          THE COURT:  Hold on one second.  I'm not -- it

25    doesn't -- representations that things were not in the brief

1    or were in Section 1(a) and not 1(b) are not material.  So

2    I'm not going to hold it against you no matter where it was

3    or was not in your brief.

4           MR. ROUHANDEH:  I just wanted to that say they are

5    in the brief --

6           THE COURT:  All right.

7           MR. ROUHANDEH:  (Inaudible.)

8           MR. COWAN:  To the extent I misspoke, I do

9    apologize for that.

10          THE COURT:  All right.  Thank you all for your

11   time and the parties are dismissed.

12          MR. COWAN:  Thank you, Your Honor.

13          THE DEPUTY CLERK:  All rise.

14          (Proceedings concluded at 11:26 a.m.)

15               * * * * * * * * * * * *

16          **CERTIFICATE OF OFFICIAL COURT REPORTER**

17   **I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify**

18   **that the above and foregoing constitutes a true and accurate**

19   **transcript of my stenographic notes and is a full, true and**

20   **complete transcript of the proceedings to the best of my**

21   **ability, dated this 19th day of October 2023.**

22                         **/s/Timothy R. Miller, RPR, CRR, NJ-CCR**
                          **Official Court Reporter**
23                        **United States Courthouse**
                          **Room 6722**
24                        **333 Constitution Avenue, NW**
                          **Washington, DC 20001**
25