APPEAL,TYPE–D

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:23–cv–03562–RDM</u>
### *Internal Use Only*

| | |
|---|---|
| META PLATFORMS, INC. v. FEDERAL TRADE COMMISSION et al | Date Filed: 11/29/2023 |
| Assigned to: Judge Randolph D. Moss | Jury Demand: None |
| Cause: 28:2201 Declaratory Judgment | Nature of Suit: 440 Civil Rights: Other |
| | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

**META PLATFORMS, INC.**  represented by  **Michael Stuart Scheinkman**
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
212–450–4754
Email: <u>michael.scheinkman@davispolk.com</u>
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul Nathanson**
DAVIS POLK & WARDWELL LLP
901 15th Street, NW
Washington, DC 20005
202–450–7000
Email: <u>paul.nathanson@davispolk.com</u>
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James P. Rouhandeh**
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
212–450–4000
Email: <u>rouhandeh@davispolk.com</u>
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**FEDERAL TRADE COMMISSION**  represented by  **Cynthia Liao**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street NW
Suite 12010
Washington, DC 20005
202–531–1325

Email: cynthia.f.liao@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**LINA M. KHAN**                          represented by   **Cynthia Liao**
*IN THEIR OFFICIAL CAPACITY AS*                            (See above for address)
*COMMISSIONER OF THE FEDERAL*                              *LEAD ATTORNEY*
*TRADE COMMISSION*                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**REBECCA K SLAUGHTER**                   represented by   **Cynthia Liao**
*IN THEIR OFFICIAL CAPACITY AS*                            (See above for address)
*COMMISSIONER OF THE FEDERAL*                              *LEAD ATTORNEY*
*TRADE COMMISSION*                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**ALVARO BEDOYA**                         represented by   **Cynthia Liao**
*IN THEIR OFFICIAL CAPACITY AS*                            (See above for address)
*COMMISSIONER OF THE FEDERAL*                              *LEAD ATTORNEY*
*TRADE COMMISSION*                                         *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/29/2023 | 1 | COMPLAINT *for Declaratory and Injunctive Relief* against ALVARO BEDOYA, FEDERAL TRADE COMMISSION, LINA M. KHAN, REBECCA K SLAUGHTER ( Filing fee $ 402 receipt number ADCDC–10526458) filed by META PLATFORMS, INC.. (Attachments: # 1 Civil Cover Sheet, # 2 Summons)(Rouhandeh, James) (Entered: 11/29/2023) |
| 11/29/2023 | 2 | NOTICE of Appearance by James P. Rouhandeh on behalf of META PLATFORMS, INC. (Rouhandeh, James) (Entered: 11/29/2023) |
| 11/29/2023 | 3 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by META PLATFORMS, INC. (Rouhandeh, James) (Entered: 11/29/2023) |
| 11/29/2023 | 4 | MOTION for Preliminary Injunction by META PLATFORMS, INC.. (Attachments: # 1 Memorandum in Support, # 2 Declaration of James P. Rouhandeh, # 3 Text of Proposed Order)(Rouhandeh, James) (Entered: 11/29/2023) |
| 11/30/2023 | 5 | NOTICE of Appearance by Michael Stuart Scheinkman on behalf of META PLATFORMS, INC. (Scheinkman, Michael) (Entered: 11/30/2023) |
| 11/30/2023 | 6 | NOTICE of Appearance by Paul Nathanson on behalf of META PLATFORMS, INC. (Nathanson, Paul) (Entered: 11/30/2023) |
| 12/04/2023 | | NOTICE OF ERROR re 1 Complaint; emailed to rouhandeh@davispolk.com, cc'd 13 associated attorneys –– The PDF file you docketed contained errors: 1. Missing summonses–government. When naming a government agent or agency as a defendant, you must supply a summons for each defendant & two additional summonses for the U.S. Attorney & U.S. Attorney General. Please submit using the event Request for |

| | | |
|---|---|---|
| | | Summons to Issue., 2. **COMPLIANCE DEADLINE is by close of business today. This case will not proceed any further until all errors are satisfied.** (cb, ) (Entered: 12/04/2023) |
| 12/04/2023 | | Case Assigned to Judge Randolph D. Moss. (zcb) (Entered: 12/04/2023) |
| 12/04/2023 | 7 | REQUEST FOR SUMMONS TO ISSUE filed by META PLATFORMS, INC.. (Attachments: # 1 Summons for U.S. Attorney General)(Rouhandeh, James) (Entered: 12/04/2023) |
| 12/04/2023 | 8 | NOTICE of Appearance by Cynthia Liao on behalf of All Defendants (Liao, Cynthia) (Entered: 12/04/2023) |
| 12/04/2023 | | MINUTE ORDER: In light of Meta's motion for a preliminary injunction, Dkt. 4 , the parties are hereby ORDERED to appear for a Scheduling Conference on that motion on December 8, 2023 at 10:00 a.m. in Courtroom 8. It is further ORDERED that the parties shall submit a report and a proposed scheduling order pursuant to Local Civil Rule 16.3(d) on or before December 7, 2023. Signed by Judge Randolph D. Moss on 12/4/2023. (lcrdm1) (Entered: 12/04/2023) |
| 12/05/2023 | 9 | SUMMONS (2) Issued Electronically as to U.S. Attorney and U.S. Attorney General (Attachment: # 1 Notice and Consent)(zjm) Modified on 12/5/2023 to correct docket text (zjm). (Entered: 12/05/2023) |
| 12/05/2023 | 10 | SUMMONS (4) Issued Electronically as to ALVARO BEDOYA, FEDERAL TRADE COMMISSION, LINA M. KHAN, REBECCA K SLAUGHTER. (Attachments: # 1 Notice and Consent)(zcb) (Entered: 12/05/2023) |
| 12/06/2023 | 11 | Unopposed MOTION for Extension of Time to File Response/Reply as to 4 MOTION for Preliminary Injunction by ALVARO BEDOYA, FEDERAL TRADE COMMISSION, LINA M. KHAN, REBECCA K SLAUGHTER. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Liao, Cynthia) (Entered: 12/06/2023) |
| 12/07/2023 | 12 | MEET AND CONFER STATEMENT. (Rouhandeh, James) (Entered: 12/07/2023) |
| 12/07/2023 | 13 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 12/08/2023. (Rouhandeh, James) Modified on 12/12/2023 to correct date served (zjm). (Entered: 12/07/2023) |
| 12/07/2023 | 14 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. ALVARO BEDOYA served on 12/7/2023; FEDERAL TRADE COMMISSION served on 12/7/2023; LINA M. KHAN served on 12/7/2023; REBECCA K SLAUGHTER served on 12/7/2023 (Attachments: # 1 Affidavit of Service as to Rebecca K. Slaughter, # 2 Affidavit of Service of Lina M. Khan, # 3 Affidavit of Service of Alvaro Bedoya)(Rouhandeh, James) (Entered: 12/07/2023) |
| 12/08/2023 | 15 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 12/5/2023. Answer due for ALL FEDERAL DEFENDANTS by 2/3/2024. (Rouhandeh, James) (Entered: 12/08/2023) |
| 12/08/2023 | | Minute Entry for proceedings held before Judge Randolph D. Moss: Scheduling Conference held on 12/8/2023. The parties Proposed Schedule is GRANTED. Motion Hearing set for 1/29/2024 at 03:00 PM in Courtroom 8– In Person before Judge Randolph D. Moss. Motion 11 Unopposed MOTION for Extension of Time to File |

3

| | | |
|---|---|---|
| | | Response/Reply as to 4 MOTION for Preliminary Injunction filed by ALVARO BEDOYA, LINA M. KHAN, FEDERAL TRADE COMMISSION, REBECCA K SLAUGHTER – DENIED AS MOOT. (Court Reporter Tammi Sefranek) (zglw) (Entered: 12/11/2023) |
| 12/11/2023 | 16 | ERRATA by META PLATFORMS, INC. re 13 Summons Returned Executed as to U.S. Attorney General. (Rouhandeh, James) (Entered: 12/11/2023) |
| 12/11/2023 | 17 | ERRATA by META PLATFORMS, INC. re 14 Summons Returned Executed as to Federal Defendant,. (Attachments: # 1 Affidavit of Service of Rebecca K. Slaughter, # 2 Affidavit of Service of Lina M. Khan, # 3 Affidavit of Service of Alvaro Bedoya)(Rouhandeh, James) (Entered: 12/11/2023) |
| 12/13/2023 | 18 | MOTION to Dismiss by ALVARO BEDOYA, FEDERAL TRADE COMMISSION, LINA M. KHAN, REBECCA K SLAUGHTER. (Attachments: # 1 Exhibit List, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Text of Proposed Order)(Liao, Cynthia) Modified on 12/14/2023 to correct docket text (zjm). (Entered: 12/13/2023) |
| 12/13/2023 | 19 | Memorandum in opposition to re 4 Motion for Preliminary Injunction filed by ALVARO BEDOYA, FEDERAL TRADE COMMISSION, LINA M. KHAN, REBECCA K SLAUGHTER. (See Docket Entry 18 to view document) (zjm) (Entered: 12/14/2023) |
| 12/14/2023 | | NOTICE OF ERROR re 18 Motion to Dismiss; emailed to cynthia.f.liao@usdoj.gov, cc'd 17 associated attorneys –– The PDF file you docketed contained errors: 1. **Notice of Corrected Docket Entry:** Your entry has been modified as a courtesy. Please note the appropriate reminders for future filings; do not refile document, 2. **Please note the following for future filings; do not refile document**, 3. Counsel is reminded for two–part documents; second docket entry is required. (zjm, ) (Entered: 12/14/2023) |
| 12/27/2023 | 20 | REPLY to opposition to motion re 4 MOTION for Preliminary Injunction filed by META PLATFORMS, INC.. (Rouhandeh, James) (Entered: 12/27/2023) |
| 12/27/2023 | 21 | RESPONSE re 18 MOTION to Dismiss *and Opposition to Motion for Preliminary Injunction 4* filed by META PLATFORMS, INC.. (Attachments: # 1 Proposed Order)(Rouhandeh, James) (Entered: 12/27/2023) |
| 01/10/2024 | 22 | REPLY to opposition to motion re 18 MOTION to Dismiss *and Opposition to Motion for Preliminary Injunction 4* filed by ALVARO BEDOYA, FEDERAL TRADE COMMISSION, LINA M. KHAN, REBECCA K SLAUGHTER. (Attachments: # 1 Exhibit K)(Liao, Cynthia) (Entered: 01/10/2024) |
| 01/18/2024 | 23 | MOTION for Leave to File *Surreply* by META PLATFORMS, INC.. (Attachments: # 1 Exhibit A – [Proposed] Surreply, # 2 Text of Proposed Order)(Rouhandeh, James) (Entered: 01/18/2024) |
| 01/25/2024 | | MINUTE ORDER: Upon consideration of Plaintiff's motion for leave to file a sur–reply, Dkt. 23 , it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that Defendant may file a response not to exceed five pages on or before February 1, 2024. Signed by Judge Randolph D. Moss on 1/25/2024. (lcrdm1) (Entered: 01/25/2024) |
| 01/25/2024 | 24 | SURREPLY to re 18 MOTION to Dismiss *and Opposition to Motion for Preliminary Injunction 4* filed by META PLATFORMS, INC.. (Rouhandeh, James) (Entered: |

