**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

META PLATFORMS, INC.,

               Plaintiff,

           v.

THE FEDERAL TRADE COMMISSION,

         – and –                       Case 1:23-cv-03562-RDM

LINA M. KHAN, REBECCA KELLY
SLAUGHTER, and ALVARO BEDOYA,
in their official capacities as Commissioners of
the Federal Trade Commission,

             Defendants.

---

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO**
**DEFENDANTS' RENEWED MOTION TO DISMISS**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
212-450-4000

*Attorneys for Plaintiff Meta Platforms, Inc.*

## TABLE OF CONTENTS

<u>PAGE</u>

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ........................................................................................................................3

    A.    *SEC v. Jarkesy* ..........................................................................................3

        1.    *Jarkesy*: Securities Fraud Is Grounded in Common Law "Soil" ...............5

        2.    *Jarkesy*: Securities Fraud Does Not Fall Within the
              Narrow "Public Rights" Exception to Article III Jurisdiction ...................6

    B.    Traditional Common Law and Equitable Actions for Fraud and Deceit ...............7

    C.    Section 5 Superimposed Federal Statutory Law on
        Common Law and Equitable Remedies for Fraud and Deceit ...........................10

ARGUMENT ...........................................................................................................................11

I.    Meta's Complaint States Claims Under the Fifth Amendment
    Due Process Clause, Article II, and Article I of the U.S. Constitution ...........................11

II.    Meta's Complaint States a Claim Under Article III of the U.S. Constitution ................11

    A.    Article III Embraces Traditional Common
        Law and Equitable Claims for Fraud and Deceit ...................................................11

    B.    Section 5 Claims Lie Within Article III Jurisdiction ............................................13

    C.    *Jarkesy* Forecloses the Commission's
        Invocation of the "Public Rights" Exception ........................................................20

        1.    Adjudication of Section 5 Claims Does Not Fall
              Within *Jarkesy*'s Narrow "Public Rights" Exception...............................21

        2.    Defendants' Attempts to Distinguish *Jarkesy* Fail ..................................24

        3.    Defendants' Litigation Choices Undermine Their Position
              That *Jarkesy* Does Not Support Meta's Article III Claim ........................27

III.    Meta's Complaint States a Claim Under the
    Seventh Amendment to the U.S. Constitution ................................................................28

IV.    Meta's Structural Constitutional Claims Are Not Waived or Estopped ...........................29

CONCLUSION........................................................................................................................31

# TABLE OF AUTHORITIES

PAGE

*Am. Airlines, Inc. v. N. Am. Airlines, Inc.*,
    351 U.S. 79 (1956) ............................................................................... 24

*Am. Fin. Servs. Ass'n v. FTC*,
    767 F.2d 957 (D.C. Cir. 1985) .................................................... 10, 17

*Am. Washboard Co. v. Saginaw Mfg. Co.*,
    103 F. 281 (6th Cir. 1900) ......................................................... 19–20

*AMG Capital Mgmt., LLC v. FTC*,
    593 U.S. 67 (2021) ..................................................................... 18, 26

*Arora v. Buckhead Family Dentistry, Inc.*,
    285 F. Supp. 3d 190 (D.D.C. 2018) .................................................. 14

*Atlas Life Ins. Co. v. W.I.S., Inc.*,
    306 U.S. 563 (1939) ................................................................... 11–12

*Atlas Roofing Co. v. OSHRC*,
    430 U.S. 442 (1977) ............................................................... *passim*

*Bath and Mountague's Case*,
    (1693) 3 Chan. Cas. 55 [AD-1] [1] ................................................... 13

*Biomedical Patent Mgmt. Corp. v. Cal. Dep't of Health Servs.*,
    505 F.3d 1328 (Fed. Cir. 2007) ....................................................... 29

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*,
    527 U.S. 666 (1999) ......................................................................... 29

*Croft v. Day*,
    (1843) 7 Beav. 84 [AD-2]................................................................. 19

*Crowell v. Benson*,
    285 U.S. 22 (1932) ............................................................. 25, 27, 28

*Doe v. Martin*,
    (1790) 4 TR 39 [AD-3]................................................................ 12–13

*Earl of Chesterfield v. Janssen*,
    (1750) 2 Ves. Sen. 125 [AD-4]..................................................... 9, 13

---

[1] For the Court's convenience, Plaintiff has provided contemporaneously herewith an addendum containing certain legal authorities cited herein that may not be readily accessible. Citations to AD- refer to the location of the cited authority in the addendum.

*Elmo Div. of Drive-X Co. v. Dixon*,
348 F.2d 342 (D.C. Cir. 1965) ........................................................ 29

*FEC v. Legi-Tech, Inc.*,
75 F.3d 704 (D.C. Cir. 1996) .......................................................... 30

*FTC v. Algoma Lumber Co.*,
291 U.S. 67 (1934) ................................................................... 9, 14

*FTC v. Cantkier*,
767 F. Supp. 2d 147 (D.D.C. 2011) .................................................. 14

*FTC v. Colgate-Palmolive Co.*,
380 U.S. 374 (1965) .............................................................. 10, 26

*FTC v. Raladam Co.*,
283 U.S. 643 (1931) .................................................................. 10

*FTC v. Sperry & Hutchinson Co.*,
405 U.S. 233 (1972) .............................................................. 17, 20

*FTC v. Standard Educ. Soc.*,
302 U.S. 112 (1937) .................................................................. 15

*FTC v. Sterling Drug, Inc.*,
317 F.2d 669 (2d Cir. 1963) .......................................................... 15

*FTC v. Wyndham Worldwide Corp.*,
799 F.3d 236 (3d Cir. 2015) .......................................................... 17

*Furnis v. Leicester*,
(1618) Croke, Jac. 474 [AD-5] ......................................................... 8

*Gordon v. Washington*,
295 U.S. 30 (1935) ................................................................. 4, 12

*Granfinanciera, S.A. v. Nordberg*,
492 U.S. 33 (1989) ................................................................. 7, 22

*Harding v. Wheaton*,
11 F. Cas. 491 (C.C.D.R.I. 1821),
*aff'd in part, rev'd in part sub nom. Harding v. Handy*, 24 U.S. 103 (1826) ...... 16

*Holloway v. Bristol-Myers Corp.*,
485 F.2d 986 (D.C. Cir. 1973) ................................................. *passim*

*Holzsager v. Valley Hosp.*,
646 F.2d 792 (2d Cir. 1981) .......................................................... 30

iii

*Hostetter Co. v. Brueggeman-Reinert Distilling Co.*,
    46 F. 188 (C.C.E.D. Mo. 1891) ......................................................................... 20

*Int'l Shoe Co. v. FTC*,
    280 U.S. 291 (1930) ........................................................................................... 27

*Jacob Siegel Co. v. FTC*,
    327 U.S. 608 (1946) ........................................................................................... 26

*Lawrence Mfg. Co. v. Tenn. Mfg. Co.*,
    138 U.S. 537 (1891) ........................................................................................... 19

*Mortlock v. Buller*,
    (1804) 10 Ves. Jun. 292 [AD-6] ........................................................................ 20

*\*Murray's Lessee v. Hoboken Land & Improvement Co.*,
    59 U.S. 272 (1855) ..................................................................................... *passim*

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*,
    458 U.S. 50 (1982) ............................................................................................. 25

*NACM-New Eng., Inc. v. Nat'l Ass'n of Credit Mgmt., Inc.*,
    927 F.3d 1 (1st Cir. 2019) .................................................................................. 29

*Oceanic Steam Nav. Co. v. Stranahan*,
    214 U.S. 320 (1909) ........................................................................................... 22

*Pasley v. Freeman*,
    (1789) 3 TR 51 [AD-7]......................................................................................... 8

*Payne v. Hook*,
    74 U.S. 425 (1869) ............................................................................................. 12

*Pillsbury-Washburn Flour Mills Co. v. Eagle*,
    86 F. 608 (7th Cir. 1898) ................................................................................... 19

*Polk's Lessee v. Wendell*,
    18 U.S. 293 (1820) ............................................................................................. 13

*Popham v. Eyre*,
    (1831) Lofft 786 [AD-8]..................................................................................... 13

*Robinson v. Campbell*,
    16 U.S. 212 (1818) ............................................................................................. 12

*Russell v. Clark's Ex'rs*,
    11 U.S. 69 (1812) ............................................................................................... 13

*SEC v. Commw. Chem. Sec., Inc.*,
    574 F.2d 90 (2d Cir. 1978) ................................................................................ 17

*SEC v. Jarkesy*,
  144 S. Ct. 2117 (2024) ............................................................................. *passim*

Stern v. Marshall,
  564 U.S. 462 (2011) ...................................................................................... 25

Taylor v. Carpenter,
  23 F. Cas. 742 (C.C.D. Mass. 1844) ........................................................... 19

Von Mumm v. Wittemann,
  85 F. 966 (C.C.S.D.N.Y. 1898), *aff'd*, 91 F. 126 (2d Cir. 1898) .......................... 19

CONSTITUTION, STATUTES & RULES

U.S. Const. art. III, § 1 ...................................................................................... 4

U.S. Const. art. III, § 2 ...................................................................................... 4