| | | |
|---|---|---|
| | | 01/25/2024) |
| 01/27/2024 | | MINUTE ORDER: In light of the Court's calendar and the FTC's order extending Meta's deadline to respond in the administrative proceeding to March 15, 2024, see Dkt. 22–1, it is hereby ORDERED that the motions hearing scheduled for January 29, 2024 is VACATED and RESCHEDULED for March 1, 2024 at 1:00 p.m. in Courtroom 8. Signed by Judge Randolph D. Moss on 1/27/2024. (lcrdm1) (Entered: 01/27/2024) |
| 02/01/2024 | 25 | SUR–SURREPLY to re 24 filed by ALVARO BEDOYA, FEDERAL TRADE COMMISSION, LINA M. KHAN, REBECCA K SLAUGHTER. (Liao, Cynthia) Modified on 2/6/2024 to correct event(zjm). (Entered: 02/01/2024) |
| 03/01/2024 | | Minute Entry for proceedings held before Judge Randolph D. Moss: Motion Hearing held on 3/1/2024 re 18 MOTION to Dismiss *and Opposition to Motion for Preliminary Injunction 4* filed by ALVARO BEDOYA, LINA M. KHAN, FEDERAL TRADE COMMISSION, REBECCA K SLAUGHTER, 4 MOTION for Preliminary Injunction filed by META PLATFORMS, INC. Matter taken under advisement. (Court Reporter Lisa Edwards) (zglw) (Entered: 03/01/2024) |
| 03/04/2024 | 26 | NOTICE OF SUPPLEMENTAL AUTHORITY by ALVARO BEDOYA, FEDERAL TRADE COMMISSION, LINA M. KHAN, REBECCA K SLAUGHTER (Liao, Cynthia) (Entered: 03/04/2024) |
| 03/11/2024 | 27 | NOTICE OF SUPPLEMENTAL AUTHORITY by ALVARO BEDOYA, FEDERAL TRADE COMMISSION, LINA M. KHAN, REBECCA K SLAUGHTER (Liao, Cynthia) (Entered: 03/11/2024) |
| 03/13/2024 | 28 | TRANSCRIPT OF MOTION HEARING before Judge Randolph D. Moss held on March 1, 2024; Page Numbers: 1–47. Date of Issuance: March 13, 2024. Court Reporter/Transcriber Lisa Edwards. Telephone number (202) 354–3269. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/3/2024. Redacted Transcript Deadline set for 4/13/2024. Release of Transcript Restriction set for 6/11/2024.(Edwards, Lisa) (Entered: 03/13/2024) |
| 03/13/2024 | 29 | NOTICE OF SUPPLEMENTAL AUTHORITY by ALVARO BEDOYA, FEDERAL TRADE COMMISSION, LINA M. KHAN, REBECCA K SLAUGHTER (Attachments: # 1 USCA Order)(Liao, Cynthia) (Entered: 03/13/2024) |
| 03/14/2024 | 30 | NOTICE by META PLATFORMS, INC. re 4 Motion for Preliminary Injunction (Rouhandeh, James) (Entered: 03/14/2024) |

| 03/14/2024 | 31 | MEMORANDUM OPINION AND ORDER: For reasons stated in this Memorandum Opinion and Order, Plaintiff's motion for a preliminary injunction, Dkt. 4, is hereby DENIED, and Defendant's motion to dismiss, Dkt. 18, is hereby DENIED without prejudice.In light of Plaintiff's renewed request for an administrative stay of Meta's deadline to respond to the FTC's Order to Show Cause, Dkt. 30, the parties are hereby ORDERED to appear for a status conference on March 15, 2024 at 10:00 a.m. via zoom. Signed by Judge Randolph D. Moss on 3/14/2024. (lcrdm1) (Entered: 03/14/2024) |
| --- | --- | --- |
| 03/15/2024 | 32 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 31 Order on Motion for Preliminary Injunction,,, Order on Motion to Dismiss,, by META PLATFORMS, INC.. Filing fee $ 605, receipt number ADCDC–10757900. Fee Status: Fee Paid. Parties have been notified. (Rouhandeh, James) (Entered: 03/15/2024) |
| 03/15/2024 | 33 | ORDER: For the reasons stated on the record at the Court's March 15, 2024 Status Hearing, it is hereby ORDERED that Meta's consent motion for a one–week administrative stay is GRANTED. It is further ORDERED that, consistent with the parties' agreement, the administrative proceeding in *In the Matter of Facebook, Inc.*, FTC File No. C–4365, is administratively STAYED until March 22, 2024 at 5:00 p.m. Signed by Judge Randolph D. Moss on 3/15/2024. (lcrdm1) (Entered: 03/15/2024) |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| META PLATFORMS, INC., | |
| Plaintiff, | |
| v. | |
| THE FEDERAL TRADE COMMISSION, | |
| – and – | Case No. 1:23-cv-3562 |
| LINA M. KHAN, REBECCA KELLY SLAUGHTER, and ALVARO BEDOYA, in their official capacities as Commissioners of the Federal Trade Commission, | |
| Defendants. | |

**NOTICE OF APPEAL**

PLEASE TAKE NOTICE that Plaintiff Meta Platforms, Inc., by and through its

undersigned counsel of record, hereby appeals to the United States Court of Appeals for the

District of Columbia Circuit from the Memorandum Opinion and Order (Dkt. No. 31) entered in

this action on March 14, 2024.


DATED: March 15, 2024          Respectfully submitted,

                               */s/ James P. Rouhandeh*
                               ——————————————————
                               James P. Rouhandeh (DDC Bar No. NY0390)
                               DAVIS POLK & WARDWELL LLP
                               450 Lexington Avenue
                               New York, New York 10017
                               Tel: (212) 450-4000
                               Email: rouhandeh@davispolk.com

                               *Counsel for Plaintiff Meta Platforms, Inc.*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| META PLATFORMS, INC., | |
| *Plaintiff*, | |
| v. | Civil Action No. 23-3562 (RDM) |
| FEDERAL TRADE COMMISSION, *et al,* | |
| *Defendants.* | |

**MEMORANDUM OPINION AND ORDER**

This case has its origins in a 2011 agreement between Defendant Federal Trade Commission ("FTC" or the "Commission") and Plaintiff Meta Platforms, Inc. (then, Facebook, Inc.) that settled an investigation that the FTC had conducted into Facebook's alleged use of "unfair or deceptive acts or practices." *See* Dkt. 18-2 at 20 (2011 Admin. Compl.); Dkt. 18-3 (2011 Agreement). As part of that 2011 agreement, the Commission issued an administrative order in 2012 that directed Meta to take certain actions to cease and desist from engaging in those allegedly "unfair or deceptive acts or practices." *See* Dkt. 18-4 (2012 Admin. Order). Over the next ten years, the 2012 administrative order was modified once, with Meta's consent, after the FTC determined that it had reason to believe that Meta had failed to comply with the order's directives. Dkt. 18-6 at 10 (2020 Stipulated Order).

Now, the FTC proposes to modify the order once more. Dkt. 18-9 (OTSC). But this time, Meta opposes modification, arguing that the modification proceedings violate several

1

provisions of the U.S. Constitution.[1]  Dkt. 1 (Compl.).  Meta brings this suit to raise those constitutional challenges, and it seeks preliminary injunctive relief to prevent the FTC from moving forward with the proceedings.  Dkt. 4.  The FTC opposes Meta's motion for a preliminary injunction and cross-moves to dismiss the complaint on the ground that "[n]one of [Meta's] claims are legally viable."  Dkt. 18 at 11.

A preliminary injunction is a "drastic and extraordinary remedy," *Monsanto Co. v. Geertson Seed Farm*, 561 U.S. 139, 165 (2010), "that may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  Here, however, the only thing that is extraordinary about Meta's motion is that it asks the Court to treat a host of controlling Supreme Court precedents as "obsolete," *e.g.*, Dkt. 4-1 at 22, and, despite binding D.C. Circuit precedent to the contrary, to treat *all* alleged "structural" constitutional claims—including those that neither touch upon any fundamental right of the plaintiff nor assert any other imminent threat of "certain and great" injury—as *per se* irreparable, *id.* at 8.  For the reasons explained below, the Court concludes the Meta is wrong in both respects and, accordingly, that it has failed to carry its substantial burden of showing that it is entitled to extraordinary, equitable relief.

For different (but similar) reasons, the Court will also deny the FTC's motion to dismiss without prejudice.  Although each of the substantive arguments the Meta presses is squarely foreclosed by Supreme Court precedent, the Court recognizes that the Supreme Court is currently considering a number of related issues in *SEC v. Jarkesy*, 143 S. Ct. 2688 (2023), and that it is possible that the decision in that case might cast portions of this case in a new light.  For present

---

[1] In a related action currently pending before the D.C. Circuit, Meta challenges the same modification proceedings on other grounds.  *See United States v. Facebook, Inc.*, No. 23-5280 (D.C. Cir. filed Nov. 29, 2023).

purposes, however, the Court will neither anticipate what the Supreme Court might hold in that case nor guess how, if at all, the Supreme Court's forthcoming decision might bear on this case. The Court will, instead, simply await the Supreme Court's decision in *Jarkesy* before finally adjudicating this case.

In short, the Court will be guided by Supreme Court and D.C. Circuit precedent—whether decades old or brand new—in adjudicating this case. To give existing precedent anything less than its full due based on speculation about what the Supreme Court might someday hold would exceed the authority of this Court, would inject grave uncertainty in the legal landscape, and would undermine the rule of law. *See Rodriguez de Quijas v. Shearson/American Express, Inc*., 490 U.S. 477, 484 (1989) (chastising lower court for preemptively renouncing a Supreme Court precedent that had been undercut by subsequent authority but that the Supreme Court had yet to repudiate); *see also id.* at 486 (Stevens, J., dissenting) (observing that lower court thereby "engaged in an indefensible brand of judicial activism"). And, under existing precedent, this is not a difficult case.

## I. BACKGROUND

### A.    Statutory and Regulatory Background

Congress created the Federal Trade Commission in 1914 to regulate the use of "unfair methods of competition in commerce." *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 966 (D.C. Cir. 1985). In explaining why the Commission was necessary, Congress described the challenges that outlawing specific business practices presented: "There is no limit to human inventiveness in this field;" "[e]ven if all known unfair practices were specifically defined and prohibited, it would be at once necessary to begin over again." H.R. Conf. Rep. No. 1142, 63d Cong., 2d Sess. 19 (1914). Expertise was needed to tackle the problem, in Congress's view,

3

because "[w]hether competition is unfair or not generally depends upon the surrounding circumstances of the particular case;" and "[w]hat is harmful under certain circumstances may be beneficial under different circumstances."  *Id.*

Understanding the complexity of the task at hand, Congress created the Commission as a nonpartisan, expert body, made up of five commissioners, each to serve a term of seven years. *See* 15 U.S.C. § 41; *Humphrey's Executor v. United States*, 294 U.S. 602, 625 (1935).  The terms of the Commissioners were staggered, so that no president could appoint all members to the Commission in one four-year term.  *See* 15 U.S.C. § 41; *Humphrey's Executor*, 294 U.S. at 624. And prior to the expiration of her seven-year term, a commissioner may be removed by the president only for "inefficiency, neglect of duty, or malfeasance in office."  15 U.S.C. § 41.  In this way, Congress designed the Commission to serve as an independent body, "free to exercise its judgment without the leave or hindrance of any other official or any department of the government."  *Humphrey's Executor*, 294 U.S. at 625–26.

As relevant here, the Commission administers the FTC Act, which prohibits the use of "unfair methods of competition" and, since 1938, "unfair or deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a)(1).  "[T]o prevent persons, partnerships, or corporations" from violating that prohibition, *id.* § 45(a)(2), the Act gives the Commission "ample authority to investigate and, if deceptive practices are uncovered, to regulate appellants' . . . practices."  *FTC v. Ken Roberts Co.*, 276 F.3d 583, 587 (D.C. Cir. 2001).

The Commission has the ability to investigate violations of the FTC Act, using various legal tools such as subpoenas, 15 U.S.C. § 49, and "civil investigative demands" ("CIDs"), *id.* § 57b-1(b).  At the conclusion of an investigation, the Commission may "issue and serve upon [an organization] a[n administrative] complaint stating its charges" if the Commission "ha[s]

4

reason to believe" that the organization is engaging in an unfair or deceptive practices and if enforcing the Act "would be to the interest of the public." *Id.* § 45(b).  The Commission issues a complaint upon "an affirmative vote" and that vote initiates an adjudicatory proceeding.  16 C.F.R. § 3.11(a).

The complaint itself must contain: (1) a "[r]ecital of the legal authority and jurisdiction for institution of the proceeding, with specific designation of the statutory provisions alleged to have been violated;" (2) [a] clear and concise factual statement . . . of the type of acts or practices alleged to be in violation of the law;" and (3) "[w]here practical, a form of [the] order which the Commission has reason to believe should issue if the facts are found to be as alleged in the complaint." *Id.* § 3.11(b).  After the Commission votes to issue a complaint, the commissioners and "any other employee who is or who reasonably may be expected to be involved in the decisional process in the proceeding" are walled-off from any Commission employee "who performs investigative or prosecuting functions in adjudicative proceedings." *Id.* § 4.7(b)(1). From that point forward, until the Commission reaches a final decision on the complaint, the prosecution of the complaint is handled by complaint counsel alone.