15 U.S.C. § 45(a)(2) ......................................................................................... 21

15 U.S.C. § 45(b) ............................................................................................. 16

15 U.S.C. § 45(l) ............................................................................................. 28

15 U.S.C. § 45(n) ............................................................................................. 16

15 U.S.C. § 53(b) ............................................................................... 10, 16–17, 26

FTC Act, Pub. L. 63-203 § 5, 38 Stat. 717 (1914) ......................................... 10

Trans-Alaska Pipeline Authorization Act,
  Pub. L. No. 93-153 § 408(f), 87 Stat. 576, 592 (1973)
  (codified as amended at 15 U.S.C. § 53(b)) ............................................ 10

Wheeler-Lea Act of 1938, Pub. L. No. 75-447, 52 Stat. 111 (1938) ............... 10

16 C.F.R. § 2.32(c) .......................................................................................... 30

<u>OTHER AUTHORITIES</u>

Henry Ballow & John Fonblanque, *Treatise of Equity* (1793) [AD-9] ..................................... 9, 15

Melville M. Bigelow, *The Law of Fraud and the*
*Procedure Pertaining to the Redress Thereof* (1877) [AD-10] ....................... 9, 15, 16, 17, 20

III William Blackstone, *Commentaries on the Laws of England* (1768) [AD-11] ................. 7, 12

Br. for Appellee (FTC), *AMG Capital Mgmt., LLC v. FTC*,
No. 19-508 (U.S. Nov. 30, 2020), 2020 WL 7093938 ......................................................... 11

FTC Surreply to EPIC, *United States v. Facebook*, Inc.,
No. 19-cv-02184 (D.D.C. Jan. 24, 2020) (Dkt. 27) .................................................................30

H.R. Conf. Rep. No. 1142, 63d Cong., 2d Sess. 19 (1914) ........................................................ 20

*In re Intuit Inc.*,
2024 WL 382358 (F.T.C. Jan. 22, 2024) ........................................................................... 27

II W. Blake Odgers & Walter Blake Odgers,
*The Common Law of England* (2d ed. 1920) [AD-12] ............................................................ 8

*1 Joseph Story, *Commentaries on Equity Jurisprudence:*
*As Administered in England and America* (1st ed. 1836) [AD-13] ............................... *passim*

## PRELIMINARY STATEMENT[2]

On Defendants' previous motion to dismiss Meta's Complaint, this Court "recognize[d] that the Supreme Court is currently considering a number of related issues in *SEC v. Jarkesy*," and decided to "await the Supreme Court's decision in *Jarkesy* before finally adjudicating this case." Dkt. 31 at 2–3.[3]  The Supreme Court has now decided *Jarkesy*.

The Supreme Court's decision confirms the legal merit of Meta's Article III claim. *Jarkesy* reiterates that the U.S. Constitution bars Congress from "withdraw[ing] from judicial cognizance any matter which, from its nature, is the subject of a suit at the **common law, or in equity**, or admiralty." *SEC v. Jarkesy*, 144 S. Ct. 2117, 2134 (2024) (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1855)).  *Jarkesy* held that Congress violated that prohibition by assigning to administrative adjudication a statutory securities fraud claim with a "close relationship" to common law fraud.  This close relationship exists even if the statutory claim is in some respects broader than the Article III claim and in other respects narrower, or if the claims are otherwise not "identical." *Id.* at 2131.  Here, the FTC's challenged administrative claims against Meta (based on Section 5 of the FTC Act) are firmly within Article III jurisdiction because of the close relationship between those claims and common law and equitable claims of fraud and deceit.

*Jarkesy* also forecloses Defendants' argument that Section 5 of the FTC Act falls within "the 'public rights' exception to Article III jurisdiction." *Id.* at 2127.  As emphasized by *Jarkesy*, the "public rights" exception is exactly that—"an **exception**"—with "no textual basis in the

---

[2] Unless otherwise indicated, emphasis has been added to quotations, and internal quotations, brackets, citations, and footnotes have been omitted.

[3] "OTSC" refers to the FTC's Order to Show Cause (Dkt. 18-9).  The "2012 Order" refers to Dkt. 18-4, and the "2020 Order" refers to Dkt. 18-7 at 3–24.

Constitution." *Id.* at 2134. *Jarkesy* limited the exception to matters that "historically could have been determined ***exclusively*** by the executive and legislative branches," such as "cases involving the collection of revenue," "immigration," "foreign commerce," "relations with Indian tribes," "the administration of public lands," and "the granting of public benefits such as payments to veterans, pensions, and patent rights." *Id.* at 2132–33. Even as to matters that "arguably" fall within the public rights exception's limited scope, "the presumption is in favor of Article III courts." *Id.* at 2134.

Tellingly, Defendants avoid these core principles, which are fatal to their motion to dismiss. Indeed, the D.C. Circuit has already answered the key question that *Jarkesy* asks, holding that Section 5 derives from, and has a close relationship to, common law fraud and deceit—explaining that Section 5's prohibition against unfair or deceptive acts or practices "superimposed a structure of Federal law upon the existing system of common law remedies for fraud and deceit." *Holloway v. Bristol-Myers Corp.*, 485 F.2d 986, 989 (D.C. Cir. 1973). This is consistent with this Court's recognition that "the common law tort of deceit and a Section 5 violation are similar." Dkt. 31 at 39.

It is immaterial that—as Defendants argue—Section 5 is, in some respects, broader than the common law and grants the FTC equitable cease-and-desist remedies. Under *Jarkesy*, a "close relationship" between a statutory claim and the Article III claim from which it grew does not require the claims to be "identical." 144 S. Ct. at 2131. Further, although *Jarkesy* focused on the ***common law*** roots of a securities fraud claim, the decision leaves no doubt that Article III applies to suits "in equity," as Article III's plain language makes clear. *Id.* at 2134. Defendants attempt to rewrite centuries of legal history by ignoring that under English law prior to this Country's founding, fraud and deceit were recognized at common law ***and in equity***—and had

both legal and equitable remedies.  For example, equity granted remedies for misrepresentations absent scienter, and treated unfairness and unconscionability as species of fraud.  Under these circumstances, Section 5 claims fall squarely within—and cannot be withdrawn from—Article III jurisdiction.

Under *Jarkesy*, the legal merits of Meta's Article III claim are independent of its Seventh Amendment claim.  Claims under Article III and under the Seventh Amendment are independent because, pursuant to *Jarkesy*, Article III jurisdiction embraces legal and equitable claims, whereas only legal claims carry a jury trial right under the Seventh Amendment.

*Jarkesy* nonetheless also supports and strengthens Meta's Seventh Amendment claim. The analysis in *Jarkesy* describes the importance of a civil penalty remedy to the Seventh Amendment right to jury trial.  While the FTC cannot impose civil penalties administratively, a court can impose civil penalties for any violation of an FTC order—and thus the imposition of an FTC order is an essential element of a claim for civil penalties, which itself carries a jury trial right under *Jarkesy*.  *Jarkesy* leaves no room for partial administrative adjudication of a claim to which a jury right attaches.[4]

For all of these reasons, *Jarkesy* establishes the merits of Meta's Article III and Seventh Amendment claims and requires the denial of Defendants' motion to dismiss those claims.

## **BACKGROUND**

### A.     ***SEC v. Jarkesy***

In emphasizing the importance of "maintaining the proper role of the Judiciary in the Constitution," *Jarkesy* began with the text of Article III, reiterating that the "'the judicial Power

---

[4] To avoid burdening the Court with redundant briefing, Meta incorporates by reference its prior briefs supporting the merits of each of its claims in this action.  *See* Dkt. 4, 20, & 24.

of the United States' cannot be shared with the other branches."  144 S. Ct. at 2131 (indirectly

quoting U.S. Const. art. III, § 1).  Section 2 of Article III provides, in relevant part:

> The judicial Power shall extend to all Cases, **in Law and Equity**,
> arising under this Constitution, the Laws of the United States …;
> [and] to Controversies to which the United States shall be a
> Party ….

U.S. Const. art. III, § 2.  Thus, the Constitution prohibits Congress from "withdraw[ing] from

judicial cognizance any matter which, from its nature, is the subject of a suit at the common law,

or in equity, or admiralty."  *Jarkesy*, 144 S. Ct. at 2134 (quoting *Murray's Lessee*, 59 U.S. at

284).

Actions that "may not be removed from Article III courts" involve so-called "private

rights."  144 S. Ct. at 2132; *see also id.* at 2136 ("In short, this action involves a matter of private

rather than public right.  Therefore, Congress may not withdraw it from judicial cognizance.").

"[A] suit concerns private rights" if, for example, "it is made of the stuff of the traditional actions

at common law tried by the courts at Westminster in 1789."  *Id.* at 2132.  "If a suit is in the

nature of an action at common law, then the matter presumptively concerns private rights, and

adjudication by an Article III court is mandatory."  *Id.*  Likewise, a matter is in its nature a "suit

in equity"—and thus subject to Article III jurisdiction, *see id.* at 2134—if "relief is sought

according to the principles applied by the English Court of Chancery before 1789, as they have

been developed in the federal courts," *Gordon v. Washington*, 295 U.S. 30, 36 (1935).