Prior to the issuance of an administrative complaint, the Commission may seek to enjoin potential or ongoing violations of the FTC Act.  If the Commission "has reason to believe" that an organization "is violating, or is about to violate" the FTC Act, and if it "would be in the interest of the public," the Commission may seek a temporary restraining order ("TRO") or preliminary injunction in a U.S. District Court to prevent further violations of the FTC Act.  15

U.S.C. § 53(b).  If a TRO or preliminary injunction issues, the Commission must file a complaint

within 20 days or the injunction will expire.  *Id.* § 53(b).[2]

Also prior to the issuance of an administrative complaint, an organization under

investigation by the Commission may submit "a proposal for disposition of the matter in the

form of a consent order agreement executed by the party being investigated."  16 C.F.R.

§ 2.31(a).  Under FTC regulations, "[e]very agreement in settlement of a Commission

complaint" must contain several provisions, including: (1) "either an admission of the proposed

findings of fact and conclusions of law submitted simultaneously by the Commission's staff or

an admission of all jurisdictional facts and an express waiver of the requirement that the

Commission's decision contain a statement of findings of fact and conclusions of law;" and (2)

an acknowledgement that "[t]he order will have the same force and effect and may be altered,

modified or set aside in the same manner provided by statute for Commission orders issued on a

litigated or stipulated record."  *Id.* § 2.32.  After the Commission accepts a proposed consent

agreement, it publishes the complaint, the order contained in the consent agreement, and the

consent agreement itself on the public record for comment.  *Id.* § 2.34(c).  Following the

comment period, the Commission may withdraw its acceptance of the agreement, "issue and

serve its complaint . . . and its decision in disposition of the proceeding," or modify the order

consistent with 15 U.S.C. § 45(b).  16 C.F.R. § 2.34(e).

After the Commission serves an administrative complaint on an organization (assuming

the parties have not settled beforehand), the organization has a right to a hearing on the alleged

violations.  The complaint itself must provide the organization with "notice of a hearing upon a

---

[2] In addition, "in proper cases the Commission may seek, and after proper proof, the [district]
court may issue, a permanent injunction."  15 U.S.C. 53(b).

day and at a place" for that hearing and that date must be at least thirty days after the complaint is served.  15 U.S.C. § 45(b).  At the hearing, the organization has a right to "show cause" as to why a cease-and-desist order should not be entered by the Commission as to the alleged violations of the FTC Act.  Act.  *Id.* § 45(b).  The matter is prosecuted on behalf of the Commission by FTC "complaint counsel," who are staff from the relevant bureau or regional office.  Dkt. 28 at 5–6, 27–28 (March 1, 2023 Hrg. 5:10–6:12, 27:2–28:9).  Hearings are held before an administrative law judge ("ALJ"), 16 C.F.R. § 3.42(a), who, based on what is presented at the hearing, recommends to the Commission proposed findings of law and fact, *id.* § 3.51.

The Commission renders the final decision as to whether the FTC Act has been violated. It may "adopt, modify or set aside the [ALJ's] recommended findings, recommended conclusions, and proposed rule or order contained in the recommended decision."  16 C.F.R. § 3.54(a).  In rendering its final decision, the Commission is required to include "a statement of the reasons or basis for its action."  *Id.* § 3.54(a).  If "the Commission [is] of the opinion that the . . . act or practice in question is prohibited [by the FTC Act]," it must issue "an order requiring such [organization] to cease and desist from using such . . . act or practice."  15 U.S.C. § 45(b).  The Commission may not impose civil penalties for a violation of the FTC Act; civil penalties may only be "recovered in a civil action brought by the Attorney General of the United States" in a U.S. District Court.  *Id.* § 45(l).

The Commission's cease-and-desist orders are reviewable by the U.S. Court of Appeals, *id.* § 45(c), "where the 'findings of the Commission as to the facts' (if supported by the evidence) 'shall be conclusive,'" *AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 71–72 (2021) (quoting 15 U.S.C. § 45(c)).  "If judicial review favors the Commission (or if the time to seek

judicial review expires), the Commission's order normally becomes final (and enforceable)." *Id.* (citing 15 U.S.C. § 45(g)).

Once all appeals have been resolved and the decision is final, the Commission may "reopen and alter, modify, or set aside, in whole or in part any report or order made or issued by it" if it finds that "conditions of fact or of law have so changed as to require such action or if the public interest shall so require." 15 U.S.C. § 45(b).  Before doing so, however, the Commission must provide the organization effected by the modification "notice and an opportunity for hearing." *Id.* § 45(b).  The Commission does this through "an order to show cause, stating the changes it proposes to make in the decision and the reasons they are deemed necessary."  16 C.F.R. § 3.72(b)(1).  The recipient of the show cause order is deemed to have consented to the modification if it fails to respond.  *Id.* § 3.72(b)(1).  If the pleadings, that is the order and the recipient's answer, "raise substantial factual issues," an evidentiary hearing will be held either directly before the Commission or before an ALJ.  *Id.* § 3.72(b)(2).  Once again, any modification to a cease-and-desist order is appealable to the U.S. Court of Appeals.  15 U.S.C. § 45(c).

Following the administrative adjudicatory process, if an organization violates a cease-and-desist order issued by the FTC, the Department of Justice may bring a civil suit in U.S. District Court to obtain monetary penalties.  15 U.S.C. § 45(l).  For each violation of the order, an organization may be fined not more than $10,000.  *Id.* § 45(l).  In addition, the Department of Justice may also seek injunctive and "further equitable relief" as appropriate to enforce the FTC's cease-and-desist order.  *Id.* § 45(l); *see also AMG Capital*, 593 U.S. at 75 (explaining that 15 U.S.C. § 53(b) does not permit the FTC to seek monetary penalties from a district court prior to the completion of the administrative adjudication process).  If an organization violates a cease-

8

and-desist order, and the unfair or deceptive act or practice at issue is one that "a reasonable man would have known under the circumstances was dishonest or fraudulent," "then the Commission [rather than the Department of Justice] may commence a civil action against such" organization in U.S. District Court, 15 U.S.C. § 57b(a)(2), and the District Court may grant "such relief as the court finds necessary to redress injury to consumers," including through the "refund of money or return of property," *id.* § 57b(b).

## B.      Factual Background

In November 2011, Meta (then, Facebook, Inc.) agreed to settle an eight-count administrative complaint that the FTC had issued against the company.  Dkt. 18-3 (2011 Agreement).  The complaint charged the company with having deceptive privacy settings in violation of the FTC Act, 15 U.S.C. § 45(a).  *See* Dkt. 18-2 (2011 Admin. Compl.).  Specifically, the complaint alleged that Facebook had failed to disclose to its users that they were unable to prevent third-party app developers from accessing their data.  *Id.* at 7–8, 11–12, 15.  The complaint also alleged that Facebook had changed its website to make public certain personal information that had previously been private without informing its users, *id.* at 10, and finally, the complaint alleged that Facebook continued to provide app developers with access to user data after users had deactivated or deleted their accounts with the company, *id.* at 17.

The 2011 settlement agreement resolved the charges in the administrative complaint through a mutually agreed upon draft consent order.  Dkt. 18-3 (2011 Agreement).  The terms of the order required Facebook to implement several changes, including: (1) obtaining consumers' affirmative express consent before enacting changes that override their privacy settings; (2) ceasing to providing access to users' data more than 30 days after a user has deleted their account; and (3) establishing and maintaining a privacy program designed to address privacy

9

risks related to Facebook's current and future products.  *Id.* at 5–6.  As part of the settlement agreement, Facebook denied all wrongdoing, *id.* at 3, but agreed to waive (1) its rights to "any further procedural steps," (2) "the requirement that the Commission's decision contain a statement of findings of fact and conclusions of law," and (3) "judicial review . . . of the order entered pursuant to this agreement," *id.* at 2.  On July 27, 2012, after publishing the proposed consent order for public comment, the Commission voted to issue the consent order.  *See* Dkt. 18-4 at 10.  At that point, the consent order, now an administrative order, became binding on Meta.

In 2018, the Commission commenced an investigation into whether Meta had violated the 2012 Order and determined that it had reason to believe that Facebook had violated the 2012 Order "multiple ways," including:

> (1) [B]y maintaining deceptive settings that misled users about how to protect their information from being shared by Facebook with third-party developers of apps used by their Facebook Friends;

> (2) [B]y promising to stop giving app developers access to the data of app users' Friends starting in 2014, when in fact many app developers continued to have such access past that date, with access for some lasting through June 2018;

> (3) [B]y inconsistently enforcing its privacy policies against app developers who violated those policies, taking less severe action against app developers that generated significant revenue for Facebook; and

> (4) [B]y implying to approximately 60 million users that they could "turn on" facial-recognition technology associated with their posted photos and videos when, in fact, that technology was "on" for those users by default.

Plaintiff's Consent Motion for Entry of Stipulated Order for Civil Penalty, Monetary Judgment, and Injunctive Relief, *United States v. Facebook, Inc.*, No. 19-cv-2184, ECF No. 2 (D.D.C. July 24, 2019).

10

The parties were once again able to reach a settlement; this time, they agreed to modify the 2012 Order, and Meta agreed to pay $5 billion in civil penalties to resolve the allegations against it.  Consistent with the terms of this agreement, the Department of Justice initiated a civil suit in this Court that sought monetary penalties and injunctive relief pursuant to § 5(l) of the FTC Act.  *See* Complaint, *United States v. Facebook, Inc.,* No. 19-cv-2184, ECF No. 1 (D.D.C. July 24, 2019).  The Department then moved, with Facebook's consent, for entry of a stipulated order of settlement.  *See* Plaintiff's Consent Motion for Entry of Stipulated Order for Civil Penalty, Monetary Judgment, and Injunctive Relief, *United States v. Facebook, Inc.,* No. 19-cv-2184, ECF No. 2 (D.D.C. July 24, 2019).  In addition to imposing the agreed-upon $5 billion civil penalty against Facebook, the stipulated order also required Facebook to "consent to the reopening of the FTC's earlier administrative proceeding against it so the FTC [could] replace the 2012 Order with an Amended Order," which was attached to the motion.  *Id.* at 3.  The Court entered the stipulated order of settlement on April 23, 2020.   *See* Stipulated Order for Civil Penalty, Monetary Judgment, and Injunctive Relief, *United States v. Facebook, Inc.,* No. 19-cv-2184, ECF No. 35 (D.D.C. Apr. 23, 2020).

After the Court (Kelly, J.) issued the stipulated order, the Commission reopened the administrative proceedings against Meta, finding that it was in the "public interest" to do so. Dkt. 18-7 at 2 (2020 Order).  On April 27, 2020, the Commission issued the amended order agreed upon by the parties in the settlement.  Consistent with the terms of the settlement, Meta did not object to the Commission reopening its administrative proceedings or its issuance of the modified administrative order.  *See id.* at 3 ("[Meta] and the Commission waive all rights to appeal or otherwise challenge or contest the validity of this Order.").  The 2020 order, as modified, (1) expanded the privacy program provisions, mandating that Meta conduct a "privacy

review" of every new or modified product before it is released; (2) required Meta to exercise more rigorous oversight over third-party apps; (3) required Meta to implement greater data security protections for certain user information; (4) imposed new restrictions on Meta's use of facial recognition technology; and (5) required Meta to report incidents where data from 500 or more users is compromised. *Id.* at 7–12.

As required by the 2020 order, Meta retained an independent assessor to review the mandated privacy program. On July 1, 2021, the independent assessor provided an initial report for Meta's practices between October 25, 2020, to April 22, 2021. *See* Dkt. 18-8. At a high level, the independent assessor concluded that:

> Across many different areas, Facebook has made extensive investments in its privacy program since the effective date of the Order, and meaningful progress has been made. We believe the overall scope of the program and structure into which the program is organized is logical and appropriately comprehensive. As a result, the key foundational elements necessary for an effective program are now in place, although their maturity and completeness vary.
>
> . . .
>
> That said—and as Facebook management itself anticipated in the Company's Day 180 Compliance Report submitted to the FTC—the gaps and weaknesses noted within our review demonstrate that substantial additional work is required, and additional investments must be made, in order for the program to mature.