In *Jarkesy*, the Supreme Court held that administrative adjudication of a securities fraud

claim carrying civil penalties violates the Seventh Amendment.  *Jarkesy*'s analysis proceeded in

two principal steps.  First, *Jarkesy* held that federal securities fraud has a "close relationship"

with common law fraud.  As a result, and given that civil penalties are a legal remedy,

adjudication of a securities fraud claim for civil penalties "implicates" the Seventh Amendment.

Second, *Jarkesy* held that a federal securities fraud claim does not fall within the narrow "public rights" exception to Article III jurisdiction (and, therefore, to the Seventh Amendment).

        1.        **_Jarkesy_: Securities Fraud Is Grounded in Common Law "Soil"**

*Jarkesy*'s analysis of the relationship between securities fraud and common law fraud speaks to both the Article III and Seventh Amendment issues in this case.  Because the Seventh Amendment preserves "the right of trial by jury" in "[s]uits at common law"—"in contradistinction to equity, and admiralty, and maritime jurisprudence"—*Jarkesy* analyzed whether securities fraud is "legal in nature."  144 S. Ct. at 2128.

*Jarkesy* rested its conclusion that securities fraud is legal in nature on two separate grounds.  First, because some "causes of action sound in both law and equity," the Supreme Court focused on the remedy to distinguish between a legal claim and an equitable claim for the Seventh Amendment inquiry.[5]  *Id.* at 2129.  *Jarkesy* concluded that civil penalties for securities fraud are "a type of remedy at common law that could only be enforced in courts of law."  *Id.* at 2130.

Second, *Jarkesy* emphasized that the "close relationship" between securities fraud and common law fraud "confirms" that the former is legal in nature.  *Id.* at 2130.  The Supreme Court noted "Congress's decision to draw upon common law fraud," which "created an enduring link between federal securities fraud and its common law 'ancestor.'"  *Id.*  The *Jarkesy* Court emphasized that it is irrelevant to this conclusion that securities fraud and common law fraud are not "identical," and that securities fraud is in some respects "narrower" and in other respects

---

[5] *Jarkesy* drew this distinction for purposes of the Seventh Amendment inquiry.  In contrast, there is no need to distinguish between legal and equitable claims for purposes of Meta's Article III claim, which rests on Congress impermissibly "withdraw[ing] from judicial cognizance any matter which, from its nature, is the subject of a suit ***at the common law, or in equity***, or admiralty."  144 S. Ct. at 2134 (quoting *Murray's Lessee*, 59 U.S. at 284).

"broader" than common law fraud.  *Id.* at 2131.  For example, securities fraud, unlike common law fraud, does not "require a showing of harm to be actionable by the SEC."  *Id.*

### 2.  *Jarkesy***: Securities Fraud Does Not Fall Within the Narrow "Public Rights" Exception to Article III Jurisdiction**

*Jarkesy* construed the only potentially relevant exception to Article III jurisdiction—the "public rights" exception— extraordinarily narrowly.  Indeed, *Jarkesy* established a "presumption" that even public rights should be adjudicated by Article III courts.  *See* 144 S. Ct. at 2134 ("[E]ven with respect to matters that arguably fall within the scope of the 'public rights' doctrine, the presumption is in favor of Article III courts.").

*Jarkesy* permits public rights to be determined by non-Article III tribunals only in "exception[al]" situations "derive[d] … from background legal principles."  *Id.*  The Supreme Court explained that it has permitted Article I adjudication in fields over which the "political branches had traditionally held ***exclusive*** power … ***and had exercised it***."  *Id.* at 2133; *see also id.* at 2134 ("*Murray's Lessee* … took pains to justify the application of the exception in that particular instance by explaining that it flowed from centuries-old rules concerning revenue collection by a sovereign.").  *Jarkesy* emphasized that "[w]ithout … close attention to the basis for each asserted application of the [public rights] doctrine, the exception would swallow the rule."  *Id.*

The Supreme Court rejected numerous arguments that securities fraud was a "public right" that the SEC could adjudicate.  It did not matter, the *Jarkesy* Court reasoned, that "an action originate[s] in a newly fashioned regulatory scheme;" that "Congress created 'new statutory obligations, impose[d] civil penalties for their violation, and then commit[ted] to an administrative agency the function of deciding whether a violation ha[d] in fact occurred;'" or that "the Government is the party prosecuting this action."  *Id.* at 2135–36.  "[W]hat matters is

the substance of the suit, not where it is brought, who brings it, or how it is labeled." *Id.* at 2136.

Because securities fraud is "a common law suit in all but name," it must be adjudicated by an

Article III court. *Id.*

Finally, the Supreme Court declared that "*Atlas Roofing* represents a departure from our

legal traditions," 144 S. Ct. at 2138 n.4 (citing *Atlas Roofing Co. v. OSHRC*, 430 U.S. 442

(1977)), and effectively limited *Atlas Roofing* to its facts, *see id.* at 2138 ("The reasoning of

*Atlas Roofing* cannot support any broader rule."). *Jarkesy* rejected *Atlas Roofing*'s definition of

the public rights exception—"cases in which the Government sues in its sovereign capacity to

enforce public rights created by statutes"—as "circular." *Id.* at 2139 (quoting *Atlas Roofing*, 430

U.S. at 450). And while the *Jarkesy* Court stopped short of definitively deciding whether *Atlas*

*Roofing* has been overruled, it approvingly cited arguments that "*Granfinanciera* can be read as

overruling or severely limiting *Atlas Roofing*." *Id.* at 2137 & n.3 (citing *Granfinanciera, S.A. v.*

*Nordberg*, 492 U.S. 33 (1989)).

### B.     Traditional Common Law and Equitable Actions for Fraud and Deceit

At and before the founding, fraud and deceit were actionable in courts of law and courts

of equity.

The common law has long imposed liability for unfairness or dishonesty in the sale of

goods. According to Blackstone, "[i]f any one cheats me … by fal[s]e weights and mea[s]ures,

or by [s]elling me one commodity for another, an action on the ca[s]e al[s]o lies again[s]t him for

damages, upon the contract which the law always implies, that every tran[s]action is fair and

hone[s]t." III William Blackstone, *Commentaries on the Laws of England* 164 (1768)

(hereinafter "*Blackstone's Commentaries*") (AD-11).

At common law, the elements of a fraudulent misrepresentation were (and are) "(i.) that a

material representation was made which was false to the knowledge of the man who made it;

(ii.) that it was intended to induce the person to whom it was addressed to act in some way; (iii.) that the latter was thereby deceived, and induced so to act; and (iv.) that he in consequence suffered damage."  II W. Blake Odgers & Walter Blake Odgers, *The Common Law of England* 720 (2d ed. 1920) (AD-12); *see also*, *e.g.*, *Pasley v. Freeman*, (1789) 3 TR 51 (upholding a common law claim for deceit by a seller against a third party who falsely affirmed to the seller the creditworthiness of a buyer) (AD-7); *Furnis v. Leicester*, (1618) Croke, Jac. 474 (upholding a common law claim for deceit by a buyer of sheep against the seller for falsely affirming the sheep were his) (AD-5).

Deception and unfairness were also actionable in courts of equity under the heading of fraud.  "Fraud … in the sense of a Court of Equity, properly includes all acts, omissions, and concealments, which involve a breach of legal or equitable duty, trust, or confidence, justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another."  1 Joseph Story, *Commentaries on Equity Jurisprudence: As Administered in England and America* § 187 at 197–98 (1st ed. 1836) (hereinafter "*Story's Commentaries on Equity*") (AD-13).  "Courts of Equity … have, very wisely, never laid down, as a general proposition, what shall constitute fraud, or any general rule, beyond which they will not go upon the ground of fraud, lest other means of avoiding the Equity of the Courts should be found out." *Id.* § 186, at 196.

Fraudulent misrepresentation was one species of fraud remediable by a court of equity:

> It is said … to be a very old head of Equity, that, if a representation is made to another person, going to deal in a matter of interest, upon the faith of that representation, the former shall make that representation good, if he knows it be false.  To justify, however, an interposition in such cases, it is not only necessary to establish the fact of misrepresentation; but that it is in a matter of substance, or important to the interests of the other party, and that it actually does mislead him.

*Id.* § 191 at 200–01.  Equitable remedies for misrepresentation did not necessarily require

scienter.  *See, e.g.*, *FTC v. Algoma Lumber Co.*, 291 U.S. 67, 81 (1934) (Cardozo, J.) ("[T]here is

a kind of fraud, as courts of equity have long perceived, in clinging to a benefit which is the

product of misrepresentation, however innocently made.").

Equity also granted remedies against unfair and unconscionable bargains under the head

of fraud:

> First.  Fraud … may be actual, arising from facts and
> circumstances of imposition, which is the plainest case.  Secondly.
> ***It may be apparent from the intrinsic nature and subject of the
> bargain itself; such as no man in his senses, and not under
> delusion, would make on the one hand, and as no honest and fair
> man would accept on the other; which are inequitable and
> unconscientious bargains***, and of such even the Common Law has
> taken notice.  Thirdly.  Fraud, which may be presumed from the
> circumstances and condition of the parties contracting; and this
> goes farther than the rule of law, which is, that it must be proved,
> not presumed.  But ***it is wisely established in the Court of
> Chancery, to prevent taking surreptitious advantage of the
> weakness or necessity of another, which knowingly to do is
> equally against conscience, as to take advantage of his
> ignorance***.