*Id.* at 8.

Following the independent assessor's report, the Commission conducted an investigation into Meta's compliance with the terms of the modified 2020 order. It concluded that "[w]hile the issues [identified in the independent assessor's report] varied in significance, [the] investigation showed [that] the most serious deficiencies and sheer number of total gaps and weaknesses overall present substantial risks to the public." Dkt. 18-9 at 5 (OTSC). Specifically, the Commission concluded that it had "reason to believe" that Meta (1) "failed to establish and implement an effective privacy program as mandated by . . . the 2020 Order;" (2)

12

"misrepresented the extent to which Expired Apps could continue to receive users' nonpublic information;" and (3) misrepresented to parents that its Messenger Kids product did not allow children to communicate with contacts that were not approved by their parents. *Id.* at 12–13. Consistent with this view, the Commission issued to Meta an order to show cause ("OTSC") why the Commission should not make further modifications to the 2020 Order. *Id.* at 2. The OTSC was issued on May 3, 2023 and set a 30-day deadline for Meta to respond. *Id.* at 14.

Instead of responding to the OTSC, Meta filed a motion in the earlier district court case in which the parties had asked the Court to approve of the stipulated order of settlement. *See* Defendant's Motion to Enforce the Stipulated Order and To Enjoin the Administrative Reopening Proceeding of the Federal Trade Commission, *United States v. Facebook, Inc.*, No. 19-cv-2184, ECF No. 38 (D.D.C. May 31, 2023). Meta argued that the modification proceedings before the Commission were improper because the district court had exclusive jurisdiction to enforce or to modify the 2020 order. Meta also raised numerous constitutional challenges to the modification proceedings and to the FTC's authority generally. *See* Memorandum of Points and Authorities in Support of Defendant's Motion to Enforce the Stipulated Order and To Enjoin the Administrative Reopening Proceeding of the Federal Trade Commission*, United States v. Facebook, Inc.*, No. 19-cv-2184, ECF No. 38-1 at 45–51 (D.D.C. May 31, 2023). The Court (Kelly, J.) denied Meta's motion, explaining that, although the "Stipulated Order directed [Meta] to pay $5 billion in civil money penalties and 'consent to' the FTC's reopening of its administrative proceedings and modification of its 2012 administrative order," the Court did not itself order Meta to comply with the terms of the then-proposed

13

modified order nor did it direct the FTC to issue the modified order.  *United States v. Facebook, Inc.*, No. 19-cv-2184, 2023 WL 8190858, at *4 (D.D.C. Nov. 27, 2023).[3]

Following this decision, Meta filed this suit, raising its constitutional challenges to the FTC's modification proceedings.  Dkt. 1.  Specifically, Meta alleges that the FTC's modification proceedings violate Articles I, II, and III and the Fifth and Seventh Amendments of the U.S. Constitution.  The same day that Meta filed this action, it also moved for a preliminary injunction, seeking to enjoin the FTC's modification proceedings from moving forward.  Dkt. 4. Defendants (the FTC and the three Commissioners who were serving at the time Meta filed this suit) oppose the motion and have cross-moved to dismiss the complaint.  Dkt. 18.  In light of the pending motions in this case, the Commission determined that there was "good cause" to extend the deadline for Meta's response to its OTSC from January 31, 2024 to March 15, 2024.  Dkt. 22-1 at 2.  Briefing on the motions was completed on February 1, 2024, and the Court held a hearing on the motions on March 1, 2024.

## II.  LEGAL STANDARD

### A.     Federal Rule of Civil Procedure 65

A preliminary injunction "is an extraordinary remedy never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), but "only when the party seeking the relief, by a clear showing, carries the burden of persuasion," *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).  To obtain a preliminary injunction, the movant "must establish" (1) "that [it] is likely to succeed on the merits;" (2) "that [it] is likely to suffer irreparable harm in the absence of

---

[3]     Meta has appealed this decision to the D.C. Circuit and subsequently moved for an injunction of the FTC's modification proceedings pending appeal.  *United States v. Facebook, Inc.*, No. 23-5280 (D.C. Cir. filed Nov. 29, 2023).  The D.C. Circuit denied that motion on March 12, 2024.

preliminary relief;" (3) "that the balance of equities tips in [its] favor;" and (4) "that an injunction is in the public interest." *Winter*, 555 U.S. at 20.

**B.      Federal Rule of Civil Procedure 12(b)(6)**

A motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6) "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  In evaluating a Rule 12(b)(6) motion, the Court "must first 'tak[e] note of the elements a plaintiff must plead to state [the] claim to relief,' and then determine whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to relief that is plausible on its face.'"  *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (alterations in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 678 (2009)).  A plaintiff may survive a Rule 12(b)(6) motion even if "recovery is . . . unlikely," so long as the facts alleged in the complaint are "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555–56 (2007).

### III.  ANALYSIS

**A.      Irreparable Harm**

The Court will start with irreparable injury because it is the "*sine qua non* for obtaining a preliminary injunction." *Shaw v. Austin*, 539 F. Supp. 3d 169, 182 (D.D.C. 2021).  "[I]t is what justifies the extraordinary remedy of granting relief before the parties have had the opportunity fully to develop the evidence and fully to present their respective cases." *Jubilant DraxImage Inc. v. U.S. Int'l Trade Comm'n*, 490 F. Supp. 3d 169, 188 (D.D.C. 2020) (internal quotation marks and citation omitted).  Without irreparable injury, a court must decline to issue preliminary relief on that ground alone.

15

That principle is dispositive here.  Meta has failed to demonstrate that it is likely to suffer irreparable injury in the absence of injunctive relief, and its motion thus fails at the threshold. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("A movant's failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."); *Achagzai v. Broad. Bd. of Governors*, No. 14-768, 2016 WL 471274, at *3 (D.D.C. Feb. 8, 2016) ("[W]here a party seeking a preliminary injunction fails to make the required showing of irreparable injury, the matter is settled, and the Court must deny the motion.").

This case is not the only one in which Meta has sought to enjoin the FTC's pending OTSC proceedings relating to the 2020 Order.  In the parallel case that was before Judge Kelly, Meta sought an injunction to halt the very same FTC proceedings at issue here, arguing that it would suffer irreparable harm if forced to participate in modification proceedings that the FTC allegedly lacked the authority to conduct.  Judge Kelly dismissed that case, *United States v. Facebook, Inc.*, No. 19-cv-2184, 2023 WL 8190858 (D.D.C. Nov. 27, 2023), Meta appealed, and it asked the D.C. Circuit to enjoin the proceedings pending appeal, *see* Motion for Injunction Pending Appeal, *United States v. Facebook*, No. 23-5280, Dkt. 2037416 (D.C. Cir. Jan. 25, 2024).  The D.C. Circuit was unconvinced that preliminary relief was warranted and in a four-paragraph order, the court squarely rejected Meta's argument.  *See* Order, *United States v. Facebook*, No. 23-5280, Dkt. 2044641 (D.C. Cir. March 12, 2024).  Of particular relevance here, the court found that Meta "ha[d] not met the 'high standard for irreparable injury.'"  *Id.* (quoting *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015)).  As the D.C. Circuit explained, "the expense and annoyance of litigation, including in an FTC proceeding,

does not constitute irreparable injury." *Id.* (quoting *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980)).

The arguments that Meta made in that parallel case overlap in significant respects with the arguments it makes in this case. Here, Meta argues that it will suffer irreparable harm if it is forced to participate in "an illegitimate proceeding, led by an illegitimate decisionmaker" that lacks the authority to conduct the proceeding. Dkt. 21 at 30 (quoting *Axon Enterprises, Inc. v. FTC*, 598 U.S. 175, 191 (2023)). That argument does not differ in material respects from the argument Meta unsuccessfully pressed in the D.C. Circuit. In that case, as here, Meta argued that the FTC lacked authority to conduct the administrative proceeding at issue, and there, as here, it argued that it would suffer irreparable injury if compelled to participate in such an unauthorized (or "illegitimate") proceeding. *See* Motion to Enforce the Stipulated Order and to Enjoin the Administrative Reopening, *United States v. Facebook, Inc*., No. 19-cv-2184, ECF No. 38-1 at 53–54 (D.D.C. May 31, 2023). To be sure, in this case, Meta argues that the FTC lacks authority to act for reasons premised on the Fifth and Seventh Amendments and Articles I, II, and III of the constitution, while in the parallel case, Meta argued that this Court—and not the FTC—is vested with authority to modify the 2020 order. But at least with respect to the question of irreparable injury, that is a distinction without a difference. In both cases, Meta has argued that the FTC lacks lawful authority to conduct the proceeding, and in both cases, it argues that it will suffer irreparable injury if compelled to participate in that (allegedly) *ultra vires* proceeding.

The D.C. Circuit's conclusion that Meta failed to show that it will suffer irreparable injury if put to "the expense and annoyance of litigation, including in an FTC proceeding," Order at 1, *Facebook*, No. 23-5280, accordingly, applies in this case with equal force. The bar for demonstrating an irreparable injury is a high one: The injury "must be both *certain and great*; it

must be actual and not theoretical;" and "[t]he moving party must show [that] '[t]he injury complained of is of such imminence that there is a "clear and present" need for equitable relief to prevent irreparable harm.'" *Chaplaincy*, 454 F.3d at 297 (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)) (emphasis added).  Particularly for a company of Meta's worth, the cost of participating in an administrative proceeding, even if unreimbursable, is insufficiently "great" to justify the extraordinary remedy that it seeks here (and that it unsuccessfully sought in the D.C. Circuit).  *See, e.g., Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1026 (D.D.C. 1981) ("[T]he injury must be more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff."); *Arriva Med. LLC v. U.S. Dep't of Health & Hum. Servs.*, 239 F. Supp. 3d 266, 281 (D.D.C. 2017) ("[T]he sole fact that a company is losing money does not irreparable harm make."); *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 48 (D.D.C. 2014) (rejecting a movant's claim that the losses it would incur constituted irreparable harm because a "claim of substantial financial losses must be evaluated from the perspective of the organization's total revenues in order to determine if the harm is of a magnitude that warrants injunctive relief").

Meta contends that it has met that high bar because a constitutional violation is always an irreparable injury.  But that misstates the governing law.  To be sure, ongoing or imminent violations of fundamental constitutional rights, such as the loss of First Amendment freedoms, constitute irreparable injuries.  *See*, *e.g.*, *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020); *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Singh v. Berger*, 56 F.4th 88, 109 (D.C. Cir. 2022).  But binding D.C. Circuit precedent has expressly rejected the proposition that "any alleged separation-of-powers injury is by its very nature irreparable."  *John Doe Co. v. CFPB*, 849 F.3d 1129, 1135 (D.C. Cir. 2017).  As the D.C. Circuit explained in *John Doe*

*Company*, such an injury is not irreparable because "'the expense and disruption of defending [oneself] in protracted adjudicatory proceedings'" does not, standing alone, constitute irreparable injury and because subsequent judicial review "'would fully vindicate' the separation-of-powers rights of the Company." *Id.* (citations omitted).  This Court is not free to ignore that binding precedent.  *See also, e.g.*, *Aposhian v. Barr*, 958 F.3d 969, 990 (10th Cir. 2020) (rejecting the plaintiff's argument that "a generalized separation of powers, by itself, constituted irreparable harm" and noting, "[t]o the contrary, . . . cases finding that a violation of a constitutional right alone constitutes irreparable harm are limited to cases involving individual rights, not the allocation of powers among the branches of government"); 11A Charles Alan Wright & Arthur R. Mille, Federal Practice and Procedure. § 2948.1 (3d ed.) (noting that *when individual constitutional rights* are implicated, most courts hold that no further showing of irreparable injury is necessary).