*Story's Commentaries on Equity* § 188 at 198 (AD-13) (citing Lord Chancellor Hardwicke's

opinion in the "celebrated case" of *Earl of Chesterfield v. Janssen*, (1950) 2 Ves. Sen. 125, 155–

56 (AD-4)); *accord* Henry Ballow & John Fonblanque, *Treatise of Equity* 109–10 (1793)

(hereinafter "*Treatise of Equity*") (AD-9).  Thus, in a case in which a party seeks to "impeach a

sale for fraud" in equity, "[t]he term 'fraud,' … is not to be understood in its popular sense.  In

the sense it which it is understood in equity, it comprises the use of undue influence and unfair

means."  Melville M. Bigelow, *The Law of Fraud and the Procedure Pertaining to the Redress

Thereof*, ch. II § 9 at 137 (1877) (hereinafter "*The Law of Fraud*") (AD-10).

C.     **Section 5 Superimposed Federal Statutory Law on
       Common Law and Equitable Remedies for Fraud and Deceit**

As initially enacted in 1914, Section 5 of the FTC Act prohibited only "unfair methods of

***competition***."  FTC Act, Pub. L. 63-203 § 5, 38 Stat. 717, 719 (1914).  In response to "judicial

decisions limiting the FTC's authority to practices unfairly inhibiting competition"—including

*FTC v. Raladam Co.*, 283 U.S. 643 (1931)—Congress amended Section 5 in 1938 "to grant the

Commission authority to protect consumers as well as competitors."  *Am. Fin. Servs. Ass'n v.*

*FTC*, 767 F.2d 957, 966 (D.C. Cir. 1985).

In particular, the Wheeler-Lea Act of 1938 amended Section 5 to add a prohibition

against "unfair or deceptive acts or practices" alongside the prohibition against "unfair methods

of competition."  *See* Wheeler-Lea Act of 1938, Pub. L. No. 75-447, 52 Stat. 111 (1938).  This

"significant amendment show[ed] Congress' concern for consumers as well as for competitors."

*FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 384 (1965).

The D.C. Circuit has observed that Congress thus "***superimposed a structure of Federal***

***law upon the existing system of common law remedies for fraud and deceit***."  *Holloway*, 485

F.2d at 989.  Congress subsequently confirmed that Section 5 claims fall within Article III

jurisdiction.  In 1973, Congress enacted Section 13(b) of the FTC Act, which authorizes the FTC

to seek injunctive relief from Article III courts, including for violations of Section 5.  *See* Trans-

Alaska Pipeline Authorization Act, Pub. L. No. 93-153 § 408(f), 87 Stat. 576, 592 (1973)

(codified as amended at 15 U.S.C. § 53(b)); *see also Jarkesy*, 144 S. Ct. at 2139 (contrasting

claims in *Atlas Roofing*, which "had never been brought in an Article III court," with securities

fraud claims, which "Congress ha[s] authorized the SEC to bring … in Article III courts").

While Section 13(b) applies beyond fraud claims, it "was enacted," as the FTC has explained to

the Supreme Court, specifically to augment the FTC's authority to "combat fraud."  Br. for

10

Appellee (FTC), *AMG Capital Mgmt., LLC v. FTC*, No. 19-508 (U.S. Nov. 30, 2020), 2020 WL 7093938, at *4.

## ARGUMENT

### I.   Meta's Complaint States Claims Under the Fifth Amendment Due Process Clause, Article II, and Article I of the U.S. Constitution

For the reasons set forth in Meta's prior briefing (Dkt. 4, 20, & 24), Defendants' renewed motion to dismiss should be denied as to Counts I, II and III of the Complaint.

### II.   Meta's Complaint States a Claim Under Article III of the U.S. Constitution

The Supreme Court's decision in *Jarkesy* confirms the basis of Meta's Article III claim. Congress cannot "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the ***common law***, or ***in equity***, or admiralty." *Jarkesy*, 144 S. Ct. at 2134 (quoting *Murray's Lessee*, 59 U.S. at 284).[6]  Under *Jarkesy*, the only potentially relevant exception—the "public rights" doctrine—is exceedingly narrow.

As shown below, Section 5 of the FTC Act improperly assigns to administrative adjudication matters whose nature was the subject of suit at the common law and in equity, and which carry administrative remedies that are equitable in nature.  And Section 5 claims do not fall within the limited public rights exception under *Jarkesy*.  Therefore, the Commission's adjudication of Section 5 claims violates Article III.

#### A.   Article III Embraces Traditional Common Law and Equitable Claims for Fraud and Deceit

*Jarkesy* confirmed that Article III embraces both common law and equitable claims, such as traditional actions for fraud and deceit.  Accordingly, "Section 11 of the Judiciary Act of 1789 … provided that the circuit courts should have 'cognizance … of all suits of a civil nature

---

[6] *Compare id.* at 2128 (explaining that "[t]he [***Seventh***] ***Amendment*** … embrace[s] all suits which are ***not of equity*** or admiralty jurisdiction").

*at common law or in equity*' in cases appropriately brought in those courts." *Atlas Life Ins. Co. v. W.I. S., Inc.*, 306 U.S. 563, 568 (1939). *Jarkesy* focused on the common law origins of securities fraud claims, while making clear that Article III applies with equal force to claims in equity. 144 S. Ct. at 2134. The tests to determine whether claims are legal or equitable under Article III are similar.

As to common law suits falling within Article III, *Jarkesy* explained: "A hallmark that we have looked to in determining if a suit concerns private rights is whether it is made of the stuff of the traditional actions at common law tried by the courts at Westminster in 1789. If a suit is in the nature of an action at common law, then the matter presumptively concerns private rights, and adjudication by an Article III court is mandatory." 144 S. Ct. at 2132.

Likewise, as to equity suits embraced by Article III, the Supreme Court has observed: "From the beginning, the phrase 'suits in equity' has been understood to refer to suits in which relief is sought according to the principles applied by the English Court of Chancery before 1789, as they have been developed in the federal courts." *Gordon*, 295 U.S. at 36; *see also Payne v. Hook*, 74 U.S. 425, 430 (1868) ("The equity jurisdiction conferred on the Federal courts is the same that the High Court of Chancery in England possesses …."); *Robinson v. Campbell*, 16 U.S. 212, 213 (1818) ("The remedies in the courts of the United States at common law and in equity, are to be … according to the principles of common law and equity as defined in England.").

At this country's founding, fraud and deceit were recognized at common law and in equity—and had both legal and equitable remedies. As Blackstone explained, "every kind of *fraud* is equally cognizable, and equally adverted to, in a court of law" as in a court of equity. *Blackstone's Commentaries* at 431 (AD-11); *see also*, *e.g.*, *Doe v. Martin*, (1790) 4 TR 39, 66–

67 (Lord Kenyon, C.J.) ("This then was a gross rank fraud, which contaminates the whole transaction, and renders it absolutely void, as well in a Court of Law as in a Court of Equity.") (AD-3); *Popham v. Eyre*, (1831) Lofft 786, 809–10 ("[F]or fraud and circumvention there would have been at common-law a relief similar to that which Courts of Equity give ….") (AD-8); *Earl of Chesterfield*, 2 Ves. Sen. at 155 ("[Fraud] may be apparent from the intrinsic nature and subject of the bargain itself … which are unequitable and unconscientious bargains; and of such even the common law has taken notice ….") (AD-4); *Bath and Mountague's Case*, (1693) 3 Chan. Cas. 55, 74 (Lord Treby, C.J.) (explaining that the legal doctrine of *Surreptio*—"when a Man will by false Suggestions prevail upon another to do that which otherwise he would not have done"—is properly called "Fraud," and expressing "no doubt but Equity ought to set aside that") (AD-1).

Article III courts carried on this tradition. *See*, *e.g.*, *Polk's Lessee v. Wendell*, 18 U.S. 293, 297 (1820) ("Courts of common law have a concurrent jurisdiction with Courts of Equity, in all cases of frauds."); *Russell v. Clark's Ex'rs*, 11 U.S. 69, 84 (1812) ("A Court of Law is as competent as a Court of Equity, to decide a case of fraud."); *see also Story's Commentaries on Equity* § 184 at 195 ("[T]he Courts of Equity may be said to possess a general, and perhaps a universal, concurrent jurisdiction with Courts of Law in cases of frauds cognizable in the latter; and exclusive jurisdiction in cases of frauds beyond the reach of the Courts of Law.") (AD-13).

Under these circumstances, it is beyond dispute that claims for fraud and deceit fall "within the bounds of federal jurisdiction." *Jarkesy* itself made that clear, expressly noting "the judiciary's long history of handling fraud claims." 144 S. Ct. at 2139.