The D.C. Circuit's reasoning, moreover, makes eminent sense.  The irreparable injury prong of the preliminary injunction inquiry focuses on the alleged *injury*—not on the cause of action.  The deprivation of a right protected by the First Amendment, even for a short time, constitutes "a certain and great" injury.  *See Singh*, 56 F.4th at 109.  In contrast, there is little, if any, articulable difference between the injury sustained when a company is compelled to participate, for example, in a proceeding before an agency that is headed by an officer who is not subject to at-will removal and when a company is compelled to participate in a proceeding that arguably exceeds the agency's statutory or regulatory authority.  Indeed, in a sense, an agency lacks *constitutional* authority to act whenever it acts in excess of its *statutory* authority—as a matter of constitutional principle, agencies have only those powers conferred upon them by statute (or, with a proper presidential delegation, the constitution itself)—leaving a fine line

19

between challenges like the ones that Meta asserts here and the array of administrative law challenges that this Court, and the court of appeals, hear day-in and day-out.  One can only imagine the deluge of preliminary injunction litigation the courts would face if every action allegedly taken in excess of the agency's authority (whether couched in constitutional terms or not) was deemed irreparable, simply because the participants should not be compelled to participate in a proceeding that the agency arguably lacks authority to bring.  But, even without that additional step, Meta's theory would turn every appointments clause, commerce clause, non-delegation, major question, and separation powers challenge into a case requiring expedited resolution of whether the plaintiff is likely to succeed on the merits.

Meta offers only two arguments in support of its expansive view of irreparable harm.  First, it invokes the Supreme Court's decision in *Axon Enterprises, Inc. v. FTC*, 598 U.S. 175 (2023), where the Court described "'being subjected' to 'unconstitutional agency authority'" as a "here-and-now injury" that is "impossible to remedy once the proceeding is over," *id.* at 191 (citations omitted).  But that language speaks to a very different proposition:  It merely recognizes that being subjected to an agency's unconstitutional exercise of authority constitutes a present injury, separate and apart from the ultimate result of the proceeding.  That is undoubtedly correct.  But not every such "here-and-now injury" rises to the level of gravity required to satisfy the irreparable injury prong of the preliminary injunction standard.  *See Kim v. Fin. Indus. Regul. Auth., Inc.*, No. 23-cv-2420, 2023 WL 6538544, at *13 n.19 (D.D.C. Oct. 6, 2023) ("*Axon*'s holding addressed whether district courts have jurisdiction over constitutional claims, not whether those claims give rise to an irreparable injury for purposes of the preliminary injunction analysis."); *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, No. 22-cv-232, 2023 WL 4934989 (E.D. Okla. Aug. 2, 2023) ("*Axon* simply answered a jurisdictional question; it did not include an

injunction analysis.").  As the D.C. Circuit has stressed time and again, the "'high standard for irreparable injury'" requires an injury that is "'certain and great'" that involves more than mere "'economic loss,'" *Mexichem Speciality Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (citations omitted), or "'the expense and annoyance of litigation,'" Order, *Facebook, Inc*., No. 23-cv-5280 (citation omitted).  In short, not every "here-and-now injury"—even one that a regulated party may seek to remedy before the agency renders a final determination—clears the high bar for establishing irreparable injury.

*Axon*, of course, had nothing to do with whether and when courts should grant preliminary injunctive relief.  Instead, it merely addressed whether a district court may consider a constitutional challenge to an FTC proceeding in a separate case, without waiting for a final agency decision, or whether the party challenging the FTC's authority must first participate in the assertedly unconstitutional proceeding before raising its challenge in the court of appeals. 598 U.S. at 180.  A "here-and-now injury" is not, as Meta suggests, synonymous with an irreparable injury.  To take just one example, an agency rule that requires regulated parties to file annual reports of some kind might impose a "here-and-now injury" sufficient to establish standing to challenge the rule.  But not every such filing would constitute the type of irreparable injury ("certain and great," *Chaplaincy*, 454 F.3d at 297) sufficient to justify the extraordinary relief of a preliminary injunction.

The sole D.C. Circuit authority that Meta invokes drives this point home.  In support of its contention that *Axon* marks a sea change in long-recognized understandings of irreparable injury, Meta points to Judge Walker's concurring opinion in *Alpine Securities Corp. v. FINRA*, 2023 WL 4703307 (D.C. Cir. July 5, 2023) (Walker, J., concurring).  In that case, the plaintiff argued that an enforcement action brought by a self-regulatory organization was unconstitutional

because the organization's hearing officers "wield[ed] executive power that may be exercised only by the President and officers under his supervision." *Id.* at *1. In explaining why he voted to grant an injunction pending appeal, Judge Walker wrote:

> Alpine would suffer an irreparable harm without an injunction because the ongoing FINRA enforcement proceedings *would put it out of business.* Plus, the resolution of claims by an unconstitutionally structured adjudicator is a "here-and-now injury" that cannot later be remedied.

*Id.* at *2 (emphasis added). This reflects that law as it has always been. Irreparable injury requires a present or imminent injury, but it also requires a "great" injury, such as the risk that the plaintiff will be "put out of business" while the litigation is pending. *See, e.g., Wisc. Gas Co.*, 758 F.2d at 675 ("[N]either petitioner has alleged that in the interim they will be forced out of business by the loss. Instead, they have merely speculated that they will suffer a financial loss. This is the type of 'mere economic loss' which will not support a finding of irreparable injury."). If Meta were correct, there would have been no need for Judge Walker to address the actual, serious injury that the plaintiff in the *Alpine Securities* case was likely to suffer—it would have been enough simply to note that the plaintiff was raising a structural constitutional challenge to the proceeding. It is telling that Judge Walker did not rely on that consideration and, instead, led with the grave injury that the plaintiff was actually likely to sustain.

Meta's second argument comes closer to the mark, but it is also unpersuasive. Focusing on its due process argument alone, Meta points to cases that have recognized the need to act without delay in removing a clearly biased decisionmaker. In the first case that Meta invokes, *United Church of the Medical Center v. Medical Center Commission*, 689 F.2d 693, 701 (7th Cir. 1982), the Seventh Circuit held that "[s]ubmission to a fatally biased decisionmaking process is in itself a constitutional injury sufficient to warrant injunctive relief, where irreparable injury will follow in the due course of events, even though the party charged is to be deprived of

22

nothing until the completion of the proceedings."  But in reaching that conclusion, the Seventh

Circuit stressed (as Judge Walker did in *Alpine Securities*) that the plaintiff faced an irreparable

injury above-and-beyond being required to participate in a constitutionally defective proceeding:

there, the plaintiff risked "'the relocation of (the Church's) ministry to another site,'" and, as the

Seventh Circuit explained, the law was "settled beyond the need for citation . . . that a given

piece of property is considered unique" and that "its loss is always an irreparable injury.''  *Id.*

(citation omitted).

       The second set of cases that Meta invokes are not preliminary injunction cases at all, but

rather mandamus actions to remove clearly biased decisionmakers (or those whose participation

gave rise to a clear appearance of bias).  The D.C. Circuit faced this question in *In re Al-Nashiri*,

921 F.3d 224 (D.C. Cir. 2019), where a Guantanamo Bay detainee sought to disqualify an

military judge through a writ of mandamus.  After finding that the petitioner had demonstrated

that the constitutional violation was "clear and indisputable," *id.* at 237, the D.C. Circuit

explained that the petitioner had shown that "no adequate remedy" existed for his injury because

"[a]fter conviction, no amount of appellate review can remove completely the stain of judicial

bias . . . ," *id.* at 238.  In reaching this conclusion, however, the court emphasized that it would

have been "too difficult to detect all of the ways that bias can influence a proceeding," especially

in unusually drawn out and complicated cases like the one at issue there.  *Id.*  In that case, the

judge had presided over that case for a long period and had issued hundreds of orders, and the

Court observed that unwinding the "long shadow" of the judge's influence on the case would be

nearly impossible at it stood then, let alone if the bias was not remedied at the earliest

opportunity.

23

Here, nothing that Meta has alleged or shown comes close to establishing actual or apparent bias anything like that at issue in *Al-Nashiri*, nor has Meta even suggested that it might prevail on a petition for a writ of mandamus seeking to remove any allegedly biased decisionmakers in this case.  To the contrary, as explained below, Meta's due process challenge runs head-on into settled Supreme Court precedent, and, far from establishing that the FTC is clearly biased (or that the FTC proceeding gives rise to a clear appearance of bias), Meta's claim is anemic at best.  In this sense, at least when it comes to Meta's allegedly biased-decisionmaker claim, the questions of irreparable injury and likelihood of success on the merits may merge: if the Court were convinced that permitting the OTSC proceeding to continue would clearly subject Meta to the authority of a biased decisionmaker that would irreparably taint the process in a manner that could not readily be undone, the Court might well also conclude that Meta would suffer an irreparable injury.  As the D.C. Circuit has framed the inquiry, to the extent "the constitutional[] violation, if true, inflicts irremediable injury," . . . "the deprivation of constitutional rights constitutes irreparable injury only to the extent such deprivation is shown to be likely."  *Archdiocese of Washington v. Washington Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) (quoting *Chaplaincy*, 454 F.3d at 303); *see also, e.g.*, *Khalid v. Garland*, No. 21-cv-2307, 2022 WL 17976614, at *2 (D.D.C. Oct. 7, 2022) (concluding that the plaintiff had not demonstrated that he will suffer "irreparable injury as a matter of law" from his alleged a violation of his due process rights because the plaintiff had "not shown a likelihood of success on the merits of his claims."); *cf. Kimberly-Clark Corp. v. District of Columbia*, 286 F. Supp. 3d 128, 146 (D.D.C. 2017) (explaining that "[i]n First Amendment cases, the likelihood of success 'will often be the determinative factor' in the preliminary injunction analysis" because "[t]he loss of First Amendment 'freedoms often constitutes irreparable injury'" (quoting *Pursuing Am.'s*

24

*Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016))).  But because Meta has not made a "clear showing" that the Commission constitutes in unavoidably biased decisionmaker—*ab initio* and without the benefit of an adjudicatory record—its motion fails on both the irreparable injury and the likelihood of success on the merits prongs of the test for granting preliminary injunctive relief.

The Court, accordingly, concludes that Meta's motion for a preliminary injunction fails at the first step—it has not carried its burden of making a clear showing that it will suffer not just an injury, but a "certain and great" injury, *Chaplaincy*, 454 F.3d at 297, if required to participate in the FTC proceeding.  As we know from the D.C. Circuit's recent decision regarding this very same proceeding, "the expense and annoyance of litigation" is not enough, Order, *United States v. Facebook*, No. 23-cv-5280 (quoting *Standard Oil Co. of Cal.*, 449 U.S. at 244), and as we know from settled D.C. Circuit precedent, an alleged "separation-of-powers" injury, standing alone, cannot fill that void, *see*, *e.g.*, *John Doe Co.*, 849 F.3d at 1135.

**B.      Likelihood of Success on the Merits**

Meta's failure to make "a clearly showing" of irreparable harm provides sufficient basis to deny the company's motion for a preliminary injunction.  Although the Court could end its analysis there, the motion fails for a second reason as well: far from establishing a likelihood of success on the merits, each of Meta's claims is foreclosed by binding precedent.  *See Trump v. Thompson*, 20 F.4th 10, 31 (D.C. Cir. 2021) ("The likelihood of success and irreparability of harm 'are the most critical' factors." (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009))).  Because each of Meta's five constitutional challenges to the structure of the Commission raises

issues more properly presented, if at all, to the Supreme Court, this Court will only briefly address each.

1.     *Waiver and Judicial Estoppel*

Before turning to Meta's five constitutional claims, the Court pauses to address the FTC's threshold argument that Meta waived its right to pursue these claims in the 2011 Settlement Agreement, *see* Dkt. 18-3 at 2 ("Proposed Respondent waives . . . all rights to seek judicial review or otherwise to challenge or contest the validity of the order entered pursuant to this agreement."), and the 2020 Order, *see* Dkt. 18-7 at 3 ("Respondent and the Commission waive all rights to appeal or otherwise challenge or contest the validity of this Order.").  Meta disputes the FTC's reading of both orders:  It argues that "[b]y their express terms, the waivers are limited to specific prior orders—namely the 2012 Order and 2020 Order."  Dkt. 20 at 39.  These "limited waivers," in Meta's view, do not apply to its ability to challenge the modification proceedings. *Id.*

The Court agrees with Meta that the best reading of each order is that the waivers they contain limit only Meta's right to challenge the validity of the orders themselves.  The 2020 Order provides that Meta is waiving its ability to challenge "the validity of *this Order*," that is, the 2020 Order, Dkt. 18-7 at 3 (emphasis added).  And the 2011 Settlement Agreement provides only that Meta may not contest "the validity of *the order entered pursuant to this agreement*," that is, the 2012 Order, Dkt. 18-3 at 2 (emphasis added).  Here, Meta is not challenging the validity of either order; in fact, Meta seeks to keep the 2020 Order intact as is without modification.  The Court, accordingly, concludes that neither waiver applies to the present suit

and that Meta did not waive its right to challenge the validity of the OTSC and the modification proceedings in the 2011 Settlement Agreement or the 2020 Order.