### B.  <u>Section 5 Claims Lie Within Article III Jurisdiction</u>

Defendants' attempts to distance a Section 5 claim from the common law are squarely inconsistent with the D.C. Circuit's conclusion that Congress's enactment of Section 5's

prohibition against unfair or deceptive acts or practices "superimposed a structure of Federal law upon the existing system of common law remedies for fraud and deceit." *Holloway*, 485 F.2d at 989. Further, in its prior decision on Defendants' motion to dismiss Meta's claims, this Court recognized that, "[t]o be sure, the common law tort of deceit and a Section 5 violation are similar." Dkt. 31 at 39. None of Defendants' arguments undermine the historical "close relationship" between Section 5 and common law fraud and deceit that the D.C. Circuit has decisively confirmed.

Defendants argue that a Section 5 violation for deceptive acts or practices lacks some elements of a common law fraud claim. Dkt. 38 at 17–18 ("Unlike the elements of common law fraud, the FTC need not prove scienter, reliance, or injury to establish a § 5 violation."). But Defendants do not—and cannot—deny that a Section 5 claim for deceptive acts or practices and a traditional common law or equitable claim for fraud and deceit generally "target the same basic conduct," which includes "misrepresenting or concealing material facts." *Jarkesy*, 144 S. Ct. at 2130; *compare FTC v. Cantkier*, 767 F. Supp. 2d 147, 151 (D.D.C. 2011) ("To prove a deceptive act or practice in violation of Section 5(a) of the FTC Act, the FTC must show: (1) a representation, omission, or practice that (2) is likely to mislead consumers acting reasonably under the circumstances, and that (3), the representation, omission, or practice is material.") *with Arora v. Buckhead Fam. Dentistry, Inc.*, 285 F. Supp. 3d 190, 198 (D.D.C. 2018) (Moss, J.) ("To prove fraud, Arora must establish (1) a false representation by a defendant, (2) scienter, (3) intention to induce the plaintiff to act or refrain from acting, (4) justifiable reliance by plaintiff, and (5) damage to plaintiff."); *see also Algoma Lumber*, 291 U.S. at 81 ("[T]here is a kind of fraud, as courts of equity have long perceived, in clinging to a benefit which is the product of misrepresentation, however innocently made.").

14

Indeed, the Supreme Court rejected an essentially identical "different elements" argument in *Jarkesy*. The decision acknowledged that, for example, "[c]ourts have … not typically interpreted federal securities fraud to require a showing of harm to be actionable by the SEC," but explaining that it is not significant that federal securities fraud and common law fraud are not "identical." *Jarkesy*, 144 S. Ct. at 2131; *see also id.* at 2163 (Sotomayor, J., dissenting) ("[F]ederal-securities laws do not require proof of actual reliance on an investor's misrepresentations or that an investor has actually suffered financial loss.").

Defendants also argue that the FTC Act's purpose was "to abolish the rule of caveat emptor." Dkt. 38 at 18. But that argument rests on cases that actually illustrate "Congress's decision to draw upon common law fraud" and that confirm the "close relationship" described in *Jarkesy*. 144 S. Ct. at 2130. In particular, the cases explain that Congress wanted to eliminate caveat emptor ***because*** it was a defense to liability for "***fraud and deception***" in certain situations. *See FTC v. Standard Educ. Soc.*, 302 U.S. 112, 116 (1937) ("[T]he rule of caveat emptor should not be relied upon to reward fraud and deception."); *FTC v. Sterling Drug, Inc.*, 317 F.2d 669, 674 (2d Cir. 1963) ("[T]he rule of caveat emptor … can no longer be relied upon as a means of rewarding fraud and deception ….").[7] Thus, Congress decided to draw upon fraud and deception in fashioning Section 5, but without the caveat emptor defense. Akin to its

---

[7] In fact, *caveat emptor* was not a defense to a traditional common law or equitable claim based on a sale of goods involving "some ***misrepresentation***, or ***artifice*** to describe the thing sold, or some warranty, as to its character or quality." *Story's Commentaries on Equity* § 212 at 221 (AD-13); *see also The Law of Fraud*, ch. I § 4 at 69–70 ("The maxim *caveat emptor* does not apply when the vendor of property resorts to any ***artifice*** to put the purchaser off his guard.") (AD-10); *Treatise of Equity* at 109–10 ("[T]he general rule of the common law of England is caveat emptor, upon which rule it [s]eems, that the vendor, without an expre[s]s warranty, merely undertakes to make a good title to the vendee; to [s]hew [sic], that the goods delivered are [s]uch as were contracted for, and that ***no deceit was practiced*** to di[s]gui[s]e their defects; and if provi[s]ions, that they were whole[s]ome at the time of the delivery.") (AD-9).

elimination of the elements of harm and reliance under the federal securities laws, Congress's elimination of the defense made Section 5 "broader" in some respects than traditional common law and equitable claims for fraud and deceit does not detract from the "close relationship" between the statutory claim and its "ancestor[s]." *Jarkesy*, 144 S. Ct. at 2130.

Defendants further argue that a Section 5 violation for unfair acts or practices lacks roots in the common law.  Dkt. 38 at 17.[8]  That argument is unavailing for Defendants for several reasons.  To start, it is inconsistent with the D.C. Circuit's statement in *Holloway* that Section 5's prohibition against unfair or deceptive acts or practices "superimposed a structure of Federal law upon the existing system of common law remedies for fraud and deceit."  485 F.2d at 989. Second, the test under Article III (as opposed to the Seventh Amendment) is whether a claim, "from its nature, is the subject of a suit at the ***common law***, ***or in equity***."  *Jarkesy*, 144 S. Ct. at 2134.  A Section 5 claim for unfair acts or practices harkens back to traditional suits in equity, in which "unfairness in the transaction itself" was a species of fraud.  *The Law of Fraud*, ch. XVII § 5 at 482 (AD-10); *see supra* at 8–9 (explaining that "fraud" embraced "inequitable and unconscientious bargains," "taking surreptitious advantage of the weakness or necessity [or ignorance] of another" and "the use of undue influence and unfair means").[9]

Third, the remedy for a Section 5 violation is equitable, as defendants concede.  *See* 15 U.S.C. § 45(b) (authorizing the FTC to issue administrative cease-and-desist orders); *id.* § 53(b)

---

[8] Defendants suggest that "unfair" is defined by Section 5(n) of the FTC Act, but that provision instead limits the FTC's "authority" to declare an act to be "unfair."  15 U.S.C. § 45(n).

[9] *See also*, *e.g.*, *Harding v. Wheaton*, 11 F. Cas. 491, 495 (C.C.D.R.I. 1821) (Story, J.) ("Cases are not wanting, in which courts of equity have relieved against bargains made by persons of full age and reason without proof of actual fraud and imposition, upon the ground, either of public policy, or the notion of an unconscionable advantage taken of a person's peculiar circumstances and necessities."), *aff'd in part, rev'd in part sub nom. Harding v. Handy*, 24 U.S. 103 (1826).

(authorizing federal courts to issue injunctions); *see also* Dkt. 38 at 15.  Accordingly, in

describing the FTC's authority to issue cease-and-desist orders against unfair practices, the

Supreme Court has likened the FTC to "a court of equity."  *FTC v. Sperry & Hutchinson Co*.,

405 U.S. 233, 244 (1972); *accord Am. Fin. Servs.*, 767 F.2d at 968.  Defendants themselves

describe "the only remedy sought in the [FTC's] modification proceeding" as "injunctive in

nature," and observe that "[i]n 1791, … injunctions, both in England and in this country, were

the business of courts of equity."  Dkt. 38 at 15 (quoting *SEC v. Commw. Chem. Sec., Inc.,* 574

F.2d 90, 95 (2d Cir. 1978)).  Under *Jarkesy*, the remedy for a claim bears importantly on whether

it sounds in law or in equity.  *See* 144 S. Ct. at 2128–29; Dkt. 38 at 19.  Because the equitable

remedies for a Section 5 claim confirm that it sounds in equity, it cannot be withdrawn from

judicial cognizance.

Finally, Defendants err in analyzing the ancestry of the statutory prohibition against

"unfair or deceptive acts or practices" by artificially breaking it apart.  This prohibition was

added by Congress in one stroke in 1938 to "superimpos[e] a structure of Federal law upon the

existing system of common law remedies for fraud and deceit."  *Holloway*, 485 F.2d at 989.

Moreover, courts have for centuries considered deception and unfairness together under the

heading of fraud.  *See*, *e.g.*, *The Law of Fraud*, ch. XVII § 5 at 482 ("Fraud may be proved either

by intrinsic evidence of unfairness in the transaction itself, or by evidence of facts and

circumstances attending it, which by the ordinary tests by which we judge of the motives to

action appear inconsistent with an honest purpose.") (AD-10); *supra* at 7–9; *see also*, *e.g.*, *FTC*

*v. Wyndham Worldwide Corp*., 799 F.3d 236, 245 (3d Cir. 2015) ("[F]acts relevant to unfairness

and deception claims frequently overlap.  We cannot completely disentangle the two theories

here.").