The Commission also contends that Meta is "judicially estopped from challenging the FTC's structure and authority to modify the 2020 Administrative Order." Dkt. 18 at 39; *see also New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." (alteration in original) (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895))). In the Commission's view, Meta assumed the position in the prior district court proceeding that the Commission could modify the 2020 Order without violating the Constitution when Meta consented to the FTC's motion for the issuance of the stipulated order. *See* Dkt. 18 at 39. Because Meta's current position in this case is "clearly inconsistent" with the position that the FTC contends Meta previously assumed, the FTC argues that Meta is estopped from now bringing a constitutional challenge to the modification proceedings. *Id.* In response, Meta once again disputes the Commission's portrayal of the procedural history. It argues that it assumed no such position in the prior litigation; it instead "waived its challenges to the entry of the 2020 administrative order." Dkt. 20 at 40. The Court once again agrees with Meta on this threshold issue.

The prior district court litigation began on July 24, 2019, when the Department of Justice filed suit against Meta. That same day, the Department moved, with Meta's (then Facebook's) consent, for entry of a stipulated order. The constitutionality of the order was not a subject of that motion, and neither party submitted any further briefing prior to the entry of the Stipulated Order on April 23, 2020 by the district court. *See* Stipulated Order for Civil Penalty, Monetary

Judgment, and Injunctive Relief, *United States v. Facebook, Inc.,* No. 19-cv-2184, ECF No. 35 (D.D.C. Apr. 23, 2020).  Meta's silence on the question of the FTC's constitutionality does not mean that Meta implicitly took any position on the subject.

Nor does the subsequent litigation in the prior district court case change this analysis.  On May 31, 2023, Meta moved to "enforce the stipulated order and to enjoin the administrative reopening proceeding of the Federal Trade Commission."  Defendant's Motion to Enforce the Stipulated Order and To Enjoin the Administrative Reopening Proceeding of the Federal Trade Commission, *United States v. Facebook, Inc.*, No. 19-cv-2184, ECF No. 38, 38-1 (D.D.C. May 31, 2023).  That motion argued, among other things, that the "Commission's dual role as prosecutor and judge violates due process," *id.* at 45 (capitalization altered), that "the Commission's protections against removal violate Article II," *id.* at 47 (capitalization altered), that "Congress unconstitutionally delegated the Commission unfettered authority to choose between administrative and judicial enforcement," *id.* at 49 (capitalization altered), and that "the Commission cannot constitutionally adjudicate private rights," *id.* at 51 (capitalization altered). These are the same arguments that Meta makes in this case, and they were left expressly unresolved in the prior case.

The Court, accordingly, concludes that judicial estoppel has no application here.

2.      *President's Article II Removal Power*

Turning to the merits, Meta first argues that the Commission lacks authority to conduct the OTSC proceeding because the members of the Commission are principal, executive officers who are not subject to at-will removal by the President—that is, the members of the Commission may be removed only for "inefficiency, neglect of duty, or malfeasance in office," 15 U.S.C. § 41.  Meta contends that this for-cause removal protection constitutes an unconstitutional

28

restriction on the president's removal powers.  That argument, however, is squarely foreclosed by binding Supreme Court precedent.  In *Humphrey's Executor v. United States*, 294 U.S. 602, 629 (1935), the Supreme Court rejected a challenge to the very same for-cause removal provision that Meta now challenges, and the Court held that Congress could "fix the period during which [the FTC commissioners] shall continue, and to forbid their removal except for cause in the meantime" without unconstitutionally restricting the president's removal authority. In the ninety years that have passed since then, moreover, the Supreme Court has repeatedly applied—and declined to overrule—*Humphrey's Executor*.  *See*, *e.g.*, *Wiener v. United States*, 357 U.S. 349 (1958) (applying *Humphrey's Executor* to find that members of the War Claims Commission could only be removed for cause); *Morrison v. Olson*, 487 U.S. 654, 688 & n.25 (1988) (recognizing that *Humphrey's Executor* was good law, notwithstanding the Court's acknowledgement that "the powers of the FTC would . . . at the present time be considered 'executive,' at least to some degree"); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010) ("In *Humphrey's Executor v. United States*, this Court held that Congress can, under certain circumstances, create independent agencies run by principal officers appointed by the President, whom the President may not remove at will but only for good cause. . . . The parties do not ask us to reexamine [this] precedent[], and we do not do so."); *Selia Law, LLC v. CFPB*, 140 S. Ct. 2183, 2199–2200 (2020) (noting that there are "two exceptions" to the president's removal powers: "one for multimember expert agencies that do not wield substantial executive power," *i.e.*, the *Humphrey's Executor* exception, "and one for inferior officers with limited duties and no policymaking or administrative authority").

Despite the controlling nature of *Humphrey's Executor* central holding—that the FTC Act's for-cause removal provision does not violate the constitutionally prescribed separation of

powers—Meta asks this Court to reach a different conclusion and to strike down the very provision the Supreme Court has upheld.  Meta argues that *Humphrey's Executor* does not dictate the outcome of this case because the Commission that exists today is a fundamentally different body from the one that existed in 1935, when *Humphrey's Executor* was decided.  To make this argument, Meta relies on dicta from *Selia Law v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183 (2020), where the Court noted several features of the 1935 FTC that were key to the *Humphrey's Executor* analysis, such as its bipartisan composition and its quasi-judicial, quasi-legislative role.  *Id.* at 2198–99 (citing *Humphrey's Executor*, 295 U.S. at 624). Meta then argues that because those features are less prominent aspects of the Commission today, *Humphrey's Executor* is effectively a historical decision that is inapplicable to the current FTC.  *See* Dkt. 4-1 at 22.

But that contention ignores the obligation of the lower courts to comply with on-point Supreme Court precedent, even when the foundation of the precedent has arguably been eroded by the passage of time and more recent precedent, *see Shearson/Am. Exp., Inc.*, 490 U.S. at 484, and it ignores Supreme Court precedent that has adhered to *Humphrey's Executor* long after the intervening events that Meta's points to occurred, *see Wiener*, 357 U.S. at 351–52; *Morrison*, 487 U.S. at 686-87.  It is certainly not this Court's place to deem a long-standing Supreme Court precedent "obsolete" (Dkt. 4-1 at 22) and thus no longer binding.  As the Fifth Circuit explained when it considered a constitutional challenge to the FTC similar to the one that Meta raises here:

> While the Supreme Court has cabined the reach of *Humphrey's Executor* in recent years, it has expressly declined to overrule it.  Thus, although the FTC's powers may have changed since *Humphrey's Executor* was decided, the question of whether the FTC's authority has changed so fundamentally as to render *Humphrey's Executor* no longer binding is for the Supreme Court, not us, to answer."

*Illumina, Inc. v. FTC*, 88 F.4th 1036, 1047 (5th Cir. 2023) (citation omitted).

Even placing those dispositive difficulties to the side, the premises are Meta's argument are far from convincing.  Meta is correct, for example, that the FTC's enforcement authority has increased over time.  But Meta fails to acknowledge that most of those changes occurred before *Weiner*, *see* Wheeler-Lea Act, Pub. L. No. 75-447, 52 Stat. 111 (1938), and all occurred before *Morrison*, *see AMG Cap. Mgmt.*, 593 U.S. at 72, yet both of those Supreme Court decisions relied upon the central holding of *Humphrey's Executor*.  Meta also argues that the present FTC is unlike the 1935 FTC because, at the time Meta filed this suit, two of the five positions for FTC Commissioners were vacant, and the three existing Commissioners were all from the same party. But those vacancies have now been filled, *see* Dkt. 27 (disclosing that two additional commissioners have been confirmed, restoring the Commission to the five-member, bipartisan body discussed in *Humphrey's Executor*), and, in any event, Meta cites to no precedent in which the Supreme Court (or the D.C. Circuit) has ever accorded constitutional weight to whether all positions on a multi-member commission were currently filled.

In sum, this Court lacks authority (or reason) to disregard the Supreme Court's holding in *Humphrey's Executor* that the for-cause removal restriction contained in the FTC Act passes constitutional muster.

3.    *Fifth Amendment's Due Process Clause*

Meta next challenges the constitutionality of the FTC on the ground that its combination of prosecutorial and adjudicative functions violates the Fifth Amendment's due process clause. Meta contends that because the Commission both "initiates or reopens an administrative enforcement proceeding by voting to initiate it" and "decides the matter, including through factual findings and legal determinations," Dkt. 4-1 at 18, the commissioners are effectively "judge[s] in [their] own cause," *id.* at 17 (quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S.

868, 880 (2009)), which creates an "unacceptable risk of actual bias" in violation of the Due Process Clause, *id.* at 18 (quoting *Williams v. Pennsylvania*, 579 U.S. 1, 14 (2016)).

Once again, Meta's arguments run head-on into controlling Supreme Court precedent to the contrary.  In *Withrow v. Larkin*, 421 U.S. 35 (1975), the Supreme Court considered whether it was constitutional for a state medical board to both conduct the investigative hearing into whether a doctor had engaged in misconduct as well as the adjudicative hearing at which the board would determine whether to suspend the doctor's license.  *Id.* at 40–41.  The Court rejected the doctor's due process claim, finding "no incompatibility between the agency filing a complaint based on probable cause and a subsequent decision, when all the evidence is in, that there has been no violation of the statute."  *Id.* at 57.  The FTC's configuration—with the Commission determining whether there is "reason to believe" that a violation of the FTC Act has been committed and, then, later determining whether a violation was actually committed—is not meaningfully different than that of the board at issue in *Withrow*.  Meta nevertheless attempts to distinguish *Withrow* by making two arguments.

First, Meta argues that the modification process under 15 U.S.C. § 45(b) violates the due process clause because FTC regulations required the Commission to determine, as a prerequisite to issuing the OTSC, that modification of the existing order was "necessary," thereby committing the Commission to an adverse result before Meta is even heard.  Dkt. 20 at 21–22.  The offending regulation in Meta's view is 16 C.F.R. § 3.72(b)(1).  That regulation provides that "[w]henever the Commission is of the opinion that changed conditions of fact or law or the public interest may require that a Commission decision . . . should be altered, modified, or set aside in whole or in part, the Commission will . . . serve upon each person subject to such decision . . . an order to show cause, stating the changes it proposes to make in the decision and

32

*the reasons they are deemed necessary*." *Id.* § 3.72(b)(1) (emphasis added).  Because the regulation requires the show cause order to contain changes that the Commission has "deemed necessary," Meta argues, the Commission has necessarily prejudged the question of whether to modify the cease-and-desist order.

But Meta's argument mischaracterizes the nature of a show cause order and the related regulation.  The Commission issues such an OTSC when it is of the opinion that modification "may" be required, *id.* § 3.72(b)(1), just as it issues an administrative complaint when it has "reason to believe" that a violation of the FTC Act occurred, 15 U.S.C. § 45(b).  The show cause order, like a complaint, contains factual allegations in support of the *proposed* order, and it sets forth the reasons why the *proposed* modification is "deemed necessary."  16 C.F.R. § 3.72(b)(1). These allegations form the basis for the modification proceeding that follows, which (if the modification is opposed) mirrors the adjudicative process for an administrative complaint.  *See id.* § 3.72(b)(2).  Instead of "entail[ing] the simultaneous exercise of the Commission's prosecutorial and adjudicative powers," as Meta argues, Dkt. 20 at 21, the modification process clearly distinguishes between (1) the issuance of the show cause order, which sets forth the basis on which the Commission believes that a modification *may be required*, and (2) the adjudicative hearing and appeal, at which the parties present their evidence and arguments before *a final decision* on whether the proposed changes to the cease and disorder should be made.  In arguing to the contrary, Meta reads the phrase "deemed necessary" out of context and ignores the words "may require" and "proposes" and "show cause," all of which signal that the Commission has yet to make a final decision.