Defendants argue that Section 5 of the FTC Act is "'self-consciously novel' in 'both concept and execution'" (unlike, according to Defendants, the securities fraud statutes at issue in *Jarkesy* and like the occupational safety statute at issue in *Atlas Roofing*).  Dkt. 38 at 21 (quoting *Jarkesy*, 144 S. Ct. at 2137).  But Defendants' argument rests on the assertion that Section 5 claims, like OSHA claims, do not "trac[e] their ancestry to the common law."  *Id.*  As shown above and as their own cases confirm, that assertion is untenable, it conflicts with the D.C. Circuit's conclusion in *Holloway*, and it ignores the importance of Section 5's ancestry in equity.

Defendants' attempt to analogize Section 5 to the OSH Act also conflicts with *Jarkesy* itself.  The Court explained that the "novel claims in *Atlas Roofing* had ***never*** been brought in an Article III court.  By contrast, law courts have dealt with fraud actions since before the founding."  144 S. Ct. at 2139.  Moreover, the Supreme Court distinguished OSH Act claims from securities fraud claims by observing that "Congress had authorized the SEC to bring such actions in Article III courts and still authorizes the SEC to do so today."  144 S. Ct. at 2139.  The same is true here.  As the Supreme Court has separately explained, the FTC Act "permits the Commission to use both its own administrative proceedings … ***and court actions*** in exercising [its] authority" under Section 5 "to prevent … unfair or deceptive acts or practices."  *AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 71–72 (2021).  Defendants' inapt analogy to *Atlas Roofing* fails on this basis alone.

Defendants also argue that Section 5 grants the FTC adjudicative authority that exceeds that of "courts at common law."  Dkt. 38 at 21; *see also id.* (arguing that in enacting the FTC Act, "Congress recognized the insufficiency of the common law").[10]  That argument, however,

---

[10] Defendants' argument that "courts at common law lacked [certain] equitable jurisdiction" is a tautology.  Dkt. 38 at 21.

disregards that Article III jurisdiction embraces not only common law claims but also "any matter which, from its nature, is the subject of a suit … *in equity*." *Jarkesy*, 144 S. Ct. at 2134 (quoting *Murray's Lessee*, 59 U.S. at 284).  And courts of equity granted relief that was unavailable from common law courts.

In fact, the FTC's cease-and-desist powers under Section 5 have a close relationship to the traditional powers of courts of equity, which had concurrent jurisdiction with courts of law over the torts of fraud and deceit.  Section 5's deep roots in traditional equity jurisprudence are highlighted by the dicta from *American Washboard Co. v. Saginaw Mfg. Co.*, 103 F. 281, 286 (6th Cir. 1900) on which Defendants rely.  In *American Washboard*, the court recognized that courts of equity can enjoin a party from deceiving "the public" by offering inauthentic goods, but disapproved extending that authority to extraordinarily broad relief compelling "*all persons* … to deal solely in goods which are exactly what they are represented to be."  103 F. at 286–87; *see Croft v. Day*, (1843) 7 Beav. 84, 90 (Lord Langdale) (granting an "injunction restraining the Defendant from carrying on [a] deception" of the consuming public) (AD-2); *Taylor v. Carpenter*, 23 F. Cas. 742, 744 (C.C.D. Mass. 1844) (Story, J.) (granting a perpetual injunction against defendant for "imitating and using any of the [plaintiff thread manufacturer's] labels and spools, with a view to deceive the public").[11]  Nor does Section 5 authorize the FTC to compel

---

[11] *See also*, *e.g.*, *Lawrence Mfg. Co. v. Tennessee Mfg. Co.*, 138 U.S. 537, 549–51 (1891) (citing cases upholding injunctions where the defendant perpetrated "fraud on the public and on the plaintiff" by "intentionally and fraudulently selling its goods as those of the plaintiff"); *Pillsbury-Washburn Flour-Mills Co. v. Eagle*, 86 F. 608, 615–28 (7th Cir. 1898) (citing cases embodying "the well-grounded principle … that fraud accompanied by damages is actionable at law, and that, where one person has so dressed out his goods as to deceive the public into the belief that they are really the goods of another person, and so put them upon the market, to the manifest injury of that person and of the public, an action at law will lie for the deceit, and, to save a multiplicity of suits, and prevent irreparable injury, equity will restrain such unfair and fraudulent competition"); *Von Mumm v. Wittemann*, 85 F. 966, 968 (C.C.S.D.N.Y. 1898) (granting "an injunction against the use of fraudulent labels"), *aff'd*, 91 F. 126 (2d Cir. 1898);

"*all persons* … to deal solely in goods which are exactly what they are represented to be."

*American Washboard*, 103 F. at 286.  In any event, Defendants are focused on differences in

degree, and not of kind.

Finally, Defendants argue that Section 5 reflects Congress's recognition that "'[t]here is

no limit to human inventiveness' in devising unfair practices."  Dkt. 38 at 21 (quoting *Sperry*,

405 U.S. at 240 (quoting H.R. Conf. Rep. No. 1142, 63d Cong., 2d Sess. 19 (1914))).  Of course,

the same could have been said upon the enactment of the securities laws.  Moreover, there is

nothing about that observation that the courts at Westminster or the English Court of Chancery

would have found novel in 1789, or that Article III courts would have found novel thereafter.

*See*, *e.g.*, *Mortlock v. Buller*, (1804) 10 Ves. Jun. 292, 306 (Lord Chancellor Eldon) ("The rule is,

that this Court will set aside a bargain for fraud: but the Court has never ventured to lay down, as

a general proposition, what shall constitute fraud.") (AD-6); *The Law of Fraud*, ch. I § 2 at 14

("Fraud is so multiform as to admit of no [set] rules or [precise] definitions; and hence equity

leaves the way open to punish frauds, and redress wrongs perpetrated by means of them, in

whatever form they may appear.") (AD-10); *see also supra* at 8.

## C.    *Jarkesy* Forecloses the Commission's<br>Invocation of the "Public Rights" Exception

Defendants' principal argument for dismissal of Meta's Article III claim is that the

Commission's adjudication of Section 5 claims for "unfair or deceptive acts or practices" falls

within the "public rights" exception to Article III adjudication (which also serves as an exception

---

*Hostetter Co. v. Brueggeman-Reinert Distilling Co.*, 46 F. 188, 189 (C.C.E.D. Mo. 1891) ("The
defendant cannot shield itself from an injunction by the plea that it has not itself sold a spurious
article in a false dress.  The fact that it has advised its customers to perpetrate a fraud of that
description, and that it has furnished them the spurious article, and that some of its customers
have probably acted on the suggestion, is sufficient to render them liable to an injunction.").

to the Seventh Amendment).  But Defendants' argument is squarely foreclosed by the Supreme

Court's holding in *Jarkesy* as to the "'public rights' exception to Article III jurisdiction," 144 S.

Ct. at 2127, which confirms that Meta's Article III claim is meritorious.  *Jarkesy* emphasized that

this analysis holds true whether "the subject of a suit [is] at the common law, or in equity, or

admiralty."  *Id*. at 2134.

### 1.     Adjudication of Section 5 Claims Does Not Fall Within *Jarkesy*'s Narrow "Public Rights" Exception

Post-*Jarkesy*, the "public rights" exception is limited to matters that "historically could

have been determined ***exclusively*** by the executive and legislative branches."  *Jarkesy*, 144 S. Ct.

at 2132–33.  "Even with respect to matters that arguably fall within the scope of the 'public

rights' doctrine, the presumption is in favor of Article III courts."  *Id.* at 2134.

*Jarkesy* directly undermines this Court's prior reliance on *Atlas Roofing* as "binding

Supreme Court precedent that forecloses [Meta's Article III] claim."  Dkt. 31 at 39.  Following

*Atlas Roofing*, this Court concluded that a Section 5(a) claim was "unknown to the common law,

[*Atlas Roofing*, 430 U.S.] at 461, because it 'prevent[s]' business from using unfair or deceptive

acts or practices, 15 U.S.C. § 45(a)(2), before those practices result in harm to consumers."  Dkt.

31 at 40; *see also id.* at 38–39 (observing that a Section 5 violation "deviates in at least one

material respect from the common law torts of fraud and deceit"—namely, that "the common

law tort requires that a victim be harmed, whereas a violation of the FTC Act does not").  But

*Jarkesy* expressly recognized a "close relationship between federal securities fraud and common

law fraud" notwithstanding that "[c]ourts have . . . not typically interpreted federal securities

fraud to require a showing of harm to be actionable by the SEC."  144 S. Ct. at 2131.

In addition, this Court quoted *Atlas Roofing* for the proposition that "public rights are

implicated in 'cases in which the Government sues in its sovereign capacity to enforce public

rights created by statutes within the power of Congress to enact.'"  Dkt. 31 at 37–38 (quoting *Atlas Roofing*, 430 U.S. at 450).  But, again, the Supreme Court in *Jarkesy* rejected that the government's role as "the party prosecuting th[e] action" was sufficient to implicate the public rights exception, as well as the notion that the "constitutionally relevant distinction" is that the issue "has been assigned to a federal agency to enforce."  144 S. Ct. at 2136 ("Again, what matters is the substance of the suit, not where it is brought, who brings it, or how it is labeled."). Nor does the conclusion that a statute was "within the power of Congress to enact" (Dkt. 31 at 37–38) support the application of the public rights exception under *Jarkesy*, *see Jarkesy*, 144 S. Ct. at 2136 ("Nor does the fact that the SEC action 'originate[d] in a newly fashioned regulatory scheme' permit Congress to siphon this action away from an Article III court.") (quoting *Granfinanciera*, 492 U.S. at 52); *see also id.* at 2133 n.1 (rejecting the dissent's "assert[ion] that *Oceanic Steam Navigation* [*Co. v. Stranahan*, 214 U.S. 320 (1909)] stands for the proposition that the public rights exception applies to any exercise of power granted to Congress").