At bottom, Meta's objection to the OTSC process is thus really a refashioned objection to the Commission's involvement in both the decision to issue to a charging document (be it a

complaint or an OTSC) and the ultimate decision on the merits.  But *Withrow* explicitly approves

of such an allocation of responsibility:  "[T]here is no incompatibility between the agency filing

a complaint based on probable cause and a subsequent decision, when all the evidence is in, that

there has been no violation of the statute."  421 U.S. at 57, *see id.* at 54–57.[4]

 Meta next argues that *Withrow* is distinguishable because, here, Meta has identified

"evidence of bias or the risk of bias or prejudgment," *id.* at 54, and in *Withrow*, the Court left

open the possibility that such evidence may rebut the presumption that "administrators 'are . . .

capable of judging a particular controversy fairly and on the basis of its own circumstances,'"

even if they are exposed to earlier investigative stages of the same controversy, *id.* at 54 (quoting

*United States v. Morgan*, 313 U.S. 409 (1941)).  But Meta's evidence is far from sufficient to

rebut *Withrow*'s presumption of regularity.

 Meta argues that the FTC never "loses" a case; that is, once the Commission issues a

complaint against an organization, the Commission invariably finds that the organization actually

violated the Act.  The FTC's 100% win-rate is proof, in Meta's view, that the Commission is

biased (or at least creates the appearance of bias).  Dkt. 20 at 16.  But Meta unable to back up

this assertion with support.  Although Meta cites to the Ninth Circuit's observation in *Axon*

---

[4] Nor is Meta's invocation of *Williams v. Pennsylvania*, 579 U.S. 1 (2016), and *In re Murchison*, 349 U.S. 133 (1955), persuasive.  In both *Williams* and *Murchison*, the Supreme Court held that a defendant's due process rights were violated by a judge's significant, personal involvement in an earlier stage of the case. *See Williams*, 579 U.S. at 8; *Murchison*, 349 U.S. at 137–39.  But both cases differ from this one in a crucial respect:  They involve criminal proceedings before a judge, not administrative proceedings.  *See Williams*, 579 U.S. at 8; *Murchison*, 349 U.S. at 137–39; *Withrow*, 421 U.S. at 53.  It does not require fine line drawing to distinguish, for example, between a prosecutor who approves the decision to seek the death penalty in a case and then sits as an appellate judge reviewing the imposition of the death penalty in that very case, *see Williams*, 579 U.S. at 10–11, and an administrative agency that authorizes the initiation of a proceeding based on the available evidence and then decides, after hearing from the respondent, whether to take the proposed action.

*Enterprise, Inc. v. FTC*, 986 F.3d 1173, 1187 (9th Cir. 2021), *rev'd*, 598 U.S. 175 (2023), that

"Axon claims—and [the] FTC does not appear to dispute—that [the] FTC has not lost a single

case in the past quarter-century," that statement was not a finding of fact by the Court but rather

a description of the parties' arguments.[5]  Axon's unsupported assertion before the Ninth Circuit,

moreover, is at odds with a study cited by the FTC in this case, which shows that the opposite is

true.  *See* Maureen K. Ohlhausen, *Administrative Litigation at the FTC: Effective Tool for*

*Developing the Law or Rubber Stamp?*, J. Competition L. & Econ. 1, 4 (2016) (finding that

between 1977 and 2016, the Commission dismissed 29% of the administrative cases before it,

including 16% on the merits).

    And even if Meta had provided evidence of a 100% win-rate by the FTC—which it has

not—the Court would remain unconvinced that such a showing would, standing alone, establish

a due process violation.  When courts have found a due process violation based on evidence of

bias, that evidence has shown that the decisionmaker was motivated to render a biased decision.

*See Caperton*, 556 U.S. at 884 ("We conclude that there is a serious risk of actual bias—based on

objective and reasonable perceptions—when a person with a personal stake in a particular case

had a significant and disproportionate influence in placing the judge on the case by raising funds

or directing the judge's election campaign when the case was pending or imminent."); *Williams*,

579 U.S. at 10–11.  But a high win-rate in and of itself does not speak to a commissioner's bias.

Meta has cited no case, for example, in which a court has found a due process violation based on,

---

[5] Meta also cites for support Justice Gorsuch's equivocal statement in *Axon* that "*some say* the
FTC has not lost an in-house proceeding in 25 years," *Axon*, 598 U.S. at 216 (Gorsuch, J.,
concurring) (emphasis added).  But Justice Gorsuch's assertion is qualified, and he cites no
authority other than the petitioner's brief, which itself cites no authority.  *See id.* (citing Brief for
Petitioner at 47, *Axon*, 598 U.S. 175 (2023) (No. 21-86)); *see also* Brief for the American
Antitrust Institute as *Amicus Curiae* in Support of Respondents at 18, *Axon*, 598 U.S. 175 (2023)
(No. 21-86) (citing statistics that directly undermined the petitioner's 100% win-rate claim).

for example, the percentage of motions to dismiss granted by a particular court or judge.  *Cf.*

*Singh v. Garland*, 20 F.4th 1049, 1055 (5th Cir. 2021) (rejecting the argument that an

immigration judge's "denial rate" showed bias in a particular case; and explaining that such an

argument "lack[ed] any basis in our precedent"); *S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*,

740 F.2d 980, 995 (D.C. Cir. 1984) ("We conclude that the statistical one-sidedness of the trial

court's evidentiary, factual and legal rulings simply cannot be used to support an inference of

judicial bias.").  Indeed, it is equally plausible that a high win-rate is a product of caution and

due diligence on the FTC's part in deciding which discretionary enforcement actions to bring.

For present purposes, however, it is sufficient to observe that Meta bears the burden of

demonstrating that it is likely to prevail on the merits, and it offers no competent evidence to

support its claim that the results of FTC proceedings are preordained and that the commissioners

close their eyes to the evidence and arguments once they vote out a complaint.

Because neither of Meta's attempts to distinguish *Withrow* is availing, that Supreme

Court precedent is both controlling and dispositive with respect to the company's due process

claim.

## 4.   *Administrative Adjudication of Public Rights*

Meta's next constitutional claim is based on Article III of the Constitution:  Meta

maintains that the FTC's use of an administrative proceeding to modify the 2020 order violates

the separation of powers because it involves the adjudication of private rights, which only an

Article III court can adjudicate.  Public rights, in contrast, can be adjudicated by entities other

than Article III courts, such as the FTC.  *Oil States Energy Servs., LLC v. Greene's Energy Grp.,*

*LLC*, 584 U.S. 325, 334 (citing *Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 32–33 (2014)).

36

The dividing line between "public" and "private" rights is not always clear.  Generally speaking, public rights arise "where the Government is involved in its sovereign capacity under an otherwise valid statute."  *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 51 (1989).  The prototypical private right, in contrast, is the type of right involved in "[w]holly private tort, contract, and property cases" and has common-law roots.  *Id.*; *see also Stern*, 564 U.S. at 484 ("When a suit is made of 'the stuff of the traditional actions at common law tried by the courts at Westminster in 1789,' and is brought within the bounds of federal jurisdiction, the responsibility for deciding that suit rests with Article III judges in Article III courts." (citation omitted)).

Meta argues that the FTC's modification proceedings implicate private rights because the proceedings, conducted pursuant to Section 5 of the FTC Act, depend on a determination that the organization has used "unfair or deceptive acts or practices," 15 U.S.C. § 45(a), which is, in Meta's view, "closely akin to [a] common law action[] for deceit," Dkt. 21 at 35.  The FTC disagrees and argues that "[t]he administrative proceedings at issue here involve public rights" because the proceedings "are connected to the government's regulation of unfair and deceptive business practices that harm consumers."  Dkt. 18 at 25.  At least at this preliminary stage of the proceeding, the Court is persuaded that the Commission has the better argument.

Although "[t]he distinction between public rights and private rights has not been definitively explained" by the Supreme Court,  *N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 69 (1982), some key features of each category of rights are clear.  Courts have long recognized that public rights are "matters 'which arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments.'"  *Oil States Energy*, 584 U.S. at 334 (quoting *Crowell v. Benson*, 285 U.S. 22, 50 (1932)).  That is, public rights are implicated in "cases in

which the Government sues in its sovereign capacity to enforce public rights created by statutes within the power of Congress to enact." *Atlas Roofing Co.*, 430 U.S. at 450; *see also Granfinanciera*, 492 U.S. at 54–55 ("If a statutory right is not closely intertwined with a federal regulatory program Congress has power to enact, and if that right neither belongs to nor exists against the Federal Government, then it must be adjudicated by an Article III court.").

Here, the proceedings at issue are between the FTC, a government agency, and Meta, a party "subject to [FTC] authority.'" *Oil States Energy*, 584 U.S. at 334 (internal quotation marks and citation omitted); *see also N. Pipeline*, 458 U.S. at 69 ("[A] matter of public rights must at a minimum arise 'between the government and others.'" (quoting *Ex parte Bakelite Corp.*, 279 U.S. 438, 451 (1929))).  The proceedings, moreover, are to enforce the FTC Act, a statute that regulates the use of deceptive or unfair business practices that can harm consumers—that is the public—in general.  *See* S. Rep. No. 75-221, at 139 (1937) ("[W]here it is not a question of purely private controversy, and where the acts and practices are unfair or deceptive to the public generally, they should be stopped regardless of their effect on competitors."); *id.* at 140 (explaining that the FTC Act was amended to prohibit the use of "unfair or deceptive acts or practices" in order to afford the public "protection from said deceptive and unfair acts").

To accomplish this purpose, Congress created a new legal duty that deviates in at least one material respect from the common law torts of fraud and deceit.  An organization violates the FTC Act through its use of a deceptive act or practice, if that organization makes a representation, or omission, or engages in a practice that is likely to mislead consumers acting reasonably under the circumstances, and if that representation, or omission, or practice is material.  *See FTC v. Cantkier*, 767 F. Supp. 2d 147, 151 (D.D.C. 2011); *POM Wonderful, LLC v. FTC*, 777 F.3d 478, 490 (D.C. Cir. 2015).  In contrast, common law deceit requires "[a] false

38

affirmation, made by the defendant with intent to defraud the plaintiff, whereby the plaintiff receives damage." *Pasley v. Freeman* (1789) 3 T.R. 51, 55 (KB).  Thus, the common law tort requires that a victim be harmed, whereas a violation of the FTC Act does not.[6]  To be sure, the common law tort of deceit and a Section 5 violation are similar.  But "Congress may fashion causes of action that are closely *analogous* to common-law claims and . . . assign[] their resolution to" an Article I tribunal like the FTC.  *Granfinanciera*, 492 U.S. at 52 (emphasis in original).  That is what Congress did when it amended the FTC Act to prohibit the use of deceptive or unfair business practices.

In pressing its argument to the contrary, Meta once again confronts binding Supreme Court precedent that forecloses its claim.  In *Atlas Roofing Company v. Occupational Safety & Health Review Commission*, 430 U.S. 442 (1977), the Court considered whether Congress could, through its enactment of the Occupational Safety and Health Act, "create a new cause of action in the Government for civil penalties enforceable in an administrative agency." *Id.* at 443.  The Supreme Court held that Congress could constitutionally do so, even if the new cause of action was in many ways similar to the common law causes of action the new claim supplemented.  The Court explained that Congress had enacted a new cause of action for the public benefit after it had "found [that] the common-law and other existing remedies for work injuries resulting from unsafe work conditions [were] inadequate to protect the Nation's working men and women." *Id.* at 461.  And the new cause of action was previously "unknown to the common law," *id.*, because

---

[6] The same distinction can be drawn between a Section 5 violation and the common law tort of fraud.  "A § 5 claim simply is not a claim of fraud as that term is commonly understood. . . . Unlike the elements of common law fraud, the FTC need not prove scienter, reliance, or injury to establish a § 5 violation." *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1204 n.7 (10th Cir. 2005); *id.* ("The FTC's action . . . was not a private or common law fraud action designed to remedy a singular harm, but a government action brought to deter deceptive acts and practices aimed at the public . . . .").

39

it preemptively punished employers for violating workplace standards before any employee was harmed, *id.* at 445.  Common law claims of negligence and wrongful death, in contrast, could be brought only after unsafe conditions resulted in harm to employees.  *See id.* at 444–45.