Defendants urge the Court to continue to follow *Atlas Roofing* notwithstanding that "*Jarkesy* was critical of the dissent's broad reading of *Atlas Roofing*."[12]  Dkt. 38 at 23 n.5. Defendants are engaged in wishful thinking.  The effect of *Jarkesy* on *Atlas Roofing* is ***not*** a mere matter of the Supreme Court's majority criticizing the dissent.  To the contrary, the *Jarkesy* Court criticized *Atlas Roofing* directly, describing it as "a departure from our legal traditions," and definitively rejected application of its holding or reasoning to anything other than the OSH Act claims it resolved.  144 S. Ct. at 2137–39 & n.3–4.  Indeed, *Jarkesy* left open the possibility

---

[12] Tellingly, however, Defendants abandon this Court's pre-*Jarkesy* reasoning that *Atlas Roofing* is "binding Supreme Court precedent that forecloses [Meta's Article III] claim."  Dkt. 31 at 39.  Defendants obviously recognize that *Jarkesy*, in fact, undermines this Court's previous reliance on *Atlas Roofing*.  *See supra* at 7, 21–22.

that *Atlas Roofing* may have been overruled by *Granfinanciera*, *see id.* at 2137 & n.3, and plainly limits *Atlas Roofing* to its facts, *see id.* at 2138 ("The reasoning of *Atlas Roofing* cannot support any broader rule.").  Under these circumstances, the Defendants' urging that the Court rely on *Atlas Roofing* (Dkt. 38 at 23 n.5) is an invitation to commit error.

Here, the object of an FTC action, like the object of the SEC action in *Jarkesy*, is to regulate transactions between ***private*** market participants.  *See* 144 S. Ct. at 2136.  Indeed, the Commission purports to act against Meta to protect private consumers against alleged deception and misrepresentations—precisely as the SEC purported to do in *Jarkesy*.  *Compare, e.g.*, OTSC at 13 (attempting to justify proposed FTC order as "provid[ing] enhanced protections for consumers" in light of purported "misrepresentations") *with Jarkesy*, 144 S. Ct. at 2126 ("According to the SEC, Jarkesy and Patriot28 misled investors" including "by misrepresenting the investment strategies that [they] employed").

In a distraction, Defendants invoke the D.C. Circuit's statement in *Holloway*, in support of its conclusion that no private right of action can be inferred from Section 5, that "[i]t was never the intention of Congress that the Commission should be a forum where private disputes or controversies between competitors should be settled."  Dkt. 38 at 22 (quoting 485 F.2d at 1000 n.63).  But Defendants improperly conflate a private right of action with private rights as construed by the Supreme Court.  Again, for Article III purposes, "what matters is the substance of the suit, not where it is brought, who brings it, or how it is labeled."  *Jarkesy*, 144 S. Ct. at 2136.  The D.C. Circuit's refusal to infer a private right of action does not change "the substance of the suit" and, indeed, it was in *Holloway* that the D.C. Circuit explained that Section 5

"superimposed a structure of Federal law upon the existing system of common law remedies for fraud and deceit."  485 F.2d at 989.[13]

Against this backdrop, Defendants make no serious attempt to show that Section 5 gives rise to "public rights" under *Jarkesy*.  With good reason.  A Section 5 claim bears no resemblance to "cases involving the collection of revenue," "immigration," "foreign commerce," "relations with Indian tribes," "the administration of public lands," or "the granting of public benefits such as payments to veterans, pensions, and patent rights" catalogued in *Jarkesy*.  *Id.* at 2132–33.  Defendants do not—because they cannot plausibly—argue that Section 5 of the FTC Act governs a field over which the political branches "traditionally held ***exclusive*** power … and had exercised it."  *Id.* at 2133.  Likewise, Defendants do not identify any "centuries-old rules" supporting administrative determination of deception and unfairness claims.  *Id.* at 2134.  And Defendants do not deny that the object of an FTC adjudication of a Section 5 claim is to regulate transactions between ***private*** market participants.  *See id.* at 2136.  Nor do defendants attempt to overcome *Jarkesy*'s presumption that Article III courts adjudicate public rights—a presumption that they do not even acknowledge.

Instead, Defendants principally seek to avoid *Jarkesy*—thus implicitly confirming that *Jarkesy* forecloses their public rights arguments.

### 2.    Defendants' Attempts to Distinguish *Jarkesy* Fail

Defendants assert that *Jarkesy* applies only to adjudication of claims that "implicate the right to a jury trial."  Dkt. 38 at 19; *see also id.* at 20 (attempting to distinguish *Jarkesy* as

---

[13] Similarly, Defendants quote dicta in *American Airlines v. North American Airlines*, 351 U.S. 79, 83, 85–86 (1956) that "the FTC Act does not 'vindicate private rights,' as the Act is concerned 'with protection of the public interest,' not 'punishment of wrongdoing or protection of injured competitors.'"  Dkt. 38 at 22.  But *American Airlines* is unavailing to Defendants.  That decision did not involve any question under Article III, and its reasoning is otherwise inapt.

involving civil penalties).  While Meta also has a jury trial right, *see infra* Point III, Meta's invocation of *Jarkesy* in support of its Article III claim in no way depends on its right to a jury trial.

Indeed, Defendants' proffered distinction of *Jarkesy* as dependent on a Seventh Amendment right is untenable because there is no public rights exception to the Seventh Amendment **separate** from the public rights exception to Article III adjudication.  To the contrary, in *Jarkesy* the Supreme Court expressly framed the relevant issue as "whether the 'public rights' exception ***to Article III jurisdiction*** applies."  144 S. Ct. at 2127.  Further, many of the leading public rights precedents—including *Northern Pipeline* and *Stern v. Marshall*— presented no Seventh Amendment issue.[14]  *See N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982); *Stern v. Marshall*, 564 U.S. 462 (2011).

Defendants also seek to distinguish *Jarkesy* on the ground that "the statute in *Jarkesy* was barely over a decade old" whereas "the FTC has adjudicated claims regarding unfair or deceptive business practices … for over a century."  Dkt. 38 at 21.  But *Jarkesy* rejected the notion that "practice could transmute a private right into a public one" or that "the absence of legal challenges brought by one generation could waive the individual rights of the next."  144 S. Ct. at 2134 n.2.  And Defendants disregard the long tradition of judicial determination of "claims regarding unfair or deceptive business practices" prior to Section 5.  *See supra* at 7–9.

_____

[14] Moreover, in *Crowell v. Benson*, the Supreme Court summarily rejected the Seventh Amendment claim before reaching the Article III claim.  *See* 285 U.S. 22, 45 (1932) (reasoning that because the claims at issue "are within the admiralty jurisdiction, the objection raised by the respondent's pleading as to the right to a trial by jury under the Seventh Amendment is unavailing").

Defendants' reliance on *Atlas Roofing* in their Article III argument (as an authority on which they chiefly rely, no less) undermines their suggestion that *Jarkesy* is inapplicable because (like *Atlas Roofing*) it addressed a Seventh Amendment claim.  As shown herein, however, *Atlas Roofing* is otherwise unavailing to Defendants in *Jarkesy*'s wake.

Defendants erroneously insist that "the Supreme Court has reaffirmed the Commission's authority [to adjudicate Section 5 claims] many times," citing cases having no relevance to the issue at hand.  Dkt. 38 at 21 (citing *AMG Cap. Mgmt.*, 593 U.S. at 71–72; *Colgate-Palmolive*, 380 U.S. at 384–85; and *Jacob Siegel Co. v. FTC*, 327 U.S. 608, 612–14 (1946)).  None of these cases involved a challenge to the Commission's statutory authority to adjudicate Section 5 claims, much less to the conformity of administrative adjudication with Article III.  In *AMG*, the Supreme Court held that the Commission ***lacks*** authority to obtain monetary relief ***in court*** under Section 13(b) of the FTC Act.  Defendants tenuously latch onto the *AMG* Court's overview of the FTC Act, which merely notes that the statute allows the Commission to adjudicate Section 5 claims and bring them in federal court.  In *Colgate-Palmolive*, the Supreme Court upheld a single Commission adjudication against an attack that the Commission erred in its specific application of Section 5 to commercials for shaving cream.  And in *Jacob Siegel*, the Supreme Court held that control of a remedy for a Section 5 violation did ***not*** "lay exclusively with the Commission," and that a reviewing court of appeals' "power to modify [an FTC order] extends to the remedy."  327 U.S. at 610–11.