The same is true here.  The FTC Act created a "new" legal duty, for the benefit of the public at-large, that was "unknown to the common law," *id.* at 461, because it "prevent[s]" business from using unfair or deceptive acts or practices, 15 U.S.C. § 45(a)(2), before those practices result in harm to consumers.  Here, moreover, unlike in *Atlas Roofing*, the Commission lacks authority to assess monetary fines in the first instance and, instead, must bring an action in federal court (or must rely on the Attorney General to do so) in order even to seek the imposition of monetary fines15 U.S.C. § 45(l), or the refund of money or the return of property, *id.* § 57b(b); *see also AMG Capital*, 593 U.S. at 75.[7]  The Court is accordingly unpersuaded by Meta's contention that proceedings to enforce Section 5 of the FTC Act, including OTSC proceedings, violate Article III because they involve the adjudication of private rights by an Article I tribunal.[8]

---

[7] Meta argues that although the FTC cannot impose fines, it can "restrict Meta's property rights and its right to develop new products and services."  Dkt. 4-1 at 27.  "Those restrictions," in Meta's view, "plainly implicate [its] private rights in its property."  *Id.*  But Meta's argument proves too much.  The dividing line between private rights and public rights is not whether an adjudication might have some impact on a person's property; indeed, most administrative adjudications have such an effect.  *See Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 583 (1985) ("Many matters that involve the application of legal standards to facts and affect private interests are routinely decided by agency action with limited or no review by Article III courts.").

[8] Meta also appears to argue, in the alternative as an as-applied challenge, that even if an OTSC proceeding involves the adjudication of public rights, the FTC cannot properly initiate such a proceeding against Meta for violating the 2020 Order.  That is so because the 2020 Order is not a cease-and-desist order issued pursuant to Section 5(b) of the FTC Act, but rather was entered with Meta's consent following a negotiation.  Dkt. 4-1 at 27.  As such, at least on Meta's telling, the order is analogous to a contract, and thus the modification proceeding is analogous to a common-law proceeding to modify a contract.  The problem with that argument, however, is

40

5.     *Jury Trial*

In addition to challenging the FTC's adjudicatory powers under Article III, Meta also advances a Seventh Amendment challenge to the Commission's adjudicatory proceedings.  Meta contends that the "FTC Proceeding will deprive [the company] of its Seventh Amendment right to a jury trial" because the proceeding "entail[s] administrative adjudication of issues involving [its] property rights."  Dkt. 4-1 at 28 (capitalization altered).  This claim requires little analysis, however, because Supreme Court precedent establishes that, "when Congress properly assigns a matter to adjudication in a non-Article III tribunal, 'the Seventh Amendment poses no independent bar to the adjudication of that action by a nonjury factfinder.'"  *Oil States Energy*, 584 U.S. at 345 (quoting *Granfinanciera*, 492 U.S. at 53–54); *see also Atlas Roofing*, 430 U.S. at 455 ("[W]hen Congress creates new statutory 'public rights,' it may assign their adjudication to an administrative agency with which a jury trial would be incompatible, without violating the Seventh Amendment . . . .  This is the case even if the Seventh Amendment would have required a jury where the adjudication of those rights is assigned instead to a federal court of law instead of an administrative agency.").

Yet again, Meta's claim is foreclosed by binding Supreme Court precedent.

6.     *Nondelegation Doctrine*

Meta's final constitutional challenge is premised on the nondelegation doctrine.  "The nondelegation doctrine is rooted in the principle of separation of powers" and the related precept that the legislative power is vested exclusively in the Congress.  *Mistretta v. United States*, 488

---

that—whether entered with or without Meta's consent—the 2020 Order is, in fact, an administrative order.  Just as consent decrees may have attributes of both private contract and judicial decree, a stipulated administrative order may have those same attributes.  But the analogy to private contract necessarily breaks down because an order is an order, even entered with consent.  *Cf. United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 237 n.10 (1975).

U.S. 361, 371–72 (1989).  "Congress . . . may not transfer to another branch 'powers which are strictly and exclusively legislative,'" *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality) (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42–43 (1825)), although it can "obtain[] the assistance of its coordinate Branches" *id.* (quoting *Mistretta v. United States*, 488 U.S. 361, 371–72 (1989)), by "confer[ring] substantial discretion on executive agencies to implement and enforce the laws," *id.*  When it "confers decisionmaking authority upon agencies[,] Congress must 'lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform.'"  *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 472 (2001) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).

Meta argues that the OTSC process is unconstitutional because the FTC had discretion to decide whether to enforce a cease-and-desist order by modifying the order under Section 5(b) of the FTC Act or by referring the matter to the Attorney General, who can file suit under Section 5(l) of the Act.  Dkt. 4-1 at 24.  This discretion violates the separation of powers in Meta's view, because the FTC Act contains no "intelligible principle" to guide the FTC in deciding which enforcement path to pursue.  *Id.*  But Meta's argument misapprehends the nondelegation doctrine.  "In a delegation challenge, the constitutional question is whether the statute has delegated *legislative* power to the agency."  *Whitman*, 531 U.S. at 472 (emphasis added).  The decision that Meta challenges, however, constitutes an exercise of executive authority.  The Supreme Court has long held that "[l]egislative power, as distinguished from executive power, is the authority to make laws, but not to enforce them."  *Springer v. Gov't of Philippine Islands*, 277 U.S. 189, 202 (1928).  "[T]he choice of how to prioritize and how aggressively to pursue

legal actions against defendants who violate the law falls within the discretion of the Executive Branch." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021).

To take just one of the hundreds of examples that leap to mind, a criminal defendant's right to waive a jury trial requires the government's consent. *See* Fed. R. Crim. P. 23(a)(2). No statute or rule tells the government whether and when to withhold such consent, but no one would seriously maintain that granting the government the discretion to make that decision runs afoul of the nondelegation doctrine. Because the decision of how to enforce the law is a quintessential exercise of executive authority, *see* U.S. Const., Art. II, § 3 (The President "shall take care that the laws be faithfully executed." (capitalization altered)); *Buckley v. Valeo*, 424 U.S. 1, 138 (1976) ("[E]nforcement power [is] exemplified by its discretionary power to seek judicial relief."), Congress cannot have impermissibly delegated its legislative power when it gave the FTC a choice of two different mechanisms, one administrative and the other judicial, to enforce its cease-and-desist orders.[9]

Meta attempts to avoid this conclusion by distinguishing between "(i) the legislative choice to assign a dispute to administrative adjudication rather than seek judicial relief, which is at issue here," and "(ii) the discretionary power to seek judicial relief" by filing a lawsuit which

---

[9]     For similar reasons, the Court is unpersuaded by the Fifth Circuit's reasoning in *Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022), concluding that "Congress unconstitutionally delegated legislative power to the SEC when it gave the SEC the unfettered authority to choose whether to bring enforcement actions in Article III courts or within the agency," *id.* at 459. In determining that the nondelegation doctrine applied, the Fifth Circuit relied on language from *INS v. Chadha*, 462 U.S. 919 (1983), that described congressional actions as "legislative" if they have "the purpose and effect of altering the legal rights, duties and relations of persons . . . outside the legislative branch," *id.* at 952. But *Chadha*'s description of legislative actions arose in a very different context: there, the Supreme Court was distinguishing congressional actions that require bicameralism and presentment versus those that do not. *Id.* Continuing the example set forth in the text above, it if fair to say that the hypothetical prosecutor's decision whether to consent to a non-jury trial would have the "effect of altering the legal rights" of the accused, but no one would suggest that the prosecutor's decision constitutes a legislative act.

is an exercise of executive authority."  Dkt. 31 at 30–31 (quotation marks and alterations omitted).  But even with that (modest) limitation, Meta's argument still proves way too much.  For example, under Meta's theory, virtually every decision by an administrative agency to proceed by adjudication as opposed to rulemaking would violate the nondelegation doctrine.  Or an agency's decision to invoke one enforcement authority in lieu of another would lie outside the executive sphere.  That is not the law.  In *United States v. Batchelder*, 442 U.S. 114, 124 (1979), the Supreme Court considered whether Congress's enactment of two federal criminal statutes that assessed different maximum penalties for the same prohibited conduct "constitute[d] an impermissible delegation of congressional authority," *id.* at 116–17, 123.  The defendant there argued that these laws were unconstitutional because the prosecutor could effectively "fix" the criminal penalty, and thereby exercise legislative power, by deciding which of the two statutes to charge the defendant under, *id.* at 124–25.  The Supreme Court rejected this argument, finding that the statutes "at issue plainly demarcate the range of penalties that prosecutors . . . may seek" and any discretion that a prosecutor exercises in picking between the two statutes was "no broader than the authority they routinely exercise in enforcing the criminal laws."  *Id.*

There is no reason to reach a different conclusion here: Congress conferred executive discretion on the Commission to seek to modify an existing cease-and-desist order administratively or by filing a case in federal court.  *Cf. Heckler v. Chaney*, 470 U.S. 821, 832 (1985) ("[A]n agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch.").  How the FTC goes about striking the "complicated balance[e] of a number of factors which are peculiarly within its expertise" and, based on that assessment, decides which of the enforcement authorities that

44

Congress granted it to invoke, lies soundly within the Commission's executive discretion.
*Chaney*, 470 U.S. at 831.  The exercise of that enforcement authority does not usurp any
legislative power.

* * *

Because Meta has failed to demonstrate that it will face irreparable harm in the absence
of preliminary relief or that it is likely to succeed on the merits of any of its claims, it is not
entitled to the extraordinary remedy of preliminary injunctive relief.   *Trump*, 20 F.4th at 31
("The likelihood of success and irreparability of harm 'are the most critical' factors." (quoting
*Nken*, 556 U.S. at 434)).  Indeed, in both respects, Meta's arguments are exceedingly weak.  For
the sake of completeness, however, the Court briefly addresses whether Meta has satisfied the
remaining factors to be considered in granting a preliminary injunction—the balance of the
equities and the public interest.

In a case, like this one, in which the government is a party to the suit, the harm to
defendants and the public interest merge and "are one and the same, because the government's
interest is the public interest."  *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C.
Cir. 2016).  Here, the Commission's interest is a strong one:  As the FTC explains, the OTSC
shows that it "has good cause to believe [that] Meta's privacy practices are still putting
consumers' privacy at risk" and it is "concern[ed] that the 2020 Administrative Order is
insufficient to protect the public from Meta's unfair and deceptive conduct."  Dkt. 18 at 42–43;
*see also* Order, *United States v. Facebook, Inc.*, No. 23-5280, Dkt. 2044641 (D.C. Cir. March 12,
2024) (denying Facebook's motion for an injunction pending appeal because "[t]he FTC's order
to show cause asserts reason to believe that, among other things, appellant failed to establish and
implement an effective privacy program as mandated by the 2020 FTC order," which

45

"implicate[s] important public interests" and tips the balance of equities in the FTC's favor). The Court agrees that, if the FTC's allegations in its OTSC are proven correct, the allegations against Meta are such that it would be in the public interest for the modification proceeding to move forward. To be sure, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (internal quotation marks and citation omitted). But, here, Meta's separation of powers arguments do not implicate any fundamental constitutional liberties and, in any event, Meta's arguments are foreclosed by controlling Supreme Court precedent. The Court thus concludes that all four preliminary injunction factors weigh against granting Meta the relief that it seeks.

The Court will, accordingly, deny Meta's motion for a preliminary injunction.

## C.        Motion to Dismiss

The FTC has cross-moved to dismiss Meta's claims, Dkt. 18, and, for the reasons explained above, the FTC's arguments carry considerable—and, indeed, overwhelming—force. But out of an abundance of caution, the Court will refrain from dismissing Meta's complaint at this time. As noted above, the Supreme Court is currently considering many of the constitutional issues that Meta now raises in *SEC v. Jarkesy*, 143 S. Ct. 2688 (2023). Although that case involves a different agency, with distinct authorities, it is possible that the Supreme Court's decision may have some bearing on this case, and it seems likely that the Court will issue its decision in the next few months. This Court, accordingly, concludes that it would be premature to dismiss Meta's claims before the Supreme Court has issued its decision in *SEC v. Jarkesy*.

46

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for a preliminary injunction, Dkt. 4, is

hereby **DENIED**, and Defendant's motion to dismiss, Dkt. 18, is hereby **DENIED**, without

prejudice.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  March 14, 2024

47