Because none of these precedents cited by Defendants entailed any challenge to the Commission's authority to adjudicate alleged violations of Section 5, the Supreme Court did not affirm (or "reaffir[m]") that authority in any sense meaningful to Meta's Article III challenge.  Under these circumstances, it is not surprising that, as Defendants irrelevantly trumpet, "*Jarkesy* does not purport to overturn these well-established precedents."  Dkt. 38 at 21.  Needless to say, *Jarkesy* had no occasion to overrule, for example, *AMG*'s holding that the Commission lacks power to seek monetary relief in court under Section 13(b).

26

**3.      Defendants' Litigation Choices Undermine Their Position
That *Jarkesy* Does Not Support Meta's Article III Claim**

Moreover, Defendants assert ***for the first time*** that the Supreme Court recognized in

*Crowell v. Benson* "that the public rights doctrine permits ***FTC adjudication***."  Dkt. 38 at 20–21

(citing *Crowell v. Benson*, 285 U.S. 22, 50–51 & n.13 (1932)).  Defendants did not advance that

position in their pre-*Jarkesy* briefing before this Court (Dkts. 18, 22, 25) or in their pre-*Jarkesy*

adjudication of a similar Article III challenge in *Intuit*.  *See In re Intuit Inc.*, 2024 WL 382358, at

*55–56 (F.T.C. Jan. 22, 2024).  If the Supreme Court had, in fact, recognized "that the public

rights doctrine permits FTC adjudication," surely Defendants would have said so previously.

Their newfound reliance on dicta in a footnote in *Crowell* is nothing more than a post-*Jarkesy*

Hail Mary pass.

In *Crowell*, the Supreme Court described *International Shoe v. FTC*, 280 U.S. 291

(1930), in passing as an example of an agency determining matters "which arise between the

government and persons subject to its authority" pursuant to "the exercise of the congressional

power as to interstate and foreign commerce, taxation, immigration, the public lands, public

health, the facilities of the post office, pensions, and payments to veterans."  *Crowell*, 285 U.S. at

50–51 & n.13.  That dicta is unavailing to Defendants for two principal reasons.  First,

*International Shoe* involved adjudication under Section 7 of the Clayton Act.  *See* 280 U.S. at

293.  Therefore, neither *International Shoe* (which did not address Article III) nor *Crowell*

(which involved the Longshoremen's and Harbor Workers' Compensation Act) spoke to

Section 5 of the FTC Act.

Second, any reading of *Crowell*'s dicta broad enough to reach adjudication of Section 5

claims by the Commission cannot be reconciled with *Jarkesy*.  Under *Jarkesy*, it is not

dispositive to the Article III analysis whether a matter "arise[s] between the government and

persons subject to its authority." *Crowell*, 285 U.S. at 50.  *Jarkesy* expressly rejected the

propositions that a public right is involved because "the SEC action originated in a newly

fashioned regulatory scheme" or because "the Government is the party prosecuting this action,"

reasoning that "what matters is the substance of the suit, not where it is brought, who brings it, or

how it is labeled."  144 S. Ct. at 2136.  As shown above, Section 5 regulates ***private*** transactions.

*See supra* at 23–24.  And *Jarkesy* held that the securities fraud claims at issue, which entailed the

exercise of Congress's interstate commerce power, did not qualify for the public rights

exception.  *See id.* at 6–7.

### III.    Meta's Complaint States a Claim Under the Seventh Amendment to the U.S. Constitution

Defendants renew their motion to dismiss Meta's Seventh Amendment claim, arguing

that *Jarkesy* "does not affect the outcome" of that claim because "the only remedy the FTC seeks

here— prospective changes in conduct—is injunctive in nature" and therefore outside the

Seventh Amendment.  Dkt. 38 at 7.

As shown above, the underlying Section 5 claim grew from common law "soil."  *Jarkesy*,

144 S. Ct. at 2130.  And while any new administrative order arising in the OTSC proceeding

cannot include civil penalties, that proceeding is governed by a statutory scheme that provides

for the future imposition of civil penalties.  *See* 15 U.S.C. § 45(l); Dkt. 38 at 10–11.  Indeed, the

entry of a Commission order is an essential element of any claim for civil penalties under Section

45(l).  Having conceded that *Jarkesy* requires a jury trial for any claim with common law soil

that bears civil penalties, Defendants fail to explain how an essential element of such a claim can

be established administratively.

At the same time, the Commission is adjudicating Meta's contract rights in the OTSC

proceeding and has proposed to enter an order declaring Meta's rights under the 2020 Order,

including contract rights.  Meta does not take issue with this Court's reasoning that under established Supreme Court precedent, the 2020 Order is an order and not purely a contract.  *See* Dkt. 31 at 40–41 & n.8.  But that same binding precedent confirms that Meta has contract rights under that agreed order.  Indeed, the D.C. Circuit has held that agreed FTC orders give rise to "enforceable right[s]" against ***both*** parties, backed by "consideration," that the Commission "may not unilaterally obliterate."  *Elmo Div. of Drive-X Co. v. Dixon*, 348 F.2d 342, 345–46 (D.C. Cir. 1965).

Defendants have not rebutted Meta's showing that the Seventh Amendment assigns the declaration of contract rights to a jury.  *See NACM-New Eng., Inc. v. Nat'l Ass'n of Credit Mgmt., Inc*., 927 F.3d 1, 8 (1st Cir. 2019).

## IV.    Meta's Structural Constitutional Claims Are Not Waived or Estopped

In its decision on Defendants' prior motion to dismiss, the Court rejected Defendants' arguments that by consenting to the 2012 Order and 2020 Order, Meta had waived its structural constitutional objections to the OTSC and is judicially estopped from asserting them.  Dkt. 31 at 26–28.  To the extent that Defendants are renewing their prior arguments, the Court should reject the arguments for the reasons it did previously.  Indeed, because "[a]n effective waiver of a constitutional right is the intentional relinquishment or abandonment of a known right," "[c]ourts indulge every reasonable presumption against waiver of fundamental constitutional rights." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 682 (1999).

If anything, Defendants' arguments are even weaker now after the Supreme Court's decision in *Jarkesy*.  *See*, *e.g.*, *Biomedical Pat. Mgmt. Corp. v. Cal. Dep't of Health Servs.*, 505 F.3d 1328, 1342 (Fed. Cir. 2007) (holding that any "inconsistency is excused by an intervening change in the law"); *Holzsager v. Valley Hosp.*, 646 F.2d 792, 796 (2d Cir. 1981) ("In any event a party cannot be deemed to have waived objections or defenses which were not known to be

available at the time they could first have been made, especially when it does raise the objections

as soon as their cognizability is made apparent."); *see also FEC v. Legi-Tech, Inc.*, 75 F.3d 704,

706–07 (D.C. Cir. 1996) (noting that "waiver is not automatic" and that the district court had

"substantial discretion" under the Federal Rules to consider a claim not raised in a party's answer

where the party argued that its waiver was excused by a "new rule of law").[15]

---

[15] Defendants quote language in which the D.C. Circuit noted that Meta had not explained in its procedural motion whether 16 C.F.R. § 2.32(c)—which requires that "*[e]very agreement in settlement of a Commission complaint*" provide that the consent order "may be altered, modified or set aside in the same manner provided by statute for Commission orders issued on a litigated or stipulated record—applies to the 2020 Order.  Dkt. 38 at 24–25.  But Meta had no occasion to address that issue before the D.C. Circuit because it had prevailed on Defendants' waiver and estoppel challenges before this Court, and Defendants had not raised those challenges before the D.C. Circuit.

Indeed, the government did not advance Rule 2.32(c)—or affirmative consent to modification more generally—before the D.C. Circuit, in prior proceedings before this Court, or in opposing Meta's motion to enforce before Judge Kelly.  Nor does it do so here.  With good reason.  Rule 2.32(c) indisputably does not apply to the 2020 Order.  The parties' 2019 settlement does not include the language that Rule 2.32(c) requires.  As the government correctly argued before Judge Kelly in 2020, the consent order procedures in subpart C (in which Rule 2.32 appears) were inapplicable because "there was no *administrative* complaint to settle; rather, the proposed settlement would resolve a complaint filed in *this Court* by the United States."  FTC Surreply to EPIC, *United States v. Facebook*, Inc., No. 19-cv-02184 (D.D.C. Jan. 24, 2020) (Dkt. 27) at 7–8 (emphasis in original).

## <u>CONCLUSION</u>

For the foregoing reasons, Meta respectfully requests that the Court deny the FTC's

renewed Motion to Dismiss.

DATED: September 13, 2024                    Respectfully submitted,

*/s/  James P. Rouhandeh*

_____
James P. Rouhandeh (DDC Bar No. NY0390)
Michael Scheinkman (DDC Bar No. NY0381)
David B. Toscano (*pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Tel: (212) 450-4000
rouhandeh@davispolk.com
michael.scheinkman@davispolk.com
david.toscano@davispolk.com

Paul J. Nathanson (DDC Bar No. 982269)
DAVIS POLK & WARDWELL LLP
901 15th Street, NW
Washington, DC 20005
Tel: (202) 962-7000
paul.nathanson@davispolk.com

*Counsel for Plaintiff Meta Platforms, Inc.*