**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| META PLATFORMS, INC., | |
| Plaintiff, | |
| v. | |
| THE FEDERAL TRADE COMMISSION, | Case 1:23-cv-03562-RDM |
| – and – | |
| LINA M. KHAN, REBECCA KELLY SLAUGHTER, and ALVARO BEDOYA, in their official capacities as Commissioners of the Federal Trade Commission, | |
| Defendants. | |

**ADDENDUM TO PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS' RENEWED MOTION TO DISMISS**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
212-450-4000

*Attorneys for Plaintiff Meta Platforms, Inc.*

## <u>INDEX OF ADDENDUM</u>

<u>CASES</u>

TAB

*Bath and Mountague's Case,*
     (1693) 3 Chan. Cas. 55  ................................................................. AD-1

*Croft v. Day,*
     (1843) 7 Beav. 84 ........................................................................... AD-2

*Doe v. Martin,*
     (1790) 4 TR 39 ............................................................................... AD-3

*Earl of Chesterfield v. Janssen,*
     (1750) 2 Ves. Sen. 125 ................................................................... AD-4

*Furnis v. Leicester,*
     (1618) Croke, Jac. 474 ................................................................... AD-5

*Mortlock v. Buller,*
     (1804) 10 Ves. Jun. 292 ................................................................. AD-6

*Pasley v. Freeman,*
     (1789) 3 TR 51 ............................................................................... AD-7

*Popham v. Eyre,*
     (1831) Lofft 786 ............................................................................. AD-8

## <u>EXCERPTS OF OTHER AUTHORITIES</u>

Henry Ballow & John Fonblanque, *Treatise of Equity* (1793)  ............................................ AD-9

Melville M. Bigelow, *The Law of Fraud and the
Procedure Pertaining to the Redress Thereof* (1877) ................................................... AD-10

III William Blackstone, *Commentaries on the Laws of England* (1768) ............................ AD-11

II W. Blake Odgers & Walter Blake Odgers,
*The Common Law of England* (2d ed. 1920) ................................................................. AD-12

1 Joseph Story, *Commentaries on Equity Jurisprudence:
As Administered in England and America* (1st ed. 1836) ............................................. AD-13

# AD-1

Case 1:23-cv-03562-RDM   Document 41-1   Filed 09/13/24   Page 4 of 176

DIE VENERIS, 19 Junii 1685.

The Decree affirmed in Chancery.

After hearing Counsel two several Days upon the Petition and Appeal of *Charles Howard*, Esq., shewing, That his Father intended a Provision for his younger Children, by Deed, made by Advice of Eminent Counsel, and did settle the Barony of *Grostock*, and other Lands, of the Value of five hundred Pounds *per Annum*, in Trustees, in Order thereunto ; and that after a long Suit in Chancery, wherein the Petitioner was Plaintiff, against his Grace the late Duke of *Norfolk*, the Marquess of *Dorchester, Henry* Lord *Mowbray*, and *Richard Marriot*, Esq., Defendants, the Cause coming to be heard before the Lord Chancellor *Nottingham*, on the 17th of *June* in the four and thirtieth Year of his late Majesty's Reign, of Glorious Memory ; who after several Days Hearing, did declare his Opinion to be, That the Petitioner had a good Title to the Barony of *Grostock* and other the Lands in Question ; and decreed the Defendants to account to him for the Profits thereof by them received after the Death of *Thomas*, late Duke of *Norfolk* ; which Decree was signed and inrolled, and the Petitioner actually vested in the Possession of the said Manors and Premisses ; and further sheweth, That the Defendants, the late Duke of *Norfolk*, the Lord *Mowbray*, now Duke of *Norfolk*, and *Richard Marriot*, exhibited a Bill of Review into the High Court of *Chancery*, for reversing the said Decree ; to which the Petitioner put in a Plea, and Demurrer : Which being argued on the 15th of *May* in the five and thirtieth Year of the Reign of our late King *Charles* the Second, before the Right Honourable the Lord Keeper of the Great Seal of *England*, who after hearing Counsel on both Sides, over-ruled the said Plea and Demurrer, and reversed the Decree aforesaid ; and ordered a Writ or Writs of Restitution to be directed to the Sheriffs of *Cumberland* and *Westmorland*, to put the Plaintiffs in the Bill of Review in Possession ; which accordingly was done, as in the Petition, amongst other Things, is suggested ; and prayed a Reversal of the last Decree ; as also upon Answer of the Right Noble *Henry* Duke of *Norfolk*, Earl Marshal of *England*, and *Richard Marriot*, Esq., put in thereunto. And after due Consideration had of what was offered at the Bar [54] by Counsel on either Part thereupon, it was ordered and adjudged by the Lords Spiritual and Temporal, in Parliament assembled, That the said Decree made in the High Court of *Chancery*, on the 15th of *May* in the five and thirtieth Year of the Reign of the late King *Charles* the Second of Glorious Memory, in Behalf of the late Duke of *Norfolk*, and *Richard Marriot*, Esq., be and is hereby reversed ; and that the Decree made in the said Court of *Chancery*, on the 17th of *June* in the four and thirtieth Year of his late Majesty's Reign, in Behalf of *Charles Howard*, Esq., the now Petitioner Be, and Is hereby affirmed.

JOHN BROWNE, *Cler. Parl.*

[55] THE ARGUMENTS OF THE LORD KEEPER SOMERS, THE LORD CHIEF JUSTICE HOLT, LORD CHIEF JUSTICE TREBY, AND MR. BARON POWEL, WHEN THEY GAVE JUDGMENT FOR THE EARL OF BATH.

DIE MARTIS, 12 Decembris 1693.   In the Middle Temple-Hall, *Com'* MOUNTAGUE *& alii vers. Com.* BATHEN. *& al', & econ'.*

This Day being appointed by my Lord Keeper to hear the Opinions of the two Chief Justices, and Mr. Baron *Powel*, who assisted at the Hearing of this Cause, and to deliver his Lordship's own Judgment therein ; Mr. Attorney General moved on the Behalf of the Earl of *Mountague, &c.*, for the Judgment of the Court ; and Mr. Baron *Powel* delivered his Opinion first.

Mr. Baron *Powel*. The Question in this Case is, Whether there be any Ground

in Equity, to set aside a Deed of Release, made in *July* 81, for the Settlement of the late Duke of *Albemarle's* Estate, [56] by which my Lord of *Bath* claims. The Validity of this Deed hath been tried at Law upon an Ejectment in the Court of *King's Bench*, by Direction of this Court, where the Title has been found for the Earl of *Bath* by the Strength of this Deed : So that it must be agreed my Lord of *Bath* hath a good Title at Law, because the Verdict hath found it so, and all Parties concerned have hitherto acquiesced under this Verdict.

This Case comes now back upon the Equity reserved, and it is only now to be considered, what Matters of Equity have been offered to avoid this Title thus found at Law. And those I think may be reduced to five Heads.

*First*, That this Deed was obtained by Surprize and Circumvention.

*Secondly*, That it was a concealed and a forgotten Deed.

*Thirdly*, That this is a Deed attendant upon a Will, and so revocable in its own Nature, although it had no Power of Revocation in it.

*Fourthly*, That there is an implied Trust in this Deed, that the Duke might have charged the Estate to the full Value, and consequently might well dispose of it in Equity.

*Fifthly*, That the great Solemnity and Deliberation used about making the last Will, and the Publishing that Will, do amount to a Revocation in Equity, notwithstanding that the Circumstances of the Power are not strictly pursued.

I am of Opinion in this Case, that this Deed having been affirmed by a Verdict upon a solemn Trial at the Bar at Law, none of these Matters are sufficient for to ground a Decree in a Court of Equity, to set aside this Deed ; and I shall give you my Reasons for this Opinion in the same Order I mention'd those Heads in, with particular Answers to the particular Objections under each Head.

1. It is said, This is a Deed that was obtained by Surprize and Circumvention. Now I perceive this Word *Surprize* is of a very large and general Extent. They say, if the Deed be not read to, or by the Party, that is a *Surprize* : Nay, the Mistake of a Counsel, that draws the Deed either in Misrecitals, or other Things, that is a *Surprize* of a Counsel, and the *Surprize* of the Counsel must be interpreted the Surprize of the Client. These Things have been urged in this Case, and I thought fit to mention them for the Introducing my Reason against this Head of Argument : And it is this :

That if these Things be sufficient to let in a Court of Equity to set aside Deeds found by Verdict to be good in Law, then no Man's Property can be safe : I hardly know any *Surprize* that should be sufficient to set aside a Deed after a Verdict, unless it be mixed with Fraud, and that expresly proved ; and I know not of any such proved in this Case.

It is true, Duke *George* by his Will, and the Settlement made upon his Son at his Marriage, takes no Notice of, nor makes any [57] Provision for the Earl of *Bath* ; but that, I take it, is not to be regarded as any Way material at all, because he takes no Notice, in either of them, of any Body else but him that was his Heir. But I must observe here by the Way, that there was not only a very near Relation between Duke *George* and the Earl of *Bath*, but a very intimate Friendship cultivated by mutual Offices of Kindness between them to his Death. And I must mention one Particular, because to me it seems a clear Answer to this Objection, that is, his Making no Provision for the Earl in the Will, or Settlement, might be the Occasion why Duke *George* did make such an earnest Application to King *Charles* the Second, that upon Failure of his Issue Male, his Majesty would be pleased to bestow the Dukedom upon the Earl, and annex *Theobalds* to it, which would then revert to the Crown. And that King did often promise he would, and afterwards did it solemnly under the Sign Manual.

But then it is said, that after this D. *Christopher* made his Will, and therein there is no Notice taken of any such Disposition of his Estate to the Earl of *Bath* ; but that is not, I think, to be regarded neither, because that was a Will only of his Personal Estate, and made when he was under Age, and could not dispose of his Real Estate.

Then come we to the Year 1675, when the Will was made, to which this Deed has some Relation, and by that Will D. *Christopher* doth settle a great Part of his Estate, upon Failure of Issue of his own Body, upon my Lord of *Bath*. There is no Pretence of any Surprize upon the Duke when he made his Will, and it is plain then he had an Intention that my Lord of *Bath* should have a great Share in his Estate, if he died without Issue.

Now then it is to be considered what there is of Proof in this Case, of any Thing that might be a Ground to conceive why he should alter this Intention between the

Years 1675 and 1681, when this Deed was made. There is no Proof of any Misunderstanding between the Duke and the Earl in that Interval; but on the contrary, that there was a continual Friendship and Intercourse of Kindness between them all the while, as doth appear by a continual Succession of Letters and other Correspondencies passing between them in those Years, one of which I cannot chuse but take Notice of, because of the Date to it, to wit, in *June* 1681, upon my Lord *Landsdown*'s Intention to travel; wherein the Duke takes Notice of the Interest he had in my Lord of *Bath*'s Family, and particularly in his eldest Son, as the greatest, next to that of the Earl himself: And, I say, I mention this Letter because of the Date, that it is so very near the Date of the Deed, that it is possible the Deed was then made, because it was, within a Month after that Letter, sealed and executed; therefore it might well be referred to in it.

[58] Next this appears to be a Deed drawn by the D. of *Albemarle*'s own Counsel, Sir *Thomas Stringer*; for it is proved the Paper-draught is all of his Son's Handwriting, except the first and last Sheet, and all of it interlined with Sir *Thomas* his own Hand: *Errington* has proved the Abstract of all Sir *Thomas* his Hand, with the very Date in it, and swears that Sir *Thomas* examined it with him. Now is it to be imagined that Sir *Thomas Stringer* should prepare such a Settlement for the Duke to execute, without any Order or Instructions from him about it? No, certainly that can't be thought. But they say Sir *Thomas Stringer*, if he did draw it, might forget it, or overlook it, and he now denies any Knowledge of it. Truly I cannot value much what Sir *Thomas Stringer* has sworn in this Case, he is not consistent with himself, and makes but a very odd Figure in the Cause.

Mr. *Stringer.* My Lord, I beg your Pardon for interrupting Mr. Baron *Powel,* but I must vindicate my Father; he never swore a Word in this Cause.

*Lord Keeper.* No, he did not, he was dead before the Cause came into Court. That was a Mistake.

Mr. Baron *Powel.* I am sure there was Oath of what he had said about this Deed.

Mr. *Stringer.* That, my Lord, you may make what you please of, but he never made any Oath in the Cause.

Mr. Baron *Powel.* But that which I mention him for, was, that there is Proof apparent that he was advised with about this Deed; and he was the Duke's constant Counsel. I do not think, I confess, that Sir *William Jones* did draw this Deed; it is not insisted upon by the Counsel of my Lord of *Bath* that he did; and any one that considers the Frame of it will think as I do. But I conceive he was advised with upon the Proviso, and the Writing in the Margent against the Proviso; I approve of this Proviso, I believe it to be his Hand, tho' several Persons of good Credit, that were well acquainted with his Hand, have sworn they believe it not to be his Hand. But they might be mistaken, and to me it appears by the Comparison of the Records, Deeds and Papers in open Court; for it is plain, according to the various Nature of the several Things he writ, or set his Hand to, he did write several Hands, and particularly wrote his Name sometimes one Way, and sometimes another. And therefore upon Comparison of that with other Papers, I do believe it to be his Hand.

The next Thing I would mention is this; here are six subscribing Witnesses to the Sealing and Executing of this Deed at *Albemarle* House, of which Sir *William Jones* was one: And one *Alleman,* that is one of the Witnesses, swears, that when the Duke delivered the Deed to the Earl of *Bath,* he wished he could have done more for him. It was probable then the Duke believed he had done something for him; and it is very probable too, he knew what he had done for him, when he wished he was [59] able to have done more. And Mr. *Prideaux* swears (tho' he does not exactly fix the Time) that the Duke told him himself, he had settled his Estate upon the Earl of *Bath.* Then I say, it is hard to believe the Duke was surprized in making this Deed, when his own constant Counsel drew it, so able a Counsel perused and approved so main a Part of it, and was present at the Execution of it, and he should express his Wishes to be able to do more, can he be supposed not to know what he did?

But now let us examine the Evidence and Objection on the other Side: They said it doth not appear that this Deed was ever read to the Duke, or by him. It is indeed proved, the last Will was read to him by my Lord Ch. Justice *Pollexfen,* but not at the same Time of the Executing of it. But however I think the not reading of a Deed to, or by the Party that executes it, is a very slender Objection to make out a Surprize, so as to set it aside. That would shake many a Conveyance; I doubt it

would shake many Deeds that were made and executed by the Duke. For tho' he was so cautious as some of their Witnesses say, that he would not execute any Deeds, but what his Counsel set their Hands to, yet I do not find that any of them used to be read to him, or he himself read them at the Time he sealed them. Therefore it is a dangerous Doctrine to set aside a Deed upon such an Account. Some People will not have Leisure to hear Deeds read, or read them themselves.

Then they object the Mistakes and Misrecitals of the Limitations of the Will in the Deed, which refers to the Will, as particularly that of *Norton Disney*, and some others of less Moment: But God forbid that the Mistake of a Counsel in a Recital in a Deed should be of that great Moment, as to set aside the Deed when executed by the Party.

But there is another Matter much insisted on by them as an Argument of Surprize; that is, this Deed is pretended to be made in Confirmation of the Will in 75, and yet it varieth from that Will in almost all the Limitations of the Estates, except in some Part of that to my Lord of *Bath*. I confess I have looked over the Variations, and there are several, but I have this in general to say to it, that I take it this Deed was made for the Sake of the Earl of *Bath*; and that it was for the Earl's better Security, that he bound himself up by so strict a Proviso not to revoke. And if you look into the Deed, it will be found to confirm the Will as to my Lord of *Bath*, which was the main Point of both Deed and Will. For it sets the Estate given to him upon a firmer Foot than it was by the Will, which was revocable in its Nature: Therefore it must be intended, as no Doubt it was, for that very Purpose to secure it more to my Lord of *Bath*, than it was by the Will.

But that, which is said to be an Argument of the greatest Weight and Moment in this Matter, that there must be *Surprize* [60] in the Case, is this; it is hardly to be believed, and almost impossible, that the Duke should send for Mr. *Monk* out of *Holland*, by his Will desire the King to bestow upon him the Barony of *Potheridge*, the ancient Seat of the Family, make a Disposition of his Estate by a Will so solemnly prepared and deliberated upon, take Care to have three Parts of it; one whereof was to be transmitted to the Dutchess of *Newcastle*, another Part delivered by himself to Mr. *Monk*, and the third Part taken with him to *Jamaica*, and there pulled out and declared to be his Will, and yet intend no real Disposition of his Estate by all this. These are Things so dishonourable to the Duke, that they are not easily to be believed of a Man of his Honour and Quality.

I confess this is an Objection of great Weight, and carrieth much Presumption with it, but it is Presumption only, which how far it shall conclude against a Verdict, is left to Consideration. But besides, I would put the Case upon a like Bottom of Presumption the other Way, and then see what we shall make of it. Duke *George* prevails with K. *Charles* II. to promise to make the Earl of *Bath* Duke of *Albemarle*, upon his Failure of Issue Male: Duke *Christopher*, when he comes of Age, doth make a Settlement of his Estate upon the Earl of *Bath* upon Failure of Issue of his Body. The Earl of *Bath* is a Person that doth heap Obligations upon both Dukes and their Family, is Assistant to the Duke both in the Purchase and Sale of *Albemarle* House, is continually the chief Person concerned in all his Affairs, nothing almost is done without him. There is no Proof of any Misunderstanding, or Ground for any, between them. Nay, it was the Report in the Family, that if the Duke died without Issue, the Earl of *Bath* was to have the Estate: He and Sir *Walter Clarges* are the Duke's near Relations; whereas Mr. *Monk*, that I said, is not in the Case proved to be at all a-kin to him; and so we must not make him to be related without Proof, but only that the Duke called him Cousin.

Now after all this, that the Duke should make his last Will, and give all this Estate to a Stranger (for so as to any Thing appears in Proof) and give nothing to the Earl of *Bath*, when by the former Settlement he had given him such hopes of so great a Share; this I think is a very unaccountable Thing; and, I confess, I know not how to extricate my self out of the Confusion it causes in me; but I must set the one against the other as to that Objection, and leave the Matter in the dark, as to the Duke's Honour, as I found it; tho', I think, I may give a further Answer to this Objection under the second Head.

But I must speak something more under this Head, for I would omit nothing that I conceive to be material in the Case. There is another Thing objected that seems dark in this Case, and that is, what was the Meaning of some Parchments that were

ingrossed by *Thompson*, the Summer before the Duke went to *Jamaica* ? The Jury have found that this Deed was [61] executed in 81 : And if then the other Side would make Use of this, as insinuating that they were the same Deeds, then that is not to be admitted, as being expresly against the Verdict. But to me it seems, that these Deeds in 87 were made upon some Design to have them executed, then perhaps to settle the Estate upon a firmer Foot than it was thought before. The Earl of *Bath* perhaps might be jealous that the Dutchess might prevail upon the Duke to revoke the former Deed in due Form ; and therefore these Deeds might be prepar'd absolutely without any Power of Revocation, and thought he might procure the Duke to seal them so before he went to *Jamaica* : I say that might be the Intention, tho' what was the Design I cannot really tell.

But admitting that such Writings were prepared with such a Design to get the Duke to execute them, I know not that all this put together will be a sufficient Ground in Equity to set aside the Deed in 81. For all Designs in gaining of Deeds will not avoid Deeds actually made : And that is plain from the Case of *Bodmin* and *Roberts*, that was one of the Precedents used in this Case, which was in short thus :

Mr. *Roberts*, Son to the late Earl of *Radnor*, married the only Daughter and Child of *Bodmin*, who was so passionately fond of his Daughter, that whenever she was in his Presence, he would break out into great Fits of Passion, and weep for Joy to see her. Notwithstanding this great Fondness of his Daughter, one Mr. *Wynne* took an Opportunity when Mr. *Bodmin* was under an Arrest, and officiously came to bail him, and insinuates into him, That his Son-in-Law was the Occasion of his being arrested ; and thereupon wrought so far upon him as to get him into a private Place, where he was removed out of his Son and Daughter's Knowledge, and where he went by a strange Name : No one of his Friends had any Access to him but *Wynne* himself, and such as he would permit. Mr. *Roberts* made frequent Application to be admitted to him, but was refused, which was all in Proof. While he was under this Concealment, *Wynne* tampers with one *Barry* that had Mr. *Bodmin*'s Will in his Custody, and would have had him suppressed that Will, whereby he gave his Estate to his Daughter. It happens, during his being thus secured, he fell sick, then there is a Will prepar'd for him to give this Estate away to *Wynne* from his only Daughter ; they get three Witnesses to the Execution of it. This Will was never read over to him ; this appears in the Proof ; but they get him to execute it : And he dies. Hereupon Mr. *Roberts* exhibits his Bill in this Court to set aside this Will. There was Proof made of all this Matter that I have open'd, and this Point of Surprize in obtaining this Will was insisted upon strongly. The Lord Chancellor at the Hearing of the Cause was assisted by the Ch. Just. *Bridgman*, the Ch. Bar. *Hales*, and Just. *Rainsford*. But notwithstanding all this Proof, they could not prevail to set aside this Will in this Court, and afterwards when they came into the House of Lords, they were of the same Opinion, and it ended at last in Relief by the Legislative Power, an Act of Parliament.

[62] This now I take to be much stronger for Relief, if any could be, than the Case now in Question ; and if then upon such apparent Surprize and Practice it could not be set aside in Equity, sure this can't, where there doth appear no Proof at all of any such Thing.

2. I come then to consider the second Head of Argument against this Deed, that it was a concealed and forgotten Deed. Now that it was concealed from the Dutchess, and those that were thought her Agents, I agree it so ; and it is plain, it was always intended it should be so. But that it was concealed from the Duke, I think has no Ground at all. The Thing they would infer it from is the Evidence of *Aleman*, whose Testimony was read once and again : And he says this Deed, at the Time of the Execution of it, was delivered to the Earl of *Bath* ; whence they infer he carried it away, and kept it concealed from the Duke, who forgot it : But upon reviewing *Aleman*'s Deposition, it can be understood to mean no other, but only delivered to that Effect as a Deed to his Use ; but not that it was delivered to him for Custody, and carried away by him.

No truly, it seems plain to me from all the Proofs and Circumstances of the Case, that this Deed did remain in the Custody of the Duke of *Albemarle* ; for that Sir *Thomas Stringer*, a little before the Duke went into *Jamaica*, doth draw an Abstract of it, in which the very Date is mentioned ; which could not be drawn from the Paper-draught, where the Date is in Blank, but must be from the Deed it self : And how should he have the Deed to do it by, unless it was in the Duke's Custody ?

Besides, there is a strong Proof, that the Will of 75 was in the Earl's Custody once ; for the Duke sent to him into the Country for it, and the Earl brought it up with him ; for it is plain by the Wording and Framing of the last Will in 75, my Lord Ch. Justice *Pollexfen* had it in his Custody for comparing the one with the other ; they run so in the same Manner, that it is impossible but he, that drew the last, must have the first by him at the same Time.

How then came this Deed of 81, and this Will of 75, into the Custody of the Earl of *Bath*, under the same Cover with the Seal of the Duke of *Albemarle*'s Coat of Arms on't ? For so it was produced first by the Earl of *Bath*, after the Notice of the Duke's Death in *Jamaica*. This cannot be imagined how it should be any otherwise, than as the Earl of *Bath* says in his Answer, that they were delivered so to him by the Duke a little before his Going beyond Sea ; or else that the Earl of *Bath* found them so sealed up and covered among the Duke's Writings. And either Way it is a mighty strong Proof, that the Deed was all along, till he went to *Jamaica*, in his own Custody, and not in the Earl of *Bath*'s.

But however it is further objected, that it was a forgotten Deed. Methinks, what I last urged is a very good Proof it was not forgotten ; but there is yet further Proof of it. Not long before he went abroad, the Duke had some Discourse with Mrs. *Crofts*, who (as [63] she swears) was told by him, That she should have a good Neighbour at *Newhall* if he should miscarry beyond Sea, *to wit*, my Lord of *Bath*. And *Lane*, that is one of the Duke's Servants, doth swear, That the Duke told him, that after his Death the Earl of *Bath* would have *Newhall*. Mr. *Crofts* swears, That upon his Application to know who he should address to in Case of his Grace's Death, the Duke told him, all he could do for him, was to recommend him to the Earl of *Bath* and Sir *Walter Clarges*, and ordered him to leave the Keys of his Writings with the Earl of *Bath* ; for he was most concerned in them, in Case he should do otherwise than well.

It is proved, that the usual Discourse of the Family was, That the Earl of *Bath* would have the Estate after the Duke's Death, which must happen from some Expressions of the Duke to that Purpose. And Sir *Walter Clarges* doth in his Answer swear, That the Duke told him, he had provided for him, as the Earl of *Bath* knew, which could be only by this Deed. And Mr. *Greenvill* swears in his Answer much to the same Purpose. And Mr. *Courtney* swears, That eight or nine Years ago, my Lord of *Bath* came to him with a Draught of a Settlement to the same Effect, to advise upon : And about three Months before the Duke went to *Jamaica*, he came again with a Copy of this Settlement, to advise, whether a Will would revoke it ; and that he gave his Opinion it would not, if the Circumstances of the Power were not pursued.

But now here the Objection recurs again : Is it possible to be believ'd that the Duke should deliberately make so solemn a Will, take six Months Time in the Drawing and Publishing of it, and then execute it in the Presence of three Witnesses, if he had not forgot this Deed, but had known all along that there was such a one ? If he did know it, and had acquainted the Counsel that drew his Will with it, certainly he would have advised him, that unless he did revoke it, according to the Circumstances of the Power, all this Care and Solemnity would signify nothing.

Truly on the other Side it is to be considered, whether the six Months was taken up in Deliberation and solemn Preparation for Making of that Will ; or, whether that was not an Evidence of a Difficulty to prevail upon the Duke to do it at all : For I must take the Liberty to say, there are Proofs in the Case of Importunities used to bring him to it. Dr. *Benwick* did tell the Duke, unless he did it, the Dutchess would have a Return of her Distemper, and be very bad again. It is proved, that when Money is to be paid for the Counsels Fees, upon drawing it the Duke was uneasy, and said, the Dutchess might pay it if she would, for it was her Business. There appears great Difficulty afterwards to get him to execute it, that Sir *Thomas Stringer* importuned him much to it ; upon which he grew very much in Favour with the Dutchess, and there was Inquiry made for a Baronet's Patent to be got for him ; all to engage him the more to get this Work done : How [64] doth he bring it about ? The Duke was that Day to go by Appointment to Sir *Robert Clayton*'s, to meet with my Lord *Jefferies*, and seal the Deeds of Purchase of *Dalby* and *Broughton*. Sir *Thomas* takes this Will in three Parts, and three Witnesses along with him to Sir *Robert*'s ; and after my Lord *Jefferies* was gone, and the Duke in a fretting discontented Humour, he gets him into a private Room in that House, and then tells him he had brought his Will to him to seal ; and the Duke, as Mr. *Crofts* swears, was unwilling to do it then, and would

have put him off ; but he pressed the Duke very hard to do it then, and told him he must do it, for he was to be gone the *Northern* Circuit the next Day, and could not be at the Execution of it ; upon which he did it, but not till after much Urging and Sollicitation.

Now I would argue hence, Why should the Duke of *Albemarle* be uneasy, and disturbed, at his being importuned to execute this Will, after so much Pains and so much Time in the Drawing and Preparing it ?   I cannot imagine any Reason why, but that he had not forgotten this Deed, which he never intended to alter, and yet must do something to satisfy some Body's Importunity.   He knew he should, in doing it, do a Thing that would look very oddly one Day, and that made him so uneasy, though at last he did comply and did it.

But admit this Deed had been at that Time forgotten by him, or concealed from him, would this in a Court of Equity be a sufficient Ground to set it aside ?   I confess of a Purchaser, where one that claims by such a Deed will stand by and permit the Purchase to go on, and conceal the Deed, as to that Purchase, the Deed will be a fraudulent Deed : But there is nothing of that in this Case, neither such a Purchase nor such a Concealment ; and therefore it can signify nothing here to set aside this Deed, though concealed and forgotten.

3. But now I come to a third Head of Objections : That this Deed is a Deed attendant upon the Will of 1675, and so revocable in its own Nature, as a Will would be, although it contained in it no Power of Revocation.   This was very warmly insisted upon by the Counsel of Mr. *Monk.*

I confess there is such a Thing as a revocable Deed attendant upon a Will, which is revocable ; that is, where a Man doth suffer a Common Recovery, and make a Deed subject to his last Will and Testament, such or such a Use may be declared by Indenture under Hand and Seal, as intended at that Time of the Recovery.   But this Indenture, after it hath declared that Use being founded upon an Assurance that was always subject to Uses declar'd in his last Will, that Will being always changeable, the Deed may be always changeable : And so is the Case in *Dyer*, 314 *b*.   And the Reason is given in my Lord of *Ormond's* Case, in *Hobart*, 349, by the Opinion of two Judges against one, because the Foundation, which is his last Will, is always revocable.   But such an Indenture to [65] declare Uses is revocable ; but a Feoffment, or a Lease and Release to Uses referring to a Will, or made to confirm a Will, that that should be revocable, there is no Colour nor any Authority in Law for it.

4. The fourth Head is, That there is an implied Trust, that the Duke might charge this Estate to the full Value ; therefore in Equity he might dispose of the Land.   This Objection does arise upon a Variance supposed between the ingrossed Deed and the Paper Draught : For it should seem that one of the Sheets in the Paper-Draught is cut just where this Trust is declared ; and so they will presume it a general Trust which would subject the whole Estate to the Duke's Disposal.

But as to this Matter, it is sworn by *Thompson*, who ingrossed the Deed, that he ingrossed it by the Paper not cut, and did ingross it truly according to the Draught, and he was believed by the Jury so to have done : Therefore I suppose it was cut since ; and if it were, the Question is by whom it was cut ?   Truly, I think it not worth the Trouble of inquiring after that, but it is most probable it was not cut by those to whose Advantage it would turn to cut it.

But here doth arise a considerable Objection, by the Will of 75 there are £20,000 Legacies given, and here is a Trust that doth subject this Estate to the Legacies of that Will of 75 : Shall then the Earl of *Bath* hold this Estate free and discharged of any Legacies by the last Will ?

I must confess this was objected on one Side, but not debated on the other Side, because they, that were of Counsel for the Earl of *Bath*, thought it did not concern this Question now in Debate.   That they said might be a Question another Time between my Lord of *Bath* and any Persons that may come here to have any Legacies given them by the Will of 87.   If the Personal Estate will not answer, I cannot say positively that they may be payable out of this Trust, tho' I give no Opinion in the Matter, it not having been debated, and so I have not considered it.

But sure the Consequence of that, if it should be so, would not be what this Head of Arguments I am upon would infer : That if the Duke might charge the Estate with Legacies, therefore he might dispose of it, for he hath bound himself by this Proviso not to dispose of it but under such and such Terms.

5. And that brings me to the last Head ; Whether this Will of the Duke of *Albemarle*, made 1687, and so solemnly done, be a Revocation in Equity, tho' it do not strictly pursue the Circumstances of the Power.

I know not any Rule more clear in our Law-Books than this, that all the Circumstances, prescribed and required in a Power of Revocation, must be observed to make it a good and effectual Revocation.   So is *Scroop*'s Case ; so is the Case of *Kibbet* and *Lee* ; there is indeed a favourable Judgment to be **[66]** given in expounding Powers, but both these Cases still agree that all the Circumstances must be strictly observed.

It may be said then, they must be observed in Law, but in a Court of Equity, it makes another Case : For when a Man hath a Power over an Estate, those Circumstances are only a Guard upon himself that he may not be surprized into a sudden Disposition of it : But when deliberately and solemnly he hath done an Act whereby he disposeth of this Estate, but there wants some little Ceremony or Circumstance, such as the not Tendring 12*d.* or the like, a Court of Equity ought to supply such a Defect to support his solemn Intention to dispose of it.   For plain it is, he is not surprized into this Act, and so the Reason of those Circumstances does fail, and they need not be strictly observed.

This Way of Argument may seem specious in a Court of Equity, I confess ; but really I think I am able to give a very plain Answer to it, and that from the Nature of Powers of Revocation : It is certain no Conveyance at the Common Law could have a Power of Revocation annexed to it.   As a Feoffment and Livery of Seisin ; and that because the Law would not admit such an Absurdity that a Man should give an Estate absolutely to another, and yet reserve a Power to recall it from him at his Pleasure.   It is such a Repugnancy as the Common Law will not permit.   But a Man might have done this at Common Law, he might have annexed a Condition to his Feoffment, that if he tendered 12*d.* to the Feoffee or his Heirs he might enter upon the Estate.   So that the Estate, which was devested out of him by the Livery of Seisin, might have been revested by a Performance of the Conditions and Re-entry.   So it stood at Common Law.

But after the 27*th H.* 8 [1535], for transferring Uses into Possession, Uses became more pliable than Conveyances at Common Law, wherein this Matter, and then Powers of Revocation first came in Use and Fashion.   Not but that it is as repugnant to a Conveyance after the Statute as it was before ; for certainly it is repugnant to give an Estate away, and yet have a general Power over that Estate.   But a Power of Revocation was let in as a Condition, and would work as a Condition ; but whereas the Performance of a Condition at Common Law would not work a Revesting of the Estate, without a Re-entry ; now the Performance or Execution of the Power doth transfer the Estate to the new Uses, or revest the Estate in him that had the Power without any Re entry.   But still there is now a Necessity of the Powers being performed, as there was of the Conditions being performed at Common Law ; for it is the Nature of a Condition and no more.   So is *Inglefield*'s Case, 7 *Co.* 39.

There was a voluntary Conveyance made with a Power of Revocation ; and he who had the Power is attainted of Treason.   Now all Conditions forfeited to the Crown must be per-**[67]**-formed or no Advantage can be taken.   This Power was in this Case agreed to be forfeited to the Crown ; the great Difficulty was, whether the King could perform the Condition, or whether the Performance was not tied strictly to the Person that had the Power vested in him ?   That was the great Doubt in that Case, but there was no Question but it was a Condition, and the King should have it as a Condition forfeited.

And it is likewise agreed in *Co. Litt.* 238, That it is a Condition, and would have been repugnant to be a general Power.   So that it is not, as they say, a Guard only upon a Man's self to prevent Surprize, but a Condition.   And as a Man must perform a Condition at Common Law to entitle him to a Re-entry, so he must execute his Power, to entitle him to a Revocation.   And a Court of Equity can no more let a Man in to defeat an Estate upon a Power of Revocation, without a due Execution of the Power, than the Common Law could let a Man in to defeat an Estate upon a Condition, without Performance of the Condition, or than a Court of Equity can think to let a Man in to defeat a voluntary Conveyance, without a Power of Revocation : For it is all but a Condition which must be performed, or no Advantage taken of it ; and a Court of Equity may do great Things, but they cannot alter Things, or make them to operate contrary to their essential Natures and Properties.

Case 1:23-cv-03562-RDM   Document 41-1   Filed 09/13/24   Page 12 of 176

I confess, where there is an Impediment of executing a Power of Revocation, or Disability of doing it, a Court of Equity may perhaps interpose. And therefore suppose the Earl of *Bath* had always had this Deed in his Custody from the Time of executing it, and the Duke having a Mind to revoke it had sent to the Earl for it ; that tho' seeing the Circumstances required he might truly pursue them, but the Earl had refused to deliver it, and the Duke not knowing what the Power was, had done such Act with a Mind to revoke it ; I agree it reasonable, that a Court of Equity should interpose to support it. But why is that ? Because the Earl who was to have the Benefit by this Deed, was the Impediment why it was not strictly pursued.

And that is a Reason which would prevail at Common Law. I will put you a Case to prove it, *Dyer*, 354. *A.* makes a Feoffment to *B.* with a Power of Revocation ; if *A.* at any Time during his Life pay or cause to be tendred to *B.* at the Font-stone in the Cathedral at *Sarum* £20. *A.* tenders the £20 at the Place in the Absence of *B.*, and without any Notice to him to attend : This is held to be no Revocation. But saith the Book (as it should seem) if he had sent to *B.* to be there, or some for him to receive the Money at the Tender, and *B.* would neither have come nor sent, it had been a good Revocation. So that where there is an Impediment by the Default of the Party who is to have Advantage by the Non-performance of the Power ; and he that hath the Power do an Act that expresseth his Meaning to revoke, that shall be a good Revocation at Law.

[68] I likewise agree, that in Case of Disability a Court of Equity may interpose ; and I agree therefore, that in Case the Duke of *Albemarle* had taken this Deed over with him to *Jamaica*, and there had had an Intention to revoke it, and had gone as far as he could to do it, had made his Will, and had six Witnesses to it, I believe it would be a good Revocation in Equity, tho' none of the Witnesses were Peers, because of the Disability he would be under to have such Witnesses.

And so that defective Executions of Powers of Revocations may be helped in Courts of Equity, in the Cases of Purchasers, and Creditors, I take it to be true too. And it is said, other particular Cases there may be, wherein a Court of Equity can relieve, tho' the Revocation be not according to the Power reserved. And as to that, I confess several Precedents have been cited, and I wonder, considering the Nature of them, that more have not been mentioned ; but I think there are not above four or five very much to the Purpose, and those I shall take Notice of, and trouble you with no more.

The first is the Case of *Thorne* and *Newman* ; and that Case is no more in short than this : *A.* covenants with *B.* to stand seized to Uses with a Power of Revocation upon the Tender of 12*d.* in the *Temple-Hall*. *A.* tenders the 12*d.* to *B.* who accepts it, but not in the *Temple-Hall*. The Question was, whether this was a good Revocation in Equity ? Truly I believe it was a good Revocation in Law.

But suppose a Man make a Lease reserving a Rent payable at *Michaelmas* in the *Middle-Temple-Hall*, and there is a Proviso of Re-entry upon Non-payment according to the Reservation. The Rent is paid by the Lessee at the Day, but not at the Place ; and the Lessor accepts the Rent, and afterwards re-enters for Breach of the Condition. If he have once accepted the Rent, being privy to the Deed, that makes it a good Performance of the Condition in Law absolutely. So is *Co. Litt.* 212.

And so it is in Case of a Bond to pay Money at a Day and Place certain ; the Money is paid before the Day, and not at the Place, and the Obligee accepts the Money. If he after bring an Action upon this Bond, the Defendant can plead nothing but Payment according to the Condition : And in Evidence he may give it in Proof, that tho' it was not paid at the Place and Day, yet being received by the Obligee before the Day at another Place, this is good Evidence at Law of Payment according to the Condition : And that appeared in the Case of *Band* and *Richardson* : *Moor*, 267 ; *Anderson*, 198 ; *Cro. Eliz.* 142. And this Case of *Thorne* and *Newman* I take to be a good Performance at Law ; where indeed the Condition is to be performed to a Stranger, that will alter the Case ; but where it is to one that is privy to the Deed, I take it, it is a good Performance at Law, and consequently must be good in Equity.

[69] Another Case cited was that of *Smith* and *Ashton*, and that was thus : One *Richard Ashton* conveys his Estate in Uses, with a Power reserved in the Conveyance by any Writing under his Hand and Seal, to make Provision for younger Children. Being sick, he prepares Instructions under his Hand, in Order for Counsel to draw it into Form ; and it is drawn into Form and ingrossed : But before it is sealed he

dieth; and this was held a good Performance of this Power in this Court. So here is a Defect in the Execution of a Power help'd in a Court of Equity.

As to this Case, I would observe, *First*, This is not a Case upon a Power of Revocation to devest an Estate, nor a Performance of a Condition. But further, here are Instructions prepared, and it went as far towards the Execution of the Power as could be, till an Impediment came in the Way by the Act of God in the Death of the Party. Now I agree, where there is an Impediment by the Act of God, or Fraud or Default of the Party, who claims by the Deed, Equity may interpose. But that does no Way come up to the Case in Question.

Then there is the Case of *Dey* and *Thwaites*, which was lately in this Court, *Thwaites* makes a Settlement to the Use of himself for Life and afterwards to such Child and Children, and for such Estate and Estates as he should, by any Writing under his Hand and Seal testified by two credible Witnesses, limit and appoint. He afterwards makes a Will, and has but two Witnesses to it (so that they did not cite the Case right, that said there were not two Witnesses). But two Witnesses are not enough by the Statute to make it a good Will, and thereby he giveth a Rent of £100 a Year to such a Child, and dies.

Now one great Question was, Whether the Power being to limit Estate or Estates, he might limit a Rent out of those Lands? It was held in Equity he might; and truly I think that he might at Law. There is, I confess, an Opinion against it in the Case of *Brown* and *Tayler*, where there were three Judges against one. But really I think it is good at Law.

A second Question was, Whether this being void as a Will by the Statute should be yet a good Declaration of the Trust, and an Execution of the Power? And I think the Court of Equity did very well in decreeing it to be good. For tho' it were not effectual in all Points (as it was intended) as a Will, yet it was a Writing which had all the Circumstances required by the Power; and therefore I see no Reason to question whether it were good.

The next Case is the Case of *Ward* and *Booth*; and that stands thus: Sir *Tho. Brereton* made a Settlement, with a Power of Revocation, by a Writing under Hand and Seal by two Witnesses; and he in a Passion one Day tore off a Label, with the Seal, but afterwards repented, delivered it to the Trustees to be preserved to the Uses; and inquiring whether what he had done amounted to a Revocation? and being advised it did not, he was very well satisfied. This Cause came to be heard before my Lord *Nottingham*, and adjudged [70] no Revocation, it appearing there was a continued Intention not to revoke. But I desire to read Part of the Ground that Decree went upon, for that justifies what I said, in Case where there is a Disability or an Impediment by Fraud, this Court may relieve, tho' there be a formal Revocation.

There is but one Precedent more that I shall mention, and that I take to be directly for the Earl of *Bath*. It is the Case of *Arundel* and *Philpot*. Mary Philpot, being a Widow seized of Lands, made a Settlement upon the Defendant, with a Power of Revocation upon the Tender of a Guinea. She afterwards makes another Settlement upon the Plaintiff, but without any Proof of the Tender of the Guinea. Upon a Bill suggesting her Intention to revoke, the Plaintiff could not prevail in this Court to set aside the first Settlement, but was dismissed to Law, and ordered to try the Title within a Twelvemonth, whether revoked or not revoked: And there was afterwards a Trial, and the Tender of a Guinea did happen to be proved, and so the Power was well executed at Law. But this Court would not interpose to set it aside as a Revocation in Equity, upon the Intention only, without a Proof of the due Execution.

And upon the whole Matter I conclude, that in a Court of Equity there cannot be a Revocation of a Deed, to which a Power to revoke is annexed, but what is pursuant to that Power, unless there be either an Impediment from the Party that claims by the Deed, or a real Disability to execute according to the Circumstances. And I think neither of these are in this Case, nor are any of those Matters alledged of Surprize, Circumvention, Concealment, or the like, any good Grounds to set aside this Deed, if they were proved, which I think there is no Pretence of.

### Lord Chief Justice *Treby*.

I am of the same Opinion with my Brother *Powel*: I shall state the Case as it stands upon this Deed and Will. The Will was made in 1675, the Deed in 1681; and

shall take Notice (as I find there was much Use made of it on one side,) of what the Expressions are in the Will, and somewhat of what Deficiencies there were of Expression in this Deed.

In 1675 the Duke of *Albemarle* made his Will; and by that Will he declares, That in respect of my Lord of *Bath's* being one of his nearest Kindred, and out of Gratitude due to him for many Acts of Friendship and good Offices done to him and his Family, his Will was that he should inherit all the Parts of the real Estate not therein otherwise disposed of; and therein he desires the King to grant to **[71]** the Earl of *Bath*, and the Issue Male of his Body, the Title of Duke of *Albemarle*; and that his eldest Son might bear the Title of Lord *Monk*: And this was intended in Trust to pay all his Debts and certain Legacies in the Will. He therein gives a Legacy of £1000 to *Henry Monk* (not the Father of the Plaintiffs the *Monks*) who it doth not appear was any Ways related to him.

Six Years after, in 1611, this Duke *Christopher* makes a Deed, and in that Deed recites this Will true as to the Date, but mistakes it in several Particulars. This Deed settles the main Part of the Estate after the Duke and Dutchess their Death, without Issue by the Duke, upon my Lord of *Bath*, Part of it immediately after his own Death, without Issue, other Parts upon Sir *Walter Clarges*, and Mr. *Greenville*: And it has been observed, that almost all the Limitations of the Estates in the Deed differ from those in the Will, at least in express Terms, if not in very Substance.

This Deed also sets forth the Grounds why the Duke made it; and it is to this Effect. He doth declare he was so unfortunate, that his next Heir at Law was descended from a Regicide; and therefore I would observe it was not only to confirm the Will, as they would have it, but for preventing so dishonourable a Descent of the Estate which he owed to the Bounty of the Crown, and for conveying and settling, and assuring the Lands to the Uses therein after declared, and confirming and corroborating that Will which he did not intend to revoke, and to prevent any Claim either by the Heir, or any pretended surreptitious Will which might be obtained from him by Surprize: These are the Considerations and Reasons expressed in the Deed, why he gives this Estate away from his Heir at Law.

Both this Deed and Will agree in this for Substance, that they limit the main Part of the Estate of the Earl of *Bath*, tho' they differ in several of the Limitations to diverse Persons: And as to some of the Limitations to the Earl of *Bath* they differ too; whether material or no, shall be considered by and by.

There is in this Deed a Proviso, which makes the great Question in this Case, that the Duke should have Power to revoke any of the Uses in the Deed, and limit new ones: But this Power is restrained by several Circumstances; it must be by Writing under his Hand and Seal, in the Presence of six Witnesses, three whereof to be Peers of this Realm, and a Tender of six Pence to the Trustees named in the Deed.

Afterwards, in the Year 1687, the Duke makes another Will, and thereby he giveth some Parcels of his Land to Mr. *Bernard Greenville* my Lord of *Bath's* Brother, Sir *Walter Clarges*, and others, and makes some larger Provision for the Dutchess for her Life than she had before: but the main Bulk and Residue of the Estate is by this Will given to Col. *Thomas Monk*, Father of the Plaintiffs; and he doth likewise in that Will make a Petition to the King, that he will be pleased to confer a Title of Honour upon him, and **[72]** make him Baron *Monk* of *Potheridge*, the ancient Seat of the Family.

That Will of 75, and the Deed of 81, are subscribed by six Witnesses each, this Will of 87, but by three; and so the Defect of this Will to make it a Revocation is, that there are but three Witnesses, and none of them Peers, and there was no Tender of 6*d.* to the Trustees.

The Intent of the Earl's Bill is, to have an Establishment of this Deed against this last Will; and the Intent of the Dutchess and Mr. *Monk's* Bill is, to set aside the Deed, and establish this last Will, and that upon certain Grounds of Equity, the Deed having obtained a Verdict for it at Law.

This is the General State of the Case, the Particulars will be brought in best under the several Heads that I shall mention: But first I shall take Notice, as I go, what Progress this Cause has had since it was first in Agitation.

*First*, It was insisted, that this Deed was a false Deed, and that was thought fit to be directed to a Trial at Law; and it was most proper it should be so; for it concern'd a great Inheritance and Freehold conveyed by Deed, and a Devise, both Titles at Law,

and that was fit to be decided in the proper Judicature for such Things, in a Court of Common Law by a Jury. Accordingly, this Trial was directed in an Ejectment at the King's Bench Bar; and this Court so far aided the Parties to come to the proper Question, as to order there should no Incumbrances stand in the Way, or be insisted upon, but any Thing that obstructed the Trouble of the Right should be set aside: So that in short the Validity of this Deed was the Thing directed to be tried; it was accordingly tried, and thereupon a Verdict obtain'd that the Deed was a good Deed, and the Earl of *Bath*'s Title under it good at Law; and Judgment was afterwards entered up; and that for the Defendant's Part was not exclusive: If there had been any Misdemeanour on the other Side, or in the Jury, they might have had Redress by applying to this Court for a new Trial; nay, they may try it again when they please, upon a New Ejectment: But they have acquiesced under it to this Day, that is to say, now for two Years together: So that we must take it for granted (at least this Court is, I conceive, bound by it) that it is a true Deed, and a good Conveyance of the Estate, as much Evidence there is of it as is possible; so strong an Evidence, that we must take it to be a true and a good Deed, and a Deed without Suspicion: Twelve Men, besides the Witnesses to it, have sworn the Validity of it (that being the sole Question before them), and this must be remembred all along in the Consideration of this Case.

Indeed the Counsel on the other Side did seem to speak a little slightly of it, as upon a doubtful Evidence, and at last, that it is true by this Verdict they must admit that this Deed was sealed by the Duke, tho' that was not a little controverted before: But in Truth, here is the Right tried; it was a Deed that was a Conveyance of the [73] Estate, and now we must take it for granted, that the whole of the Deed was tried and confirmed by the Verdict; so that it is a good Conveyance at Law, and passeth all that the Words can carry. And therefore, in our Consideration of this Case, we must lay aside all the Evidence that was, or was properly to have been given at the Trial, as to the Truth and Validity of the Deed: And I, for my Part, can allow my self no Consideration of this Deed in speaking to it, but such as are Considerations of Equity, consistent with the Truth of the Deed.

And this is now the only Thing that is to be applied unto, what there is in Equity and Conscience, why this Deed should be set aside when it is allowed to be good in Law; there is no doubt but there may be good Ground in some Cases in Equity, to set aside that which is good at Law. But the Question is, whether in this Case there be any such or no?

But before I proceed to the Consideration of what has been insisted upon in that Kind, I desire to take Notice of something about the Will of 87. I am very well satisfied that that Will is well proved: There is my Lord Ch. Just. *Pollexfen* hath proved the Instructions given for the Preparing it, and the Drawing of it; and there are three Witnesses that speak to the Publication: And this is confirm'd by the Testimony of Sir *Robert Clayton*, who transacted the first Part of that Affair, to bring the Duke and my Lord Ch. Justice together: And I do equally reject all the Evidence on the one Side and the other, against the Truth of either the Deed or this Will.

Then this Will would have been a good Disposition of the Lands, if the Law did not hinder; this is, if this Deed did not stand in the Way, as a prior Disposition, and found good in Law; so the Deed is good, if Equity do not hinder it. Now the Grounds of Equity, which my Lord *Mountague*'s Counsel insist upon, are I think these: I have made indeed four of them, but in Substance I do not differ from my Brother *Powel* about them, for I comprehend that the Deeds being ancillary, as it was called, and attendant upon the Will, under the Head of a Revocation in Equity; I say the Heads of Equity insisted upon, to set aside this Deed, are Four.

*First*, Surprize and Circumvention in obtaining of it, and that relates to the Creation of it.

*Secondly*, Concealment from the Duke, and this by my Lord of *Bath*, and so he was not informed how his Power was circumstanced, and therefore not able to execute his Power according to the Circumstances, which makes it become a fraudulent Deed, and for that Cause the Plaintiffs shall have Relief against it.

*Thirdly*, There is a Revocation in Equity, tho' it be not in all Points such as would be sufficient in Law, yet there is so much done towards it, such a Solemnity in the Action done, and such an Impediment of doing more, as will amount to an equitable Revocation.

*The fourth Head* is that which was mention'd of the trust in the deed.

Case 1:23-cv-03562-RDM   Document 41-1   Filed 09/13/24   Page 16 of 176

As to the first Point of Surprize, it was a Head much labour'd by the Case, on the Plaintiffs Side, and yet I confess I am still at a Loss, [74] for the very Notion of Surprize ; for I take it to be either Falshood or Forgery, that is, tho' I take it they would not use the Word, in this Case, Fraud ; if that be not the Meaning of it, to be something done suddenly and unawares, not with all the Precaution and Deliberation as possibly a Deed may be done.

Here was a Case cited not long ago, in another great Case in this Court, out of the Civil Law, about Surprize, but that was under another Head : That is, A Man was inform'd by his Kinsman that his Son was dead, and so got him to settle his Estate upon him : This is called in the Civil Law, *Surreptio.* I know not whether that Word shall answer those Gentlemens Notions about this Matter. Now the Civilians define that thus, *Surreptio est cum per falsam rei narrationem aliquod extorquietur* ; when a Man will by false Suggestions prevail upon another to do that which otherwise he would not have done.

And I make no doubt but Equity ought to set aside that, but then this is properly call'd Fraud, and that must be made out, it can never be intended. I find not any such Thing pretended to be made out, that my Lord of *Bath* did use any false Suggestions to the Duke, or Informations at all, for what appears in the Proof : I beg Pardon if I mistake or forget any Thing of the Proof.

Then here is Matter of a Surprize objected, which must be something that will not avoid this Deed at Law, but will avoid a Deed in Equity, which yet is not direct Fraud or Falshood in the Party, but is to be gathered out of the particular Circumstances of the Case ; but what in certain to make of it I confess I cannot tell.

I would repeat the Words that the Plaintiffs Counsel used : They say it is absurdly drawn, it was unduly put upon the Duke, 'twas done without his Perusing it ; it was contrary to his common Intention, before and after the Sealing of it. It must be admitted that there was Deliberation, and Consideration, and Intention enough prov'd to make it a good Deed at Law, otherwise there would not have been a Verdict for it : But it should seem there was not enough of these in Equity, and the Want of this is what they call Surprize, and that must avoid this Deed in Equity.

But I confess I am not satisfied that there was any Surprize in this Case in any Thing : The Duke at the Time of making this Deed was under no Force, no Restraint, no false Information, as I observe, no nor any Sollicitation from my Lord of *Bath* at all : He was in his own House at his full Liberty, he was in very good Company ; for I take it for granted (as I shall insist further by and by), that Sir *William Jones* was by at the Execution of this Deed, and a Witness to it ; the Duke was under no Sickness, no Weakness : And I must take Notice of one Proof more which was mentioned, He had not been drinking, but was in very sober Company. This appears to be the Condition in which the Duke was at the Sealing of the Deed in Question.

[75] But let us consider what are the Particulars of Surprize, that they who oppose this Deed insist upon ; I think they are reducible to these Three. There was a Want of collateral Circumstances that use to attend the Execution of Deeds, made with good Deliberation, and without Surprize : Then there are some Observations made upon the Wording of this Deed, which argue a Surprize : And then they say it must be obtained surreptitiously, because it is contrary to his constant Intention and all the Course of his Actings as well before as after that Time.

First they say there is a Want of collateral Circumstances that are to attend the Executors of Deeds made with good Deliberation, and without Surprize, and that appears in these Particulars.

*First,* It doth not appear who drew this Deed : It is certain, they say, that it could not be Sir *William Jones,* and I think so too : They observe, and with very good Reason, that he saying, *I approve of this Proviso,* doth prove that he did only concern himself with the Proviso, and did apply himself singly to that, and did not manage the Body of the Deed.

Then it doth not appear that the Draught of this Deed was read, or the Deed subsigned, or countersigned, by Counsel, as was the Duke's usual Method ; nor was there any Counterpart of the Deed : Whereas to the Will of 87, it was carefully drawn and made, and three Parts of it prepared, and then there were very great Persons concerned as Trustees in this Deed, and yet several of them knew nothing of it.

To this I must acknowledge, that the Objection is for the most Part true ; but how far it is an Objection we shall consider further by and by.

*First*, For the Want of Instructions about the Drawing this Deed, this is now above ten Years before it comes in Question ; and such Instructions there might have been, but in Length of Time lost or laid aside ; and when once a Deed is actually made, great Persons, as well as lesser ones, are careless of the Preparations of such Deeds : The Deed binds the Estate, and if that be carefully kept, there may easily be a Negligence as to the Rest.

I did observe before, that tho' the particular Limitations in the first Will and this Deed do differ, yet both Deed and Will do agree in Substance to settle the Bulk of the Estate to my Lord of *Bath*. It is likewise observable, that there is a strong Proof Sir *Thomas Stringer* drew this Deed, for his Hand is interlined in every Sheet of the Draught ; and as I do remember his Son writ it. Sir *Thomas Stringer* was at that Time my Lord Duke's Counsel ; and I confess there have been reported several Things about this Matter from his Mouth, which because they are very various and inconsistent, I wish he had been alive, that he might have set all right ; but as the Matter now stands here, it has rendred him very doubtful in the Case.

[76] I confess I do believe Sir *William Jones* had too little Patience (give me leave to say so), and too much Skill to make such a Deed ; I speak as to the Art and Skill of framing it ; therefore I conceive he did not, but Sir *Thomas Stringer* did.

As to the not Reading of the Deed to the Duke, which the Defendants Counsel do object, neither was the Will of 87 read to the Duke at the Time of his Sealing and publishing it : So far it is true, that after it was ingrossed and brought to Sir *Robert Clayton's*, it was not read to the Duke ; but the Particulars of it he had been acquainted with at the Time of the Drawing, and so it might be as to the Deed too, for any Thing appears to the contrary.

That there was no Counterpart, and that the Trustees were not acquainted with it : The Answer is, That the Duke did intend it as a Secret, and therefore the less Notice was to be taken of it ; and the Duke intending mainly by it an Advantage to my Lord of *Bath*, it was thought fit to be conceal'd, for some Reasons, from the Dutchess.

But after all, I know no such Rule in Equity ; I am sure none of the Precedents that I have seen come near it ; that where there is a Deed for the Making of which no Instructions are found, no Proof of its being read to the Party at its Execution, no Counterpart, or the Trustees not acquainted with it, that these are sufficient Grounds to set such a Deed aside in Equity : I do not think any of the Precedents, or all of them together (and I am sure I have read them all) will amount to prove any such Thing.

The second Matter to make out the Surprize, is some Considerations taken out of the Bowels of the Deed it self, several Improprieties of Expression, as (in Part of Dower) and (in full of Dower) which are not Phrases that look like the Act of a Lawyer, one well skilled in the Propriety of the Law-dialect : It doth also misrecite the Will of 75, that is particularly, as to the Lands given to the Dutchess, that they are given for Life, when it was only during her Widowhood : The Lands are said to be given to Mr. *Greenville* as if he were immmediate Devisee, whereas it is a Devise to him in Remainder after a Limitation to the Duke in Tail.

But certainly Improprieties of Expressions and Misrecitals of Deeds are too slight Acts to avoid Deeds so made, so attested, so proved, as this Deed in Question has been : They are rather indeed Flaws and Objections that go to the Manner and Form, than the Substance, and shew rather Want of Art in the Counsel that drew it, than Want of Honesty and Integrity in the Deed it self : Besides that, a Devise to one for her Widowhood is a Devise for Life in one Sense, and Common Parlance, tho' it be defeasable ; and a Devise to one in Remainder is a Devise to him, tho' not an immediate one.

Another Observation out of the Deed it self is, that here are Estates limited to the Duke's younger Sons out of Lands, which he had no Power to create or carve such Estates out of, they being settled before upon his Marriage on the eldest Son ; and that is true ; it is so, [77] as to the Lands called *Norton Disney* : But there are other Lands not comprized in the Settlement, and all the Rest, that were new purchased, were in his Power to settle as he pleased.

But the great Objection out of the Deed is this, That this Deed doth in several Places declare it self to be made to confirm and corroborate the Will in 75. How comes it then to pass, that it should differ from it in all the Limitations, except one ? And that is in the Draught of my Lord of *Bath's* own Writing ; and that Part of the Estate is by the Deed to come to the Lord of *Bath*, upon Failure of the Duke's Issue Male only, so that his Daughters are wholly debarred.

To this I say, what they object (that there is rather a Contradiction than a Confirmation of the Will), is true; I am not satisfied I assure you in that which the Defendants say to it, that the Will is mentioned only, as to preventing the Descent. It is first mention'd there, but I think it goes through, and is repeated more than once; but that which I would observe, is this, that this Deed does confirm the Will in the main and substantial Part of it, the Settling the Bulk of the Estate upon my Lord of *Bath*.

Besides, the Expression of the Deed is not only for confirming the Will in 75, but also to the Settling of the Lands to the Uses after declared; and if it do not confirm every Limitation, yet it doth in the substantial Settlement of the Estate.

It was further said, that the only Limitation which agrees with the Will, is that which is in the Draught of my Lord of *Bath's* Hand-writing, where Lands are limited to my Lord of *Bath*, after Failure of Issue Male with Exclusion of the Daughters, which, the Plaintiffs say, it cannot possibly be imagin'd the Duke ever intended to do. But I must mention what Answer the Defendants give to it: They say the Duke had then £1500 a Year; and he makes an Intercession to the King to bestow the Honour of Albemarle upon the Earl of *Bath*; and that it might not go alone, he limits £3000 a Year upon his Failing of Issue Male; so that the Honour should come to the Earl, and there was enough left for Daughters. Now if their Valuation of the Duke's Estate be right (which truly I know not) it is some Answer why some Part should be given to the Earl only after the Failure of Issue Male.

But then I would observe too, the Deed by this Obligation doth confirm the Will of 75, and that Will also affirms the Deed: If the Will of 75 were once well, as I see no Colour to the contrary, then I am sure all these Objections from the Duke's contrary Intentions are all answer'd, that he never intended to give him his Estate, for if they admit that the Will was once the true Will of the Duke of *Albemarle*, then there was an apparent Intention in the Duke of *Albemarle* to give the Earl of *Bath* the Bulk of his Estate, if he died without Issue.

[78] Now as to the Variations in the Limitations of the Deed from those in the Will, I think truly it stands indifferent to one Side or other. For here was the Distance of six Years between them, and the Duke might alter his Mind; it might be one Way one Time, and another Time another; he might alter his Mind as to his Daughters, he might after so many Years despair of Issue; and so not mind the Making any Provision for them; he might change his Mind as to his other Kindred, and therefore might in these Particulars vary from the Will of 75.

But I would still have this observed, that in Substance they do agree; he doth preserve the same Favour and good Intention for my Lord of *Bath* to give him his Estate as his nearest Kinsman: If then these Limitations in the Deed were pursuant and agreeable to the Duke's then Mind, it is no Matter if there be any such Variations or Alterations from what was in the Will; and that it was agreeable to his Mind then, I shall by and by take Notice of some Things that occur in this Case, and which seem to satisfy me in it that this was his Intent. For I did observe, that one Thing they insisted upon, to shew it was by Surprize, was, that this was contrary to the Intentions of both the Dukes of *Albemarle*, and the constant Series of Purposes in the Family, and they undertake to give Instances of it.

The Defendants Counsel say, That his Intention was to give his Estate to the Earl of *Bath*, who was his near Kinsman; to whom he had very great Obligations; that my Lord of *Bath* was concern'd in that great Action of Restoring the Royal Family, which was the Raising of his own; that he was a constant Friend of Duke *George*, and his Son's chief Counsellor and Adviser; and that the Family were under great Obligations, is and must be admitted both from what is in the Deed expressed, and what is otherwise proved.

But the Plaintiffs say no, they had no such Intention, neither one or other of them, and particularly Duke *Christopher* had none, neither before the Making of this Deed nor after. Duke *George* makes his Will in *June* 1665, wherein he gives all his Real and Personal Estate to his Son, and nothing at all to my Lord of *Bath*. I did not look into the Will, which is very short, and there is nothing given to any Body but his Son, that is the Whole of the Will; then in the Year 1669 is the Settlement made by Duke *George* upon his Son's Marriage, and there is nothing settled upon my Lord of *Bath*, not so much as a remote Remainder. In 73 Duke *Christopher* makes his Will, and therein gives great Legacies to the Dutchess, but not to the Earl of *Bath*.

These are Instances before this Will and Deed, but the Answers given them are these, which makes me not satisfied with the Plaintiffs Objections or Proofs of his never intending to give my Lord of *Bath* his Estate.

[79] *First*, As I said, Duke *George*'s Will is very short, and takes Notice of No-body but his Son ; and as he gives nothing in it to my Lord of *Bath*, so neither doth he to any Body else, and that very Devise is void, because it was to the Son and Heir, to whom it would without that have descended ; and it signifies very little to their Purpose, being in the same Year with King *Charles*'s Sign Manual at his Request to promise the Earl the Dukedom upon failure of Issue Male.

As to the Marriage-Settlement in 1669, there is indeed nothing settled on the Earl of *Bath*, so much as in Remainder ; but in such Settlements, Men usually do provide only for the Issue of that Marriage, and so leave the Disposition of Remainders to subsequent Settlements.

As to the Will of Duke *Christopher* in 1673, at that Time they say he was but a Minor of twenty Years of Age, and it was only to dispose of his Personal Estate ; for as to his Lands, if he had made any Devise of them, it had been void, and the Personal Estate was at that Time about £60,000. But within a Year or two after that, when he came of Age, is the Will of 75 made, and there is a mighty liberal Gift made to my Lord of *Bath* ; and pursuant to his Father's Desire, and King *Charles* his Privy Seal, doth he make that request for the Dukedom for my Lord of *Bath*. And it must be observed, upon all these Things, that as there is nothing given to my Lord of *Bath* in Duke *George*'s Will and Settlement, nor in Duke *Christopher*'s Will in 1673 ; so nor is there any Lands in either of them, nor in the Will of 1675, or Deed of 81, given to *Thomas Monk* the Father of the now Plaintiffs ; so that that Objection is much stronger against them than against my Lord of *Bath*.

Now I do not find any Proof of a Provocation or Cause given by my Lord of *Bath*, to make the Duke totally change from this Intention to give him the greatest Part of his Estate, and put him quite out of his favour, nor doth it appear he was so ; here were several Letters read, there have been Copies of them brought us, and I have looked upon them ; against these Letters it has been observed, that there is no Notice taken in any of them of this Deed, but there is some of the Will of 1687, while the Duke was in *Jamaica* about the Death of Colonel *Monk*.

I confess, I cannot say there is any one Letter that speaks of this Deed, by the Name of a Deed ; but there is one or two that have an Aspect upon it, and very near Respect unto it, and cannot refer to any Thing else, particularly that which was written relating to my Lord *Lansdown*, when he was going to travel, and another about his Marriage, wherein he takes Notice how much he was concerned in him, even next to his Father himself, as he very well knew ; and that he wrote so much about him for Reasons best known to the Earl himself ; this seems [80] to point at the same Conveyance, and aims at this Deed, to my Thinking, directly.

They have made another Objection, that the Duke never intended to leave any Part of his Estate to Sir *Thomas Clarges*, because he was under the Duke's Displeasure, upon Account of something he took ill from him, but that receives an easy Answer ; what is limited to him is but a Remainder, and that of no great Estate neither ; besides that, the Evidence of the Duke's being displeased with Sir *Thomas*, is but a hearing by a third Hand ; but I find no Displeasure proved at all that was conceived by the Duke against my Lord of *Bath* to the last : Come we then to the Time of making this Deed, and let us see whether the Duke did really intend what the Words of this Deed do import, and that I think is made evident by Proofs that have not been answered or contradicted : The Deed takes Notice of the very great and many Acts of Friendship and Kindness received by him and by his Family from my Lord of *Bath* ; and it is proved, the Duke declared it ought never to be forgotten, nor could he ever make him sufficient Amends. It should seem he had procured his Father's Garter for him, when he might have had it himself ; he thereupon tells Mr. *Prideaux* that he was settling or had settled his Estate upon my Lord of *Bath*, which must be much about the same Time that this Deed was made. One of the Witnesses to the Deed says, at the Sealing of it he wish'd he could have done more for him.

But to me, one of the clearest Evidences of the Duke's Intention to do this for my Lord of *Bath*, and that it was no surprize upon him, is the Presence of Sir *William Jones* at the Execution of this Deed ; for I do take it upon the Proofs, it is most evident that he was then present ; and I will tell you what the Evidence of it is : Mr. *Vivian*

says, he was often used as Counsel for the Duke of *Albemarle*, and particularly relied upon ; and this *Vivian* happens to be one of the surviving Witnesses, and he positively says, Sir *Will. Jones* was there, and a Witness to the Deed ; so again Mr. *Strode*, who knew him very well ; and the Third says, there was a great Lawyer there, though he doth not pretend to know him, it is *Clark* : Mr. *Hebblethwait* says, he believes the Name indorsed is Sir *William's* Hand-writing, and no better Witness could there possibly be for that Purpose than he ; nor could there be greater Evidence than those Multitudes of Instruments that were produced in Court, whereby to my apprehension it did appear plainly that the Characters did very well agree.

Now if Sir *William Jones* was there at the Sealing of this Deed, I think I need say no more upon this Point ; he was a Gentleman very well known to be both of great Ability and Integrity, and Reputation ; and he would never have given up all his Honour and Reputation, and the Quiet of his own Conscience to make one in a Confederacy of circumventing this Noble Duke, or defrauding any one of his Estate, and therefore believing him [81] first to be present, which I really do, I cannot but conclude that it was really and *bona fide* done without Fraud or Surprize. Besides this Evidence, there are several Discourses also that have been proved, wherein the Duke hath declared both his Intention, and that the Thing was done, which sheweth he was not surprized into it, I name Mr. *Crofts* in particular, who must be admitted to be a good Witness, being one of the three Witnesses to the Will of 1687: And he says, the Duke of *Albemarle* told him the Earl of *Bath* was to succeed to his Estate.

It is indeed objected upon this Head, what needed then all this Privacy be used ? Why should the Duke conceal it from the Dutchess his Lady, to whom he had been so kind in it ? Why from the Duke of *Newcastle* and the other Trustees, Persons of Quality and Honour ? They say it could not be for any Dissatisfaction the Duke had with his Dutchess, for they always agreed very well together, and they have read the Testimony of my Lord *Carmarthen*, who says, that he never observed a Couple to live better together, or any Woman to carry it better towards a Husband than the Dutchess, and they have produced you some Letters from the Duke to her, which shew great Fondness and Affection to her.

Truly in the first place I do not know why any Reason should be expected to be given why he useth Privacy in any Action he doth ; sure he may or he may not at his Pleasure ; there may be private Circumstances that may induce him (and that with very good Reason) to use more or less Privacy in the Affairs he transacts. But besides this they bring you in Proofs that I cannot but mention, that the Dutchess had conceived a Displeasure, tho' it be not known for what Reason, against the Earl of *Bath* ; that the Duke was uneasy under her importunities to do what he had no Mind to, and that was the Cause of his Drinking so hard to divert himself ; the Duke was apprehensive she would pursue her Displeasure against my Lord, and he would have but an unquiet Life, if she came to the Knowledge of this Settlement, at least till she had prevailed with him to alter it, which he resolved not to do.

Now it may be (I speak with all the due Respect to my Lord *Carmarthen's* Evidence), that the Publick Carriage might be Plausible, especially in the Presence of one of his Quality, and yet there might be some latent Displeasure which might break out amongst themselves, whenever my Lord of *Bath* came in Competition with those for whom my Lady Dutchess had more Affection, and would make use of her Interest in the Duke about it ; and the Counsel for the Plaintiffs could very hardly maintain but that the Duke had once an Intention that my Lord of *Bath* should have his Estate, till, say they, he came to have the Knowledge of one of his own Name, whom he designed to prefer and provide for.

[82] If so, then I am sure the first Time that any such Change of Mind doth appear, is by this Will of 87 ; for before that they do not pretend to any Thing done for Colonel *Monk*, and that will serve to answer that Objection, that this Deed of 1681 was against the Duke's constant Intent before and at that Time.

It is true, he doth call Colonel *Monk* Cousin in this Will of 1687 : Whether he was a kin to him or no, doth not appear in Proof at all in the Case, but on the contrary it is in Proof that my Lord of *Bath* is really near a kin to him ; and it was as much his Intent, when he made this Deed, to keep up his Title and Honour in My Lord of *Bath's* Family, as can be imagined or conceived.

As to the Will of 1687, that doth declare his last Intention, and that they say is most probable, that my Lord of *Bath* should not have the Estate, but Colonel *Monk* should ;

for it was a Will made with great Deliberation, being five or six Months preparing, great Advice about the Drawing of it taken, particular Instructions by himself given, several Copies made and left with several People.  On the other side they observe the Distance of Time, six Months between the Preparation and Execution, which is not an Argument that he was very forward to do it ; but rather an Argument that he was very unwilling to do it, and the very Time of executing it was when he was very uneasy about his being forced to execute the Conveyances of *Dalby* and *Broughton* to my Lord *Jefferies* ; his Mind was then disturbed ; but if he had a real Intention and Purpose to revoke the Deed, he had an Opportunity to get this Revocation done in their Presence, and afterwards he might easily have got a third Peer.

The great Objection is, what should the Duke take all this Pains for, and this Care and Thought about the Preparations for this Will, so carefully execute it, deliver the several Parts to several Persons, and all for nothing ?  I do admit it is a great Objection, and I think there is but one Answer to it, but that is a pretty plain and strong one : Why was all that Care and Thought used about the Will of 1675, and the Deed of 81 ? Did he intend nothing by it then ?  And if he did then intend something, what Provocation, what Demerit, what was done or left undone by my Lord of *Bath* to change the Duke's Mind, that whereas before he gave him all his Estate, now he should give him never a Farthing ?  Truly I think it was the Duke's Intent to do this last Act only for his own Ease ; he knew the Dutchess had a Displeasure to my Lord of *Bath*, and therefore he himself, designing to express his Kindness to my Lord of *Bath*, would make such a Deed, and put it out of his own Power to alter it upon any slight Attempts, or unless he should have Reason to change his Mind towards him upon Extraordinary Occasions and Circumstances ; so by not complying with these extraordinary Terms in the Power, he could preserve his Purpose towards my Lord [83] of *Bath*, notwithstanding any Attacks upon him, and yet by such a Will as this he could pacify the Importunities of the Dutchess, who not knowing of the Deed did acquiesce in a Settlement by Will ; so Things might pass easily, and he not be disturbed by any Bickerings or Misunderstandings between the Dutchess and my Lord of *Bath*.

And truly it appears by what Dr. *Benwick* saith, that the Duke was to buy his Peace at Home by such a Compliance, for he was told the Dutchess would be very bad as to her Distemper if her Desires were not answered ; and in *Jamaica* there is Proof of a very great Uneasiness the Duke was under, the Chamber was lock'd up, and Persons that came to him were forced to come in at the Windows.  I have been long upon this Head of Surprize, because it was so much laboured by the Counsel for the Plaintiffs ; but after all this I think it is but a short Point ; here is a Deed made in 81, fully proved and found to be a good and true Deed by a Verdict at Law, and as such, is a good and sufficient Conveyance of the Land at Law : And that is made to my Lord of *Bath* pursuant (as to the Ground and Substance of it) to the Will in 75 ; though all the particular Limitations do not agree ; here is no Fraud, no Falsehood proved, no Practice that appears at all upon the Duke to obtain it.  But here is the Want of a Counterpart and Want of Notice to the Trustees, and these must be Matters to make out a Surprize to set aside this Deed.

I confess I am at a very great Loss upon what Ground of Reason that Rule is founded, and am totally to seek for a Precedent to be guided by in the Case, and therefore I cannot but be of Opinion that it cannot be set aside in a Court of Equity upon that Point.

The next Thing is that of Concealment ; they say, that this Deed was secreted and concealed by my Lord of *Bath* from the Duke of *Albemarle*, that he might not know the particular Circumstances of his Power, so as to pursue them when he had a Purpose to execute it ; and this they ground upon a Matter of Fact, which they say is testified by one of the Witnesses to the Deed ; that the Deed at the Time of the Execution was delivered to the Earl of *Bath*, and so they say it was kept by him, and the Particulars of the Power were forgot by the Duke, and so he was not informed what he ought to do, nor enabled to make a present Revocation.

They say likewise, this Deed was concealed, and not discovered upon the Sale of Part of the Estate conveyed in it to my Lord *Jefferies*, and Leases and Annuities.  But that which they insist upon (as I by my Notes take it) is a Passage in my Lord of *Bath*'s Answer to their Bill, that about the Year 1686 my Lord Duke sent to the Earl for his Will, in Order to make a new Settlement of his Estate, and this was just before he made the Will of 87.

Case 1:23-cv-03562-RDM   Document 41-1   Filed 09/13/24   Page 22 of 176

Now truly I think it may have this short and plain Answer; the Duke, if he had a Mind to revoke this Settlement, had more [84] need of the Deed than the Will, he might revoke the Will without looking into it, by making a subsequent Will; but he could not revoke the Deed, because he was by the Proviso circumscribed to the Observance of such and such Circumstances; say they those Circumstances the Duke might be apt enough to forget, and then, when he knew the Duke's Purpose to alter the Settlement of his Estate, my Lord of *Bath* should have been so ingenuous as to have sent the Deed, or have acquainted him with the Purport of it, and should have considered, that the Duke did mostly need that to effect his Purpose, more than the Will to revoke, that he might observe the Statutes of Frauds and Perjuries, required by three Witnesses to make a good Disposition of Lands by a Will, and without much ado that might be complied with: But yet all the while this Power not being observed, all his Counsel, by subtile Advice, told him would signify nothing, therefore he would not discover that, and not doing it, it must be a fraudulent Concealment in him sufficient to set aside this Deed.

They say, it is no Objection, that this was not a fraudulent Conveyance in its Creation, for every Man shall be relieved against that, which being by Fraud concealed from him he could not make such reasonable Provision against, as, if he had known of it, he might have done. Truly I do think this is the best Ground of Equity that has as yet been offered in this Case, and were it not grounded upon Facts, which in Truth upon the Proofs are quite otherwise, I should think it were a good Ground for Relief; for wheresoever a Man doth endeavour to inform himself of the Circumstances of his own Power and Condition in Order to revoke such a Settlement, where he has a Power so to do, and is hindered from coming at the knowledge of them, and especially by that Person whose Interest is to prevent a Revocation, he ought to be relieved in such Case; for it is against good Conscience that any Man should profit by any such subtile sinister Practices; therefore I say the Objection were good, if the Fact were true.

But alas, it is founded in this Case upon Presumption meerly: It doth not appear, that the Duke was desirous or needed to be informed at all in the Matter, or that he did really intend a Revocation, we do not hear any Proof that he did ask or speak to any Counsel about it; nor is it true in fact that the Duke should expect the Deed out of my Lord of *Bath's* Hands, nor indeed could he expect any such Thing, for I take it, it stands plain in Proof thus:

My Lord of *Bath* says in his Answer, that the Deed was delivered to, and kept by the Duke; they say that Answer of his, being a Defendant, is not to be regarded, for it is replied to generally, and so the Facts not acknowledged any further than they are proved. But to that I say, the Plaintiff must prove that [85] this Deed was in my Lord of *Bath's* Hands; they say *Aleman* proves it, who says it was deliver'd into the Earl's Hands: This was look'd upon as so material a Point in this Case, that the Deposition was called for to be review'd; and upon reading it again, it was plain it must be understood of the Delivery of the Deed only to execute it and make it a good Deed, not a Delivery into his Custody.

Nay, there is a farther strong Evidence, that it was in my Lord Duke's Hands, and not in my Lord *Bath's*; for Sir *Tho. Stringer* doth, a little before the Duke went beyond Sea, make an Abstract of it, and delivers it to his Man to make a Copy of; and then after the Duke's Death both Deed and Will were produced under one Cover (but it is plain the Will was delivered to the Duke). This answers it, and agreeth to what my Lord of *Bath* saith in his Answer, that they were both delivered to him by the Duke a little before his going to *Jamaica*, under that Cover, and sealed with the Duke's own Seal, and so they are found. And truly, if it were but doubtful, whether it were in the one Hand or the other, we must not determine that it was in my Lord of *Bath's* Hands, or convict him or any Man of Fraud where the Evidence is doubtful, it ought to be proved, and plainly proved; for Fraud is a Thing odious, and never to be intended or presumed.

But the Truth was, this Deed was concealed not from the Duke, but from the Dutchess, that she or her Counsel should not get at it to procure a Revocation.

As for the Case of *Charles Clare* that was mentioned, it doth not in any Sort come up to this Case; he had lent Money upon a Statute, afterwards Money is lent upon a Mortgage of the Lands liable to that Statute; he ingrosseth the Mortgage, and never discovereth the Statute, the Lands were not worth more than the Mortgage-Money,

and by Reason of this Concealment, it was adjudg'd Fraud in him, and he should have no Benefit of his Statute against the Mortgagee. Here was a knowledge proved in the Case, which is not in my Lord of *Bath's*, that the Duke would revoke ; and yet I must needs say, and I appeal to those Gentlemen that usually attend at this Bar, whether they did not think it a hard Case.

And as to the Case of *Raw* and *Pott*, besides that it was a Case between a younger and an elder Brother, and so might have a better Ground or Handle for Equity, yet I think it was justly decreed, because the Party knew it, and conceal'd it on Purpose, and encouraged the Thing : for when he was asked, why he did not discover it ? Then he answered, if he had, then there would have been a Fine levied, and a Recovery suffer'd, and then he knew all would have been well enough ; but there is no such Matter as Knowledge, or the like, here.

The next Head of Objections is that of a Revocation in Equity ; and for that the first Thing insisted upon is this ; they would have the Deed of 81 to be depending upon the Will of 75, it was ancillary, it leaned upon it, and therefore this Will of 87 revoking [86] the Will of 75, revokes likewise the Deed of 81 : And for this they did cite two Cases out of *Dyer* ; the first is *fol.* 49, 6. A Man makes a Feoffment to perform his last Will, and this Will is annexed to the Charter of Feoffment, and a Livery of Seisin is made ; accordingly it was adjudged that he might alter and revoke that Will, tho' it took Effect by the Livery ; for that doth not alter the Nature of a Will, which is always revocable by the last Will : But doth that revoke the Deed too ? No certainly, the Deed stood good ; and there is nothing to the contrary appears in that Book.

The other Case is *Dyer*, 314, 6. A Man by Deed indented declares, That whereas he had suffer'd a Common Recovery, to the Intent to perform his Will, touching the Disposition of his Lands, he wills so and so ; and whether he could, during his Life, alter the Uses in this Indenture, was the Question ; and it is held he might : For this Indenture is *Quasi* a will, which is changeable : I will go further than that, I say it was a Will, or it was nothing ; for tho' it were in Form of an Indenture between several Parties, yet when he says, he wills so and so, after he had recited a Power to declare by Will, this must be taken for a Will, or it is no Execution of the Power ; for when a Man suffers a Recovery, or makes a Conveyance to me by his last Will, he hath two Interests in it ; he may dispose of it as Owner, or by Way of Direction : If he will dispose of it by Way of Direction, as this was, he must follow the Method prescribed, and that must be by Will ; and so this must be a Will, or no Execution of his Power. But what is that to his Purpose, that a Will, which a Deed is made to confirm, being revoked, that shall revoke the Deed too ? Sure that is no Consequence, nor hath any Ground upon this Case.

But then, say they, here is a Revocation, and that a Revocation in Equity ; for though it be a good Deed in Law, yet there is such a contrary Disposition by this Will, as must revoke it, being revocable according to the Power. Indeed here is not the Number of Witnesses required, nor the Quality, nor a Tender of the Money, and Powers of Revocation ; for it is natural Equity, that he, who is Owner of an Estate, should dispose of it as he pleaseth. But there is another Rule of Law that is as certain as any other, that all Circumstances must be observed, or the Power not well executed ; and that is *Scroop's* Case, and other Cases that have been mentioned : And though the Law will go as far as it can to expound the Circumstances, as a Performance, yet a Performance is necessary.

The Foundation for this Revocation in Equity, which the Plaintiffs go upon, is this ; where there is a deliberate Intent to make a new Settlement of the Estate, and a Man goeth as far as he can to make it, there Equity shall supply any Defect.

*First*, I must deny, that in this Case the Duke of *Albemarle* hath done all that he could do ; for he thought six Witnesses necessary to the Will of 1675, and six Witnesses to the Deed of 81, and so provides in this Power for Revocation, besides other Circumstances, and here are only three Witnesses to this last Will.

[87] Neither is this a proper Settlement of a Family ; for it doth not appear that Mr. *Monk*, who is mainly taken Care of in this last Will, was any Kin to the Family at all : Nay it should seem the Duke was not spontaneous about it, for he would have the Dutchess pay the Counsels' Fees as for her Business ; when he came to execute it, it was not a Place that he came to for that Purpose, but upon quite another Affair ; he would have put it off to another Time ; he would have avoided it, it was done in

a Hurry, and before Witnesses prepared for that very Occasion, and brought from *Newcastle House*; and therefore it is not so much his Intent and firm last Purpose.

On the other Hand they oppose this Argument thus; That the Duke did at the same Time write to my Lord of *Bath*, that his Purposes towards him were unalterable; and what his Meaning in that should be, unless his Purpose not to revoke this Deed and Settlement, truly I cannot tell: He left the Keys of all his Evidences with him when he went away; *Crofts* was ordered to deliver them to the Earl as chiefly concern'd, if he should miscarry; he trusts him with the chief Management of his Affairs, directs him to be advised with upon all Occasions, as he used to do himself before, and so is the same still towards him in all respects as ever he was.

I do not find in any of the Plaintiff's Proofs, that there is any Cause shewn for altering this Mind of my Lord Duke's, if he had not himself declared it so to be unalterable; there was no Provocation on the one Side, or Increase of Merit on the other Side, why he should change from his Kindness so grounded towards the nearest Relation of his Blood, to entertain a Stranger, to whom he had never a Thought of giving any Thing before; it is hard to think that my Lord of *Bath*, Sir *Walter Clarges*, Mr. *Greenville*, and even the Dutchess her self, should continue the same, and the Duke should not; I find no Evidence of it, nor can tell any Reason for it, and without Reason I cannot be induced to give my Opinion, against a Deed really, deliberately, intentionally made, upon only the single Act of this Will, testifying so great and total a Change; surely if any such Thing had been meant, it was strange he should take no Notice of this solemn Will and Deed made before, and ask Advice whether it were not fit to revoke or look into it.

To my thinking, the Duke hath in Effect declared, that this Will in 1687 should be taken for a Will as obtained by Surprize, for he binds himself by this Proviso only to revoke in such and such a Way to prevent Surprize: We then find there a Will that wants these Circumstances, required in the Proviso, and then we must take it to be what he intended to fence himself against; and nothing doth reconcile the Duke to himself in this Matter, but that he was apprehensive he should be drawn to do something that was against his Mind, and therefore he doth fence himself with this Proviso against all such Attempts.

[88] The Will and the Deed do both provide largely for the Dutchess, but whether the Will doth it so liberally as the Deed doth, I cannot tell; they did talk as if there was 3 or £4000 Difference: I cannot tell what as to the Value it may be; but I am sure in this Will there is no Provision made for my Lord of *Bath* at all, and there is none for Mr. *Monk* in the Deed, or any other Thing before this last Will.

I must crave Leave to differ from the Counsel for the Plaintiff in what they take to be a Ground for a Revocation in Equity, that the Duke had forgotten this Deed; I am not satisfied that upon that Ground only this Court should relieve against it: And my Reason is this; Suppose his Intention to revoke do appear, it ought to be in such a Manner as the Law requires, and pursuing such Circumstances as he has put upon himself, because here is a voluntary Conveyance on both Sides; and where there are two voluntary Conveyances, he that hath the Advantage at Law ought to keep it. And so the Resolution was in *Fry* and *Porter*'s Case (Cases in Chancery, 1 Part 138; and 1 Vent. 199): And I take it to be the standing Rule in Equity; for what shall turn the Scale? Shall the Defendant urge any Thing of Merit? That cannot be in this Case, but in the Eye of the Law they are both equal under the Consideration of the Court, and *in pari gradu*; and indeed if it should be otherwise, what would become of Circumstances in Powers of Revocation, by which Men shackle and circumscribe themselves with very good Reason at their Creation, if the last Will alone shall set aside all?

It is objected, That it was always the Duke's solemn Intent to prevent the dishonourable Descent of his Estate upon his right Heir at Law, who sprung from a Regicide, and to prevent a Surprize by a sudden surreptitious Will; and both these Ends are attained by the solemn deliberate Preparation for his Will, and the Disposition of his Estate to Mr. *Monk*, and it is substantially and therefore equitably performed, tho' not strictly legally.

I think there was a further End in this Deed, and that was to settle his Estate upon a Person of Honour nearly related to him in Blood; and this Court cannot take it from him without reflecting on this Settlement, and upon him that made it, and upon him for whom it was made; no, nor can it be done, as I take it, without performing

the Circumstances required and prescribed for that Purpose in the Proviso, without which I think this Court ought not to determine that the Intent is performed, or that his Mind is changed. And if we shall depart from these Limits, I cannot tell where we shall stop. I can set this as a good Limit; here is a voluntary Conveyance on the one Side, and a voluntary Conveyance on the other Side; the latter Conveyance must make it out, that the Circumstances requisite are performed; and if not, I think the Law must decide it; and there hath been nothing made out, by which, as I conceive, there can be any Advance given in a Court of Equity to determine it otherwise than the Law will.

[89] I shall speak but very little to the other Head; It is objected and asked, whether there should be no Relief in any Case where there is a Defect in the Execution of the Power. I think that would be very hard on the other Side, and it would be convenient Relief should be given in these Cases.

*First*, For a Purchaser; I speak not now of a Purchaser for a valuable Consideration without Notice, for that is helped already by the Statute, and so where there is any Fraud, or the Party is guilty of any Deceit or Falsehood, whereby a Man is prevented from executing his Power, tho' he never so much intended or desired it.

But there is no such Thing here, and the Plaintiff's Counsel were wiser Men than down-right to call this Fraud, only they stile it Surprize and Circumvention.

I think also it may be fit for this Court to give Relief where there is a foreign Consideration, as Consideration for Payment of Debts, or providing for younger Children; as where a Man makes a Conveyance or makes a Will, and chargeth his Lands over, when he has such a Power, for the Payment of his Debts, and the Circumstances of the Power are not exactly observ'd, there shall be Relief in Equity for the Sake of the Matter; Payment of Debts is a most conscientious Thing, and fit for a Court of Conscience to take Care of, and see performed; and providing for Children is a Thing of the same Nature, they are looked upon as Creditors; and I think this is reasonable, and the Precedents have all gone that Way.

The Stat. 32 *H.* 8, which gives a Man Power to devise Lands by Will in Writing, recites it as reasonable, that a Man should dispose of his Estate to pay his Debts, and provide for his Children, but goeth no further; those were wise and prudent Considerations upon which the Law did enlarge a Man's Power of disposing of his Estate; but there is nothing of either of these in this Case; every one will say he is not a Man of good Conscience that will not pay his Debts, or provide for his Children; but will any Man say that my Lord Duke had not been a Man of good Conscience if he had not given this Estate to Mr. *Monk* or to my Lord of *Bath* either? He might lawfully and conscientiously give it to the one or the other; but there is no Consideration of Equity appearing why he should be obliged to it, or to take it from the one to give it to the other, he might use his Liberty according to Circumstances and his own Power.

Another Ground of Relief in Equity is Accident, or an Impossibility of complying with the Circumstances when he hath a plain Intention to do it; I agree it is so; but then he might do all that he can; as the Case that was put, of a Man's being oblig'd to pay or tender Money at such a Place, and he falls sick or lame, or Bedridden, that he cannot go thither, and it is tendered by another by his Order, or at another Place; this being the Act of God, I think it would be a good Performance of the Condition, and that I think is the best Answer that can be given for the Decree in *Popham's* Case.

[90] But now here when the Duke was inform'd of his Paper, or might have been, and neglected all, and perform'd nothing, shall this Court supply these Defects, and Want of Performance? Sure they may as well supply all the Rest; that there should be no Hand, no Seal, and for ought I know, no Will or Deed, but only a Parol Declaration.

There is one Thing that I should properly mention last under this Head; they object it is not said, that it should be in the Presence of six Witnesses altogether: Now it was in the Presence of three Witnesses here in *England*, and three more in *Jamaica*; and so here are six Witnesses, though not all at once, and there was no Peer to be had as a Witness in *Jamaica*; so there is an Accident tendering it impossible to have any such, and therefore Equity will relieve against such an Impossibility.

I do agree, if the Duke had gone about directly to make and publish his Will in *Jamaica*, with an Intention declared to revoke this Deed, and had had six Witnesses to this his Act and plain Intention, there being no Peer to be had there, it should have been a good Revocation; as in the Case mentioned by the Counsel of *Kibbett* and

*Lee*, in my Lord *Hobart*, 312. Indeed if the Power were limited to be executed in the Presence of three Subsidy-men, it is said in the Book, that they must be averred to be Subsidy-men, but yet I take it now that old Way of Subsidies is out of Use ; three substantial Men that would have been Subsidy-men : If that were the present Way of Taxing, it would be enough, for none such would be had, nor could there be any Peer in this Case that is put.

But to consider the Case and Proofs as to *Jamaica*, what it amounts to : I would fain know how it appears, that it was the same Will that he executed at Sir Robert *Clayton*'s : The Duke only said, Doctor, this is my Will ; perhaps it was the same, perhaps it was not : But how comes his Writing, his Hand and Sealing in the Presence of three Witnesses, and declaring it after to be his Will (to make the most of it) in the Presence of three more, to be an Execution in the Presence of six Witnesses ; but beyond all this, here is no Proof that he did intend to publish this as his Will, it is only a private Saying of his on the by, when he saw it among other Papers which then he shew'd Dr. *Sloan* ; he was not then solemnly making his Will, or executing his Power ; he doth not so much as bid them take Notice that he declared that to be his Will, or any Thing to make them remember it afterwards : So that I take it, it signifies nothing as to this Matter.

I would trouble your Lordship no longer, for I have been long enough already ; I am loth to meddle with the Cases and Precedents, because that may take up too much of your Time ; but because the Precedents have been brought me, I must say something to them, to shew that I have read them ; I will therefore open some of them, such as I think come nearest the Case.

[91] They say, the Common Law goeth as far in relieving upon Cases of Powers of Revocations, as appears by *Kibbett* and *Lee*'s Case, that I mentioned but now ; where a Will is declared to be a Writing ; so the Case of *Thorne* and *Newman*'s Payment in another Place than that required in the Proviso : In that Precedent it is recited, that the Indorsement on the Back was, that the Money was paid according to the Proviso, and no Notice taken of the Place ; for upon the very Reading of the Indorsement, the Plaintiff was forc'd to be non-suit ; and afterwards that Matter was disclosed in Equity, that it was in another Place than the Place in the Proviso, but yet no Relief against his own Acceptance, who was the Party privy.

The next Case is the Case of *Guy* and *Dormer* : A Man sells his Estate, with a Power to revoke by any Writing, in express Words.

Now here they did not help the Want of a Performance, but the Judgment was, the Performance was real ; besides I cannot allow that to be any Argument, that if the Law has gone as far as it may, Equity shall go further : To me the Argument runs quite contrary ; Equity shall carry it no further ; for Equity should follow the Law.

There were several Precedents cited by the Plaintiff's Counsel ; but I confess, upon Consideration of them, very few do come up to the Case in Question ; I shall take them as near as I can in order of Time.

The first is that of *Prince* and *Green*, 40 *Eliz.* [1597–98]. There was a Power to make Leases intended to be reserved in a Conveyance by a Covenant to stand seized to Uses, and a Lease is made accordingly, as a Provision for a younger Son. This Power was not long after *Mildmay*'s Case, and the Case in *Roll's Abr.* 1 *Part, Tit. Chancery* 378. But because, says the Order, neither the Party nor his Counsel did then know but such Power was warranted by Law, though by late Judgments they were found to be void, and so it was impossible to them to prevent it, the Court did relieve in this Case to make good the Lease ; and it is there said that the elder Brother, who would avoid the Lease, was an unreasonable Man, and this was a Provision for a younger Child, which is not our Case, neither the Counsel's Mistake of the Law, nor a Provision for a younger Child.

The next is the 44 *Eliz.* [1601–2]. the Case of *Ferrers* and *Tanner* ; A Man deviseth Annuities out of Lands to his Half-Sisters, and gives the Land to his Half-Brother, who makes over his Estate to prevent their being seized of the Rent in order to distrein, and the Court, after some Time, and upon Sight of a Precedent, did relieve the Devisees.

Here I would observe how difficult it was even for this Court to do that, for they say, the Heir that had the Land, did promise the Devisor before his Death to perform the Will, and that was a Deceit, otherwise the Devisor might before his Death have done it by a Conveyance, or granted the Land with a Condition to do such an Act, or

BATH AND MOUNTAGUE'S CASE

permit such a Thing; and that he did consent afterwards before the Master of Chancery to do it, I will not say but that this Court [92] might have declared this Payment without these Circumstances, nor that these might not make the Case somewhat better; indeed in the short Print of the Case in *Moor* 626, *pl.* 859, there is no Reason but the Resolution only.

The next Case is in the Year 1655, the Case of *Hamilton* and *Maxwell* in this Court, which in short was upon very good Reason, because it was a Provision for a younger Daughter, and that is agreed on all Hands to be a good Ground for Equity, and he declar'd that his elder Daughter was otherwise sufficiently provided for.

Another Case is that of *Bowman* and *Yates*, and that is about a Covenant for levying a Fine for raising a Rent out of Lands, which was indeed defective at Law, but decreed in Equity to be paid and satisfied; but if it be looked into, I think it will not appear very pertinent to this Case, it being only to support the Intention of an Agreement upon Marriage : This was 12 *Car.* 2 [1660–61].

The next is the Case of *Wallis* and *Grimes* (Cases in Chancery, 1 Part 80), 19 *Car.* 2 [1667–68], which was this ; Sir *Thomas Grimes* the Grandfather makes a Conveyance in Trust for Payment of £500 to younger Children, the Heir makes a Mortgage without Notice, and this Trust is endeavour'd to be set up against the Mortgagee, but the Court would not permit it; but comes not near our Case, for a Mortgagee is in Nature of a Purchaser.

Then 20 *Car.* 2 [1668–69], was *Pitt* and *Pelham*'s Case in the House of Lords. (*Vide* Cases in Chancery, 1 Part 176.)

There this Court did relieve, because it was a plain Intent the Land should be sold, and there was only a Want of naming the Person that should sell, and the Law would help that : He that hath the Land shall do that Office, and he that was next Door to a Provision for Children, it being for Nephews.

For the Case of *Smith* and *Ashton* (Cases in Chancery, 1 Part 263), besides the Answer my Brother *Powel* gave to it, it has also this flat Answer to be given, that it was a Provision for Children ; that was the next Case in Point of Time.

Then comes the Case of *Brisco* and *Peters*, 28 *Car.* 2 [1676–77]. I have, as carefully as I can, perused that Case, but cannot really observe how it is made Use of in our Case, and it is very much to be consider'd, that it is no Rule between two voluntary Conveyances how far a voluntary Conveyance shall be fraudulent against a Purchaser.

The next Case is that of *Thwaytes* and *Dey*, which hath also had a full Answer given to it already : It was doubted, whether there was a Seal to it ; but the Court seemed satisfied with that; and all the remaining Question was, whether a Man making a Conveyance, and reserving a Power to make any other Estate, could charge that Land with a Rent for a younger Child, and the Court held he might, and I think it a good Decree.

These are the Precedents that are made on the Plaintiff's side, there are but few brought for the Defendant's Part, but two that I think are very material ; the one is that of *Ward* and *Booth*, which hath been opened and applied by my Brother *Powel* ; but I would observe from what he quoted out of the decretal Order in that Case, that it doth very extraordinarily declare the Limits of this Court's Proceedings, [93] in such Cases as these. Here was not a formal Revocation, but a clear and express Intention to revoke, that doth not appear in the present Case ; there should be, I agree, Relief in such Circumstances, if there were Fraud in the Party, if there had been any Accident to render it impossible to execute the Power in all Formality ; but here is neither Fraud nor Accident ; and therefore, by the Reasons and Rules in that Case, there can be no Relief in this Case.

The other is *Arundel* and *Philpot*'s Case, and that is so very express an Authority for this Court's leaving the Determination to Law, that nothing can be more : There they say, where it is a voluntary Conveyance against a voluntary Conveyance, you must try and decide the Matter at Law ; and it did fall out in that Case, that there was no need of a Court of Equity to interpose, for upon the Trial it did fall out to be proved, that there was a due and legal Execution of the Power, that there was a Tender of the Guinea.

As to the Matter of the General Trust, I need say no more than this, whether that would avail any Thing upon a Controversy between the Legatees and my Lord of *Bath*, I cannot tell ; but I am sure it is not at all as this Case now stands. Yet methinks as to a General Trust, that it cannot be ; for that were to make the Duke use all this

Solemnity in making this Settlement to no Purpose, and would render this Power of Revocation very useless and idle : the Use of this Power was because he had put the Estate out of him both in Law and Equity ; and so there could be no General Trust or Means to bring it back again without a due Execution of the Power.

There are but two or three small Objections more that I shall but mention, and conclude.

*First,* They say several Grants will be avoided if there be no Relief against this Deed, that is, some Leases, some small Annuities to Servants, and a Grant of £100 to the Duke's natural Son ; this is all. Now whether it is not reasonable to imagine, the Duke thought that the Trusting the Earl with so great a Part of his Estate, he would have more Honour and Respect for him, than to dispute such trivial Matters ; and for any Leases or Contracts, they come within the Rule of Purchases, and so the Consideration would preserve them.

Then they say, here is no Monument for the Duke, a Person of so great Quality ; but that may be made good out of the Personal Estate ; I am sure it is no Objection in Point of Law.

But the last Thing they urge, is, If there be no Relief in this Case, you put the greatest Indignity and Reproach upon the Duke that can be imaginable, that he should call Mr. *Monk* Cousin, send for him out of *Holland,* to leave his Will with him, in the Will give him so great a Share of his Estate, desire the King to make him a Baron, and appoint his Son to be educated as one that was to make no small Figure in the World ; that he should send for my Lord Chief Justice *Pollexfen* to draw his Will, make three Parts of it, deliver one to the Dutchess of *Newcastle,* another to Colonel *Monk,* **[94]** and carry a third with him to *Jamaica,* and there take publick Notice of it, and after all this Expectation raised in Mr. *Monk* of a Fortune, run him into the Charges of an expensive, but what he knew would be a fruitless Suit : This, say they, is an inconceivable Dishonour to the Duke, to be represented as one that would prevaricate so with the King and the World, and play with the Misfortunes of his Kinsman, and the rather, because the Duke was a plain sincere hearted Man, and in all this did but pursue his real Intentions of Kindness to Mr. *Monk* and his Children.

Truly, methinks they have just as much to say on the other Side : What shall those many declarations of Kindness to the Earl before this Deed, in this Deed, and after this Deed, by Letters, and other Things, signifying his Care of my Lord *Lansdown* as one he was most concerned for next to my Lord of *Bath* himself, his petitioning the King to confer on him the Title of Duke of *Albemarle* in Case of his Failing of Issue Male ; and all this to signify nothing ; besides the known Kindred, the apparent Obligations and Merit of my Lord of *Bath* : Sure if all this be consider'd, the Duke's Honour is as much concern'd on this Side as on the other, to approve himself sincere in all these solemn Transactions : Would he own him as his nearest Kinsman, and the most deserving of his Blood, and all the while have a secret Purpose in the last Act of his Life to make a Will, by which he would set aside all he had professed to do for him, and by leaving this Deed and Will with him, leave only so much in his Hands as should put him into a chargeable Suit for nothing ? Therefore, upon the Whole, I think there is greater Reason to conclude that the Duke did not certainly mean to do this last Act, as what he would have to stand against so much formerly done the other Way : But I rather think the Evidence is strong to perswade any one that the Making of this last Will was to satisfy another Purpose, and make his own Condition easy at Home.

But my Opinion, as to the Judicial Part of this Case, which I thus happen to be of, is the stronger in me, because of the Authority of two Cases, which I take to be express in Point, and those are the Cases of *Wynne* and *Roberts,* and *Fry* and *Porter.*

In the Case of *Wynne* and *Roberts,* there was Proof of a very great Surprize upon the Man, whereby he was induced to make a Will, and to disinherit his Child, of whom he was before very fond, and who was married into a very Honourable Family, and to break a Settlement solemnly made before : All this Matter was charged in the Bill, and proved : But notwithstanding this, the Court declared they would give no Relief ; but if they could expect any, they must go to Law, and at last it was ended only by a Bill in Parliament. The Court said, Try it at Law, a Will or no Will, and do not expect the Chancery should make Mens Wills, or set them aside, if legally made, especially then not upon bare Conjectures and Suppositions concerning a Man's Intentions, to relieve against a solemn Act and Title found at Law.

[95] In *Fry* and *Porter*'s Case (Cases in Chancery, 1 Part 138 ; 1 Vent. 199), one of the great Reasons, why the Court denied Relief there, was, that it was a Controversy between two voluntary Conveyances ; and there that Side that had the Advantage at Law, ought to keep it ; and it was without Precedent to relieve in any such Case.

So I say in this Case, we have no Precedent of Relief in any such as this now before us ; we must not say this Court is unlimited, unbounded by any Rules ; it is no Doubt limited by Precedents and Practices of former Times, and it is dangerous to extend its Authority further : If therefore I err in my Opinion in this Case, I err with these Precedents on my Side ; and because I have never a one to guide me the other Way, the Defendants are in Possession of a Verdict, Judgment and Title at Law, and I can see no Ground of Equity to relieve the Plaintiffs against them.

*Then it being very late, the Court put off the Delivering the Lord Chief Justice* Holt's *Opinion, and the Lord Keeper's Decree till another Day.*

------

[96] DIE VENERIS 23 Decemb. 1693. In the Court of Chancery in Westminster-Hall, *Comes* MOUNTAGUE & *alii versus Comitem* BATHONIENSEM & *alios,* & *econtra.*

### *Lord Chief Justice Holt.*

In this Case, wherein the Earl of *Mountague*, and the Dutchess of *Albemarle*, and others, are Plaintiffs ; and my Lord of *Bath*, and others, Defendants, I shall open the Case very shortly, as it stands upon the two Wills and upon the two Deeds.

There was a Will made in the Year 1675, by *Christopher* Duke of *Albemarle*, wherein there is a Disposition of several Parts of his Estate upon his Dying without Issue to several Persons ; but the main Part and Bulk of it is given to my Lord of *Bath* : And in that Will there is Mention made of a particular Esteem and Affection which the Duke bare to my Lord of *Bath* ; that he was the nearest of his Kinsmen by his Father's Side ; and that he also was indebted to him for many great Acts of Friendship and Offices of Kindness performed to him and his Father. Then there is in that Will also an express Desire that the Title of Duke of *Albemarle*, by the King's Favour, might be conferred upon the Earl of *Bath* ; and that the eldest Son of the Earl of *Bath*, and so the eldest Son of the Family successively, should be called Lord *Monk* : So that the Names of *Albemarle* and *Monk* may, with the King's Favour, remain with his Estate in the Posterity and Family of my Lord of *Bath*, in Memory of the late Duke his Father and himself.

The Estate being so disposed of by his Will of 75, there are two Deeds made in the Year 1681, a Lease and a Release. The Release doth recite this Will ; but in the Recital of it, there are some Differences from what is in the Will it self, some Variations from it. In this Deed it is mention'd, that the Intent and Design of the Deed was to dispose of the Estate, according as was in the Will : And whereas it might be thought strange that the Duke by his last Will, which by that Deed he doth confirm, and not intend to revoke, should give away his Estate from the Heir at Law : Therefore, for the Satisfaction of the World, the Duke doth declare the Reason, which hath been frequently mention'd ; and then the Deed disposeth of the Estate, some to the *Greenvils*, some to the *Clarges*, but the Main and Bulk of the Estate he settled upon my Lord of *Bath*. But in this Deed there is a Power of Revocation, to this Effect, That it shall be lawful for the Duke at any Time to revoke this Deed, upon the Tender of a Shilling, by Writing under Hand and Seal, in the Presence of Six Witnesses, whereof Three to be Peers of the Realm, and then to limit new Uses.

[97] Then he makes his Will in the Year 1687, and therein he gives his Estate in a different Manner, that is the Bulk and Main of it is given, instead of my Lord of *Bath*, to Mr. *Monk*, whom he supposeth to be his Kinsman, and desires that the Name and Title of Baron *Monk* may, by the King's Favour, be bestowed upon him, in Case he himself died without Issue.

Now the Question is, Whether or no this Will in 87 hath revoked this Deed made in 81 in Equity, for there are but three Witnesses to this Will, and not one of them a Peer ; so that in Law it is very plain it is no Revocation at all : It cannot be a good Revocation there, because the Power is not pursued, the Circumstances are not observed ;

**AD-2**

**[82]** REYNELL *v.* REYNELL.   *Dec.* 13, 1843.

An order of the Master, giving the Defendant three weeks to answer after the
   Plaintiff had amended his bill, which was defective for want of parties, discharged
   as irregular.

This bill was filed on the 21st of July 1843.   On the 6th of November, and before
the Defendant had answered, the Plaintiff gave notice to the Defendant, that on the
15th of July 1843 he had conveyed one moiety of the estates mentioned in the bill,
" to Charles Wilson, his heirs and assigns, to uses, for the benefit of R. S. M. Sprye
and Henrietta D. his wife."

   The Defendant's solicitor thereupon wrote to the Plaintiff's solicitor, to know if
he intended to obtain an order to amend, by adding those persons parties, and in
reply was informed, on the 10th of November, " that no amendment would be made
until after the Defendant's answer had been put in."

   **[83]** On the 16th of November the Master ordered "that the Defendant should
have three weeks' time to plead, answer, or demur to the Plaintiff's bill, not demurring
alone, after the Plaintiff should have amended his bill."

   Mr. Kindersley now moved to discharge this order, on the ground that it was
irregular, and that the Master had no authority to make an order in this form.

   Mr. Piggott, *contrà*, contended, that the order was valid, though perhaps unusual,
and that it was one which would have the effect of saving considerable expence and
delay to the parties.

   THE MASTER OF THE ROLLS [Lord Langdale].   The Master must have been taken
by surprise in this case ; I think the order cannot be supported.   Let it be discharged
without costs, and let the Defendant have three weeks' time to answer.

**[83]** ELLIS *v.* GRIFFITHS.   *Jan.* 11, 1844.

In a foreclosure suit, the mortgagee having received rents between the date of the
   Master's report and the day appointed for payment, the Court, on motion, referred
   it back to the Master to continue the accounts, and to fix a new day.

A decree was made for foreclosure, and a day was appointed for payment at the
Rolls Chapel of £4961, 2s. 9d., the amount by the Master's report found to be due on
that day, and in default the Defendant was to be foreclosed.

   **[84]** The mortgagee, being in possession, received half a year's rent, after the date
of the report, and before the day appointed for payment. (*Garlick* v. *Jackson*, 4
Beavan, 154 ; and *Alden* v. *Foster*, 5 Beavan, 592.)   He attended at the Rolls on the
day named (14th November 1843), but no person tendered the amount.

   The balance having been altered by the receipt of the rent, the mortgagee now
came, by motion, to refer it back to the Master to carry on the subsequent account,
and to appoint a fresh day to redeem.

   Mr. Stinton, in support of the application.

   THE MASTER OF THE ROLLS [Lord Langdale] made the order.

**[84]** CROFT *v.* DAY.   *Dec.* 18, 1843.

[See *Metzler* v. *Wood*, 1878, 8 Ch. D. 608 ; *Turton* v. *Turton*, 1889, 42 Ch. D. 144 ;
   *Tussaud* v. *Tussaud*, 1890, 44 Ch. D. 691 ; *Reddaway* v. *Banham* [1896], A. C. 209.
   Cf. *Valentine Meat Juice Company* v. *Valentine Extract Company, Limited*, 1899, 1900,
   17 R. P. C. 1, 673 ; *Cash* v. *Cash*, 1901, 1902, 18 R. P. C. 213 ; 19 R. P. C. 181 ;
   *Morrall* v. *Hessin*, 1903, 20 R. P. C. 429.]

A blacking manufactory had long been carried on under the firm of Day & Martin,
at 97 High Holborn.   The executors of the survivor continued the business under

the same name. A person of the name of Day having obtained the authority of one Martin to use his name, set up the same trade at 90½ Holborn Hill, and sold blacking as of the manufacture of Day & Martin, 90½ Holborn Hill, in bottles and with labels having a general resemblance to those of the original firm. He was restrained by injunction.

Principles on which the Court interferes to prevent the use of trade marks.

This was a motion, on behalf of the executors of Mr. Day, the well-known blacking maker, to restrain the Defendant, his nephew, from selling blacking manufactured by him, in bottles having affixed thereto labels, being copies, or fac-similes or imitations with colourable variations only, of those used by the firm of Day & Martin, or any labels which should repre-[85]-sent, or have the appearance of representing, the said firm of Day & Martin as manufacturers of the composition or blacking described in such labels, and from using trade cards of the same description.

It appeared from the case of the Plaintiffs, that in 1801 Charles Day and Benjamin Martin entered into partnership as blacking manufacturers, for the term of 21 years, and carried on the business at 97 High Holborn. In 1808 Martin transferred his interest to Day, who was to be at liberty to use Martin's name for the remainder of the 21 years. This term was afterwards extended for 25 years, from the year 1820, determinable on the death of Martin, and they agreed (but how did not appear) to be partners for that period.

Martin died in 1834, and Day died in 1836, and the business was carried on in the names of Day & Martin by Day's executors. The Defendant Day, the testator's nephew, had recently set up as a blacking maker at No. 90½ Holborn Hill, and had sold blacking in similar bottles, and with similar labels (with some variations), to those which had heretofore been used by Day & Martin, and to those now used by the executors of Day. The variation was thus described in the affidavit:—"Saith, that the name of the article sold as being real Japan blacking made by Day & Martin, and the description and directions for the use of the said article, and the price, and signature of the names Day & Martin, contained in the labels of the Defendant, are in the same precise words, and (with very trifling and unimportant variations) are in the same character and description of type, as the name of the article to be sold, and the description, and directions for use, and the price, and the signature of the said firm in the label used by the firm of Day & Martin as aforesaid ; and the only difference in the **[86]** two labels is, that the Defendant has substituted the Royal arms in the centre of the label, for the representation or drawing of the manufactory of the firm contained on the labels of the firm, and has substituted in the label the figures and words 90½ Holborn Hill, for the figures and words 97 High Holborn, contained in the label of the firm, and has omitted to insert in the figures 90½ the names Day & Martin, in the manner in which those words or names are inserted by the firm in their said figures 97."

The Defendant by his affidavit stated, that the carts of the Plaintiffs now bore the names of Charles Day and Richard, and not Benjamin, Martin. That previously to his the Defendant's vending or offering for sale any blacking, he applied to an intimate acquaintance of his, of the name of Martin, to join him in the manufacture and sale thereof, and obtained permission to use his name, in conjunction with his own, as manufacturers and vendors of blacking, and that he, the Defendant, was now in treaty, and only waiting the result of this suit, finally to settle the terms of a partnership with Mr. Martin, for carrying on the said business of blacking manufacturers.

Mr. Tinney, Mr. Purvis, and Mr. Toller, in support of the motion, argued, that the Defendant was intentionally practising a fraud upon the Plaintiffs, and a deception on the public ; and that whatever might be his right to manufacture and sell blacking in his own name, still he had no right or authority to assume the additional name of Martin, and use labels, &c., whose general character was so similar to that which the Plaintiffs and the testator had long been in the habit of using, as to induce purchasers to believe that the article **[87]** sold by the Defendant was manufactured by and purchased from the Plaintiffs.

Mr. Turner and Mr. Mylne, *contrà*, contended that the Defendant had an undoubted right to affix his own name to his own manufacture, and that he had authority to add

CROFT *v.* DAY

that of Mr. Martin, with whom he was in treaty for a partnership. That there was a marked difference between the labels, and as to those points in which there was a resemblance, they had long been adopted by the trade in general.

That the Plaintiffs had practised a deception on the public, by representing the manufacture to be that of Day & Martin, while no person of those names was concerned therein; that consequently the Plaintiffs came before the Court under circumstances to disentitle them to its assistance.

*Knott* v. *Morgan* (2 Keen, 213), *Perry* v. *Truefitt* (6 Beavan, 66), were referred to.

THE MASTER OF THE ROLLS [Lord Langdale] (without hearing a reply). What is proper to be done in cases of this kind must, more or less, depend upon the circumstances which attend them.

There are cases like that of the London Conveyance Company, in which the injunction is granted at once; there are cases like that of the Mexican Balm, in which the injunction is refused until the Plaintiff has established his right at law. In short, in such cases, there must be a great variety of circumstances; and the Court must deal with each case according to the nature of its peculiar circumstances.

**[88]** The accusation which is made against this Defendant is this:—that he is selling goods, under forms and symbols of such a nature and character, as will induce the public to believe, that he is selling the goods which are manufactured at the manufactory which belonged to the testator in this cause. It has been very correctly said, that the principle, in these cases, is this:—that no man has a right to sell his own goods as the goods of another. You may express the same principle in a different form, and say that no man has a right to dress himself in colours, or adopt and bear symbols, to which he has no peculiar or exclusive right, and thereby personate another person, for the purpose of inducing the public to suppose, either that he is that other person, or that he is connected with and selling the manufacture of such other person, while he is really selling his own. It is perfectly manifest, that to do these things is to commit a fraud, and a very gross fraud. I stated, upon a former occasion, that in my opinion, the right which any person may have to the protection of this Court, does not depend upon any exclusive right which he may be supposed to have to a particular name, or to a particular form of words. His right is to be protected against fraud, and fraud may be practised against him by means of a name, though the person practising it may have a perfect right to use that name, provided he does not accompany the use of it with such other circumstances as to effect a fraud upon others.

It is perfectly manifest, that two things are required for the accomplishment of a fraud such as is here contemplated. First, there must be such a general resemblance of the forms, words, symbols, and accompaniments as to mislead the public. And, secondly, a sufficient distinctive individuality must be preserved, so as to procure for the person himself the benefit of that **[89]** deception which the general resemblance is calculated to produce. To have a copy of the thing would not do, for though it might mislead the public in one respect, it would lead them back to the place where they were to get the genuine article, an imitation of which is improperly sought to be sold. For the accomplishment of such a fraud it is necessary, in the first instance, to mislead the public, and in the next place, to secure a benefit to the party practising the deception by preserving his own individuality.

There are many distinctions, even more than have been stated, between these two labels. It is truly said, that if anyone takes upon himself to study these two labels, he will find several marks of distinction. On the other hand, the colours are of the same nature, the labels are exactly of the same size, the letters are arranged precisely in the same mode, and the very same name appears on the face of the jars or bottles in which the blacking is put. It appears, therefore, to me that there is quite sufficient to mislead the ordinary run of persons, and that the object of the Defendant is, to persuade the public that this new establishment is, in some way or other, connected with the old firm or manufacturer, and at the same time to get purchasers to go to 90½ Holborn Hill, and not to 97 High Holborn. I think what has been done here is quite calculated to effect that purpose, and the Defendant must be restrained.

My decision does not depend on any peculiar or exclusive right the Plaintiffs have to use the names Day & Martin, but upon the fact of the Defendant using those

names in connection with certain circumstances, and in a manner calculated to mislead the public, and to enable the Defendant to obtain, at the expense of Day's estate, a benefit for himself, to which he is not, [90] in fair and honest dealing, entitled. Such being my opinion, I must grant the injunction restraining the Defendant from carrying on that deception. He has a right to carry on the business of a blacking manufacturer honestly and fairly; he has a right to the use of his own name; I will not do anything to debar him from the use of that, or any other name calculated to benefit himself in an honest way; but I must prevent him from using it in such a way as to deceive and defraud the public, and obtain for himself, at the expense of the Plaintiffs, an undue and improper advantage.

The form of the injunction was discussed, when

THE MASTER OF THE ROLLS, after stating that he was inclined to rely on the terms of the injunction in *Knott* v. *Morgan,* as that case had been the subject of appeal, said, he would himself settle the terms of the injunction.

By the terms of the injunction, the Defendant, his servants, &c., were restrained from selling, or exposing for sale, or procuring to be sold, any composition or blacking described as, or purporting to be, blacking manufactured by Day & Martin, in bottles, having affixed thereto such labels as in the Complainants' bill mentioned, or any other labels, so contrived or expressed, as, by colourable imitation or otherwise, to represent the composition or blacking sold by the Defendant, to be the same as the composition or blacking manufactured and sold by John Weston (the manager), for the benefit of the estate of Charles Day the testator; and from using trade cards, so contrived or expressed, as to represent that any composition or blacking sold or proposed to be sold by the Defendant, is the same as the composition or blacking manufactured or sold by John Weston.

## [91]  STORY *v.* TONGE.   *Jan.* 23, 25, *Feb.* 20, 1844.

### [S. C. 13 L. J. Ch. 191; 8 Jur. 566.]

Whether a *feme covert,* who is entitled to a reversionary interest in a chose in action, can, by obtaining a release of the prior interest, effectually dispose of the property, *quære.*

The testator gave his residuary personal estate to his widow *durante viduitate,* and on her decease, upon certain trusts, under which Elizabeth, the wife of G. L. Moore, was entitled to a vested interest in one-ninth part, immediately expectant on the decease or marriage of the widow.

The property amounted in the whole to about £1800, and consisted of a mortgage, and of a sum of £312 consols in Court. The parties being desirous of compromising the suit, the widow released unto G. L. Moore and wife her interest in one-ninth of the residuary estate, the object being, to reduce the reversionary interest of Mrs. Moore into one in possession, for the purpose of effecting the compromise.

A petition was now presented, praying a division of the consols in the manner agreed upon. He cited the following authorities:—*Doswell* v. *Earle,* 12 Ves. 473; Lewin on Trusts, 296 (2d edit.); *Wilson* v. *Oldham, Ibid.* 297; *Bean* v. [92] *Sykes,* 2 Hayes on Convey. 640 (5th edit.); *Lachton* v. *Adams,* 5 Law J. Rep. (N. S.) Chanc. 382; 6 Jarman's Convey. 236 (1st ed.); *Preston* v. *Smelt,* 2 Leg. Ex. 501; *Re Silcock's Estate,* 3 Russ. 369.

THE MASTER OF THE ROLLS [Lord Langdale], after consideration, thought that the principle involved in this case was of too much importance to be decided on petition, and intimated that a bill must be filed to accomplish the wishes of the parties.

**AD-3**

incumbent on the plaintiff to prove? **[38]** He must prove the subscription of the underwriter, his own interest in the goods, his shipping them on board the vessel described in the policy, and the loss of them in consequence of such an act by the captain as amounts to barratry; that is, that he went out of the course of his voyage for a fraudulent purpose. It was not incumbent on the plaintiff to prove that the captain was not the owner, for that would be calling on him to prove a negative; and if the captain were not the owner, it is immaterial who was. Proof of that fact, which operates in discharge of the other party, lies upon him. I agree that, if the captain had freighted the ship for the voyage, he could not be guilty of barratry; but the proof of such a fact lies equally on the defendant. It is then asked, why it should not be presumed that the captain went out of his course by the directions of his owner, if he had any? The reason is plain; because the Court cannot presume fraud in another person. The case put of an indictment for burglary, does not answer the purpose for which it was cited. For suppose the goods were not actually taken and carried away, observe what would be sufficient to be proved; the fact of breaking and entering the house; and whose house it was; and that it was in the night; because all these circumstances are specifically alleged in the indictment, and they are all affirmatives; then the intent with which these facts were done is equally material: but if the prosecutor prove all the former circumstances, it is a question for the jury to determine, whether he did not enter with the view of stealing the goods, unless the party accused can shew to their satisfaction that his intent was innocent. That brings me to the next question, which, in my opinion, is the most material one here, namely, what was the view of the master when he sunk his anchor at the mouth of the river Mississippi? for if it were done with a fraudulent view, I hold that the very sinking of his anchor was an act of barratry. His intent in so doing was a question for the jury; and they have found by their verdict, that it was with the barratrous intention charged. It appears that he had some negroes on board belonging to himself, which he wished to have disposed of at New Orleans; but finding upon going up thither in his boat, that he should not be able to do so, he returned back again to his ship, and immediately sailed for another port. Then is it too much to say, that he went to New Orleans for the purpose of his own private advantage, and that the stopping the course of his ship was for a fraudulent purpose? Does it not prove clearly that when he dropped **[39]** his anchor, he did not intend going to New Orleans, unless it suited his own private advantage? The evidence, too, to be collected from the letters, shews that he was considered as a thief and criminal, and pursued as such; and that all the persons concerned treated him in the character of master only.

Grose, J. of the same opinion.

Rule discharged.

DOE ON THE DEMISE OF WILLIS AND OTHERS *against* MARTIN AND OTHERS.
   Friday, Nov. 19th, 1790. By a marriage-settlement lands were conveyed to trustees to the use of the wife for life, remainder to the use of the husband for life, remainder to the use of all and every the children of the marriage, or such of them, and for such estates, &c. as the husband and wife should appoint; and for want of such appointment, to the use of all and every the child or children, equally, if more than one, as tenants in common; and if but one, then to such only child, his or her heirs or assigns for ever; remainder over; in the deed was contained a power enabling the settlers to revoke the uses of the settlement, and the trustees to sell the estate, and convey it to a purchaser, so as the purchase-money should be paid to the trustees (and not the settlers) and invested in the purchase of other lands to the same uses; it was held, that the remainder to the children was a vested remainder in fee in each child when born, liable, however, to be divested by an appointment by the parents; and consequently (no appointment having been made) that the remainder to the children could not be defeated by a deed of revocation by the parents and a conveyance by them and the trustees to a purchase, who paid the consideration-money to the settlers (not to the trustees) which was never laid out in the purchase of any other lands. That power of revocation was conditional; and as the conditions, namely, the payment of the money to the trustees, and the settling of other estates to the same uses, were not performed, the deed of revocation was a nullity.—Fraud will vitiate

any transaction, though the principal do not personally take any part in the fraud, if his agent do; for the principal is civilly responsible for the acts of his agent. [6 East, 289, 494. 1 Taunt. 289.]

[Principle applied, *Cholmeley* v. *Paxton*, 1825-30, 3 Bing. 214; 11 Moore, 27; 10 B. & C. 572; 5 M. & R. 517; *Heron* v. *Stokes*, 1842-45, 4 Ir. Eq. R. 285; 2 Dr. & War. 100; 12 Cl. & F. 161. Referred to, *Rochfort* v. *Fitzmaurice*, 1842, 4 Ir. Eq. R. 379; 2 Dr. & War. 15; *Phipps* v. *Ackers*, 1842, 9 Cl. & F. 600; *Hart* v. *Tulk*, 1852, 2 De G. M. & G. 314. Distinguished, *Watkins* v. *Williams*, 1851, 3 Mac. & G. 632. Referred to, *Lambert* v. *Thwaites*, 1866, L. R. 2 Eq. 155. Applied, *Rotherham* v. *Rotherham*, 1884, 13 L. R. Ir. 453. Referred to, *Board of Works* v. *Symes*, 1892, 32 L. R. Ir. 602.]

This was an ejectment for some premises in the Isle of Wight, on the joint and several demises of Richard Legg Willis, James Willis, Bethia Ann Willis, and Mary Willis, and on the trial at the Summer Assizes at Winchester, 1789, before Buller, J. a special verdict was found, stating in substance as follows:

That Bethia Legg, being seised in fee of the premises in question, on her intended marriage with Richard Willis, by deeds of lease and release, dated the 14th and 15th of February 1757, between Richard Willis of the first part, Bethia Legg of the second part, and Peter Bracebridge and Robert Willis of the third part, conveyed to Bracebridge and Robert Willis and their heirs to the use of herself in fee till marriage, and afterwards, to her sole and separate use for life, without impeachment of waste, and not to be subject to the controul or debts of her husband; remainder to the use of Richard Willis for life, without impeachment of waste; remainder to the use of all and every the child or children or such of them of Richard Willis and Bethia for such estates and interest, &c. and in such parts, shares, and proportions as Richard Willis and Bethia should by deed [40] appoint, and for want of such appointment, then to the use of the child or children of Richard Willis and Bethia in such parts, shares, and proportions, and for such estates and interest, as the survivor of them should by deed or will appoint; and for want of such appointment, then to the use of all and every the child or children equally, share and share alike, to hold the same; if more than one, as tenants in common, and not as joint tenants; and if but one child, then to such only child, his or her heirs or assigns for ever; and in default of such issue, then to the use of the survivor of Richard Willis and Bethia in fee. The deed contained the following proviso: that in case the said Richard Willis and Bethia, his intended wife, or the survivor of them, should at any time thereafter be desirous to make sale of the said manor, &c. or any part thereof, then and in such case it should and might be lawful to and for the said Richard Willis and Bethia, his intended wife, or the survivor of them, at any time or times thereafter, by any writing or writings to be signed or sealed by the said Richard Willis and Bethia, his intended wife, or the survivor of them, to revoke and make void all and every or any the use and uses, trust or trusts, estate or estates, therein respectively before limited, and declared of and concerning the said manor, &c. with the appurtenances; and for the said Philip Bracebridge and Robert Willis, or the survivor of them, his heirs and assigns, to sell and dispose of the same, for the best price that could or might be had or gotten for the same, and convey the same to a purchaser thereof, "so as that the purchase-money thereof should be paid into the hands of the said Philip Bracebridge and Robert Willis, or the survivor of them, his heirs and assigns, and not into the hands of the said Richard Willis and Bethia, his intended wife, or either of them, to be laid out and invested by the said Philip Bracebridge and Robert Willis, or the survivor of them, his heirs or assigns, in the purchase of other freehold messuages, lands," &c. at the request of the said Richard Willis and Bethia, his intended wife, or the survivor of them, to be settled to the same uses, trusts, intents, and purposes, as were therein before limited, &c. It was also provided, that the trustees might invest the purchase-money in Government or other securities in their names, and pay over the dividends to the persons who would have been entitled to the profits of the real estates. And for the security of the purchaser of the estate, it was agreed that the payment of the purchase-money unto the trustees, &c. should discharge such purchaser, notwithstanding any loss or misap-[41]-plication that might happen to such purchase-money. The verdict then set forth, that on the 3d March, 1757, the marriage between Richard Willis and Bethia Legg took effect; and that

they had several children ; (to wit) Richard Legg Willis, their eldest son and heir, James Willis, Bethia Anne Willis, and Mary Willis, the lessors of the plaintiff ; and also one Thomas Willis, since deceased. That Robert Willis survived Philip Bracebridge, his co-trustee, and by will appointed Mary Willis his widow, and Richard Willis his brother, executor and executrix thereof, and in January, 1765, died, leaving Robert Willis an infant, his only son and heir at law ; which last-mentioned Robert Willis, at the time of executing the indentures of 14th and 15th April, 1767, hereafter mentioned, was of the age of five years. That on the 17th of September, 1766, the first-mentioned Richard Willis, the lessor's father, being insolvent or much embarrassed in his circumstances, contracted and agreed with Joseph Martin, now deceased, for the sale of the said manor, &c. for 7680l. ; and that before and at the time of making the contract, and from thence and until and at the time of executing the indentures of the 14th and 15th April, 1767, hereafter mentioned, Joseph Cruttenden, attorney at law and one of the solicitors of the Court of Chancery, was the general agent of the said Joseph Martin, and acted as such agent in the transaction hereinafter mentioned. That Cruttenden was also the agent of the first-mentioned Richard Willis (the lessor's father) in this particular transaction. That on the 17th of February, 1767, Cruttenden, who had previously received, and had in his custody the marriage settlement of the said Richard Willis and Bethia Willis his wife, and the title-deeds of the said manor, &c. presented a petition on behalf of the first-mentioned Richard Willis and Bethia his wife, to the Right Honourable Charles Lord Camden, then Lord High Chancellor of Great Britain, stating (amongst other things) to the effect hereinbefore mentioned, and that were the said petitioners to exercise the power so given to them of revoking the uses and trusts of the said recited settlement, for the purpose of making a sale of the said manor, &c. so settled as aforesaid, yet as there was no power given to them to limit or declare any new or other use or uses, either to the petitioners or their heirs, or otherwise, so as to convey a good legal title to a purchaser, the petitioners were advised that, on such revocation being executed, the legal estate would result unto and become vested in the said Robert Willis the infant, as heir of the surviving trustee, in trust, to convey the same to a **[42]** purchaser, pursuant to the power before-mentioned ; in which case it was apprehended that the said Robert Willis the infant would become an infant trustee within the statute of the 7th of Ann.(*a*) intitled "An Act to Enable Infants who are Seised or Possessed of Estates in Fee, in Trust, or by Way of Mortgage, to make Conveyance of such Estates ;" stating also, that a doubt had arisen upon the construction of the latter proviso in the settlement, to whom the purchase-money should be paid, and by whom laid out and invested in the purchase of land to be settled to the uses of the marriage-settlement ; that the petitioners were desirous that the agreement entered into with Martin should be carried into execution ; that a good legal conveyance should be made of the manor, &c. unto the said Martin and his heirs, discharged from the uses and trusts of the settlement ; that the purchase-money should be paid to the executors of the surviving trustee, to be invested according to the trusts of the settlement ; and therefore praying that it might be referred to one of the Masters in Chancery, to examine and certify whether the said Robert Willis the infant were a trustee within the Act ; and that upon the Master's report, such further orders might be made as to the Lord Chancellor should seem meet. The verdict then stated an order of reference, dated 17th February 1767, to Mr. Lane, one of the Masters in Chancery, to examine and certify how the said manor, &c. were vested in the said Robert Willis the infant, and whether he were an infant trustee within the Act ; and that Cruttenden attended the said Master Lane upon the order of reference, as solicitor for the first-mentioned Richard Willis and Bethia his wife, and also as solicitor for Robert Willis the infant. The verdict then stated, that the Master reported on the 23d of March that Robert Willis the son was an infant trustee within the meaning of the Act ; but no notice was taken in the report of the proviso for revoking the uses in the settlement ; or of the application of the purchase-money, or of any doubt suggested in the petition. Upon the making of this report, Cruttenden presented another petition on behalf of Richard and Bethia Willis to the Lord Chancellor, reciting the order of reference and the Master's report, and praying that the report might be confirmed ; and that upon payment by Martin of 7680l.

---

unto the executors of Robert Willis the surviving trustee, to be by them invested according to the trusts of the settlement, Robert Willis the infant might be directed to **[43]** join in a conveyance of the manor, &c. to Martin, discharged of the trusts of the settlement. That, previous to the hearing of the petition, Cruttenden prepared and delivered a brief to counsel for Richard and Bethia Willis, and another brief to another counsel for Mary Willis and Richard Willis the executor and executrix, containing merely a direction for him (if necessary) to consent on their behalf to the prayer of the last petition, so far as the same concerned the executors; and another brief to another counsel for Robert Willis the infant, containing merely a direction for him to submit, on behalf of Robert Willis the infant, to such order as the Court should make in respect to him on the last petition. That on the hearing of that petition on the 20th of March, 1767, the Lord Chancellor made an order, whereby, after stating the report, and that counsel for the petitioners and Robert Willis the infant had attended on that day, and that the counsel for Robert Willis the infant did not oppose the prayer of the last petition, the Lord Chancellor ordered that the Master's report should be confirmed, and that Robert Willis the infant, according to the report, should convey the premises pursuant to the Act of Parliament; which last-mentioned order was made by the Lord Chancellor before any revocation of the uses created by the indenture of the 15th of February, 1757. That on the 31st of March, 1767, by a certain deed or instrument in writing, prepared by Cruttenden, and indorsed on the indenture of the 15th of February, 1757, and duly executed by the first-mentioned Richard Willis and Bethia his wife, they by virtue and in pursuance of the power and authority in the last-mentioned indenture contained, and by force and virtue of all other powers, &c. revoked and made void all and every the use or uses, &c. in the last-mentioned indenture limited and declared of and concerning the said manor, &c. which by the last-mentioned indenture, and the lease for a year thereby referred to, were granted, released, and conveyed by Bethia Willis to the several uses, and for the several purposes in the same indenture mentioned, to the intent and purpose that the fee-simple and inheritance thereof might be sold and conveyed according to the true intent and meaning of the last-mentioned indenture and of the parties thereto. The verdict then set forth indentures of lease and release, dated the 14th and 15th April, 1767, which were prepared by Cruttenden, and made between Robert Willis the infant of the first part, Mary Willis, widow, and Richard Willis, executor and executrix, of the second part, the first-mentioned Richard Willis and Bethia **[44]** his wife of the third part, and Martin of the fourth part, by which, in consideration of 7680l. paid by Martin to Robert Willis the infant, and Richard Willis and Mary Willis the trustees and executors before named, or to one of them, with the privity and consent and by the direction and appointment of the first-mentioned Richard Willis and Bethia his wife, Robert Willis the infant, by virtue of the said Act of Parliament, and in obedience to the order made in pursuance thereof, with the privity and consent and by the direction and appointment of the first-mentioned Richard Willis and Bethia his wife, granted, bargained, sold, and released, and the first-mentioned Richard Willis and Bethia his wife, by virtue of all powers and authorities granted to them, or either of them, implied, reserved, or appertaining, limited, and appointed, granted, bargained, sold, released, ratified and confirmed the said manor, &c. to Martin in fee. That upon the execution of the last-mentioned indenture, the sum of 5180l. part of the consideration-money, was paid by a draft or check drawn by Martin on the house of Messrs. Martin and Co. (in which house Joseph Martin was then a partner) in favour of the first-mentioned Richard Willis or bearer; and which draft or check was delivered by Martin to Cruttenden, and by Cruttenden for form's sake, to Richard Willis and Mary Willis, executor and executrix, and by them (Richard Willis and Mary Willis) to Robert Willis the infant, for form's sake; and that the draft or check was finally taken from Robert Willis the infant, by the first-mentioned Richard Willis in the presence of Cruttenden, and by him the first-mentioned Richard Willis applied to his own use; and that the residue of the consideration-money was duly paid by Martin, in satisfaction of a mortgage on the manor, &c. charged thereon before the making of the indenture first-mentioned. The verdict then stated that Martin had personally no intention to defraud the children of the first-mentioned Richard Willis and Bethia his wife, or to defeat the settlement; but that Cruttenden being such agent as aforesaid, and the first-mentioned Richard Willis fraudulently combined together to procure the purchase-

money to be paid into the hands of the first-mentioned Richard Willis; and which was accordingly effected by means of the proceedings aforesaid, and which proceedings were by Cruttenden and the first-mentioned Richard Willis calculated for that purpose; and that no part of the purchase-money was ever laid out or invested by Robert Willis the infant, or any other person or persons, in the purchase of other freehold messuages, lands, &c. pursuant to the proviso in that behalf contained in the indenture of **[45]** the 15th of February, 1757. The verdict then stated, that in Hilary term 9 Geo. 3, a fine sur conusance de droit come ceo, &c. was levied of the premises in question by Richard Willis and Bethia his wife to Joseph Martin. That on the 21st of December, 1775, Joseph Martin by will devised to the defendants and their heirs upon certain trusts therein mentioned, and died in March, 1776; on whose death the defendants entered, &c. In 1778, Bethia Willis died; and in 1780, the first-mentioned Richard Willis also died, without making any appointment by virtue of the power contained in the release of February, 1757. On Richard Willis's death Richard Legg Willis was beyond the seas, and did not return till the latter end of the year 1785; James Willis was then an infant, of the age of 19 years; Bethia A. Willis was of the age of 18 years; and Mary Willis is still an infant. Thomas Willis, having survived Richard Willis and Bethia, died in 1782, being then an infant; after whose death and within five years next after, Richard Legg Willis returned to this country, and James Willis and Bethia A. Willis attained their respective ages of 21 years, and before the time when, &c. they the said Richard Legg Willis, J. Willis, B. A. Willis, and M. Willis, in due form of law entered, &c. in order to avoid the fine; and thereupon became seised, &c. and being so seised, caused an action to be commenced for trying the title, &c. within one year next after such entry; which action is now prosecuting with effect, according to the form of the statute, &c. And after such entry, and while they were seised, they demised to the plaintiff, &c. who entered, and was possessed thereof until the defendants entered and ejected him, &c. But whether, &c.

This verdict was argued three several times; first by Jekyll for the plaintiff, and Gibbs for the defendants, in Hilary term, 1790; a second time by Watson, Serjt. for the plaintiff, and by Lawrence, Serjt. for the defendants, in Easter term last; and on this day by Morris for the plaintiff, and Wilson on behalf of the defendants.

Arguments for the lessors of the plaintiff. First, the limitations to the children of Richard and Bethia Willis, created by the marriage settlement, were not concurrent contingent remainders to wait for the death of the survivor of the father and mother, but were vested remainders in all and every the children as they came in esse, though liable to be divested during the life of the father or mother by a legal appointment. 2dly, in default of appointment, all the children took a fee, and not merely estates for life. 3dly, the lessors of the plaintiff were not barred either at common law or by the operation of the **[46]** Statute of Ann.(a) even if the whole transaction had been bonâ fide. 4thly, certainly not, as the transaction was fraudulent; for though the verdict negatives a personal fraud in Martin, yet, in point of law he is involved in the fraud by the act of Cruttenden, his agent. 5thly, but, even if the deed of revocation were nevertheless valid, the legal estate resulted to the releasees. First, the premises are limited to the wife for life, remainder to the husband for life; remainder in fee to vest on the birth of the first child, subject on the birth of other children to be proportionably divested and expanded; and liable to two powers apparently controlling the operation of the deed; the one, to revoke old uses, the other, to appoint in portions; the first giving or leaving to the releasees an estate; the latter not so applying as to suspend the vesting of the remainder. This question arises on a marriage-settlement, the great object of which was to make a provision for the children. Now if the want of an appointment were to suspend the vesting of the remainders during the lives of the father and mother, and make them contingent, it would be in the power of the parents to disinherit the children altogether, and thus the primary object of the settlement would be defeated. But this defect may be remedied by considering the releasees as trustees to preserve the contingent remainders, though not specifically made so. For in cases where estates are devised in trust, there is no necessity for particular trustees to preserve contingent limitations; the freehold in the trustees in general is sufficient for the purpose. Trustees in such cases have a fee where the purposes of the trust require it, though there be no

specific words of limitation. 1 Vez. 268, 491. 3 Burr. 1686. *Hopkins* v. *Hopkins*, Cas. temp. Talbot, 44, and 1 Atk. 581. The statute 10 & 11 W. 3, c. 16, s. 1, is a legislative exposition of this principle; for that declares that, where an estate is by a settlement limited in remainder to the first and other sons of any person, with remainders over to the use of any other person, any son or daughter of such person born after the decease of the father may take such estate as if he had been born in the lifetime of the father, though no estate be limited to trustees to preserve contingent remainders. Here the estate limited to the trustees was a trust and not an use; or if it were an use, it was an use executed in them; for otherwise the estate limited to the wife for her sole and separate use could not be secured to her, but must **[47]** fall under the husband's control. A remainder must vest during the existence of the particular estate; if to persons in esse, it vests presently; if to persons not in esse, it is contingent: yet those contingent uses, when they happen, vest by interposition, if the first estate for life which ought to support them be not disturbed. The doctrine of vesting by interposition is laid down in *Napper* v. *Sanders*, Hutt. 119. *Chudleigh's case*, 1 Rep. 133. In *Napper* v. *Sanders* there were two prior contingent remainders, and the third vested. Now here, if there were no appointment by the parents jointly, or by the survivor, for want of such appointment the remainder over was vested. So in *Lord Derby's case*, Lit. Rep. 370, where a remainder is limited to a person in esse, so as to depend on a contingency, this contingency may be considered as confined to such remainder, without extending to subsequent limitations. *Tracy* v. *Letheulieur*, 3 Atk. 774. So here, if the limitation depending on the appointment of the parents, or the survivor, failed for want of appointment, the limitation over took effect. The two first are contingencies, but do not affect the third limitation for want of appointment. This case is distinguishable from that of *Loddington* v. *Kime* (*a*) and cannot therefore be governed by it. Here the limitation to the children became vested on the birth of the first child, liable however to be divested on the subsequent births of the younger children. And it was admitted in that case (*b*) that if the tenant for life had had a son, such son would have taken a vested remainder. Now here a child was born before any act was done to bar the remainders. If A. make a feoffment to the use of his wife that shall be, and his first-begotten son, for their lives, and A. afterwards marry, his wife shall take the whole use; and if he afterwards have a son, that son will take jointly with the wife. Dy. 339. Bac. Law Tr. 351. *The Earl of Essex* v. *Temple*, 1 Ld. Raym. 310; and *Matthews* v. *Temple*, Comb. 467, are to the same effect. It is no objection that these estates commence at different times. *Oates* v. *Jackson*, 2 Stra. 1172. Co. Lit. 188. Had the power of appointment in this case been executed, these interests of the children would have been divested: but there was no appointment; and therefore as the trust still continued to support the remainders, and as the words of inheritance on the construction of trust-deeds are referable to the first-mentioned class of issue, the remainder to these children was vested. The power **[48]** of appointment was no more than a dormant power; and till that was exercised, the remainder vested sub modo. It is not the uncertainty of taking in possession which makes a remainder contingent; for he in remainder may in any case die before the determination of the particular estate; but the chance of such a casualty would not make his interest less vested. So where an estate is limited to A. for life, remainder to his first and other sons in tail, remainder over to the first and other sons of B. upon the birth of a son of B. the remainder would vest in him, liable to be divested on the birth of a son of A. There is no distinction between that case and the present. Here the remainder vested in interest on the birth of each child, liable to be diminished as to the quantum only on the birth of other children, unless some act were done, namely, an appointment by the parents to any particular child or children; and the Court will always lean against construing remainders to be contingent; for it is a general rule not to permit the fee to be in abeyance longer than is absolutely necessary. And besides, the intention is liable to be frustrated in such cases, by leaving it in the power of the tenant for life to defeat the subsequent limitations in all cases where trustees to preserve the contingent remainders are not interposed. *Carter* v. *Barnardiston*, 1 P. Wms. 516, 517. But the

---

(*a*) Ld. Raym. 203.   Salk. 224.   Vin. Abr. title "Remainder," pl. 23.
(*b*) 1 Ld. Raym. 208.

case of *Cunningham* v. *Moody* (a)[1] is expressly in point: there money having been agreed on a marriage to be laid out in the purchase of lands to the use of the husband and wife for life; remainder to the children in such proportions as the parents should appoint, and in default of appointment to all equally, Lord Hardwicke said, that the power of appointment did not prevent the subsequent estates from being vested, though liable to be divested on appointment. This was a case determined by Lord Hardwicke on great consideration, and upon a review of the opinion which he had before thrown out in *Walpole* v. *Lord Conway* (b)[1]; and is therefore the more to be relied on. The same authority too considerably shakes the second resolution in *Leonard Lovie's case* (c); of which it may also be observed that it is merely the obiter opinion of the Chief Justice, and extrajudicial, it not being the point immediately before the Court. Secondly, the children took a fee in default of appointment, and not merely estates for life. The limitation was (for want of appointment) " to the use and behoof of all and every the said child or children equally, share and share alike, to have and to hold the same, if more than one, as tenants in common, **[49]** and not as joint-tenants; and if but one child, then to such only child, his or her heirs or assigns for ever." In the construction of deeds as well as wills, regard is always had to the intention of the parties: and the intention in this case may fairly be collected from the whole deed to be this: that the child or children of the marriage, whether one or many, should take a fee; for if the several children (there being more than one) took only estates for life, and one of them had a child, that child would take nothing. The two branches of this sentence on which the question arises, may be coupled together, and then the word " heirs" may be taken as relative to both. This may be easily done, and the same rendered complete, by putting the words " to hold the same, if more than one, as tenants in common, &c. and if but one child, then to such only child," into a parenthesis; and then it will run thus, " And for want of such appointment, then to the use of all and every the child or children equally, share and share alike, his or her heirs and assigns for ever;" or the word " their " before the word " heirs," may be supplied even in a Court of Law, in order to effectuate the intention of the parties. In *Robinson* v. *Robinson* (a)[2], where an estate for life and no longer was expressly limited to the first taker, the Court held that he took an estate-tail in order to effectuate the devisor's intention. On the same principle in *Evans d. Brooke* v. *Ashley* (b)[2], where an estate tail-male was expressly limited to the three first sons of the devisor's sister, and in default of such issue, to every son, &c. the fourth son took the same estate as the three others. In 3 Bulst. 127, Croke, J. put this case: a devise of Blackacre to the eldest son and his heirs, for his part or portion; and of Whiteacre to his youngest son for his part, omitting the word " heirs," the youngest took the same estate in Whiteacre that the eldest took in Blackacre. As the word " heirs " was supplied in that case, the word " their " may in the present. Thirdly, that the lessors of the plaintiff are not barred at common law by the acts of the infant trustee, Robert Willis, clearly appears from the preamble of the statute 7 Ann. c. 19, which recites, that inconveniences had arisen from the inability of persons under age having lands, &c. only in trust or by way of mortgage (though by the direction of the cestui que trust, or mortgagor) to convey any estate in such lands; and to remedy that inability the statute was passed. Neither are the lessors barred by the operation of this **[50]** statute (a)[3]; for it directs with great caution that all parties as aforesaid,

---

(a)[1] 1 Vez. 174.           (b)[1] 3 Barnard. 153.           (c) 10 Rep. 85 a.
(a)[2] 1 Burr. 38.                                           (b)[2] 3 Burr. 1570.
(a)[3] Which enacts, that it shall and may be lawful to and for any such person or persons, under the age of one-and-twenty years, by the direction of the High Court of Chancery, or the Court of Exchequer, signified by an order made upon hearing all parties concerned on the petition of the person or persons for whom such infant or infants shall be seised or possessed in trust, or of the mortgagor or mortgagors, or guardian or guardians, of such infant or infants, or person or persons, entitled to the monies secured by or upon any lands, tenements, or hereditaments, whereof any infant or infants are or shall be seized or possessed by way of mortgage, or of the person or persons entitled to the redemption thereof, to convey and assure any such lands, tenements, or hereditaments, in such manner as the said Court of Chancery or the Court of Exchequer shall by such order so to be obtained direct, to any other person or persons; and such conveyance or assurance so to be had and made as aforesaid,

shall really and substantially, and not colourably, appear before the Court at the
making of such order. And in the construction of this statute it has been determined
in the Court of Chancery, that they will not make an order but in the plainest and
most unequivocal cases; namely, where the infant is a bare trustee; not in ambiguous
cases where the trust is merely constructive, or the infant has an interest in or a claim
to the estate. *Ex parte Vernon*, 2 P. Wms. 549. *Goodwin* v. *Lister*, 3 P. Wms. 387.
*Hawkins* v. *Obeen*, 2 Ves. 559. Now when this order was obtained in Chancery, there
is no pretence to say that Robert Willis was a trustee within the meaning of the
statute. The uses of the settlement were all executed, and not revoked at that moment:
the order therefore was void; for the subject of it was not within the jurisdiction of
the Court, inasmuch as that jurisdiction will never be exercised but in the case of a
mere trustee. If it had been otherwise, and the uses had been revoked previous to the
order, and it had been consequently intended to be a resulting trust to the infant, still
it was not a trust within the definition of those trusts under the scope of the statute.
For it was not a trust merely for the benefit of the father or mother of the lessors of
the plaintiff, who revoked the uses, but for the benefit of their children also; who should
have been brought before the Court, as parties interested, before the making of the order,
as is made necessary by the direct requisition of the statute. Nor was it a trust merely
for the infant to convey the estate; he was also to receive and lay out the purchase-money,
which was an act of discretion beyond the capacity of an infant; and for which exercise
of capacity the infant was not a trustee within the statute. If it be admitted that this
**[51]** case cannot be supported under the statute, but it be contended that it may
nevertheless be good at common law, and *Zouch d. Abbot* v. *Parsons* (a) be cited to .
prove it, it may be observed that that case is essentially different from the present.
There the question was, whether an infant's conveyance by lease or release were
absolutely void or only voidable? In that case the infant was between sixteen and
seventeen years old; the money was paid into proper hands (on which Lord Mansfield
laid considerable stress); and there was no fraud. In the present case the infant was
only five years old; the money was paid into improper hands; and fraud is found.
But, fourthly, whatever consideration this question might have deserved had the
transaction been bonâ fide, it is found to be fraudulent, and therefore the whole is
vitiated. As anciently as *Twyne's case* (b), fraud was held to vitiate a conveyance;
judgments are also void on that ground; warrants of attorney, 2 Stra. 1043. Cas.
temp. Hardwicke, 233. Cowp. 728, and Dougl. 186; and Fines. Bracton, 436, 437.
Cro. El. 531. 3 Rep. 80. 5 Rep. 68. Tothill, 99. 12 Rep. 123. Steph. Touch. 18.
and Jenk. 254. The history of the fraud in this case is sufficiently apparent on the
verdict; the object of it was to procure to Richard Willis the produce of the sale of
the estate; and this could only be effected by a misrepresentation to the Court of
Chancery, and by fraudulently concealing in the Master's report the application of the
purchase money, as directed by the proviso in the marriage-settlement. Cruttenden
knew that the money was never to be laid out in the purchase of another estate
pursuant to the proviso, but to be so paid under the direction of the Court, that the
father of the lessors of the plaintiff might receive it; for it is expressly stated in the
verdict, that part of the money was only paid into the hands of the infant, for form's
sake; and that it was taken from him by Richard Willis, in the presence of Cruttenden.
*Le Neve* v. *Le Neve*, 3 Atk. 646. *Brotherton* v. *Hat*, 2 Vern. 574, and *Jennings* v.
*Blincorn*, 2 Vern. 609. If it be said that all which Cruttenden did fraudulently was
as the agent of Willis, yet the misapplication of the purchase-money, to which the
fraud tended, was certainly the act of Cruttenden as Martin's attorney; and if Martin
were not to suffer by this, he would derive an advantage from his agent's fraud. In
*Fitzherbert* v. *Mather* (c), it was held that the principal was bound by the misrepresenta-
tion of his agent. In that case Ashhurst, J. **[52]** said, "On general principles of
policy, the act of the agent ought to bind the principal, because it must be taken for
granted that what the agent knows the principal knows." Besides, here the purchase-
money was by the express terms of the proviso to be paid to the heirs; the payment,
therefore, to the executors, which is here stated, cannot be supported. This, then,

shall be as good and effectual in law, to all intents and purposes whatsoever, as if
the said infant or infants were, at the time of making such conveyance or assurance,
of the full age of twenty-one years.

(a) 3 Burr. 1794.           (b) 3 Rep. 80.           (c) Ante, 1 vol. 12.

affects the revocation itself with fraud, since it was a feature of Cruttenden's contrivance to assist the sale. But if it be said that the revocation may be separated from the subsequent application of the money, and that as far as respects the revocation itself it may be supported, it may be insisted by way of answer, that, as the power of revocation was not general and absolute, but merely conditional, the deed of revocation was in itself void, because neither accompanied nor followed by a due appointment. A power must be strictly pursued; it is in the nature of a condition, and cannot be effectual unless all the circumstances prescribed by it be pursued. 3 Ch. Cas. 66. But here the purchase-money was neither raised, paid, nor invested according to the requisitions of the power. And the power of revocation and the power of conveying are so interwoven, that the act of revocation cannot be supported, because it was neither accompanied nor followed by a conveyance from the trustees, and a subsequent re-investing of the purchase-money to the same uses. The latter was an integral part of the condition; it was of the essence of the power; and the whole execution of it falls to the ground, because not precisely and specifically pursued. If the power were imperfectly executed, the revocation is a mere nullity. And nothing can be clearer than that if the transaction were commenced with a view to the fraud, no part of it is available to any intent or purpose whatsoever. As to the fifth point, the same deed, which gave a power to revoke the old uses as to the premises settled, prescribed specifically what fresh uses as should be limited, namely, that the trustees should still have in them the legal estate for the purpose of conveyance to the purchaser, and that the fruit of that conveyance, the purchase-money, should be re-invested by them, the trustees, in the purchase of other estates liable to the same uses. The application to the Court of Chancery was on a suggestion that, on the execution of the power of revocation, the legal estate would result to the trustee : the Court admitted it would ; for the reference to the Master was merely to report whether the trustee-infant were within the Statute of [53] Ann. It cannot be contended by the defendant from what is said in Co. Lit. 237, where powers of revocation are mentioned as novelties since Littleton's time, that Bethia Willis had a fee by the revocation ; for there is a provision in this deed tantamount in operation to a power to limit new uses, since the trustees are expressly to stand seised to that effect. They had not merely the scintilla juris, spoken of in *Chudleigh's case* (a) ; for they were to convey in case of a revocation, which necessarily implies that they were still seised of the estate. So that, if the revocation were valid, the legal estate is in the trustees, and did not result to Bethia Willis. If so, there was nothing on which the fine levied by Richard and Bethia Willis could operate. Either the fine was infected by the fraud, as part of the transaction, and void on the grounds mentioned in the fourth head of argument, or, if separated from the rest, and the revocation were good, it passed nothing to the defendant's ancestor, the cognizors having no interest to convey.

Arguments for the defendants.—1st, the limitation to the children of Robert and Bethia Willis was not a vested, but a contingent remainder ; and, therefore, by the destruction of the precedent life-estate before the contingency happened, that remainder fell of course. Lord Ch. J. Willes, in delivering the opinions of the Judges in *Smith d. Dormer* v. *Packhurst* (b), in the House of Lords, states two heads, under which all contingent remainders may be reduced : 1st, where a remainder is limited to a person not in being, and who possibly may never exist ;—2dly, where a remainder depends upon a contingency, collateral to the continuance of the particular estate. The birth of the children in this case, made this a contingent remainder of the second sort ; for whether all or which of the children should take, and what estates they should have, was a matter perfectly undefined by the settlement, and depended upon an appointment according to the terms of the settlement, or the neglect of an appointment ; either of which is a contingency independent of the determination of the first estate, the continuance of which had no sort of connection either with the appointment or the neglect of it. But as it was uncertain whether or not such an appointment would ever take place, it necessarily follows, that the estates, which were to take place according to the one event or the other, must be equally uncertain ; in the same [54] manner as the example put by Lord Ch. J. Willes in the case cited, of the second kind of contingent remainders, where, after an estate for life, limited to A. the remainder was to B. in fee after the death of J. S. or after J. S. should come from

DOE *v.* MARTIN

Rome. Now, here the appointment or non-appointment was equally contingent and collateral to the continuance of the particular estate, as the death of J. S., or his coming from Rome, was in the instances there put. According to the second resolution in *Leonard Lovie's case* (a)[1], where the grandfather by indenture limited to himself an estate for life, with power to lease, &c. and to the use of the performance of his last will, and to the use of any persons to whom he should devise any estates, remainder to W. L. in tail, &c. This, and all the subsequent remainders were held to be in contingency, and not executed till the death of the grandfather: and this has been recognised in other cases: in *Loddington* v. *Kime*, 1 Ld. Raym. 208, and in Roll. Abr. So in *Plunket* v. *Holmes* (b), where the devise was to her son T. for life [who was also heir]; and if he die without issue of his body, living at the time of his death, then to L. and his heirs; but if T. have issue, living at the time of his death, then the fee to remain to the right heirs of T. There it was held, that T. took an estate for life, remainder to L. in fee, on the event of T.'s having no issue living at his death, remainder to the right heirs of T. on the contingency of his having issue; and, therefore, a common recovery suffered by T. destroyed L.'s contingent remainder: so here Willis and his wife took estates for life; remainder to all the children, on the event of there being no appointment; remainder to the appointees, in the event of an appointment; therefore the consequence is the same, and the contingent remainder to the children is defeated by the deed of revocation, and the subsequent acts. The case of *Loddington* v. *Kime* (c) is of the same sort. There the devise was to A. for life, without impeachment of waste; and in case he have any issue male, then to such issue male and his heirs; and if he die without issue male, then to B. and his heirs. The first remainder to the issue male of A. was held a contingent fee; so was also the subsequent remainder to B.; not contrary to, but concurrent with the former, and was a contingency with a double aspect; for if A. had issue male, then the remainder had vested in such issue male in fee; if he had no issue male, at his death the remainder to B. took effect. **[55]** In like manner this may be said to be a contingency with a double aspect: if the husband and wife died without making an appointment, then the remainder to the children vested; if with an appointment, then the estate vested according to such appointment. And as the power of appointment exhausted the whole fee, every limitation over in default of it must necessarily be contingent, and consequently such was the limitation to the children in this case, in default of appointment. That this was a contingent remainder appears also from the definition given by Mr. Justice Blackstone (a)[2], of this species of limitation. Remainders (says he) are either vested or contingent. Vested remainders, or remainders executed, whereby a present interest passes to the party though to be enjoyed in futuro, are where the estate is invariably fixed, to remain to a determinate person, after the particular estate is spent. Contingent or executory remainders [whereby no present interest passes] are where the estate in remainder is limited to take effect, either to a dubious and uncertain person, or upon a dubious and uncertain event. To try this question by these rules: on the birth of a child no estate became invariably fixed to remain to him as a determinate person, after the determination of the particular estate; but, on the contrary, as he might have all or none according to the act of his parents, as well the persons to whom the estate was to remain, as the event, were dubious and uncertain; so that all the criterions of a contingent remainder are here to be found, and none of a vested one. It is the uncertainty of a remainder's taking effect, even though the subject-matter survive the particular estate, which denominates it contingent; now here though all the children survived their parents, yet the power of appointment might be so exerted as to defeat the remainder limited to them. Nor is it, on the other hand, the present capacity of taking in possession as soon as the particular estate shall determine which renders a remainder vested; that was determined by *Loddington* v. *Kime;* for till the tenant for life should have a child, the next in remainder was capable of taking in possession; and yet there the remainder was held to rest in contingency; and though it was urged, that on the birth of a son in that case the remainder limited to such son would have become instantly vested, yet that was because the non-existence of such person was the only thing that made the contingency; whereas here the contingency also rests on there being no appointment.

---

(a)[1] 10 Rep. 85 a.                                      (b) Sir T. Raym. 28.
(c) 1 Ld. Raym. 203.   1 Salk. 224, S. C.   (a)[2] 1 Bl. Com. 168.

As to these limitations **[56]** being by way of use, that will not make any difference. 10 Co. 85, for though it has been argued, that, as this conveyance is by way of use, it may vest and divest, that does not alter the nature of the question. No authority has been cited to shew that the remainder to the children in this case was a vested remainder, liable to be divested; and whether a remainder be vested or not, which is limited by way of use, must be determined by the same considerations as the question arose on a common law-conveyance. The capacity which an estate, limited by way of use, has of divesting, does not at all contribute to vest it: before that quality can be called forth, it must have vested; and from that no argument can arise to shew that it vested any more than from a condition being annexed to an estate at common law. The same circumstances which create uncertainty as to the one sort of estate, must have the same operation with respect to the other: and whether an estate be limited by way of use to A. on his return from Rome, or by a deed of feoffment on the same event, it must be equally contingent. If this distinction had any foundation, it would equally have applied to the cases of *Plunket and Holmes*, and *Loddington* v. *Kime;* and would have converted the remainders in those cases, which were held to be contingent, into executory devises, liable to vest and divest on certain events. As to the case of *Cunningham* v. *Moody* (a)[1], which was chiefly relied on to shew that this was a vested remainder, the determination in that case does not come up to the present; for that was a question, whether the fee vested in the father or not?—and not whether the several remainders to the children were vested remainders?—for if the fee were vested in the father, it followed that the plaintiff was entitled, who was a sister of the half blood. That case only decided, that the power of appointment did not put the fee in abeyance; and does not prove that the remainders to the children were vested. It goes no further than other cases, deciding that which is a known rule as to contingent remainders, namely, that where a remainder is limited in contingency, the fee in the mean time remains in the grantor and his heirs, subject to the contingency. It was so held in *Plunket* v. *Holmes* (b), *Purefoy and Rogers* (c), and in *Lewis Bowles's case* (d), which is referred to by Lord Hardwicke, in the case in Vesey, as the ground of his determination; and that furnishes a sufficient argument in answer to the reluctance of the law, which has been urged, to the fee's remaining in abeyance; for here the ultimate remainder in **[57]** fee might be held to continue in Mrs. Willis, the settlor, during all the time that the remainder to the children rested in contingency; though it is not necessary for the defendants to insist on that point: and it is to be observed, that in *Lewis Bowles's case*, all the limitations are in tail; which distinguishes it materially from the present, because after a contingent remainder in tail, a subsequent remainder may be vested; for even supposing the contingent remainder to become vested, the other is still expectant upon it, the fee not being all disposed of: but after a contingent limitation in fee, no other limitation can be vested; because if the contingent remainder take effect, it absorbs the whole fee. Not only the point relied on in *Cunningham* v. *Moody* was not before the Court, but it appears that Lord Hardwicke held a very different opinion in another case; that of *Walpole* v. *Lord Conway* (a)[2]. There money was directed to be laid out in lands, to be settled to the use of Francis Lord Conway for life; remainder to his intended wife for life; remainder in trust for such child or children, and for such estates absolutely or conditionally, &c. in such proportion as Francis Lord Conway should appoint; and in default of such appointment, to the use of all and every the daughters, younger sons and the heirs of their bodies, &c. One question which arose there was, whether a son of one of the daughters was entitled to his mother's share?—and that depended upon the question, whether the remainder to the daughters, &c. were contingent or vested, liable to be divested on the appointment? As to which Lord Hardwicke said, "The late Lord Conway had a power during all his lifetime to limit the estate amongst the daughters and younger sons, in such manner as he thought proper; and, therefore, during all that time the remainder over to those children, in default of such appointment by the

---

(a)[1] 1 Ves. 174.                          (b) Sir T. Raym. 28.
(c) 2 Saund. 380.                          (d) 11 Rep. 79 b.
(a)[2] Mr. Wilson observed, that he quoted this case from Barnardiston's Rep. in Ch. 153; which he had compared with the register's book, and found very accurate. The only difference was, that the case was entitled *Walpole* v. *Lord Clarendon*, he being the first-named defendant; and the name of Pring was used instead of that of Brigge.

father, must have been contingent;" and his Lordship relied on the 3d and 4th resolution in *Loddington* v. *Kime*: and though it is stated at the end of the case that his Lordship had entertained a doubt, while he was speaking, as to this share, yet that doubt was not as to the remainders resting in contingency, for that is expressly declared against; but whether, taking it to be such, the issue, according to *Archer's case*, would not be entitled to stand in the place of his mother, **[58]** who died before Lord Conway? Secondly, the children, for want of appointment, took only estates for life: for it appears that it was not intended that any but an only child should take a fee; as the word "heirs," which is inserted in the latter part of the clause, limiting the estate in case there should be only one child, is omitted in the first part, whereby, in the event of there being more than one, it is limited to them as "tenants in common," omitting the word "heirs." But it has been said, that there is a mere clerical omission of the word "their" before "heirs," which the Court ought to supply, in order to give effect to the intention of the parties; but that is begging the question. The grammatical construction is full and complete without the insertion of that word; and supposing the intent of the settlers to have been to give only estates for life, in the event of there being more than one child, it could not have been expressed in more apt words than those used. Nor would the parenthesis contended for cure the defect; for still the word "their" must be supplied: and, in this respect, "their" is as important an omission as the word "heirs:" if the Court cannot supply the one, they cannot supply the other. It is impossible to determine with certainty that the settlers meant any thing else than is expressed: but even if the Court could conjecture that such omission had been made by accident, they would not be warranted in supplying it even in the case of a will, and still less in a deed. It has been long settled, that in a deed no words can supply the word "heirs," although the intention of the party to pass a fee be manifest; and although words are used which, in a devise, would have passed the fee. It was so held in 1 Leon. 2, where, the word "heirs" being omitted in the granting part, it was resolved, that the fee did not pass, though it were used in the reciting part. In Littleton, s. 1, it is said, "If a man would purchase lands or tenements in fee-simple, it behoveth him to have these words in his purchase, 'To have and to hold to him and to his heirs;'" for these words, his heirs, make the estate of inheritance; and Littleton proceeds to state that the words "to hold to him for ever," or "to him and his assigns for ever," give but an estate for life for want of the word "heirs"; and Lord Coke, in his Commentary thereon (*a*)[1] says, "If a man give land unto two, to have and to hold to them two, et hæredibus, omitting suis, **[59]** they have but an estate for life for the uncertainty." Now this case is much stronger against the fee passing; for here the words are quite plain. Nor is it unnatural that the parents should wish to favour the heir at law in the one event, and not in the other; nor have the Courts been governed by any such consideration in their construction even of wills, where the apparent intention of the devisor as against the heir, is more favoured than in deeds; for in *Right, Lessee of Mitchell et Ux.* v. *Sidebotham* (*a*)[2] where the devisor "gave and devised to A. her heirs and assigns for ever, all his lands at B. and gave and bequeathed to A. aforesaid all his lands at C." it was held that A. took only an estate for life in the lands at C. although there were introductory words purporting an intention to dispose of all his property, and although he had given a disinheriting legacy of 1s. to the heir: that case is stronger than this, for there the limitations were to the same person; here they are to different persons. In *Doe* v. *Morgan* (*b*) Lord Kenyon said, that deeds had always been construed more strictly than wills; and that established rules ought not to be departed from. The consequence of this is, that the defendant is at least entitled to judgment for one-fifth, one of the children being dead. It was also observed that there was some ambiguity in the special verdict as to the time when the youngest child was born. From comparing the dates, it is clear that she was not born at the time of the revocation; and it remains doubtful whether she were born before or after the fine: then as the estate limited to the children was clearly contingent till the time of their respective births, as to one-fifth part, no demise could be made at all unless it appeared that she was born before the fine. Thirdly, supposing the lessors of the plaintiff right upon the two other points, it will remain to be considered how far the fraud found by the

---

(*a*)[1] Co. Lit. 8 b. and 1 Rol. Abr. 833, M.           (*a*)[2] Dougl. 730.
                              (*b*) Ante, 3 vol. 765.

special verdict affects the transaction, so as to divest altogether the legal title acquired by the defendant's ancestor. This question involves in it several considerations. It is not meant to be contended that Cruttenden is not to be considered as the agent of Martin in point of law, and that the latter is not implicated in the fraud of the former : —but it does not follow that, because some part of the transaction was fraudulent, the whole must be avoided. If the legal forms which have been gone through may stand without injury to the children, there is no reason why that part of the **[60]** transaction should not have its due operation, and be separated from the subsequent acts which are infected by the fraud, and operate against the children. This will depend first upon the validity of the deed of revocation. The power of revocation is not by the terms of the settlement required to be executed by the same deed as the power of appointment and conveyance to the purchaser : and it cannot be contended that, if at a time subsequent to the revocation the purchase-money had been properly applied, the conveyance to Martin, if properly executed, would not have been good. If that be so, the validity of the revocation cannot depend on the subsequent trans- action, and be valid or not according to the proper or improper application of the money afterwards. By the general rule of law, every deed takes effect from its delivery ; and if the parties intend that it shall not operate until ·the performance of some condition or the happening of some event, the proper and only means of effecting this is to deliver the deed as an escrow. *Degory* v. *Roe*, 1 Leon. 152. Now if the revocation were good, there could be no estate remaining in the children. Again, the conveyance to Martin was also good, for the children were not injured by that ; and it was made pursuant to legal forms. The next consideration was the application of the purchase-money ; and there it was that the fraud began : for the parents had a right to sell the estate under the power of revocation ; but they had no right to apply the purchase-money to their own use. What the children then have to complain of is, not that they have lost the land, but the money which arose from the sale of it : and their remedy is in equity against the representatives of Martin, who, being a purchaser with notice of their claims through the fraud of his agent Cruttenden, must make good again the purchase-money, to the application of which he was bound originally to have attended, and the estate will perhaps remain liable in his hands as a security for the amount : but a Court of Equity would not overturn the legal title acquired by him. This is the mode of administering relief constantly pursued in similar cases. If an estate be sold charged with an incumbrance of which the purchaser has notice, but neglects to look to the application of so much of the purchase-money ; upon a bill filed for relief on the part of the person who had the lien, the Court of Chancery would not overturn the conveyance in toto ; but they would still hold the estate answerable for that sum. Or, suppose the charge were to the full value of the estate, still the conveyance would not be **[61]** void at law, but the purchaser would be liable to pay over again the whole pur- chase-money to the person beneficially entitled. The same rule applies equally to the present case : fraud does not vitiate, by relation back, more of a transaction at law than is sufficient to do justice to the party injured. If a trustee to preserve contin- gent remainders, convey to a purchaser with notice, the legal estate is thereby conveyed ; but a Court of Equity will consider the purchaser as taking the land subject to the trust ; as was held in the case of *Mansell* v. *Mansell* (a) and *Pye* v. *Gorge* (b). Now, in those cases, if the fraud had vitiated the whole transaction, the Court of Chancery would have sent the question to be tried at law : whereas, on the con- trary, the purchaser was decreed to join in the conveyance, which affirmed his legal title. And besides, the children here have their remedy at law against the executors of Martin. But, upon the finding of the facts in the special verdict, some part of this transaction stands perfectly clear, even of implied fraud on the part of Martin. For it is expressly stated, that Martin had personally no intention to defraud the children. And as it further appears that the contract for the purchase was made between Martin and Richard Willis, without the intervention of Cruttenden, that part of the transaction stands free from fraud ; and the fraud can only attach upon the misapplication of the purchase- money, for which the remedy of the children is in equity against the executors of Martin. Fourthly, if it appear that the legal and formal part of the transaction may be separated from the subsequent fraud, and the deed of revocation was good, taken

simply by itself, it follows that the legal title is in the defendants, under which they may protect themselves in a Court of Law. That depends on the question, in whom the legal estate was after the deed of revocation? The effect of the Statute of Uses in this case was to execute all the uses in esse, and leave in the releasees no estate but that scintilla juris or possibility which might be sufficient to serve the new uses when they might arise, but not sufficient to support the contingent remainders. *Chudleigh's case,* 1 Co. 120. If there were no use in esse at the time of the determination of the estate of Willis and his wife, the consequence is that no estate could be executed in the children, and the limitation to them must fail for want of a prior estate to support it, unless the words directing Bracebridge and Robert Willis to convey the estate to a purchaser, necessarily imply that the estate must be vested [62] in them for that purpose, and unless that estate will support the contingent uses. But no estate can be implied in the trustees, except on a supposition of a regular valid revocation of the uses limited by the settlement. For there could be no estate in the trustees but as a new springing use to arise on the revocation, and not from any tortious act of Willis and his wife, conveying a greater estate than by law they could, and destroying that estate out of which the uses were to arise. As to *Chudleigh's case* (a)[1], it was agreed that the feoffment made by the feoffees divested all the estates and the future uses also ; and then the new estate could not be subject to the ancient uses which arise out of the ancient estate divested by the feoffment. Here the settlement reserved a power of revocation to Willis and his wife ; and the direction to the trustees to convey, was in effect giving them a power of appointment, which might be very well reserved to them without implying any estate in them, as a power simply collateral ; the purchaser would then be in under Willis and his wife, and not under the trustees ; as in the case put in *Digge's case* (b), where if executors or feoffees, who have power by the will of cestui que use to sell the use, make a feoffment of the land to the former use, yet they may sell the use ; for the same use, which was devised to be sold, remains untouched by the feoffment ; and after the sale the vendee shall be in by the devisor, and not by the feoffees. Their authority is like the case put in Co. Litt. 265 b. where Lord Coke, treating of the difference between a power or an authority, and a right, and between powers and authorities themselves ; as to the first, says, that if a man by his last will devise that his executors shall sell his land, and they release all their right and title in the land to the heir, this is void ; for they have neither right nor title to the land, but only a bare authority. And so it is if cestui que use had devised that his feoffments should have sold the land. And, as to the second, he says, that there is a diversity between such powers or authorities as are only to the use of a stranger, and not for the benefit of the releasor, and one that is for his benefit, as in these usual powers of revocation when the feoffor, &c. hath a power to alter, change, determine, or revoke, the uses intended for his benefit, he may release. And such power as this is instanced by Lord Hale in *Edwards* v. *Slater* (c), where he says powers to raise estates are ·either simply collateral (as where a party who has such power has not, nor ever had, any estate in the land ; as where such power is reserved [63] to a stranger ; and there it cannot be destroyed by him, because it is more than a bare nomination) or not simply collateral. If the former were the case here, the words of the settlement may be fully satisfied without any estate being implied in the trustees, which can only be done from necessity, in order to satisfy and effectuate the settlement. But even supposing, that after the revocation the legal estate were in the trustees, then it became the case of an infant trustee under the Act, and all the formal requisites being complied with, the legal estate passed to the defendant's ancestors : and it is not necessary to consider now how far the Court of Chancery were imposed upon, or how far they may hold the defendants liable to the trusts under the deed of settlement ; for all those considerations will be properly inquired into before that Court, who will take care to give such effectual relief as may protect the interests of the children. It is enough upon the present occasion to say, that all the legal and formal steps directed to be taken by the statute were complied with. Again, the same consequence follows, if the infant be considered as a trustee at common law ; for it was held in *Zouch d. Abbot* v. *Parsons* (a)[2], that conveyance by an infant is not absolutely void, but only voidable : and no act is here stated to have been done by him, in order to avoid it ; till which

---

| | |
|---|---|
| (a)[1] 1 Co. 135 a. | (b) Ibid. 173, 4. |
| (c) Hard. 415. | (a)[2] 3 Burr. 1794. |

the legal estate is in the vendee. But even supposing this not to be the case, either of an infant trustee under the Statute of Ann. or of a trustee at common law, and that the legal estate remained in the trustees, still the lessor of the plaintiffs cannot recover, in as much as there is no demise on the record from the infant trustee; and this is not such a case of a plain equity as will enable the cestui que trust to recover in ejectment.

Lord Kenyon, Ch.J. The principal question in this case is, whether the remainders to the children of Robert and Bethia Willis were vested or contingent? If the latter, it cannot be disputed, but that the destruction of the particular estate on which they depended, before they became vested, would destroy them. One argument which has been used is, that the estate limited to the trustees was an use executed in them; for that otherwise the estate limited to the wife for her sole and separate use would not be secured to her, but be under the husband's controul. But in answer to that, it is sufficient to observe, that it is limited to the trustees, without saying "to and to the use of the trustees." If none of the limitations of the settlement could possibly take effect without this construction, **[64]** I should be inclined so to decide it; as was done some years ago in a case in the House of Lords. But that is not the case here; for this estate was limited to Bethia Willis and to her heirs, until the marriage should be solemnized: it was therefore intended that the legal estate should not be taken out of her unless the marriage took effect. Besides, the Court of Chancery would consider the husband, if it vested in him, a trustee for the wife; so that she might have all the benefit intended by the marriage settlement. If the remainders to the children of R. and B. Willis were contingent, the objection made by the defendants, that the conveyance by Willis and his wife, and the fine, by destroying the particular estate before they vested, also destroyed those remainders, must prevail; for it is too late, as the law now stands, to say that such is not the established doctrine of contingent remainders. This doctrine indeed involves in it difficulties which have been frequently felt by wise and able lawyers, who have wished to break through the rule: but they have been deterred from the attempt by the consideration of the consequences that might possibly ensue. There are two instances, it is true, where the law is otherwise: in equitable estates, where the contingent remainders are not destroyed, because the estate is vested in trustees to preserve the contingent remainders; and in copyholds, where the estate in the lord of the manor will support all the remainders: but in the case of freehold estates of inheritance, the rule is so established that it is not now to be shaken. On the first question in this case, our judgment must depend on the authorities cited: the three leading of which are *Lovie's case*, *Walpole* v. *Lord Conway*, and *Cunningham* v. *Moody*. Of the first, inserted in Rolle's Abridgment, which was published under the inspection of Sir M. Hale, it is sufficient to say, that it was held in a case circumstanced like the present, that the remainder was contingent. This was also adopted in a great measure by Lord Hardwicke, in *Walpole* v. *Lord Conway*. But I am happy to find that, in the last of those cases, *Cunningham* v. *Moody*, where the same point arose, and where Lord Hardwicke had an opportunity of reconsidering this question more fully, and at a time of life when his judgment was more mature, that great Judge determined differently: and I cannot find any substantial distinction between that case and the present. There Lord Hardwicke (after saying that the fee was not in abeyance) added, "Nor does the power of appointment make any alteration therein; for the only effect thereof is, that the fee which was vested was thereby **[65]** subject to be divested if the whole were appointed." Now in this case the limitations to the children were first subject to a power of appointment, but for want of such appointment to the children in fee (I say in fee, as I shall shew in the course of my opinion). And whether the limitations precede or follow the power of appointment, it makes no difference. The object of the parties here was to make the whole estate subject to the power and will of the parents, according to the situation and exigencies of the family. I therefore say, in the words of Lord Hardwicke in *Cunningham* v. *Moody*, that the fee was vested in the children, subject, however, to be divested by the execution of the power of appointment. The opinion of Lord Hardwicke in the latter case is peculiarly deserving of attention, because when it was discussed, the former one of *Walpole* v. *Lord Conway*, where he had intimated a different opinion, was strongly pressed upon him, and because too he decided the last case at a time when he had the assistance of some of the most eminent lawyers who ever attended the Bar of that Court. I cannot therefore forbear thinking that, on the authority of

that case, we ought to decide that the remainders to the children were vested, subject nevertheless to be divested by the parents executing the power of appointment. No appointment has been made; and therefore at the time when the acts stated in the verdict were done by the parents in opposition to the interest of their children, the limitations to the children were not destroyed. This decision puts an end to this cause as far as respects all the children but one: but it has been contended that they only took estates for life, and that one being since dead, the reversion in fee of the parents immediately came into possession. And that brings me to the next question, whether the children took estates for life or in fee, which arises on these words: "And for want of such appointment, then to the use of all and every the child or children equally, share and share alike, to hold the same, if more than one, as tenants in common, and not as joint-tenants; and if but one child, then to such only child, his or her heirs or assigns for ever:"—and the question is, whether the words "his or her heirs" may not with propriety, and ought not, considering the whole settlement and the manifest intention of the parties, to act as words of limitation on all the preceding words in the sentence? I cannot bring myself to doubt but that they may. By putting the stops, or using the parenthesis, as pointed out by the plaintiff's counsel, it becomes perfectly clear: and we know that no stops are ever **[66]** inserted in Acts of Parliament, or in deeds; but the Courts of Law, in construing them, must read them with such stops as will give effect to the whole: if then we use the points suggested by the counsel, the clause will read thus: "To the use of all and every the child or children equally, share and share alike, his or her heirs or assigns for ever." If this had been like the case of *Hay* v. *Lord Coventry* (a), we might have lamented that the parties had not inserted words of inheritance to carry their probable intent into execution; but we could not have supplied them. But in this case there are words of inheritance; and I think we should defeat the manifest intention of the parties and the object of the settlement, which was to give the children estates of inheritance, were we not to read this part of it in the manner contended for by the plaintiff's counsel.

Then it has been argued, that the rights of the children, whatever they were, were subject to the power of revocation by the parents; and that the deed of revocation, standing per se, and taken separately from the conveyance to Martin, defeated their rights: but I am most clearly of opinion, taking the whole of the power together, that that deed was no legal revocation. They had only a power to revoke, on condition of re-investing the money in the purchase of another estate for the benefit of their children. And it would be strange to say, that any interval might happen between the sale and purchase of that other estate; it was all to be considered as one deed and one act. And though the purchase-money need not have been re-invested immediately, yet it was to lie in the hands of the trustees in the mean time, until a proper opportunity should offer of so re-investing it. But it is said, that the transaction as far as Martin was concerned, was fair and honourable, and that the fraud only consists in the misapplication of the purchase-money: but, without imputing any fraud to Martin, and indeed it is negatived by the verdict, the maxim, that the principal is civilly responsible for the acts of his agent, universally prevails both in Courts of Law and Equity; and therefore, whatever misconduct and fraud are imputed to Cruttenden by the verdict, it must affect his principal, Martin. Now the conduct of Cruttenden in this transaction is too infamous to be stated. Nothing can be clearer than that this was not a case within the Statute of Anne. At present we are not called upon to decide what was the effect of what was done by the Lord Chancellor, or how far we, sitting in a Court of Law, can inves-[67]-tigate what was done there; for this case does not depend upon that inquiry; the subsequent proceedings put it out of all doubt. We must remember that the power of revocation was restrained so as that the purchase-money should be paid into the hands of the trustees (and not into the hands of R. and B. Willis) and by them laid out and invested in the purchase of other freehold estates; the whole therefore was considered as one transaction. Now, in order to comply with this requisition, that was done in point of form, but not in substance; for it is expressly stated in the verdict that the draft was delivered by Cruttenden, for form's sake, to R. and M. Willis, and by them to R. Willis, the infant trustee, for form's sake, and then taken from him who ought to

*(a)* Ante, 3 vol. 83.

have applied it, and put into the hands of that very person of whom the settlers were jealous, and to whom they had expressly directed that it should not be paid; and in truth it never was applied to the purposes of the settlement. This then was a gross rank fraud, which contaminates the whole transaction, and renders it absolutely void, as well in a Court of Law as in a Court of Equity. Therefore the lessors of the plaintiff are entitled to recover to the full extent.

Ashhurst, J. The general question on the whole of this case is, whether the persons conveying had a right to convey the estate in question? for if not, however fair the transaction may have been on the part of the purchaser, the defendants cannot retain; but the legal title must prevail, without considering the hardship of their case. In order to determine this, the first consideration is, whether the lessors of the plaintiff had a vested interest, and what was the quantum of that interest? and, secondly, whether any acts have been done to divest them of that interest? As to the first, I am of opinion that the limitations to the children were vested. The authorities on this point cannot indeed be reconciled: *L. Lovie's case* is rather against this opinion; but the latest authority, that of *Cunningham* v. *Moody*, which appears to have been very well considered by Lord Hardwicke, seems decisive. The facts in that case do not materially differ from those in the present: and the principle of it is immediately applicable. Then the limitations to the children became vested on their birth, subject however to be divested by the appointment. As to the quantum of estate which those children took, I think they took a fee; for it is doing no great violence to the construction of the limitation to them to say, that the words "his or her heirs, or assigns, for ever," apply to the words in the former branch of the clause, by leaving the intervening [68] words in a parenthesis. With respect to the second question, whether their interests were divested by the acts stated in the verdict? that could only be done by a due execution of the power of revocation; a bad execution has no operation whatever. Now I consider this power not an absolute but a conditional one; for it is so as that the purchase-money be paid into the hands of the trustees, and not into the hands of R. and B. Willis, and be laid out in the purchase of other lands. Two conditions were therefore annexed to the execution of the power; the one, that the money be paid into the hands of the trustees; the other, that it be laid out in the purchase of other lands, and settled to the same uses. Now neither of those has been complied with; and consequently the deed of revocation is a mere nullity, and does not divest the estates limited to the children. If we were to enter into the question of fraud; to be sure a more gross and infamous fraud never appeared on the records of the Court, than that which was practised by the agent of the purchaser, and for which the principal is responsible; but the determination of the two first points render this inquiry quite unnecessary.

Buller, J. This case has been so fully discussed, both on the Bench and at the Bar, that I will content myself with stating the general grounds of my opinion. On the question relative to the power of revocation, little remains to be said : that the revocation was fraudulent is clear, for the reasons given by my Lord. It was the object for the settlers to settle the money arising from the sale of the estate, on other estates to the same uses, if it could be done with advantage. The power of revocation was conditional only; the money was to be paid into the hands of the trustees on condition and for the express purpose of thus settling it: but that condition not having been complied with, the deed of revocation is void.

With respect to the first and principal question, the argument on the part of the defendants, as far as authorities are concerned, rests on *L. Lovie's case*, and on that of *Walpole* v. *Lord Conway*. But what was said by Lord Coke in the former case, certainly did not apply to the point before the Court; the question there arose on the will only; and nothing was said either in argument or by any other of the Judges on the construction of the deed. The same case is also reported in Moor. 772; where it appears that the remainder under the will was contingent, because it could not arise unless the eldest son died without issue, and there was also an alienation. Therefore I think it did [69] not occur to Lord Coke that a remainder, when once vested, could be afterwards divested by the execution of the power. If there were no authority against this case, I could not have made up my mind to agree to it: but his opinion has been since controverted in other cases. In 2 Lord Raym. 1150, Mr. J. Powell, speaking of *L. Lovie's case*, said, "Though it was a doubt in *L. Lovie's case*, whether a remainder could be limited after a contingent fee, yet it is none now.

Case 1:23-cv-03562-RDM   Document 41-1   Filed 09/13/24   Page 53 of 176

And therefore if a fee-simple be limited to such persons as A. shall appoint by his will, remainder over, that is a good remainder vested till the appointment." Now the instance there put is directly this case; and if the limitations to the children were vested on the birth of a son, nothing has since happened to divest them. The defendants' counsel have rather hinted at, than insisted on, a difference between this case and that put by one of the plaintiff's counsel, of a remainder to the first and other sons of A. with a remainder to the first and other sons of B. his brother; where, on the birth of B.'s son before A. had any son, the remainder would vest in the former, subject to be divested on the birth of a son of A.: but I see no distinction; for when a child of Robert and Bethia Willis was born, the limitation was vested in him exactly in the same manner as if the limitation had been to their first and other sons. If there had been no power of appointment, the limitation to the children would have vested on the birth of a child : that was the point decided in *Lewis Bowles's case*. Then suppose the limitation to the children had been followed by a proviso containing a power of appointment, that would not have varied the case : if so, what difference is there, either in reason or in law, whether the power of appointment be inserted in one part of the instrument or the other? The Court must consider the whole deed together, in order to collect the intention of the parties. As to the quantum of interest which the children took, that question also seems equally clear. Suppose the limitation were to "all and every the children, and his or her heirs and assigns for ever ;" that would not be grammatically written ; but, the intention of the parties being manifest, the Court must read it thus : his, her, or their heirs and assigns for ever. This question arises on a family settlement, which was made for the benefit of all the children of the marriage ; and in order to give effect to the intention of the parties, we may leave the intervening words in a parenthesis, by which **[70]** means the word "heirs" will have relation to the words in the former part of the sentence.

Grose, J. If my brother Buller found the case so much exhausted as to make it unnecessary for him to go fully into every part of it, much less necessary is it for me to do so. The first considerable question is, whether the remainder to the children, which was certainly contingent in its creation, did or did not become vested in the children as they came in esse? I confess I was at first forcibly struck with *L. Lovie's case*, and *Walpole* v. *Lord Conway*, as also with the common definition of a contingent remainder. But I think that the rule laid down in *Cunningham* v. *Moody* is the best and wisest construction ; and there the rule is, "that a remainder may vest liable to be divested by the execution of a power of appointment." The ground of it is, that the Courts will never suffer the fee to be in abeyance but from necessity. And I am the more inclined to adopt this rule, as being the most likely to give effect to the intention of the parties ; which the contrary doctrine would probably defeat. Therefore I think that on the birth of the children the limitations to them became vested : and as to the quantum of estate which they took, I have not a particle of doubt. By reading the words in the mode adopted by the Court, all the difficulty is removed. With respect to the execution of the power of revocation ; I cannot read it without seeing what was the plain intention of the parties to the settlement. It was to enable the husband and wife to revoke the former uses, and the trustees to sell the estate, so as that the money should be paid to the trustees, and be by them applied in the purchase of other estates to the same uses. This then I consider only a partial power of revocation, which was given to them only for the purpose of effectuating the other part of the power, that of investing the money in other lands more beneficially for the children ; and the whole must be taken together. It is admitted that some part of the transaction was fraudulent : but it is argued that the different parts of the transaction may be considered separately from the rest, and that the fraud consists, not in the revocation, but in the subsequent misapplication of the money. But I think that the fraud was in the conveyance, which was made with an intent not to apply the money as directed by the settlement, but to pay it into Willis's hands. This was merely a conditional power, which must be considered **[71]** altogether ; and no part of the execution of it can be good, unless the whole be so.

Judgment for the plaintiff (a).

(a) *Doe d. Tanner* v. *Dorvell*, post, 5 vol. 518.

**AD-4**

Case 1:23-cv-03562-RDM   Document 41-1   Filed 09/13/24   Page 55 of 176

of the testator. If that would have been so, if the plaintiff should make that election, it will be so now : consequently they are entitled to no more out of the father's estate than to make up £10,000. (Reg. Lib. 1750, A. fol. 606. Ent. Duke of *Bridgwater* v. *Lyttleton*.)

(1) Where there is no residuary devise, or other particular disposition of them, the profits of a personal estate between testator's death and the vesting of an executory estate, or between the determination of the first limitation, and the vesting of a subsequent one, will accumulate for the benefit of the person next to take by virtue of the limitations, Barnardist. 74 ; 3 Wms. 300.

[125] Earl of CHESTERFIELD and Others Executors of JOHN SPENCER *v.* Sir ABRAHAM JANSSEN, *Feb.* 4, 1750–1.

[S. C. 1 W. & T. L. C. (7th ed.) 289.  See *Earl of Aylesford* v. *Morris*, 1873, L. R. 8 Ch. 489 ; *Benyon* v. *Cook*, 1875, L. R. 10 Ch. 392 (n.) ; *Nevill* v. *Snelling*, 1880, 15 Ch. D. 698.]

Lord *Hardwicke*, Lord Chancellor ; Sir *William Lee*, Chief Justice ; Sir *John Strange*, Master of the Rolls ; Sir *John Willes*, Chief Justice ; *Burnet*, Justice.—Post obit security. Confirmation, &c. *A*. aged thirty, borrows £5000 on bond to pay £10,000 if he survives *B*. aged seventy-eight. *A*. survives a year and eight months, having on death of *B*. confirmed the bargain by a new bond, &c., freely ; and paying part. (For the modern doctrine in such instances and some of the latest cases, see the Supplement, p. 297, &c. &c., particularly *Bowes* v. *Heaps*, 3 Ves. & B. 117, &c. *Gowland* v. *De Faria*, 17 Ves. 20.  *Peacock* v. *Evans*, 16 Ves. 512 ; and *Evans* v. *Chesshire*, Supplement, p. 300.)  No relief given in this case, except as to the penalty. (See *Hill* v. *Caillovel*, 1 Ves. sen. 122.)  (1 Atk. 301, S. C. ; Cowp. 770 ; Brown, 1 ; 2 Vern. 14, 27, 121 ; 1 Wms. 310 ; 3 Wms. 290 ; 2 Atk. 133.)—[Supplement, 297.]

The state of the case upon the pleadings and proofs, as far as was material for the consideration of the court, was shortly this :

*John Spencer* in 1738, being possessed of an income of £7000 *per ann.* and of a personal estate in plate, jewels, and furniture, to a great value, and having contracted a debt to the amount of £20,000 to several persons, mostly tradesmen, by whom he was pressed, and which he was desirous to pay off, proposed to borrow money, and particularly a sum of £5000 for that purpose.  As he had a well-grounded expectation of a great increase of fortune on the death of his grand-mother the Duchess of *Marlborough*, if he survived her, he resolved to contract thereon.  He was above thirty ; originally of a hale constitution, but impaired : and although afterward he lived more regular, yet he was addicted to several habits prejudicial to his health, which he could not leave off.  She was seventy-eight ; of a good constitution for her age ; and careful of her health.  He sent to market a proposal, which he supposed, would easily meet with a purchaser ; as it was natural to expect in common course, that his grandmother should die first, though she was a good old life, and he but a bad young one. This proposal was, that if any one would lend him £5000, he would oblige himself to pay £10,000 at or soon after the death of his grandmother, [126] if he survived her, but to be totally lost if she survived him : this was rejected by several knowing persons as not sufficiently advantageous ; as it was at first by the defendant ; but afterward accepted by him : and a bond of £20,000 conditioned to pay £10,000 was given on those terms.  She lived six years and three months ; he survived her one year and eight months.  Upon her death, it did not clearly appear who made the first application, whether the defendant for his money, or *John Spencer* for delay of payment, as he might not be able immediately to raise £10,000, although by the event he came to a great annual estate : but it was clear, that as soon as it was proposed by the defendant to *John Spencer*, he consented to do it : and, near two months after the contingency happened, he executed a bond in the penalty of £20,000 conditioned for the absolute payment of £10,000, at or before *April* following : and executed also a warrant of attorney for confessing judgment thereon ; which was afterward entered. *John Spencer* in 1745, at different times paid two several sums of £1000 each in part of this debt ; and expressed himself several times satisfied with the conduct of the defendant ; and that he should be paid his whole demand as soon as possible.  The defendant after his death sued a *scire facias* against his executors for an execution ;

Case 1:23-cv-03562-RDM   Document 41-1   Filed 09/13/24   Page 56 of 176

who resorted to this court, praying an injunction, and for relief on payment of the £5000, with interest from the time of advancing it.

*For plaintiffs.* This case is of great importance to the estate of Mr. *Spencer*, but of greater to the public. The bill is to be relieved against an exorbitant, unconscientious demand, on the known terms in a court of equity, payment of principal really advanced and legal interest. There are three general points to be determined. First, how that contract would have stood, if properly brought in judgment in a court of law, and considered merely upon legal principles? Next, what the fate of it ought to be in a much stronger degree in a court of equity, when examined by principles of equity? Lastly, the subsequent transactions relied upon in the answer as a ratification of the original bargain?

As to the first, it is not good in point of law, and therefore usurious. . Oppression of this kind is almost of as ancient date as the use of money as a *medium* of trade; and usury of a much more innocent nature was against the principles not only of the canon law, but of the common law of the land. Lord *Coke* says in 3 Inst. 151, that a man being found guilty of usury after his death, all his goods were forfeited to the crown; although it is now altered by several statutes, which confine it to such a *quantum*; [127] allowing a certain moderate profit for the use of money: the difference therefore between usury and interest is in *specie* nothing, but in *gradu*. Though the severity of the common law is changed, the nature of things cannot be changed; it was the constitution of this country, and is so, that no gain should be exorbitant, on the loan of money: and therefore it is immaterial whether it falls within the statutes or no: but this case does; where such a contract is originally for the loan of money, and exceeding the legal allowance, it is rescinded by the act of parliament itself, though attended in some measure with a chance; being construed a subterfuge and evasion of the act; for if it may be extended to one life, it is difficult to tell where to stop. The legislature took a different method formerly; in the first acts describing minutely what species should be allowed; confining it to a direct loan of money for illegal gain, or sale of goods or merchandise to persons in necessity; the specifying whereof introduced endeavours to evade the particular kind of usury described: therefore the 21 *J.* 1, c. 17, is in general terms; in consequence of which courts of law were vested with a kind of equitable jurisdiction, to consider the circumstances of the case stated as particularly as in bills in this court. The intent of the parties at the original communication is considered even by the courts of law as decisive; and where that is for a loan of money or colourable sale of goods, whatever is thrown in of a different kind, it is usurious, otherwise not. · *Reynolds* v. *Clayton*, Mo. 397, and *Becher's* case there cited. Next, wherever security is taken for a larger sum than is really advanced, it is usurious; unless the party may deliver himself therefrom by paying a less, or by doing some collateral act. The throwing something hazardous into the bargain, by which (as it is insisted) the lender might in some event have lost the whole, will not take it out of the statutes, and seems to have arisen from the statute 11 *H.* 7, c. 8, telling how far one might go to keep out of the acts. Mo. 397, and *Button* v. *Downham*, Cr. El. 642. *Burton's* case, 5 Co. 69. *Roberts* v. *Tremain*, Cr. J. 507. *Cottrel* v. *Harrington*, *Brownl.* 180. *Fuller's* case, 4 *Leon.* 208; *Noy.* 151; 2 *And.* 15, and *Mason* v. *Abdy*, *Carth.* 67; 3 *Sal. Comberb.* 125. The only exception is the *fœnus nauticum*, or bottomry-bonds; which for the sake of the public, and benefit of trade, are held not within the statutes of usury. The only view of the parties here was a loan of money, and security for double the sum advanced, subject to the contingency; the borrower could not deliver himself from the payment; and the court will then lay every thing else out of the case. In the calculation of lives it is difficult to say, where the true rule is: *Halley* and *Newton* have varied: but on the first sight one would think the lender had here greatly the advan-[128]-tage from the disproportion; so that on the face of it it would be deemed a subterfuge in a court of law. Suppose the bond existing; and an action brought by the defendant, after the grandmother's death; and the statute of usury pleaded; the parties may advance matters *dehors*; and it would be determined to be within the statute; which is very extensive, and, though penal, to have a liberal construction. The terms, on which men communicate to borrow and lend, cannot alter the nature of the case. The *quantum* of the risk is not material; nor did the transaction proceed on the comparison of lives; or health or constitution: but if it did, the defendant was satisfied of the contrary to what he now endeavours to support by proof, as to the constitution of Mr. *Spencer*.

As to the second point : Courts of equity, not being tied up to rules, consider questions of this kind in a more extensive manner, and in general have avoided laying down any particular rule, as that would (like old statutes of usury) teach persons, how far they might safely go ; but declare, that wherever there is a spark of oppression, the motive on one side necessity to apply for money ; on the other, a covetous passion for undue lucre, they always relieve ; not indeed setting it aside, but by giving what is really due. Their principles have been established gradually and with deliberation : and if one or two judges, who presided here, have differed and been unwilling, they have at last been compelled by the force of precedents and the growing evil. There were many cases for relieving against unreasonable bargains in case of young heirs in the time of Lord *Ellesmere, Bacon* and *Coventry*. The first case afterward is *Waller* v. *Dalt*, 1 C. C. 276 ; which was introductive of *Barny* v. *Beak*, 2 C. C. 136. In *Berny* v. *Pitt*, 2 Ver. 14, Lord *Jefferies* held, there was no difference, whether it was for money or wares ; that the first thing prohibited by the statute is for the loan of money, and that of wares put secondarily only ; and reversed Lord *Nottingham's* decree, who had not been long in this court when he took that distinction. In *Berny* v. *Tison*, 2 Vent. 359, Lord *North* affirmed the decree, though he shewed an unwillingness, by adding *ne trahatur in exemplum*. In *Batty* v. *Lloyd*, 1 Ver. 141, Lord *North* dismissed the bill. In *Nott* v. *Hill*, 1 Ver. 167, he would not relieve, and reversed Lord *Nottingham's* decree : but on a bill for specific performance of the same agreement, 1 Ver. 271, he seems a little to remit that rigour he had at first, and would not countenance the practice. But Lord *Ardglass* v. *Muschamp*, where there was both a risk and confirmation, shews, he had entirely got the better of it from the force of precedents. Other cases were before Lord *Jefferies*, and Lords Commissioners, 1 Ver. 467 ; 2 Ver. **[129]** 77, 78, 121, 402. So *Twisleton* v. *Griffith*, 1 Wil. 310. In *Curwyn* v. *Milner*, 3 Wil. 293, Lord *King*, though he seems like Lord *North* to have brought legal notions into this court at first, yet relieved. In *Lawley* v. *Hooper* (3 Atk. 278), 19 *November* 1745, an annuity of £200 was charged on the estate of an elder brother as a provision for the life of a younger, who when in distress, granted £150, part thereof, to *Davenant* for £1050, seven years purchase ; with a proviso that the vendor might re-purchase on notice, but there was indorsed, that it should be on paying £75 more than originally advanced : your *Lordship* held it a mortgage and redeemable ; and that the £75 more, when the thing was the worse for the wear, made it unfair. The principle, on which the court has gone in these cases, is an unconscionable bargain, and it being contrary to public convenience to encourage it. Such contracts are generally founded in oppression by taking advantage of the borrower's necessity ; which is the general ground of the malignancy of usury : they are of public mischief by encouraging extravagance of young men. If stopping the progress of it, as a growing evil, be thought for the public good, and no real inconvenience in laying an embargo on this sort of trade, this is *nodus dignus vindice*. These contracts are generally by persons having an expectation only. Men thereby pledge their estates before they have them, consequently before they know the value. It is too true, that men generally have not so much regard to creating reversionary inconveniencies, when they consult present gratifications ; know not how to estimate what they never felt the benefit of, by which their estates, like their pleasures, are gone before they enjoy them ; and several poor creditors commonly fall with one of these prodigals. There is no remedy immediately by our law against this extravagance, as by the *Roman* law by *Curatores*, interdicting a man, not of understanding sufficient to manage his own property, from the use thereof. This extravagance has established a trade of annuities and *post obits*, universally exclaimed against. The ruin of a man, who falls into this method, is declared not to be far off : he ruins his estate without spending half ; for a borrower on *post obits* never put it out to interest ; and many of these are purchased at above half. Our sons may at this moment be doing the same ; and all we have laboured for may be gone just after our death. It is on the principle of public utility that courts of equity have gone further than the law. So from the general inconvenience, *præmiums* for places are not allowed ; because there the office falls to the man, not that he is fit for it, but the office fit for him. So in marriage brocage bonds, the first of which was *Hall* v. *Potter*, it is not for the sake of the party seeking relief ; or bonds to have so much a-year out of a particular office ; or by clients to agents pending suit, although the party to whom it is given appears meritorious ; or by a young man just

after twenty-one to his guardian. In *Shepley* v. *Woodhouse* [130] (2 Atk. 535), 17 *March* 1742, a bond by a man and woman to intermarry in thirteen months after her father's death, and for a reasonable settlement : the woman above thirty, and living in her father's house ; the court went on public inconvenience, as tending to deceive and encourage disobedience to parents.  The cases are not confined to young heirs ; young remainder-men are as much the object : and the opinion of Lord *Talbot* was, that the relief of this court should be extended to meet such contracts ; they are grown into a sort of stated traffic, which tempts young men farther than their vices.  Lord *King* indeed said, if this was *res nova*, he might have had some difficulty ; and it may not be easy to draw the line.  If a young heir wanted to portion a daughter, or a sum to put into trade, buy books, or for such occasions, equity might not interpose : but where it is to feed extravagance, the court will stop there.  The same set of men are generally employed in such contracts ; and a catalogue of some of their fortunes is nothing but pieces of ruin out of several families.  No proof of fraud or undue advantage is requisite : the case speaks for it : and otherwise it would be saying, the court will not relieve at all, as to such secret transactions witnesses are not called in.  It is unjust and unreasonable, and in that light a court of equity calls it a fraud ; arising from avarice on one side, and distress on the other ; and will relieve on the same principles as in Sir *Thomas Meere's* case, 1 Ver. 465.  So by Lord *Talbot* in *Bosanquet* v. *Dashwood, Talb.* 40.  That it was not sought by the defendant, will make no difference ; the proposal generally coming from the person in distress.  The defendant could not be ignorant of it, or of Mr. *Spencer's* expectation and dependency on his grandmother ; his own witness, *Richard Backwell*, saying it was hawked about, that Mr. *Spencer* wanted money on those terms ; and the necessity of concealing it from her made him a slave to the person with whom he treated.  It is literally true, that he was neither young nor an heir : but he was not old enough to manage his affairs.  *Twisleton* was thirty-four : yet was his conduct relieved against.  It is not generally in the case of heirs, though called contracts with young heirs ; for an heir cannot sell a reversion : though he may estop himself by fine, he cannot grant.  Mr. *Spencer* was *quasi hœres*, expectant though not apparent : the Duchess *in loco parentis* ; and his dependency on her from her constant declarations a parental dependency ; and known so to be by the defendant ; who on that expectation built this contract.  The contract itself as well as witnesses prove his necessity.  The bare applying to pay two for one has been held sufficient.  *Poor* and *rich* are relative terms : and however large a man's estate, if he cannot pay a debt, he is literally necessitous ; and otherwise he never would have granted on *post obits*, or risked his expectations on such terms.  Comparing the ages, the defendant cannot be said to run any risk : and the defendant has not shewn, that the contract moved on a comparison of the [131] health of each : nor is there any certainty in judging on these cases of lives.

And as to the third point ; all the other acts of Mr. *Spencer* were, when under the like circumstances, as originally ; proceeding from his inability to do more.  His acquiescence cannot be considered a ratification, but may be excused by his looking on it as a debt of honour and a sort of wager.  The bond and judgment is an evidence he could not pay ; he would go as far as possible ; no money could be raised but by annual rents, whereas an immediate payment was to be made ; and the borrower is a servant to the lender.  Like *Curwyn* v. *Milner*, 19 *June* 1731, 3 Will. 293, and *Wiseman* v. *Beak*, 2 Ver. 121, and Lord *Ardglass* v. *Muschamp*, where stronger instances of confirmation did not avail.  So in some of the prize causes in *Exchequer* some repeated confirmations were held rather an aggravation.  *Cole* v. *Martin*, 2 Will. 290, differs materially from this : for there a person under no distress renounced a relief he might have had.

Although the contract is usurious in law, the proper way is to come into equity to stop this *species* of traffic, which is of public inconvenience ; no act of parliament could be made to meet this evil ; nor any rule that would not be inconvenient in particular cases.  The policy of law and equity in this kingdom does nothing more than what has been done in other ages and nations : as appears from the *Macedonian* decree ; *Digest, lib.* 14, *tit.* 6, *Law* 1, *&c.*, where though the words are *filius familias*, it shall not be confined to that.

There ought therefore to be relief on payment of the real principal and interest.

*For defendant.*  This is indeed a matter of importance ; being a question, whether a man's own act, without fraud, in full senses, and having the absolute disposal, shall

bind him ?  If (as has been argued) there was no other way in which the court could
assist the preservation of families from ruin, it is better the law should be wrong in
itself, than uncertain.  So far as a court of equity can prevent such destruction by
general rules, it will lay down such rules : but will not endeavour to preserve a weak
or wicked man ; nor say, that by the rules of equity an honest and wise man cannot be
protected in his honesty and wisdom.

The question of law must arise out of the fact ; the particular question of equity
must depend on the fact also, considered under all its extensive circumstances, taking
in the convenience and in-[132]-convenience : but still the ground to go upon must be
made out by evidence : it will hereby be shewn, that this is a fair, honest, and honour-
able contract.

The circumstances come under these heads.  1*st*, The character, situation, and
figure of life, of the obligor : 2*d*, The same as to the obligee : 3*d*, The motive or reason-
ableness thereof, inducing the obligor to solicit such a bargain : 4*th*, The manner
of transacting and concluding : 5*th*, The fairness and equality of the price from the
chance under all the circumstances according to the probability at the time, and the
event, that has happened : 6*th*, The opinion the obligor always had of this.

As to the first, It is material in all cases.  His understanding is not charged by
the bill to be weak, or likely to be imposed on, or that he was imposed on.  He was
turned of thirty ; no heir of any sort, in which the term is applied in these subjects ;
for if one, living with his father, is considered as heir (although *nemo hæres viventis*),
he had no father, but was himself father of a family : he was in no state of quarrel
with any relations : known never to have gamed, which, it is proved, he hated :
and he had taken up some former extravagancies ; and lived more temperately : was
his own master ; possessed of a fine family-seat, with furniture suitable to his rank
and figure ; of £7500 *per annum* for life, beside present personal estate, contingent
reversions, and hopes from his grandmother.  The pressure on him for his debts of
£20,000 (it appears not how contracted) was from tradesmen.  Justice obliged him
to pay them ; it would be scandalous not to do so ; and prudence required it, lest it
might alter his grandmother's opinion of him.  He must have paid this by the annual
profits, joint or single annuities for his life, or selling his personal estate, reversion, or
the chance he had from his grandmother ; and this would have been probably the
opinion of the best and wisest friend he had.  None would advise the selling his personal
estate, family-pictures, &c., which would be declaring himself bankrupt.  The annual
profits would not do it, nor would his creditors wait without impatience for it.  As
to annuities, the way taken by tenant for life who wants money for particular purposes,
it certainly is not a beneficial way of contracting.  It has appeared frequently, that
if a man sells an annuity for his own life, so that he wants to sell it, the price is above
seven years purchase, supposing him of middle age and in good health : if he was to buy
an annuity for his own life, the same man gives fourteen or fifteen, and in 1743, they
went so far as to give sixteen or seventeen, which is a great difference.  If there is
any objection to the life, they make him abate in proportion.  Taking it in the common
way, he could get but £7000 for £1000 *per annum* ; taking in the objections to his
life, perhaps not £5000.  If he was to sell his reversion in fee or the reversion of
£10,000 (the interest [133] of which he had for life), if he had no younger children, he
could have sold them for little advantage : nor could he have got any thing for his
chance under Lord *Sunderland's* will.  Then his only chance to raise money was
this ; and it was the most reasonable way, if fairly done and on reasonable terms :
and otherwise his goods might be taken in execution, and sold for little value, as
generally happens.

Next, for the circumstances of the defendant ; who is not charged in respect of
his character, behaviour, or manner of dealing ; as in securities to women, their
character must be charged and proved.  It would have been material also, that he had
been acquainted with Mr. *Spencer* (the contrary of which is proved, as far as a negative
can) or a companion in creating the debt and encouraging it.  All circumstances
weighing in other cases, are clear of this:  The defendant is not a person looking out
for young men to prey upon ; he did not think it a beneficial contract, and absolutely
refused it ; but afterward accepted it on particular application and pressing.  Mr.
*Spencer* himself, in private, fixed on what he thought the fair price, and does personally
and by agents propose these terms to any, who would buy ; which were refused by
several, only because not advantageous.

The motive has been observed on already.

As to the manner ; it is proposed in the first moment as a conditional bargain. If it turned out against the defendant, there was certainty of a loss ; if for him, they might live so long, as that there would be a very improbable chance of gain.   No undue advantage is taken ; for what is proposed, is simply accepted.

As to the equality of it as a bargain of chance ; whoever deals in or buys lives, must have regard particularly to the constitution of the person, manner of life and age. If the life is bad, the company will not ensure at all ; all circumstances must be considered, and it is enough to go on probable opinion.   The bargain supposes an inequality in their lives, that the grandmother was most likely to die first : she was of good health, and took care of it ; Mr. *Spencer* the contrary, from his course of life.   The insurance-offices always go on opinion, and inquire into a general account ; so that if a false account is given in, actions are frequent in *Guildhall* for the fraud.   It is proved, that notwithstanding advice, he would not alter his course, and said, he did not desire to live longer than his constitution would let him.   In all these chances, if a man has gone through such shocks to his constitution, as he did, they deduct two years purchase.   It was the opinion at that time, that he was a bad life ; and it appears negatively, that it could not be insured at £5 *per* [134] *cent.* taking it on the event, she lived six years after ; he survived her but twenty months.   Supposing his life was insured at £5 *per cent.* which is the insurance in case of a person in the best health, on a computation of the value of lives and terms for years the defendant is gainer about £3000, and might absolutely have lost it, if she had lived many months longer. Interest of the interest, which would then be lost, must be made in all computations. It is so as to the burdens to be borne between tenant for life and reversioner, which is rather too favourable to the tenant for life.   The defendant has proved, that none would give that, or so much as he did : the plaintiffs have proved nothing of that, which would have been material to shew the value of the contract : the disproportion then of the risk will not make it a bad contract : nor does this court consider bargains in the nice scale of exact equality ; nor adopting the rule of the *Roman* law, by which if a bargain was one half under value, it was set aside.

Lastly, his subsequent acts, as paying part, writing the letter himself to confess judgment, and taking every step after her death to carry it into execution, would not perhaps be of so much weight, if they were not consistent with his private opinion : his declarations in private being that he was honourably and fairly dealt by.   The judgment was given freely, and not complained of afterward : so that if it could have been set aside originally, it cannot now ; and being in his senses, he might have released any demand.   A release in terms of all his right to set it aside would have operated in point of law.   Then is it not so in equity ?   A release indeed may, like any other contract, be set aside in this court : but that must be on new imposition in obtaining the judgment.   Things did not remain in the same situation ; for now the money became absolutely due ; nor was he under the same necessity ; and might have disputed it then.   In *Cole* v. *Gibbons*, 3 Will. 290, the contract had not a possibility of being fair : yet there was no relief, because it was confirmed with open eyes. In *Standard* v. *Metcalf, November* 1734, the plaintiff lived with the defendant, her uncle, and soon after coming of age was prevailed on by him to settle her estate upon herself for life, remainder to her issue in tail, remainder to her uncle and his heirs : she afterward became a lunatic ; the transaction was thought on the face of it to be hard, and an imposition by the uncle, acting as guardian, there being no consideration, nor any occasion for it, not being for marriage : on a bill to set it aside, the defendant insisted, it was fair, and that after the settlement she by will, to which he was not privy, had given the estate in the same way.   Lord *Talbot* thought it an extraordinary contract and unfair, though no proof of fraud, and said, if it depended on the settlement only, he should have relieved, but the will had confirmed it, which took off that ground to set it aside : on appeal it was affirmed with this variation only, that as the bill was by the [135] committee it ought not to bind the lunatic, but should be without prejudice to her, if she should become *sane,* and seek to set it aside.   The will did not operate there, but only shewed a confirmation ; so, but in a stronger degree, does the subsequent act here.

As to the use in fact to which this money was applied, it is not material to the defendant to shew that ; having advanced it *bona fide* : but what materially distinguishes this from other cases, is, that it was applied to the payment of the borrower's tradesmen.

To consider next the question of law : whether this contract, as it stood originally upon the bond, is void at law : if so, it is indeed putting it on a clear foundation : mankind will have a rule for their property, and know the construction of the statute ; and it will be needless to argue as to the consequences in this court, for one cannot with his eyes open make an agreement contrary to that statute. As a bargain for a contingency there is no objection ; for all sorts of contingencies are the subject of a legal contract. Any objection then to this must be on the statutes of usury ; which is not frequent in a court of equity. No contract is a contract on usury within the statutes, which was not so before them. By the common, taken from the canon law, a notion long prevailed, that it was not lawful to take any interest for the use of money, which prevails in *Roman* catholic countries to this day ; and it is astonishing, how they should think money might not be a commodity to be used as well as any other. This notion kept that commerce out of the world. In *France* they let out money to interest in another shape. Lord *Coke* in 3 *Inst.* labours hard to shew, that taking any interest is contrary to nature, and endeavours to prove it also contrary to the law of *Moses* : but the age is grown wiser, and the law is altered. Any sort of *præmium* was usury : now an illegal *præmium* only. *Præmium* is a word more extensive than *interest* ; and *usury* is, taking a higher *præmium* than the law allows for the use of money. The statute *H.* 8. is an act against usury ; fixing the rate of it ; which has been followed by the legislature until 12 *Ann.* and the rate of interest varied ; and the sense of all the statutes may be taken together. Perhaps it may be a doubt, whether it is for the public good to have any law fixing the rate of interest, or that it should be like other commodities at market : *Locke's* treatise upon the consideration of reduction will at least make that doubtful. But it must be taken on the statutes, which comprehend only contracts on usury. There must be a principal sum due, and a rate of hire for the use : if it exceeds the proportion fixed, the security is void ; and no artificial contrivance shall evade that law : therefore on pleading the statute of usury it may be poved by any collateral evidence, where it appears not on the face of the contract. Where there is no principal and rate of forbearance, the statute relates not to it. [136] At common law therefore, when usury in general was forbid, a contract on condition or peradventure was not within it. *Hawkins, C.* 82, never disputed as to this point ; where the principal may be hazarded really, it cannot be usury. Contracts on *bottomry* are not excepted out of the statute ; yet are clearly not within it from the nature of the contract, the contingency of the ship's returning. So the discounting notes or bills of exchange is not within the statute ; no principal being due which is forborne. So the buying up of securities at a low rate on the estate of a third person, of which more than legal interest may be made, is not within the statute : so a wager at odds which is *Button* v. *Downham* : so of casual bargain ; *Bedingfield* v. *Ashley* : so *Fountayne* v. *Grimes*, and *Long* v. *Wharton*. Insurance interest or no interest, is barely a wager, and not within it ; according to *Doddridge*, J., in *Roberts* v. *Tremain*, and *Sharply* v. *Hurrel*, Cr. J. 209. Yet none of these cases but may be turned into such a shift as to be brought within the statute, if that is the truth of the agreement ; as in *bottomry*, if it be a mere evasion and no risk. Where the principal is secured, no contrivance can exceed the rate of interest ; which being forbid absolutely, is forbid on contingency. The cases cited for plaintiffs prove only, that where it is but a nominal risk, it is a mere shift and evasion ; as in *Clayton's, &c.*, where the demurrer admitted the corrupt agreement, and there was no objection to the pleading. A stress is endeavoured to be laid on words in determining a question of property, from the word *loan, &c.*, made use of in this case. If it is a loan within the statute of usury, it is material ; but a contract on usury is not a loan in its nature ; a loan being that which is gratuitous. It is true, there is a difference between a loan not consumed by using, and a loan which is consumed. The first, as of a horse, is called *commodatum* ; for lending is not understood to be letting it, if not consumed : the other is to be repaid in weight and measure, and is called *mutuum* : but in its original was gratuitous. But the court always goes to the substance. What is a loan in its nature cannot be made a purchase by calling it so : nor *e contra*. This never was proposed in the nature of usury ; the original communication being for this contingent bargain : no principal was due, nor rate for forbearance ; which there cannot be from the nature of the contract. In *bottomry* it is called a loan : but not therefore usurious : and there is no difference between this and *bottomry* ; which is admitted to be a hazardous contract and good ; not because it is for benefit of trade, but that a material risk is run, and to be paid for it. So that

Case 1:23-cv-03562-RDM   Document 41-1   Filed 09/13/24   Page 62 of 176

it turns on this, whether it is a fictitious, colourable contingency to evade the statute ; for if it is so, it is void ; otherwise not.  If no bargain can be made of a contingency on a life, but what is within the statute of [137] usury, it will be a proposition understood by every one.  Suppose an action brought, and a plea put in ;  this could not be considered as a nominal contingency and to evade the statute.

Next, whether this court can set aside this legal contract upon arguments of conscience arising out of the case, and that in the utmost latitude ?  the proper jurisdiction of equity is indeed to take every one's act according to conscience, and not suffer undue advantage to be taken of the strict forms of positive rules.  As this is only a ground of equity, it may indeed be made out by any sort of evidence upon all the circumstances ;  and on all together the court cannot say, the defendant is guilty of misbehaviour (which is not charged or suggested), or say, this ought not to stand.  Here is no fraud or over-reaching, no evidence, from whence imposition is to be presumed ;  and the amount of the cases cited for plaintiffs is, that the court will relieve against fraud in this as in other cases.

But supposing these points against the plaintiffs, another, and a very general question has been made of the first impression ;  *viz.* supposing the transaction good in law and conscience, yet this court should, for the sake of making a rule, set it aside on principles of policy or political reasoning ; for on fraud there can be no case in which this court will not relieve.  No political principle can be stated on which it should be set aside ; therefore such a ground of determination is impossible in this court.  There may be a difficulty to tell what sort of rule.  It is admitted, that no certain one can be drawn, because it would be dangerous, when applied to particular cases ; and it is therefore said, acts of parliament cannot be made to meet cases of this kind.  This court does not exercise or assume a legislative power, but disclaims it ; and never will make a law to set aside contracts on public principles out of that cause, if good in law and conscience, let the convenience or inconvenience be what it will.  The contracts in *Exchange Alley* were all contingencies : yet it was necessary to have an act to set them aside, although easily proved inconvenient to the public.  So of fair and equal wagers ; an act of parliament 7 *Anne* was forced to interpose.  So of gaming ; money won at fair hazard, without cheating, this court never set it aside before the legislature interposed.  So that political arguments are never taken into consideration.  The contracts of sailors, selling their shares before they know what they were, could not be set aside here.  It is true, there cannot be a more wretched condition than to have the rule of property uncertain : *misera servitus ubi jus vagum.*  Lord *Digby* says, " set the mark " on the door of the house, and let me know that it is wrong, or it is doing it *ex post facto.*"  Where the court has gone upon public convenience, it has been in cases defined and ascertained, which, it is admitted, this cannot be.  It is a misfortune, that accounts of courts of equity are conveyed to the public in loose notes by persons not con-[138]-cerned in the cause, and mistaken, and that general rules are drawn from particular premises.  The court, in all the cases alluded to, have inferred a presumption ; but in all, the presumption may be taken off : it depends on the evidence.  If a trustee buys the estate himself, the evidence from his situation is sufficient ; he has misbehaved ; for he cannot be a check on himself, and does not act fairly (see *Whelpdale* v. *Cookson*, 1 Ves. sen. 9, and Supplement, p. 8), but the presumption may be taken off : as if he agrees openly and fairly with *cestuy que trust* (see *Coles* v. *Trecothick*, 9 Ves. 234), or with the knowledge of this court.  So in bonds to lewd women, getting security for nothing ; she has grossly misbehaved ; and the common presumption is, that she has taken an advantage : but that may be taken off.  So in marriage-brocage bonds, the defendant there has laid such a bias upon himself, that he cannot properly advise ; has a power and distress over the party : this is evidence, unless taken off.  So in a private bargain to give back part of the marriage portion, contrary to the public treaty, it is fraudulent, and a presumption arises of undue advantage ; because the father may say, he will not otherwise agree : but that may be taken off.  Bargains for money, under which offices are procured from one who had the giving or recommending, have nothing to do with this : but there the presumption from the misbehaviour, as the man cannot get the office without it, may be taken off ; as where sold with the King's leave ; as commissions in the army ; or a sum of money may be paid out of the trust of an office, as in Mr. *Bellamy's* case.  Another instance is, the setting aside securities to attornies pending the business ; which was *Walmsley* v. *Booth*, 2 *May* 1741, where *Japhet Crook* being prosecuted for forgery, employed the defendant to be his attorney,

who was to get bail, money, and probably even evidence for him, and just then procured him to enter into a bond for £1000, for which there was no consideration, but for services done : this a court of justice would never suffer ; but has relieved on principles of a general nature, that an attorney should not take advantage of his client's distress to get from him what he ought not ; this court, and a court of law, will, without shewing errors, tax an attorney's bill, though settled by the party himself, unless a great acquiescence or some such matter : it was an unreasonable bargain ; and the presumption was from his not being at liberty : but it has never been determined as a rule, that a *bona fide* attorney may not receive a gratuity over and above, pending the matter. Another rule insisted on is, that mutual bonds to marry shall be set aside by the court, though never so fair : yet in *Atkins* v. *Farr* [1 *Atkyns's Reports*, 287], *February* 1738, your Lordship decreed relief on such a bond.   (*Note* : As the bond was gone by default of defendant, on which plaintiff might have had a remedy at law, and therefore was intitled not only to a discovery, but relief.   1 Atk. 238.)   That rule was taken from *Woodhouse* v. *Shepley* ; but your Lordship there said, you gave no opinion what would be the case, if the bond was entered into by two persons *sui juris*, without fathers, or emancipated, having fathers.   The ground there was not, that the woman did not know of the bond (which she certainly did) she lived in her father's house, had nothing but from him : they met at night out of the house, and executed this bond ; it was held a fraud and imposition on the [139] father, who was made to believe the match was off : it was seducing her from his house, and encouraging her in disobedience : therefore though she knew what she did, the court relieved.   Lastly, as to the case of *post obits* : it is said, where sons, whether in remainder or otherwise, or *filius familias*, not having a fortune or emancipation of their own, are encouraged in riot and expence, the court relieves without evidence, from the particular purpose, because no son in the life of his father shall make such a bargain : but that is not the ground of relief ; for that may be denied like all other presumptions : from the reason of the thing it is the misbehaviour to persons under this description, to share in riot and encourage disobedience ; which appears from *Domat*, under the general title *Loan* ; and in another place he says, that, on a bargain with *filius familias*, under such circumstances there may be relief, under such not ; not saying, but that a son might, for a portion, even where *filius familias*, do it.   As to which an observation arises on the case determined by Lord *Nottingham*, who relieved against many of these contracts on particular evidence.   Lord *North* thought he went too far.   Lord *Jefferies*, that he did not go far enough : which is not to be wondered at ; for, judging upon circumstantial evidence, they might draw different conclusions.   Lord *Nottingham's* reasons in his manuscript shew, he did not think he was going on the general rule, that a son could not sell a contingency.   The case is intitled *Berney* v. *Fairclough* and others, 32 *C.* 2.   *Berney* was drawn into several securities for money to be paid after his father's death, who then was infirm and kept alive by art ; by some he was to pay five for one, and thus was involved in debts to 50 or £60,000, in all which he appeared to be circumvented and beset ; most of the money pretended to be borrowed, being raised by delivery of wares at an excessive price, as wine, hemp, &c., which could not be sold for a quarter of the price ; but the plaintiff, from his necessity (his creditors being underhand procured to fall upon him), was willing to get money on terms, against which he sought relief.   Lord *Nottingham* first made him pay the principal borrowed, before he would give an injunction ; but relieved him as to the rest at the hearing ; because, he said, this infamous dealing ought to be suppressed ; that the *Star Chamber* used to punish, and this court ought to do it ; and that no family could be safe, if this was suffered.   But *Pit* prevailed : and the bill against him was dismissed, though he gained about three for one ; for it was in the time of his father's health, three years before his death, without any circumvention or practice, upon an express agreement to lose the principal if the son died in his father's life ; which shews the ground of the determination ; relieving against those defendants guilty of misbehaviour, yet thinking that a proper bargain might be made by the heir. Lord *Jefferies* on the evidence of that case, when before him, laid a different stress, and relieved against *Pit* also.   From that time there is no case until *Twisleton* v. *Griffith*, which turned on the particular fraud and cir-[140]-cumvention.   *Curwin* v. *Milner*, as cited, is a determination against Lord *King's* opinion : that he thought himself tied down by precedents, but, if it had been entire, he might have been of a different opinion : and in the note in 3 *Wil.* it is mis-stated, *and* instead of *or*.   It is going a great way to say, there can be no case where a son could sell a reversion, where the presumption is

Case 1:23-cv-03562-RDM   Document 41-1   Filed 09/13/24   Page 64 of 176

taken off. Presumption is evidence but until the contrary proved. This is not the case of a son ; but of one, master of his own property. *Cujus dare, ejus disponere.*— The principle is too large, that this is to be set aside because of a want of money on one side ; that holding in every bargain ; then as to the prospect of gain on the other, it is a laudable motive provided they act honestly. He was under no more necessity than any man may be presumed to be, who sells his estate, and cannot therefore come into equity to set it aside, because he wanted money to pay debts, and would not otherwise have sold it. The ground of common recoveries is to enable people to discharge debts by sale of estates. If it is to be set aside, as being an expectation from a grandmother, the court must go into very minute circumstances. As to the court's relieving upon general principles against annuities for life of the seller, the court never laid it down, that such annuities simply were paid. *Lowley* v. *Hooper* was on particular grounds ; the plaintiff was in gaol at the time ; and fraud infecting the whole : but the court did not say, no annuity shall be allowed that a man sells for his own life ; if so, there is an end of all insurances on lives. The reasoning in *Batty* v. *Lloyd*, 1 *Ver.* 151, was never contradicted. There would be great difficulty, was one not allowed to sell such things and turn into money, but must starve *ob hæredis causam.* Contracts for contingencies have been admitted ; *Beckley* v. *Newland*, 2 *Wil.* 182, and in *Hobson* v. *Trevor*, 2 *Wil.* 191, a contract for sale of an expectancy was even carried into execution. In *Whitfield* v. *Fausset*, 1 vol. 387, a mere possibility was sold by the father, nothing vesting in life of the father and mother ; and yet your Lordship decreed a further assurance by the heir ; which, if an ilegal contract, would not have been done. So where an officer, going abroad, assigned his future pay, a bill was brought to stop the money in his agent's hands : it was argued, such assignments were not to be endured, because uncertain and against the public service, and should be discouraged, as spending one's estate before he has it ; yet the court thought every one might dispose of his property ; and decreed it because not unconscionable, though that was a contingency and possibility ; equity going further than the law, which allows as contracts, but equity as conveyances. But what is this public good, which is not to be defined ? Is the end proposed by this, that none shall spend above his annual income ? That is not to be secured in human nature or prevented. Though the *Romans* had that law, they were allowed to spend their estates. Is property to be locked up to another generation ? for that effect it will have ; which is contrary to the principles of the constitution of the legal part of the [141] government ; the later books for perhaps 200 years giving a reason why the statute *de donis*, is not to be kept and preserved, that mankind may apply their property to pay their debts ; and judges have said, there is great inconvenience in people's not being able to sell their own estates. Is the end proposed, that a man may raise money on easier terms if this is set aside ? The consequence would be directly contrary. If one wants money, and a difficulty is laid upon contracting with fair, honest men, he will go into the hands of knaves, who will make him pay for running the risk of the law, and insist on more, when it is understood, that he could not make a contingent bargain. This was not lent to feed riot, but to get rid of a pressure, which is a reasonable cause, and therefore no ground to set it aside on political motives. As the law cannot find out a general rule to proceed on, much less will this court ; and in every case, where equity cannot relieve, it is not fit to be relieved.

*February* 4, 1750–1, the court delivered their opinion. *Absente Willes*, C. J.

*Burnett, J.* Upon the state of this case, three points are made. 1st, That the original contract is usurious, contrary to the statutes, as being a greater *premium* than the law allowed ; and if so, the new security will fall to the ground as well as the contract itself. Next, that if not usurious, it is so unreasonable an advantage taken of necessity and future expectancy, as the court is warranted to relieve against as an unconscionable bargain. 3d, That if the court is warranted to relieve against this, the new security will be considered as a continuance of the same oppression, and stand in the same light, though entered into after the event.

The other side insist, that the original contract is a mere contingent bargain, and consequently not within either the intent or words of any statute : there are no circumstances of a destitute heir or person seduced from parental government ; no practice, fraud, or surprize : and that the bargain is equal, taking into consideration the risk run of the principal ; and therefore the court is not warranted to relieve even on the foot of the original bargain. But supposing the court would relieve on that, yet there

is no precedent (but to the contrary) of relief when the party has taken on himself to be a judge of the equity of the contract, and confirms it with his eyes open.

The case is new : and I shall endeavour to throw my thoughts into one connected light, and occasionally take in all the cases cited.

[142] As to the first point, whether the loan of £5000 to be paid £10,000 on the death of the Duchess if he survived her, but nothing if he died before her, is usurious, or a mere casual, contingent bargain ?   I hope, I may be excused in calling it a loan ; because, although in a case, where the capital is not in all events to be paid, the word may be improper in courts of law, this court at least has adopted the use of that word in respect of a mere contingent bargain, that of *Bottomry*.   If this contract be usurious, it must be either because it is contrary to express words of the statute, or an evasion out of it. It would be mis-spending the time of the court to enter into the old notion about usury, and the condemnation of it by canonists, civilians, and some common lawyers ; because all those expressions depend on a principle, which is out of the present case.   The common lawyers differ ; there being great opinions either way.   Lord *Coke* seems to call all usury unlawful.   2 *Inst.* 89, 3 *Inst.* 151 ; but in *Hard.* 420, Lord *Hale* says, the *Jewish* usury only is prohibited by the common law ; and the true spirit of usury lies in taking an unjust and unreasonable advantage of their fellow creatures.   But it must be agreed, that nothing is legally usurious, that is not prohibited by the *st.* 37 *H.* 8, *c.* 9, which leading statute is followed by the rest ; the 12 *Anne, c.* 16, varying from it only in reducing the legal interest : the cases determined on the first statute have been therefore always looked on as authorities on any of the subsequent.   Therefore to make a contract usurious within the express words of the statute, the reward must be taken for forbearance or giving a day of payment ; and whatever shift is used, it will be usury : but not within the statute where it is otherwise.   If in truth it was a sum advanced by way of loan, and the reward in truth given for forbearance, no shift will prevail.   I shall better explain myself by the instances I shall put.   Supposing there is a purchase of an annuity at ever such an under price, if the bargain really was for an annuity, it cannot be usury : but if the communication was about borrowing and lending, it may be usury within the statute : and how ?   If by reason of all the circumstances, and of the communication, the exility of the sum given, the original contract being a borrowing and lending, the court thinks the annuity was a mere device to pay the principal with usurious interest to evade the statute, this will be within the statute ; though on the face of the bargain it appears ever so fair a sale of an annuity : the contrivance of the annuity as the usurious reward of the loan of money, shall not evade the statute made for the benefit of mankind.   This I take to be the sum and substance to be collected out of the several cases.   *Cro. E.* 27 ; 4 *Leo.* 208 ; *Noy*, 151 ; 1 *Brow.* 180 ; and 2 *Lev.* 7.   So a bargain on a mere contingency, where the reward is given for the risk, not for forbearance, will not be within the statute (1 Ves. sen. 164) : but otherwise if the intent was to have a shift ; which was *Cr. E.* 642, 3. If therefore a man gives or lends money, not to be paid if the event should be one way, but double if the other, [143] and it is uncertain which way it will happen, it is not within the statute : for the reward is given for the risk, not forbearance (*Note* : This point was materially relied on in the judgment given by Sir *William Grant*, Master of the Rolls, on the ultimate decision of *Evans* v. *Chesshire*, 21 *March* 1806, Supplement, p. 300.   In which case the obligor had for a part of the time borne half of the expence of insurance, and the whole expence of it for another period) : but if under colour of such an hazardous bargain the real treaty is for a loan, with an usurious reward for that loan, and to evade the statute, the contingency inserted is of little moment, being no ingredient between the parties : the court or a jury on the whole may pronounce such a contract usurious, notwithstanding the colour of contingency, if they are satisfied the reward is given for forbearance, not for the risk ; as in the adding a single life, which is a healthy life, if that life should survive half a year : so they might as well add a contingency, if any one of six persons was alive at the end of six months ; and one of the cases is, if any one of three persons is alive at that time.   The intent of the bargain is the material thing : if that was borrowing the money, it is within the statute, whatever colourable contingency inserted : and this is the sense of all the resolutions in the several cases.   5 *Co.* 69, 70 ; 2 *And.* 15 ; *Mo.* 397 ; and *Mason* v. *Abdy*.   But where the principal was fairly and truly put in hazard, and such as none would run for the interest the law allows, there is no case where it has been held within the statute.   The slightness or reality of the risk seems to be the only rule directing

the judgment of the court.  *Cr. E.* 741, *Bedingfield* v. *Ashley* ; and in 3 *Keb.* 304, *Long* v. *Wharton*, which, though inaccurately reported, seems to me good law.  I cannot see two contracts bearing a greater similitude than this and *Bottomry*.  A life may be insured : so may a ship, which may sink the day after : so may the party die ; one is as much an adventure as the other.  It was endeavoured to distinguish *Bottomry* from every contract upon this, that though above what the law allows upon a loan, yet *Bottomry* contracts were established in favour of trade, there being a risk of the principal, and they being necessary for trade and commerce.  But whatever favour the court may shew to such contracts, they will never establish them upon the destruction of a statute ; and the principle of the court thereon was, that the *Bottomry* bond was not within the statute ; nor could it be ; for it is plain, that a real risk was run, that the principal may never be payable ; therefore it cannot be given for forbearance, but grounded merely on the contingency, the risk.  But as a colourable contingency, in case of a life annexed to the payment may make that bond usurious, so will a colourable contingency annexed to a *Bottomry* contract : as in a bond, if one out of twenty ships, bound from *Newcastle* to *London*, arrived safe ; that would be a contingency thrown in to evade the statute, which would be too hard for such a bond : so if such a contract is made, if the packet should return to *Dover* from *Calais* at a season of the year in which there is no danger : and this I may say with the more security, as *Joy* v. *Kent*, *Hard.* 418, is an express proof of it ; where a *Bottomry* bond was sent to be tried, whether it was an evasion of the statute ; which would not have been so, if it could not have been an evasion.  Indeed Lord *Hale* throws out expressions [144] very favourable to trade, but so inaccurate in that book, that I do not think they could be such as came out of the mouth of so great a man.  His *dictums* then are of no authority.  One of the first cases of *Bottomry*, which came in question, was *Sharpley* v. *Hurrel*, *Cr. J.* 208.  What the court goes on there, is the real risk of receiving less ; which is cited again in *Roberts* v. *Tremayn*, 2 *Roll.* 47, and *Cr. J.* 508, which differed from the other.  In *Soome* v. *Gleen*, as in 1 *Sid.* 27, the resolution is founded on the real hazard of the principal, which cannot be within the statute.  On the whole therefore I am of opinion, that this is not a contract founded on its origin upon usury, but a contingent bargain, and consequently within the express words or intent of none of the statutes of usury.

The next point is, supposing it not a contract within the statute, whether it is not such an unconscionable bargain obtained on an expectant upon his expectancy, as the court is warranted on precedents to relieve on paying the sum advanced with interest from the time of advancing ?  If it was necessary to give an opinion upon this, I own I should have great difficulty.  On one hand I should apprehend, it would be too large to say, in no case an heir or expectant could borrow money on his expectancy ; and yet to let him borrow without any advantage to the lender seems to put him under difficulties ; fathers being frequently close-handed, though liberal enough at their death : so that an heir, if hindered from supporting himself by these means, might starve in the desert within view of the land of *Canaan*.  On the other hand, I should dread the consequence of giving the sanction of this court to future bargains.  Lord *Cowper* states the inconveniences of a sanction, which had been given.  I am sure, it is a point of that consequence to the welfare of mankind, that without necessity no court will give an opinion, of which an ill use may be made.  For the plaintiff it is insisted, that there have been many contracts, not illegal or iniquitous in some circumstances, but from the universal ill tendency on the prejudice to the public have been always set aside in this court : instances of which were in marriage-brocage bonds, and other contracts of like nature ; and that the ill tendency of heirs contracting with strangers to furnish their wants, is to make them quit a regular family life and dependency, to withdraw from advice and counsel of friends, and to have youth supplied with the means of gratifying their passions, and the bringing people together on the worst principles on which men may contract, avarice on one side, and a craving appetite on the other.  The greediness of gain is the only principle on which a stranger can be induced to furnish a stranger ; and the occasion of applying to a stranger is, because the wants are such, as he would not reveal to his family ; which tends to a delusion in what is of general concern, the provision for [145] posterity.  A man may be giving his estate to a money-lender instead of the person intended : and every one disguising the truth from a man, who has a right to the truth, is wrong, and ought not to be encouraged ; and by this delusion he gives his estate to strangers, when he thinks he is giving to his heir or relations, and when, if he had known the truth,

he would have provided for that heir or relations, so as to prevent his beggaring himself. This has been a growing practice to supply young heirs ; and the court has extended its remedy.  At first the cases are, where there is express proof of gross practice or actual imposition : from thence it went to cases, where on the face of the contract it was so gross and unreasonable a contract between the parties, the court, on presuming a man would not enter into it but by imposition, has relieved ; of which one case among many is *Nott* v. *Hill*, 1 Ver.  As the mischief increased, the court has extended its remedy.  Where the bargain is so lucrative, and the person under necessity, so that the judgment of the court has been, that necessity alone could induce to make that contract, there has been relief ; the first case of which kind is *Berney* v. *Pitt*, 2 C. C. 136 ; 2 Ver. 14, a very remarkable case, and a stronger there could not be.  It is also stated by Lord *Cowper* in *Twistleton* v. *Griffith*, 1 Wil. 310, where were marks enough of imposition to warrant relieving on that foot ; but he chose to establish it on the general principle and Lord *Jefferies's* decree, not on the particular circumstances of the case ; and he seems to rejoice in the consequence, that this would put a difficulty on an heir to borrow on his expectancy.  The last case is *Curwyn* v. *Milner*, 3 Wil. 293, where Lord *King* decreed relief ; but said, if it was new, he would not have gone so far, where such a contract was fair, and done with open eyes ; saying he thought himself bound by precedents, and that he saw no difference between an estate settled on an heir on his father's death and an expectancy of personal estate at death of a relation ; it is the same kind of expectancy that tempts to these kind of bargains, and the influence the same.  On the other hand it is insisted, none of the particular cases cited come within the circumstances of this : that all those of fraud, practice, or imposition, are out of the case ; it being a bargain sent to market by the borrower, and the terms his own : no destitute heir under parental government ; having a great personal estate, and so not in the circumstances of the party seeking relief in other cases ; the bargain itself different ; the risk being different ; and the bargain, in all its circumstances, so equitable, that if the court should enter into a nice examination of the proportion and risk, it would appear, the defendant would have been out of pocket, if the grandmother had lived a little longer : that this court will not lay down a principle in general, that an heir or expectant may not contract on his expectancy : that there have been instances, where such contracts have been carried into execution, as *Hobson* v. *Trevor*, and *Whitfield* v. *Fausset* ; that it is a sufficient terror to such contractors, that they are always liable to the examination of this court : and that they can never stand but on the reasonableness and justice of the contract ; which will re-[146]-strain one kind of men from preying on the follies of another.  These are the arguments on both sides ; and there would be danger and difficulty in giving an opinion on either ; but no necessity for it ; that being taken away by Mr. *Spencer* himself ; who has made himself the judge, by voluntarily giving a new security.

Which is the third point, supposing the court would relieve against this in its original, whether it will, when altered by the party in the strongest manner, not unapprised, and with his eyes open.  There is no case of a contract so confirmed, which was not illegal (but such as the court would have relieved against in its original instance), where the court has relieved against the confirmation : unless obtained by fraud or oppression, and then it has been considered as a continuance of the first oppression ; of which there are two cases in Ver., Lord *Ardglass* v. *Muschamp*, and *Wiseman* v. *Beake* : but no resemblance to the present from either.  There was no fraud, practice, or imposition, in the original contract or subsequent security (1 Wms. 727, 639 ; 1 Atk. 10 ; 2 Atk. 529 ; 1 Brown, 369 ; 1 vol. 19 ; post, 264) : the defendant was not very pressing for his money ; the security not being given until a good while after ; which shews, no suit or distress was threatened ; but fairly and voluntarily done, and upon intimation received that the defendant had a doubt whether he could make good the contract in a court of equity.  *Cole* v. *Gibbon*, 3 Will. 290, and the note of the case at the bottom of that, is applicable to the present.

As there is nothing therefore to set aside this contract on the foot of usury within the statutes ; and next supposing it was such as would be set aside, if left to the consideration of the court, yet as the party with his eyes open has bound himself to execute it, he ought to execute it.  It is too much to set it aside ; the penalty therefore is the only thing which can be relieved against in this case.

Sir *John Strange*, Master of the Rolls.  There is no occasion to introduce what I have to say with making a particular state of the case : but as it depends on a variety

of circumstances, many of which must be considered in the argument, I shall content myself with taking them up in the course of it.

The questions upon which I am to offer my advice are three.  First, whether the original advancement of the £5000 in the manner, as deposed by Mr. *Backwell* and disclosed in the defendant's answer, and the bond taken upon it, are to be considered as usurious, and consequently void in point of law ?  Secondly, whether, supposing the bond does not come within the statutes of [147] usury, the transaction or bargain in 1738, is of such a nature as will intitle the plaintiffs to be relieved in equity on the circumstances attending that part of the case ?  Thirdly, whether what appears to have been done by Mr. *Spencer* after the death of the *Duchess*, will in any and what manner influence the determination of this case.

As to the first, I concur in opinion, that this is not an illegal agreement made void by the statutes of usury.  The prohibition will stand on the words and meaning of 12 *Anne*, c. 16, for that does not materially differ from 21 *J.* 1, or 12 *C.* 2, and appears calculated for such loans wherein two principal circumstances must concur : agreement to give and receive an allowance of profit in the mean time for the money hired in a greater proportion than allowed by the statutes : neither of which circumstances occur in the present case.  The repayment of the money advanced depended on a contingency, which if it happened one way, the whole was totally lost : during the pendency of this no interest or profit could accrue to the defendant, but a mere wager or bargain upon contingency which died first : so that the whole was at hazard.  It is objected, that though the letter of the contract may be so, yet if the design of the parties was to borrow £5000, and one should give a greater use for the money than the law allows, the putting it into this shape will not evade the statute, in which statute are very general words to take in all covin, shifts, &c., which I agree to : and therefore if the court can satisfy itself, that this was not in reality a bargain, whereon the principal was designed to be at hazard, and the shape in which it was put was only a contrivance to evade the statute, it will be usury, and consequently void.  Whether the agreement is usurious or not, may be determined two ways : 1*st*, By verdict of a jury on a plea of the corrupt agreement : 2*dly*, By the court's exercising their own judgment on the circumstances of the case disclosed to them.  The first of these methods could not be taken in this cause ; because it appears the bond was cancelled upon the giving the judgment after death of the grandmother, and therefore no action could be brought on it ; and if there had been a *scire facias* at law on the judgment either against *John Spencer* or his executors, no plea of the corrupt agreement could be received ; the judgment *redditum invitum* not being a contract or assurance, which are the words of the statute : and this was the opinion of *B. R.* in *Foot* v. *Jones*, Pas. 9 *G.* 2 [1736], the other method has been often taken, as in *Roberts* v. *Tremayn*, Cr. J. 508.  Thus wherever the court has seen, that the contingency to put the principal in hazard is only added colourably, and only a nominal risk, the court to prevent an evasion of the statute has determined it to be usury ; as in *Clayton's* case, 5 Co. and other cases, where the adding the con-[148]tingency of a particular person's being alive at the end of a year was only a shift.  So by *Holt*, Comb. 125, and Carth. 68.  But a wager between two to have forty for twenty, if one was alive at a future day, would not be usury.  Cr. El. 642, *Button* v. *Downham* ; and in 1 Lut. 470.  Notice is taken of its appearing, that both principal and interest was at hazard.  The present case is fully before the court, and proper for the exercise of their judgment.  To say it is usury, the court must be convinced, that it was the design of the defendant to make a loan of this, and to secure exorbitant profit for it, and calculated as a shift to evade the statute.  But I cannot think either from the evidence or the answer of the defendant, that it was the scheme, or even in contemplation of the party.  It appears a mere wager which of the two should outlive the other.  The £5000 was actually advanced, not colourably : therefore none of the cases cited prove this to be within the statutes of usury, or warrant the court to declare it void thereon.  The word *lend*, on which some stress was laid, concludes nothing.  Every advancement of money on *bottomry* is a loan ; and it was properly observed to be called so in the acts of parliament : but it is the nature of the agreement and intent of the parties into which the court must look to determine the question.  Cr. El. 642, puts it intirely on the question, whether it was the intent of the parties to be a wager or a loan at interest.  So in Mo. 398. It has been argued, that lending money on *bottomry*, when more is taken than the legal interest, is grounded on the consideration of the profit to trade ; and therefore it is

said not to be applicable : that certainly has been one reason why so large a profit for the use of money has been allowed in that instance : but the general reason has been the not coming within the intent of the statute : for if it had, the court could not depart from it : but the hazard the lender runs of never seeing a penny of his principal or any of the interest, takes it out thereof : and that holds as strong in the present case ; and is so laid down in general, where the principal and interest is in hazard.  1 Sho. 8, *Mason* v. *Abdy*, and in Sid. 27, a diversity is taken between a bargain and a loan. Whether a hazard, or not, is considered as the rule for determining whether a bargain or loan.  I am of opinion therefore, this bond does not come within the statutes of usury, and cannot be declared void at law thereon.

On the next question, as the advice I shall offer will be grounded entirely on what was done by Mr. *Spencer* after the death of the Duchess, was I to suppose for argument's sake, the plaintiffs were intitled to the relief prayed, I shall offer nothing as a determination of that branch of this case ; though it may not be improper to throw out something in general.  I see no reason to quarrel with the principal cases cited as the ground for the interposition of a court of equity : on the contrary I cannot help declaring, I concur with those determinations, and do not mean in the least to abate [149] the force of them.  In the present case there are certainly many circumstances, that cast a favourable light on the defendant's part of the transaction.  He does not appear to be a person having an intent of fraud.  The scheme moved not from him, but from Mr. *Spencer* (vide also *Townshend* v. *Lowfield*, Supplement, p. 81.  *But it seems such a circumstance ought to have little weight.*  Vide Supplement, p. 299, 306), on whose own terms the money was advanced without any haggling on the part of the defendant, after it was refused by others as not a desirable contract on the calculation of chances. Not that the hands of the court are tied up from relief from the want of fraud or imposition : I have no jealousy of any thing of that in this case : yet cases may be, wherein this court would interpose to prevent improvident persons from spending or ruining their estates before they come to them, though no proof of actual fraud or imposition : which is agreeable to the saying of Lord *Jefferies* in *Berney* v. *Pitt*, when he reversed Lord *North's* decree.  So was it considered in *Twisleton* v. *Griffith*, and in *Curwyn* v. *Milner*.  The necessity must be seen by every wise and considerate person.  The court keeps a strict hand over these agreements ; which must indeed all stand on their own particular circumstances ; and perhaps it is not advisable to lay down any general rule about them, or more than is necessary to the relief in each particular case.

Therefore, without offering any advice on the bond in 1738, abstracted from the subsequent transaction, I will proceed to the third question ; upon which I am of opinion, that the plaintiffs are intitled to no other relief against the bond and judgment in 1744, but as to the penalty, on payment of what remains due, and the interest from the death of the grandmother : and though I have given no opinion upon the former part of the transaction, yet I must take up this as considering the plaintiffs intitled to the relief prayed ; as the case stood on the first agreement.  And here it is not improper to take a short view of the different situation Mr. *Spencer* appears in 1744, from what he was in 1738.  When the first bond was given, he was notwithstanding a large income involved in great difficulty for want of money to pay creditors ; casting about every way for a present supply ; and suffering dangerous schemes to be privately hawked about ; fearful lest it should come to his grandmother's ears, that he was mortgaging his expectations from her.  It is not very clear, who took the first step toward the new engagement after death : the bond was not given until near two months afterward, though dated the next day after in order that it might carry interest from thence.  But supposing the defendant had called on Mr. *Spencer* for his money before the 31*st* of *October* (which from his genteel behaviour in other parts I can hardly think he did), yet there is no circumstance of force on Mr. *Spencer* ; and the security, then standing out against him, was only a bond for pay-[150]-ment of the money ; not a judgment, on which immediate execution could be sued ; which bond would have given him time enough to turn himself about, before he would be under a necessity to be exposed to an execution.  It appears to be his fixed design after her death to pay off the whole as fast as he could ; and that with a preference to the defendant ; who, he said, had treated him like a gentleman.  The defendant declared, he would not press him for his money, although he should be glad to have it ; and Mr. *Spencer* executed the bond and warrant of attorney freely and voluntarily, and well pleased therewith.  It may be said, that all this proceeded from his not being apprised, that

there could be relief in equity against the first bond. In *Cole* v. *Gibbons* the bill for relief and the answer were both read to the party, and yet the assignment was confirmed; which circumstance, greatly weighing with Lord *Talbot*, is not wanting in the present case: it is what the defendant himself may make use of on his part, and it will be evidence for him, *viz.* that he answered to the manager of Mr. *Spencer*, that he doubted, whether the security would be good, and therefore only desired a note or memorandum: so that from this doubt of the defendant Mr. *Spencer* was apprised of the possibility of relief he had, if he applied to a court of equity; which shews, he acted with his eyes open in this article of confirmation; that it was not a sudden, but deliberate act, and agreeable to that frame of mind he continued in to his death; as appears from his subsequent letters.

Contracts of *post obits* are to be discouraged: and though the relief is not granted in the present case, yet should the court hold a strict hand over these sorts of contracts. How this would be in the case of a young heir under parental authority, I do not say. It may be improper to forejudge such a cause: but inconvenience there can be none in the determination of this. Yet in giving my opinion and advice in this very particular case against relieving the plaintiffs, I am far from blaming the plaintiffs, who are trustees for the infant, for submitting the case to the consideration of the court; which I think very rightly done.

*Lee*, Chief Justice. The first point is, Whether on the evidence before the court relating to this transaction there is sufficient appearing to determine this contract to be usurious. As to the nature of usury, considering it at common law, or in the law of nature, or divine law, or the civil law of other countries (of which there is a large account in Pal. 291), it is unnecessary to spend time on that subject; because the idea of usury is fully settled in this country by the legislature; which has made use of all the words the language could furnish, to prevent taking more than the legal interest, in which usury consists: and to attain this end the borrower is at liberty to disclose every circumstance in his contract, that, it might appear, whether there [151] was any shift, &c. It appears by 2 And. 15, and *Mason* v. *Abdy*, Carth. where the difference is taken and settled, that where the hazard of losing the principal is but a colourable contingency, the agreement is usurious: but where the contingency is real and forcible, it is otherwise. I think, that is the material consideration, and the substantial and true reason, that *bottomry*-bonds are not considered as usurious on the construction of the statute itself; there not being words in the statute to reach *bottomry*-bonds, when they run a desperate contingency of winds, seas, and enemies; the reasons touching trade not being the true reasons, although they might be inducements to courts to construe the statutes in a favourable way. So if on advancement of money by way of loan the lender will by an agreement between the parties, in whatever manner formed, have the repayment of the principal with profit exceeding the legal interest, that will be corrupt within the statute of usury. If therefore, two persons speaking together, one desires £100, and for the loan will give more than the law allows, and for evasion of the statute a practice is invented that the borrower shall grant to the lender £30 *per annum*, for so many years, this practice is within the statute, and will be usury, although the lender never has his £100 again; for by this bargain by way of loan he has full satisfaction for his £100, and more profit than the law allows; which is 1 Bul. 36, which brings the present case to the single consideration, whether the hazard the defendant ran of losing the whole principal without satisfaction for the money advanced, was not a real hazard, which might require a reward beyond the legal and common interest: and where that is the case, it appears from all the authorities, that all bottoms on this in courts of law, that it is always thought, where the profit the lender is to have is as a reward for the hazard he is subject to, and not for the forbearance of the day of payment (which are the words of the statute) they are not usurious. In Molloy, 314, 317, it appears, these real contingencies are not within the statute of usury on this foundation.

But on the second point, I think, it will be well worth the consideration of a court of equity, whether they will not interpose in case of these hazardous bargains to pay double, so as to prevent the lender's going away with such an exorbitant gain? It is difficult to form any general rule, that can meet every case of this kind, that may happen: but they must in general be governed by the circumstances in each case, only this may be always proper to be attended to, as far as may be, to bring all contracts, that are in nature of loans, to that mean prescribed by parliament, that none take

more than the legal interest : and by the cases cited and stated in courts of equity
it appears, they have used a sagacious attention to discover, whether there is any fraud
expressed, or from the nature of the transaction or person concerned, any thing carrying
on the face [152] of it an appearance of imposition ; as in the case of young heirs, &c.,
a court of equity has disabled them from taking advantage thereof, and interposed
to prevent unconscionable bargains.  That therefore is a matter worth the regard
of a court of equity so as to prevent all trade of this sort, such as is called *Jewish* interest,
which seems a *malum* conusable at common law.  What has been done by Mr. *Spencer*
after the death of the Duchess, prevents the court from entering minutely into the
consideration of the first contract ; for any objections thereto are taken away by himself,
in whose place the plaintiffs stand.  The first contract surely might recover strength
and be validated by the intervention of a new case, that was fit to create a right.  If
he was under apprehensions of his grandmother, when the first security was given,
yet they were at an end at the last.  If he was an infant, when he gave the first bond,
the contract would be voidable as to him : but if when of full age he gave a new bond,
it would be good against him.  In the case in Dom. 136, called the *Macedonian* decree,
it is said, that if any creditor lent money for a just and reasonable cause, sufficient to
support the equity of the obligation, it was by a favourable interpretation of the decree
of the senate excepted from the general prohibition according to the quality of the use
to which the money was put.  The defendant has this exception in his favour ; the
use of his money being to pay just debts to tradesmen ; for if these contracts are to
be set aside upon the hatred to the creditor, who has made an improper loan, yet that
imputation is taken away : and even in the case of a son, if the father approves or
ratifies the obligation by paying part, or the son acquits it himself, it cannot be revoked ;
Dom. 137, 138, in his observations upon that decree.  But it is said, that though he
was not under the same difficulty, when he gave this new security, as at the giving
the first bond, yet he was a debtor then to the defendant, and liable to be called on by
legal proceeding ; but that cannot be a reason to set aside this deliberate act of Mr.
*Spencer*, against whom there was then no process, but a readiness in his creditor to
take paper-security instead of money, which he had a right to.  I rely on 3 Wil. 291,
as a stronger case than this : being a deliberate act confirming an unreasonable bargain
when the party was fully informed of every thing and under no surprize : that made
it good.  In *Cann* v. *Cann*, 1 Wil. 727, Lord *Macclesfield* says, there is no colour to
set aside a release, which the maker had a right to make, and was not ignorant of his
right ; and that solemn conveyances are not slightly to be blown over.

I entirely concur therefore in opinion.

*Lord Chancellor.*  Before I proceed to give my own opinion in this case, I must take
notice, that Lord C. J. *Willes* has signified to me his entire con-[153]-currence on these
three points.  Next, that the great and able assistance I have had in this case has
made my task extremely easy : and as I concur in the decree I am advised to make,
the great pains taken in clearing up and considering the points might have excused
me from taking up any time.  One thing I ought to say in the outset : that if I could
have foreseen upon what particular point the judgment in this case would fundamentally
turn, I should have spared the judges the trouble of this attendance.  As three points
have been properly made at the bar, it is necessary to say something to each.

The first is a mere question of law upon the statutes of usury, and on the rules
of law, and the same as in a court of law, if an action had been brought on the bond,
and the whole matter had been disclosed in special pleading.  If I had even now a doubt
concerning it, I should have held myself bound by the opinion of the judges as a matter
within their conusance, in like manner as if I had sent this to be tried at law : in which
case the court always decrees consequentially to the trial.  (See the distinction between
the trial of *an action* and an *issue*, in *Ex parte Kensington*, Coop. Ca. Chan. 96.)  But
I have no doubt about it ; and concur in opinion.  This question was laboured by
the plaintiff's counsel ; many authorities cited ; strong inferences made by them.
I do not intend to go through them : but contracts on contingency are to be distin-
guished plainly ; for a wager on chance is not within the statute, because no loan.
But if there is a loan of money with an agreement to receive back more than the prin-
cipal and legal interest in any event, there, though a contingency is thrown in, on
which the whole principal and interest may be lost by possibility, it is usurious and
contrary to the statute.  On this it was insisted for the plaintiffs.  I will not now
enter into a critical dispute, how far any such contract, where by the falling out of

the contingency one way or other the money may be lost, is in strictness a loan. The civil law has very nice and refined distinctions upon this : *commodatum & mutuatum* are there technical terms for a loan. By the first was meant where the things lent were to be restored in *specie* : by the second, where in *genere* only : but in both the things were to be restored in all events, and nothing was to be paid for the use or hire ; which when it was so, was *locatum & conductum* by the *Roman* lawyers ; under which perhaps all our laws would strictly come. But these minute distinctions upon loans are not adopted by us ; but we mix and confound their *commodatum & mutuatum* ; as appears in an action upon a loan, which takes in both. So though interest is to be paid for it, it is with us still a loan. So though money is to be advanced upon a risk, which upon a contingency may be totally lost, it is still a loan of money ; and all the books, treating of *bottomry*, call it money lent on *bottomry*. [154] Besides this is plain by the express words of the stat. 11 *H.* 7, c. 8, which shews, they understood, that an adventure might be inserted in a contract of a loan ; and it is observable, that this, if real and fair, exempted it from the laws of usury ; though at that time all kind of usury or taking interest was unlawful. By the law of *England* therefore the insertion of a contingency will not of itself prevent a contract's being a loan. Consider the result of the cases cited on the statute of usury ; which I will not repeat, but only deduce proper and natural inferences from them. First, if there is a loan on contingency, in consideration whereof a higher interest than the law allows is contracted for forbearance, if the risk goes only to the interest or *præmium*, and not to the principal also, though real and substantial risk is inserted, it is contrary to the statute ; because the money lent is not in hazard, but safe in all events ; and no regard is then had whether the contingency is real or colourable ; as appears, from what *Dodderidge* J. says in *Roberts* v. *Tremayn* ; who by the way takes it for granted that such a loan may be with us on contingency. Next, if the contingency extends to both, and there is a higher rate than the law allows, regard is had, whether a *bona fide* risk is created by the contingency, or whether only colourable ; for if so, courts of law hold it contrary to the statute, because it is an evasion to get out of the statute ; which is prohibited by the law itself. *Clayton's* case, 5 Co. 70, and in the case put by *Popham* in *Burton's* case immediately preceding. So in *Mason* v. *Abdy*. But where the contingency has extended to principal and interest both, and not colourable only, but a fair and substantial risk is created of the whole, it takes it out of the statute : though called a loan, it is considered as a bargain on chance, and differs little from a wager. On this depends the case of *bottomry* ; for I agree, that the approving thereof is from their being fair contracts on a real hazard, and not that they concern trade ; though trade and commerce is taken into consideration, but not alone relied on to support usury ; for that cannot be. The plaintiffs counsel object to this by laying stress on certain expressions and *dictums* of judges in some cases, that there must be no transaction or communication of borrowing and lending ; and care must be taken, that there be no such ; and therefore as the first proposal in the present case was to borrow money on a contract to pay two for one, it is usurious notwithstanding the contingency thrown in. A very right answer has been already given ; that courts of justice are to regard the substance of things on a contract, and not mere words, which might be inaccurately used by the parties in private dealing. But another answer may be given : that in the most accurate books these expressions are applied to cases arising on purchase of an annuity or sale of goods and merchandize at a *præmium* or advanced profit beyond the rate of legal interest ; in which cases these expressions are properly applicable ; but cannot be so to loans on contingency ; that is a fair, real contingency ; for there, from the nature [155] of the thing, the communication must be about a borrowing and lending ; as is plain from the case of *Bottomry* ; and the case put by *Dodderidge*, J., in terms is of lending £100, &c., upon a casualty, if it goes to the interest only and not the principal, it is usury ; which he clears by the case of *Bottomry*. The very stating of the case on the purchase of an annuity or sale of goods proves the truth of this. An annuity may be purchased at as low a rate as you can, provided it was the original negotiation to purchase and sell an annuity : but if the treaty began about borrowing and lending, and ends in the purchase of an annuity, it is evident, that it was only a method or contrivance to split the payment of the principal and usurious interest into several instalments, and consequently that it was a shift ; which is *Fuller's* case, and *Tanfield's*, 4 *Leon.* and *Noy*, 151, which I take to have been on the same deed as that in 1 *Brownlow*. So in the sale of goods or merchandise it is lawful to sell

as dear as you can, on a clear bargain by the way of sale : but if it is first proposed to borrow, and afterwards to sell goods beyond the market price, this is usurious : of which there are two cases in Mo. 397.   The very putting these cases shews how proper and forcible those expressions of the judges before-mentioned are, when used in the purchase of annuity and sale of goods ; but how improper when thrown out in cases of loans of money on contingency.

The second question is, supposing the first contract to be valid in law, whether it was contrary to conscience, and to be relieved against in this court upon any head or principle of equity ?   I will follow the prudent example of not giving any direct and conclusive opinion.   As it would be unnecessary, it is the safest not to do it : yet it has been made necessary to say something on it.   It cannot be said, that such contracts deserve to be encouraged ; for they generally proceed from excessive prodigality on one hand, and extortation on the other ; which are *vitia temporis*, and pernicious in their consequences ; and then it is the duty of a court, if it can, to restrain them. This court has an undoubted jurisdiction to relieve against every species of fraud. 1. Then fraud, which is *dolus malus*, may be actual, arising from facts and circumstances of imposition ; which is the plainest case.   2. It may be apparent from the intrinsic nature and subject of the bargain itself ; such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other ; which are unequitable and unconscientious bargains ; and of such even the common law has taken notice ; for which, if it would not look a little ludicrous, might be cited 1 Lev. 111, *James* v. *Morgan*.   A 3d kind of fraud is, which may be presumed from the circumstances and condition of the parties contracting : and this goes farther than the rule of law ; which is, that it must be proved, not presumed ; but [156] it is wisely established in this court to prevent taking surreptitious advantage of the weakness or necessity of another : which knowingly to do is equally against the conscience as to take advantage of his ignorance : a person is equally unable to judge for himself in one as the other.   A 4th kind of fraud may be collected or inferred in the consideration of this court from the nature and circumstances of the transaction, as being an imposition and deceit on the other persons not parties to the fraudulent agreement.   It may sound odd, that an agreement may be infected by being a deceit on others not parties : but such there are, against such there has been relief. Of this kind have been marriage-brocage contracts ; neither of the parties herein being deceived : but they tend necessarily to the deceit on one party to the marriage, or of the parent, or of the friend.   So in a clandestine, private, agreement to return part of the portion of the wife or provision stipulated for the husband to the parent or guardian.   In most of these cases it is done with their eyes open, and knowing what they do : but if there is fraud therein, the court holds it infected thereby, and relieves.   So where a debtor enters into a deed of composition with his creditors for 10s. in the pound, or any other rate, attended with a *proviso* that all creditors executed this within a certain period, if the debtor privately agrees with one creditor to induce him to sign this deed, that he will pay or secure a greater sum in respect of his particular debt : in this there can be no particular deceit on the debtor, who is party thereto : but it tends to deceit of the other creditors, who relied on an equal composition, and did it out of compassion to the debtor.   This court therefore relieves against all such underhand bargains (1 Wms. 768 ; 1 Atk. 105).   So of *præmiums* contracted to be given for preferring or recommending to a public office or employment : none of the parties are defrauded ; but the persons, having the legal appointment of these offices, are or may be deceived thereby : or if any person, agreeing to take the *præmium*, has authority to appoint the officer, it tends to public mischief by introducing an unworthy object for an unworthy consideration.   These cases shew what courts of equity mean, when they profess to go on reasons drawn from public utility.   To weaken the force of such reasons, they have been called political arguments, and introducing politics into the decision of courts of justice.   This was shewing the thing in the light which best served the argument for the defendant, but far from the true one, if the word *politics* is taken in the common acceptation : but if in its true original meaning, it comprehends every thing that concerns the government of the country ; of which the administration of justice makes a considerable part ; and in this sense it is admitted always.   To apply this : thus far, and in this sense, is relief in a court of equity founded on public utility.   Particular persons in contracts shall not only transact *bona fide* between themselves, but shall not transact

*mala fide* in respect of other persons, who stand in such a relation to either as to be affected by the contract or the consequences of it ; and as the rest of mankind beside the parties contracting are concerned, it is properly said to be governed on public utility. The [157] last head of fraud, on which there has been relief, is that, which infects catching bargains with heirs, reversioners, or expectants, in the life of the father, &c., against which relief always extended. These have been generally mixed cases, compounded of all or several species of fraud ; there being sometimes proof of actual fraud, which is always decisive. There is always fraud presumed or inferred from the circumstances or conditions of the parties contracting : weakness on one side, usury on the other, or extortion or advantage taken of that weakness. There has been always an appearance of fraud from the nature of the bargain ; which was the particular ground, on which there was relief against *Pit* ; there being no declaration there of any circumvention, as appears from the book, but merely from the intrinsic unconscionableness of the bargain. In most of these cases have concurred deceit and illusion on other persons not privy to the fraudulent agreement : the father, ancestor, or relation, from whom was the expectation of the estate, has been kept in the dark : the heir or expectant has been kept from disclosing his circumstances, and resorting to them for advice, which might have tended to his relief and also reformation. This misleads the ancestor ; who has been seduced to leave his estate not to his heir or family, but to a set of artful persons, who have divided the spoil beforehand. Consider, which of these species is in the present case. There is no colour of evidence of actual fraud in the defendant ; who did not think he was doing any thing immoral or unjust : although if the declarations of Mr. *Spencer* can be believed, the defendant had a misgiving, how far it could be held good in this court. But though this case is clearer of actual fraud than almost any that has come, yet several things are insisted on for the plaintiffs, as necessity on one side and advantage taken of it on the other : unconscionableness in its nature from the terms of paying two for one in case of the death of an old woman the next week or day : that there was deceit upon her, who was in *loco parentis*, from whom were his great expectations. This was however the thing intended. I admit also, there are more circumstances alledged on the side of the defendant to weaken and take off, than have concurred in most cases of this kind. Mr. *Spencer* was of the age of thirty ; possessed of a great estate of his own ; not weak in mind, but of good sense and parts : though in that the witnesses differ. If it was necessary to give an opinion upon this point, I should consider the weight of these objections and the answers to them : but as it is not, I will only consider the contingency inserted, which was to cure the whole.—I would not have it thought that the insertion of such a contingency would in every case sanctify such a bargain. Suppose such a bargain made by a son in life of his father or grandfather, on whom was his whole dependency : I appeal to every one what the consequence of it would be. Whether such a contingency is inserted or not, it will come to the same thing ; [158] the creditor knowing the fund for payment must depend on the debtor's surviving the father or grandfather, whether it is said so or not : and therefore I have always thought, there was great sense, in what *Vernon* reports to be said by the court in *Berney* v. *Pitt* : " that the expressing the death of the son in life of the father makes the case " worse," &c. I have not mentioned the reasons drawn from the discouragement of prodigality and preventing the ruin of families : considerations of weight ; and ingredients, which the court has often very wisely taken along with them. It is said for the defendant to be vain and wild for the court to proceed on such principles : if it had been said, it was ineffectual in many instances, I should have agreed thereto ; but I cannot hold that to be vain and wild, which the law of all countries and all wise legislatures have endeavoured at as far as possible. The senate and law-makers in *Rome* were not so weak as not to know, that a law to restrain prodigality, to prevent a son's running in debt in life of his father, would be vain in many cases : yet they made laws to this purpose ; *viz.* the *Macedonian* decree, already mentioned ; happy, if they could in some degree prevent it : *est aliquod prodire tenus.* It is said for the defendant that this would be to assume a legislative authority ; and that several acts of parliament have been thought necessary to restrain and make void contracts of a pernicious tendency to the public. What can be properly called such an assuming in this court, I utterly disclaim : but notwithstanding I shall not be afraid to exercise a jurisdiction I find established (2 Vern. 14), and shall adhere to precedents (1 Wms. 310). As far therefore as the court went in *Benaey* v. *Pitt*, in *Twisleton* v. *Griffith*,

in *Curwyn* v. *Milner*, and the opinion of Lord *Talbot* on the original transaction in *Cole* v. *Gibbons* (3 Wms. 290), so far, and as far as these principles do naturally and justly lead, I shall not scruple to follow. The acts of parliament instanced will be found to be made (many of them), not for want of power in this court to give relief in many of these contracts, but to make them void in law, to give the party a short remedy against them. The judgment I am going to give will not be founded upon this : but I have done it, that the work of this day may not be misunderstood, or precedents thought to be shaken : not that this establishes such a contract, as is called fair, like killing fairly in a duel, which the law does not allow as an excuse for murder. Junct annuities and *post obits* are grown into traffick ; which ought to abate of its fairness.

As to the last question, of the subsequent acts of Mr. *Spencer* : this is the point on which the determination of this case will depend ; and I entirely agree with the opinion delivered already. Had the first bond been void by the statutes of usury, no new engagement would have made it better : the original would have infected it. But if a man is fully informed and with his eyes open, he may fairly release, and come to a new agreement, and bar himself of relief, which might be had in this court. (See *Crowe* v. *Ballard*, 1 Ves. jun. 215, 220, and the references in headnote to this case.) The material [159] inquiry is, whether this was done after full information, freely without compulsion, *&c.* ? and upon the best consideration of the evidence it appears to be so done, and with fairness. First, the condition of the necessity of Mr. *Spencer* was over ; for though he had no power over the capital of this accession of estate, yet it was so great a one, that little more than one-third of a year's income would have paid off the whole. If that then be a state of necessity, how far shall it be carried ? Then, the state of expectancy was over by the death of the Duchess : and also the danger of her coming to the knowledge of his conduct and circumstances, and his fear of offending her ; which was the principal restraint upon him : so that there was no ancestor or relation left upon whom any deceit could be committed in consequence of any new agreement : and it appears, that before this new bond he had sufficient notice that he had a chance at least that he might have relief in equity, from the defendant's own declaration to him of his doubt whether it would be good. Lastly, there was no impediment against his seeking relief by disclosing the whole case at that time in a court of justice. Under these circumstances was the new engagement, without any fraud, contrivance, or surprise to draw him in ; which operates more strongly than the deed of confirmation in *Cole* v. *Gibbons*, that it is too much to set it aside. The only difference to distinguish that from this case was, that there the releasor was not in the power of the releasee, here Mr. *Spencer* was debtor, and his creditor might immediately have distressed him by an action : but the answer is, there was neither an attempt nor threat to bring an action. It is objected further for the plaintiffs, that *Cole* v. *Gibbons* was a single case ; and there are several precedents, in which such new security and subsequent transaction was not sufficient to give a sanction to a demand of this kind : as in Lord *Ardglass* v *Muschamp* : but the circumstances there shew it not to be at all applicable : then the confirmation in *Wiseman* v. *Beak* was still more extraordinary ; and that was a very extraordinary invention of Serjeant *Philips* of a bill to be foreclosed against a relief in equity. In both those cases the original transaction was grossly fraudulent : but I have only shewn it here to be a doubtful object of relief in this court ; which surely is the most proper case of all others to put an end to by a new engagement.

On the whole therefore the only relief is that, which I am advised to give, against the penalty of the last bond.

The only doubt, which could arise on this, is as to costs ; to which the defendant is not entitled. The plaintiffs are only executors ; they had a probable cause of litigating this contract, which is far from deserving favour, and were in the right to submit it to the judgment of the court : and it is observable, that in *Cole* v. *Gibbons*, which was on this point, the bill was dismissed without costs : and no costs given on the bill, but on the contrary deducted. [160] There was indeed in that case no penalty, as there is here : but still that does not take away the discretion of this court in respect of costs according to the circumstances of the case : and there are several cases of a bond with a penalty disputed, where, though the costs at law will undoubtedly follow the demand, yet on the circumstances costs in this court are refused.

Therefore let it be referred to the master to take an account of the principal, and interest due on the bonds of 1744, and the judgment thereon, and to tax the defendant

Case 1:23-cv-03562-RDM   Document 41-1   Filed 09/13/24   Page 76 of 176

his costs at law ; and an account of the money paid by Mr. *Spencer* to the defendant ;
and let that first be applied to discharge the interest, and then to sink the principal ;
and all just allowances be made ; and on payment by the plaintiffs to the defendant
of what is found due, let the defendant deliver up the bond to be cancelled, and acknow-
ledge satisfaction on the judgment : but that must be at the expence of the plaintiffs :
and if the plaintiffs pay, what is so found due, let there be no costs in this court on either
side : but otherwise let the bill be dismissed with costs.


PRIEST *v.* PARROT, *Feb.* 8, 1750–1.

[See *Knye* v. *Moore*, 1822–25, 1 S. & S. 64 ; 2 S. & S. 264.  *Skarff* v. *Soulby*, 1848–49,
18 L. J. Ch. 9 ; 1 Mac. & G. 374 ; 1 Hall & Tw. 427.]

Grant *ex turpi causa.*  Bill for payment of a sum of money and an annuity secured
by a deed poll (the marginal note in the former editions was dubiously expressed
as to whether the security were by *bond* or *grant*.  It appears from R. L. &c., to
have been the latter.  Vide Supplement, p. 313) by a young woman who had been
seduced by a married man (besides the additional cases referred to in the Supplement,
p. 314, see *Matthews* v. *L———*, 1 Madd. Rep. 558), in whose family she lived as com-
panion to his wife, and who, by continuing to live with him occasioned a separation,
*dismissed* ; but without costs, on account of her previous good character.

A bill for payment of £100, and an annuity of £40, was granted by defendant to
plaintiff ; who, being a young woman, came to live in the family of defendant, then
a married man, as a companion to his sister ; and afterward occasioned a separation
between him and his wife.

*Lord Chancellor.*  This case is in some parts new : nor do I remember it has
directly come before the court.  The consideration of the grant is plain ; for though
expressed to be for divers causes and considerations, it is plain on the evidence, to
what it is applied : nor is it disputed.  It is plain also to me, that what this unhappy
woman (who has been very criminal also) has submitted to, was from the seduction
of defendant ; for her youth, when she came into the family, and good character
before, are evidence thereof (*Note* : Relief against such bond denied, in 1 Ver. 483,
but would have been granted in case of a common strumpet, and in 2 Ver. 242, same
doctrine was held, and in Prec. Chan. 114, but in 2 Ver. 187, it was held, that where
the party himself comes for relief against such bonds, court may refuse, *secus* where
his executor comes, 2 Wms. 432 ; Gib. Rep. 9 ; Cas. temp. Talb. 153 ; 3 Burr. 1568) :
and that certainly has been the principal ground of the determinations in this court,
where it has been considered as *præmium pudicitiæ*, when the young woman submitted
to the suggestion of the man and was guilty of no fault before.  But I know no case,
where the court has given countenance to these sort of bonds in case of a married man,
she knowing it.  That differs the case ; because persons, who submit to a temptation
of that sort, are without excuse ; they know absolutely they are doing a wrong,
which [161] cannot be recovered or healed, and which occasions mischief to families.
That differs it from the cases, wherein the court has gone some lengths to make some
provision for such unfortunate people.  Yet if this is a family of opulence, and this a
poor woman ruined by his temptation and corruption, it very much deserves their
consideration, whether she should starve : if therefore there is any probability of the
family's doing any thing of that kind, as it was the act of the defendant the occasion
of it, I would let the cause stand over.

I own, my present opinion is, I cannot give relief for those reasons, which distinguish
the case extremely and materially from others which have been determined.  Where
a young woman, appearing to be modest before, is applied to by a man, and submits to
his temptation, he does a great injury : but she knows, the crime she submits to is not
so aggravating as adultery ; and she may be inclined to suppose he will be induced
to marry her ; and there are often such promises, which it is almost impossible to give
evidence of : if the parties are both single, there is room for presumption thereof :
and if that is the case, the subsequent marriage takes off the enormity of the offence
before, and in most countries of *Europe* even legitimates the issue ; which admits of
presumption, and is some excuse ; and beside, in such case, people know they are
doing that which is not of so bad consequence in families.  Whereas when a man

**AD-5**

CASE 5.  BARMUND'S CASE.

*Likelihood of divorce cannot be laid as special damage.*

1 Roll. Ab. 34.   2 Roll. Rep. 24.   Pop. 140.   Godb. 273.   Cro. Car. 322. 436.
1 Com. Dig. 193.

Action upon the case for saying, "that he had two bastards, and should have kept them:" by reason of which words discord arose betwixt him and his wife, and they were likely to have been divorced.   After verdict, it was moved in arrest of judgment, that these words were not actionable, because he doth not shew any temporal loss; as loss of marriage, or the like: but this imagination to be divorced is not to any purpose, for it is but a causeless fear.—All the Court were of that opinion; and therefore it was adjudged for the defendant.

[474]  CASE 6.  FURNIS *against* LEICESTER.

*If a vendor falsely affirm the goods to be his, knowing them to be a stranger's,*
*an action lies for the deceit, though the goods are not reclaimed.*

Carth. 90.   Comb. 142.   *Ante,* 197.   1 Show. 68.   3 Mod. 261.   Cro. Eliz. 44.
Jones, 196.   1 Roll. Ab. 96.   1 Roll. Rep. 276.   Moor, 126.   Yelv. 20. 40.
1 Roll. Ab. 91.   Sid. 146.   1 Lev. 102.   1 Bac. Ab. 49, 50.   1 Com. Dig. 166.
Ld. Raym. 593.   3 Ter. Rep. B. R. 57.

Action on the case.   The declaration stated, that the defendant *falso et deceptivè* sold to him such a day two hundred and twenty sheep, affirming that they were his own sheep, *ubi revera* they were the sheep of J. S.   The defendant pleaded not guilty; and it was found against him.

It was moved in arrest of judgment, that the action lay not, because he doth not shew that the defendant had committed any offence in affirming them to be his; and he doth not shew that he had any damage, or that J. S. had retaken them, or sued him for them, as 42 Ass. 8.

*Sed non allocatur:* for the sale of goods which were not his own, but affirming them to be his goods, knowing them to be a stranger's, is the offence and cause of the action; and if he should tarry until the goods were taken from him again, it might peradventure be mischievous to him, and he should be without remedy.   Wherefore, *absente* Montague, it was adjudged for the plaintiff.   *Vide* 9 Hen. 7. pl. 21. b.

CASE 7.  KIRKMAN *against* THOMPSON.

A conveyance of lands by a husband or his ancestor to a husband and wife, is within the protection of 11 Hen. 7. c. 20. though money and marriage be blended in the consideration.   *Post.* 624.

Moor, 93. 250.   Jones, 254.   Cro. Car. 244.   Dyer, 147, 148.   Lend. 40.   2 Vern. 489.
Cro. Eliz. 12.   Pigot on Recov. 81.   Cruise on Recov. 160.

A gift to husband and wife, and the heirs of the body of the wife, conveys an estate for life to the husband, and an estate in special tail to the wife.

A fine levied by husband and wife of the wife's jointure is not within the 11 Hen. 7. c. 20.

Ejectment.   Upon a special verdict the case was, that one Richard Greycroft was seised in fee of the land in question, and by indenture covenanted with Richard Boles, as well in consideration of two hundred pounds paid by the said Richard Boles, as in consideration of a marriage betwixt Leonard his son and Ann the daughter of the said Richard Boles, to convey the land "to the use of the said Leonard and Ann, and the heirs of the body of the said Ann to be engendered, and to his right heirs."   The marriage takes effect.   The father dies before the assurance.   Leonard, in performance

of his father's covenant, makes the assurance accordingly. Afterwards they have issue Richard the lessor; and afterwards Leonard infeoffed one Woodroff. Leonard and his wife levied a fine to the said Woodroff, under whom the defendant claims. Richard Greycroft enters as for a forfeiture by the statute of 11 Hen. 7. c. 20. The question was, whether this entry was lawful or not?

First, this being a conveyance as well made for money for the father of the wife as for a marriage, not being found expressly to be a jointure, whether it shall be said to be a jointure within the statute of 11 Hen. 7. c. 20.?—And it was resolved that it should; for the conveyance being by the husband or his ancestor in consideration of a marriage, although it be conjoined with a consideration of money, is within the statute; and it shall be expounded as a jointure within the letter and intention of the said statute.

[475] Secondly, it was moved, whether this were an estate-tail in the wife only, or in the husband and wife? for if it be an estate-tail in the husband as well as in the wife, then it is clearly a good alienation out of the statute.—And it was held an estate-tail in the wife, and but an estate for life only in the husband.

Thirdly, (which was the principal question) this being a jointure within the statute, whether the alienation by the wife with her first husband who limited it, be a forfeiture within the statute? For it was moved, that this statute intended to provide for the issues of such wives who are inheritable to the said entail, and it is as an advancement settled by the ancestor of the husband; and therefore, although the first husband who made the limitation joined in the assurance, he having but an estate for life, it shall be a forfeiture in the wife.—But it was resolved by all the Court, that it was not any forfeiture within the words nor within the intent of the statute. First, not within the words; for the words are, "If any woman being sole, or with any after-taken husband, &c." And here she was not sole; and this husband who conveyed it, is he who was married to the wife before the conveyance. But Doderidge, Justice, said, that if that conveyance had been a conveyance by the father to the wife before marriage, and afterward she had taken the son to husband, it would peradventure have been a more difficult question.—Secondly, it was held to be out of the intent of the statute, because the husband who made the assurance joined with the wife in the alienation; and this statute, being in restraint of the common law, is to be taken strictly; and the statute did not intend but to provide that disinherison shall not be to the heirs of the husband contrary to his intent; but here this being with his intent may well stand with the statute, and is not any alienation against the purview thereof. Wherefore it was adjudged for the defendant.

### CASE 8.  HINGEN *against* PAYN.

If a plaintiff assign for breach of a condition, that he was turned out of his house by two, and the jury find that it was by one only, yet the verdict is good.  *Ante*, 63. 380. 407.

2 Roll. Abr. 428. 465.  1 Sid. 5.  Dougl. 665, 666.  1 Ter. Rep. 238.

A grantee shall not take advantage of a condition before he has given notice to the lessee, though he may of a covenant.

Cowp. 126. 597.  1 Term Rep. 645.

Debt upon an obligation of four hundred pounds, conditioned for the performance of covenants in a lease.

The defendant pleads performance generally.

The plaintiff shews, that the lessor, by deed enrolled within the six months, bargained and sold the reversion to J. S. and T. D. and there being a covenant in the lease, that the lessee at Michaelmas (being the end of the term), or after upon request, should deliver the possession to the lessor, his heirs or assigns, he alledgeth for breach, that J. S. and T. D. the next day after Michaelmas, came to the house, and required of the defendant the delivery of possession, and he had not delivered the possession. Issue being taken upon this request, the jury found, that the said J. S. only came and required the possession, and he did not deliver it, &c. It was moved, that the

**AD-6**

The *Lord Chancellor*, upon the motion for the Injunction, at first had some difficulty about granting it ; *Worsefold* being a mere trespasser : but at length his Lordship granted the Injunction against both *Worsefold* and the tenants. *Register's Book*, A. 1786, folio 1.

[292] MORTLOCK *v.* BULLER.   *Dec. 7th, 10th, 12th, 24th,* 1804.

[See *Merediths* v. *Saunders*, 1814, 2 Dow, 518 ; *Thomas* v. *Dering*, 1837, 1 Keen, 744 ; *White* v. *Cuddon*, 1842, 8 Cl. & F. 788 ; *Bellringer* v. *Blagrave*, 1847, 1 De G. & Sm. 66 ; *Marshall* v. *Sladden*, 1849, 7 Hare, 438 ; *Shrewsbury Railway Company* v. *London & N.-W. Railway Company*, 1853–56, 22 L. J. Ch. 688 ; 26 L. J. Ch. 482 ; *Wolley* v. *Jenkins*, 1856, 26 L. J. Ch. 384 ; *In re Rolling Stock Company of Ireland Ltd., Clack's Case*, 1866, 14 W. R. 987 ; *Salamon* v. *Sopwith*, 1876, 35 L. T. 465 ; *Noble* v. *Edvardes*, 1877, 5 Ch. D. 389 ; *Burrow* v. *Scammell*, 1881, 19 Ch. D. 183 ; *In re Cotton's Trustees*, 1882, 19 Ch. D. 627 ; *Thomas* v. *Williams*, 1883, 24 Ch. D. 567 ; *Ecclesiastical Commissioners* v. *Pinney*, [1899] 2 Ch. 736 ; *Rudd* v. *Lascelles*, [1900] 1 Ch. 815, 818.]

The Court is not bound to decree a specific performance in every case, where it will not set aside the contract ; nor to set aside every contract, that it will not specifically perform. Under circumstances, that would have amounted to a breach of trust, inadequacy of consideration, arising from gross negligence of the agent, and a want of due authority, the bill was dismissed ; though the Plaintiff was unimpeached ; without prejudice to his remedy at law.

The bill was filed for the purpose of obtaining the specific performance of a contract for the sale of an estate at *Isleham*, in the county of *Cambridge*, to the Plaintiff *John Mortlock*, under the following circumstances :

By the settlement, dated the 5th of *March* 1799, previous to the marriage of *John Buller*, Esq., and *Elizabeth Yorke*, the estates at *Isleham* were limited, subject to a term of 99 years, in trust to raise £200 a-year pin-money, to be paid to the separate use of Mrs. *Buller*, to the use of *John Buller* for life without impeachment of waste ; remainder to the use of Lord *Hardwicke*, *Charles Yorke*, and *James Buller*, and their heirs, during his life, in trust to preserve contingent remainder ; remainder to *Elizabeth Yorke* for life, without impeachment of waste ; remainder to the same trustees for 2000 years, upon trust to raise portions for younger children ; and, subject thereto to the use of the first and other sons of the marriage in tail male ; remainder to the use of *John Buller*, his heirs and assigns for ever.

The settlement contained a power to the trustees at any time or times at the request and with the approbation of Mr. and Mrs. *Buller* during their joint lives, or of the survivor, to be testified by some deed or writing, to be sealed and delivered by them, him, or her, in the presence of and attested by two or more witnesses, to sell or exchange ; and it was declared, that the trustees should with the consent of Mr. and Mrs. *Buller* or the survivor, and after the decease of the survivor at the discretion of the trustees, apply the money arising [293] from the sale, in the first place, in paying off the incumbrances, and afterwards lay out the residue in the purchase of other lands, to be settled to the same uses.

In the summer of 1800 the trust estates were advertised for sale by auction on the 24th of *September* in fifteen lots ; unless the whole should be disposed of by private contract before the 8th of *September* : and by the printed particulars it was declared, that the purchaser should pay a deposit of £15 *per cent.* ; and sign an agreement for payment of the remainder of the purchase-money on the 31st of *December* next. The Plaintiff *John Mortlock* having applied to the auctioneer. a meeting took place with Mr. *Buller* ; who asked £26,500 for the purchase. *Mortlock* offered £26,000 ; which was declined by Mr. *Buller* ; until he should have consulted his friends. By a letter, dated the 3d of *September*, the auctioneer informed *Mortlock*, that no less sum would be accepted ; in consequence of which *Mortlock* the following day by a letter, to the auctioneer declared himself ready to accede to the terms proposed ; and his agent accordingly on the 9th of *September* paid the deposit to the auctioneer. and signed the contract for the completion of the purchase ; and the auctioneer signed a receipt for £4975, the deposit in part of £26,500, the purchase-money.

LLMC DIGITAL

The answers of the trustees represented, that, Mr. *Buller* expressing his wish, that the *Isleham* estate should be sold, Mr. *Yorke* generally signified his inclination to concur in such a measure, if it were thought advantageous for the trust : Mr. *James Buller* said, that he should be ready to concur in the wishes of his brother upon that subject ; and Lord *Hardwicke* answered, that, if Mr. *Buller* should think it advantageous to part with the estate at that time, there would be no difficulty in ob-[294]-taining the consent of the trustees. The trustees did not any farther interfere in the proceedings towards the sale ; which was conducted under the sole authority of Mr. *John Buller* ; but a draft of the conveyance was approved by Mr. *James Buller* on behalf of himself and Mr. *John Buller*, and on behalf of the other trustees by their Solicitor. The trustees, however, in *December* 1800, being informed, that *Mortlock* had made a large profit by his bargain, and had actually contracted for the re-sale of part of the estate for several sums, amounting to £34,900, leaving a considerable part undisposed of, refused to concur in the conveyance. Upon that re-sale the purchasers were but seven in number ; and the money was to be received by instalments in the course of the year 1801. The circumstances, under which the value of the estate was fixed, were these. In the spring of the year 1800 Mr. *Buller* applied to the auctioneer to survey the estate ; and advise him of the value and the best mode of selling. In *June* and *July* the auctioneer represented, that he had surveyed the estate ; and, according to his own evidence, that it was worth at least £28,000 ; but, if from £24,000 to £27,000 should be offered, a consultation should take place ; and he would before the auction value it again, as then divided into fifteen lots. In the beginning of *September* 1800 the auctioneer again surveyed the estate in person : the former survey having been made by a clerk ; and the amount of the second valuation was £33,386. That valuation was first produced to the solicitor of Mr. *Buller* in the beginning of 1801 : the auctioneer having never before communicated the fact to Mr. *Buller* or any other person.

After the answers were put in Mrs. *Buller* died ; not leaving any children. A supplemental bill was filed ; claiming the relief against Mr. *Buller*.

[295] The *Solicitor General* [Manners Sutton], Mr. *Richards*, Mr. *Wilson*, and Mr. *Hart*, for the Plaintiff. The defence to this bill rests upon inadequacy of consideration and misinformation as to the value of the estate ; imputing, not any fraud to the Plaintiff, but want of care and attention, and mismanagement, to the agent of the Defendant. Inadequacy of value may with other circumstances raise a presumption of fraud ; but in a transaction like this, the conduct of the purchaser unimpeached, no advantage taken of youth, distress, &c., no relation or confidence between them, the Defendant consulting those, qualified to give him the best advice, every circumstance removing, instead of raising, suspicion, mere inadequacy cannot induce the Court to withhold a specific performance. What constitutes inadequacy of price ? Where is the line to be drawn ? Upon a subject so vague, indefinite, and uncertain, it is impossible to draw any rule. In the last case of that nature, *White* v. *Damon*, your Lordship affirmed Lord *Rosslyn's* decree (7 *Ves.* 30 ; see the note, 8 *Ves.* 137. *Burrowes* v. *Lock*, 10 *Ves.* 470) ; but upon a very different ground ; that the only witness was interested ; holding upon the other point, that the discretion must be exercised upon principles, that will bear the test of application to other cases ; and in the first decree Lord *Rosslyn* even felt the necessity of taking into consideration some circumstances of an equitable nature ; observing upon the place and time of sale. In *Mortimer* v. *Capper* (1 *Bro. C. C.* 156, see page 158 ; 1 *Ves. jun.* 219 ; 13 *Ves.* 103) Lord *Thurlow* mentions a case, where the consideration was only one-tenth of the value, and yet a specific performance was decreed. Reverse the case ; and, if any principle of this nature exists, suppose, more than the value was given by a purchaser : the answer would be, *Caveat emptor* : he must look to the estate ; and the same prin-[296]-ciple must apply to the other party to the contract. In *Griffith* v. *Spratley* (2 *Bro. C. C.* 179, n.) the words of Lord Chief Justice *Eyre* were, that inadequacy is certainly a badge of fraud ; but is in itself no solid ground of relief. Can the Court sit to judge of the proportion : that is, of the degree of convenience to one party, and inconvenience to the other, resulting from the performance of the contract ? Suppose a contract for the whole cargo of a ship : could the objection, that it had been disposed of by retail at a considerable profit, be maintained ? It did not suit Mr. *Buller* to treat with the tenants for the separate parts ; and the objection is merely, that the retail price

has turned out more productive than the wholesale.  A Plaintiff has as much right to the performance of an agreement, if fair, and within the rules of the Court, as to any other relief.  It is regulated by the same sort of discretion, depending upon precedents and rules established ; and the Court has for 150 years been in the habit of exercising this jurisdiction.  The principle is stated clearly in *Bettesworth* v. *The Dean and Chapter of St. Paul's* (*Sel. Cas. Ch.* 66 ; 3 *Bro. P. C.* 389 [1 *Bro. P. C.* 2nd ed. 240]).

But, if inadequacy would do, it is not made out ; for the re-sale by the Plaintiff was in a very different manner, and upon very different terms from those, upon which he purchased : a sale in lots : no deposit ; with all the hazard, attending such a mode of sale ; and accommodation given as to the payment.  The difference may also be accounted for by the circumstance, that the re-sale was to the tenants upon the spot ; most likely, not merely upon the *Pretium affectionis*, but having an interest, to give a higher price.

[297] As to the circumstances, under which this relief is sought, by the death of Mrs. *Buller* without children the interest of the trustees is gone ; and the Plaintiff is entitled to the benefit arising from that accident : but, if the interest under the trust is not to be considered as out of the question, having given Mr. *Buller* a right to act for them, they are bound by his acts.

Mr. *Romilly* and Mr. *Leach*, for the Defendant, Mr. *Buller*.  Admitting, that this agreement is perfectly fair, that no fraud, misrepresentation, or misconduct, can be imputed to the Plaintiff, yet this agreement ought not to be specifically performed : first, upon the single ground of great inadequacy of consideration : secondly, this case contains other circumstances, most material ; which make it unfit for a Court of Equity to decree a performance.  With reference to the first point, refusing the decree your Lordship will act in comformity to rules of equity, recognized by a great number of your predecessors, and a late decree by a very experienced Judge in Equity.  The only authorities, that have been mentioned, are *White* v. *Damon*, and the case, mentioned by Lord *Thurlow* in *Mortimer* v. *Capper*.  Subscribing entirely to the doctrine laid down by your Lordship in the former case, it contains nothing, that has relation to this.  Your Lordship expressed yourself in a most guarded manner ; confining your observations to the case of a sale by public auction.  Certainly there is great reason to be surprised at Lord *Rosslyn's* decision : but his opinion, that even in that case a performance could be refused, marks strongly what he would have thought, if the sale had been by private contract.  Sales by auction are of a very peculiar nature : a sort of contract with the public, that the article shall be sold for whatever is offered, however in-adequate.  Upon that ground it has been held at law, and that has [298] been followed in equity, that employing persons to bid on behalf of the vendor, with a view to enhance the price, is a fraud.  (See *Conolly* v. *Parsons*, 3 *Ves.* 625, n.)  There must be competition.  The vendor takes the benefit of that ; and contracts a sort of engagement of public faith, that he will let it go at whatever shall be offered.  There must be some reciprocity.  If the purchaser cannot enforce the contract, where the price is too little, neither ought the vendor, where it is too much.

It is impossible to proceed upon the authority of the case, mentioned in *Mortimer* v. *Capper*.  A most important distinction upon the subject of contracts, that Courts of Equity have always made, between ordering a contract to be rescinded and decree-ing a specific performance, is disregarded.  It has been long settled certainly, that inadequacy of consideration is not a ground for decreeing an agreement to be delivered up to be cancelled, except perhaps in the instance, put by Lord *Thurlow*, where it is so gross as to excite an exclamation.  (6 *Ves.* 273.  *Underhill* v. *Horvood*, 10 *Ves.* 209.)  This distinction has been frequently forced upon the Court by a bill for the specific performance of an agreement, and a cross bill to have it delivered up to be cancelled ; and the Court has refused to rescind the agreement, on the ground, that it was not obtained by fraud ; and has also dismissed the other bill : *Savage* v. *Taylor* (*For.* 234.  *The Marquis of Townshend* v. *Stangroom*, 6 *Ves.* 328 ; 16 *Ves.* 83).  It is stated every where, that the jurisdiction of equity upon specific performance is discretionary : not capricious, and unrestrained by any rules ; but, adopting your Lordship's expression in *White* v. *Damon* (7 *Ves.* 35) : " It must be regulated upon grounds, that will make it judicial."  It is not

LLMC DIGITAL

to be admitted, that it is a discretion, to be ex-[299]-ercised upon such certain and precise rules, that it can be known previously, what will be the decision. All your Lordship's predecessors have frequently stated, that a performance shall not be decreed of an unreasonable, unconscionable, or a hard, agreement. It is scarcely possible to find expressions, admitting greater latitude, or more vague : yet those expressions have been adopted, among other great Judges, by Lord *Hardwicke*, in *The City of London* v. *Nash* (1 *Ves. sen.* 12) ; who said, the most material objection for the Defendant was, that the Court is not obliged to decree a specific performance ; and will not, where it would be a hardship. The Court refusing assistance, considers, that, the party is not without relief ; though he cannot have that, which is considered as more effectual and better than damages. The ground, upon which this relief was originally granted, was, that it was conceived a more effectual remedy, as it is in given cases, than damages : but, applied to many different cases, it is a much more imperfect remedy ; and from some late instances does not appear in so favourable a light ; as the case of a man, whose object was to be a freeholder of *Essex*, contracting for an estate, which, though situated on that side of the river, turned out to be in *Kent*. (See 6 *Ves.* 678 ; and the note.) Other cases, familiar in the exercise of this jurisdiction, make the wisdom of carrying this relief to the extent, to which it has gone, very questionable. It frequently happens, that a purchaser will neither take the title, nor give up the contract ; but insists, that the title shall be tried in a Court of Equity ; and, if it proves good, he will take the estate : if bad, so much the worse for the vendor. This Plaintiff's object in this contract was plainly money only : not, to keep possession of this estate. Money therefore will answer his object better than a specific performance ; the only effect of which, [300] from the mode, in which he proceeds, will be to put a sum of money in his pocket. The Court also never will make a decree, the effect of which will prove the seeds of future suits ; and the consequence of this decree must be, supposing Mrs. *Buller* was living, a suit against the trustees for a breach of trust ; who might bring an action against the agent for damages on account of his negligence.

One of the cases of inadequacy of value, is a late decision at the *Rolls*, by Lord *Alvanley* : *Day* v. *Newman* (stated by Mr. *Romilly* from his own note), upon the 11th and 12th of *December* 1798, by original and cross bill. The original bill prayed the specific performance of an agreement for the sale of an estate, of the value, as represented on one hand of 9 or £10,000 ; and, on the other, only £5000. The contract was for £6000 down, and £14,000 at the death of a life, aged 65. 'Lord *Alvanley* said, it was not a case of actual fraud ; but it was insisted, the bargain was grossly inadequate ; and the inadequacy was very great : it was impossible upon the whole evidence to make the estate to be worth more than £10,000, though he would not decree the contract to be delivered up, he was satisfied, he ought not to decree a performance : the Court would decree neither the one nor the other : the only inconvenience of not delivering up the contract would be, that an action would lie for damages. Lord *Alvanley*, then adverting to *Nott* v. *Hill* (1 *Vern.* 167), *Berny* v. *Pitt* (2 *Vern.* 14), &c., desired to have it understood, he did not mean to disturb the cases, where advantage was taken of necessity ; adding, that there was no such circumstance in that instance ; and that upon the whole he [301] was not warranted either to decree a specific performance, or to deliver up the contract ; and therefore dismissed both bills.

In *Tilly* v. *Peers* (in the Court of Exchequer, 1791. Cited by Mr. *Romilly* from his own note) Lord Chief Baron *Eyre* expresses himself thus : " Laying out " of our consideration all circumstances of fraud, the Court upon the mere con-" sideration of its being so hard a bargain will not enforce it." Baron *Thomson* said, that, if there was no cross bill, and no circumstance of fraud, the Plaintiff would not have been entitled to relief : the consideration was not one-third of the value : but upon the cross bill it was a case of clear fraud. In *Kien* v. *Stulelcy* (2 *Bro. P. C.* 396), the decree must have been reversed upon the inadequacy and unreasonable terms of the bargain ; for the circumstance, that the title was not made out by the day, certainly was not a ground for refusing a performance : *Squire* v. *Baker* (5 *Vin.* 549), from the MSS. Table, taken from the Index of Lord *Harcourt*, is another authority, that an unreasonable agreement shall not be executed ; but the party may make the most of it at Law. *Young* v. *Clerk* (*Pre. Ch.* 538), supports

LLMC DIGITAL

the general doctrine, that this Court is not bound to decree a specific execution of articles, where they appear to be unreasonable; or where it would be unjust or unconscionable to assist them. In *Buxton* v. *Lister* (3 *Atk.* 383), Lord *Hardwicke's* words are extremely strong; declaring, that nothing is more established than that every agreement of this kind ought to be certain, fair, and just in all its parts: if any of those ingredients are wanting, the Court will not decree a specific performance: for it is in the discretion of the Court, whether they will decree a specific performance; as otherwise a [302] decree might be made, which would tend to the ruin of one party. (3 *Atk.* 385, 386.)

It is not sufficient to say, these rules are vague and indefinite, if they have been acted upon. In a case, where there is a clear remedy at Law, where the only question is, whether Equity shall give that extraordinary assistance, which is not of very antient origin, there is no great inconvenience in deciding upon the particular circumstances; as this Court is obliged to do upon costs, and in many other cases, which must be left to an indefined discretion; and there is no more difficulty in deciding upon the point of adequacy, than what is reasonable, or unreasonable; conscientious, or unconscientious; just, or unjust.

Then, with reference to the circumstances of this case: within two months after the agreement with the Plaintiff, and, before he could be called upon to execute it, he has contracted to sell for nearly £35,000 a part of the estate, for which he was to give only £26,500. Certainly the second sale was under different circumstances; in lots; the payment by instalments; and part of the money to remain on mortgage. But the instalments were to be received in 1801, in *March, May, June,* and *September*; and, allowing for all the advantages, it is impossible to say, there was not great inadequacy. The purchasers were but seven in number. It was not therefore, as represented, retailing the estate to the tenants; and, if the advantage is to be attributed to a sale in lots, it must be recollected, that by the original plan of sale the estate was divided into fifteen lots. No evidence of surveyors is produced: but what can be more unsatisfactory? Can the *Pretium affectionis* be [303] supposed to influence so many persons? Some circumstances, of a very important nature, appear upon this evidence. There is not the least doubt, that the auctioneer has conducted himself with a degree of negligence so gross, that an action would lie. When an agent has conducted himself in that manner, will a Court of Equity enforce the contract against the principal; compelling him to have recourse to that remedy; the purchaser also having a right to sue the agent, if not authorised to sell to him? Will the Court make such a decree, where the effect will be to give a great advantage to a third person, arising entirely from the gross negligence of an agent? A second valuation was made by this agent, amounting to above £6000 more than the former. Of that he makes no communication: but with that information, acquired at the expence of the vendor, in his possession, he signs a contract at the former valuation.

Hitherto the case has been considered, as if Mr. *Buller* had been treating for an estate of his own. But it must also be considered with reference to the trust. The trustees ought to have consulted Mrs. *Buller,* and also to have considered, what was her interest upon the subject. The agent, apprized of the circumstances, takes upon himself to act, without guarding the contract with the approbation of the trustees; and thereby undertakes the duty of trustees, to take care that no contract shall be entered into, that is not advantageous to the trust. Would not the trustees, acting in this manner, have been considered guilty of a gross and flagrant breach of trust? Will the Court execute a contract obtained by a breach of trust? A Plaintiff, seeking this extraordinary relief, must make out a case, entitling him to it; and it is not enough, that he has a legal contract; and that his conduct has been such, that the [304] Court will not interfere to deprive him of it. For this purpose his conduct must appear to have been fair, just, reasonable, and conscientious. In this particular branch of jurisdiction, it is necessary to have recourse to the *Arbitrium Boni Viri*; which has been erroneously supposed the general standard in this Court. These circumstances present an extreme case; and it is not necessary to have recourse to general doctrine. If the trustees had improvidently employed some person to contract for them, and before execution had discovered, that the value was £5000 more, ought they not to have acquainted

LLMC DIGITAL

Mrs. *Buller* of that; and would she under that representation have consented
to the sale; without which consent they had no authority to convey?

But, upon the Statute of Frauds (stat. 29 *Ch.* II. *c.* 3), there was no valid con-
tract of the trustees by their authorized agent. The Plaintiff has not proved such
authority; and the admissions of the answer do not supply the want of evidence.
Lord *Hardwicke* states, that he, not only never authorised this agent, but did not
know he was consulted, till long after this contract was entered into; and the
representation of the other trustees is, that they never consented to any thing but
Mr. *Buller's* desire, generally expressed, to sell: nothing in their admissions import-
ing their consent to make this person their authorised agent, so as to bind them.
The effect is nothing more than a communication of the desire of Mr. and Mrs.
*Buller* to sell; and their answer, that, if the thing is advisable, they will not object.
What other answer could they give? They could not object to the desire to sell:
but their consent to that does not bind them to, or implicate them in, the terms
of the sale.

[305] The *Lord Chancellor* [Eldon]. In this very important cause one or two
cases may deserve consideration. In *Twining* v. *Morrice* (2 *Bro. C. C.* 326) there
was no pretence in the evidence of any contract by *Blake*, that he should bid for
the vendors. Lord *Kenyon* said, this Court is not bound specifically to execute
every contract; and if there was any sort of surprise, that made it not fair and
honest to call for an execution, he would not give the extraordinary relief of a specific
performance (*Bridger* v. *Rice*, 1 *Jac. & Walk.* 74. *Martin* v. *Mitchell*, 2 *Jac. &
Walk.* 413): neither would he order the contract to be delivered up: but would
let the purchaser go to law. The only ground there was, that *Blake*, who pur-
chased for *Twining*, having been the Solicitor for the vendors, Lord *Kenyon* was
satisfied, his bidding had damped and chilled the sale; creating a suspicion, that
he was a puffer; and though there was no evidence, that the estate would have
brought more, he thought that circumstance a very sufficient ground for refusing
a specific performance. There is another case, in which, I think, Lord *Alvanley*
was right: *Emery* v. *Wase*.(1) Upon the appeal, I adopted Lord *Alvanley's* opinion,
that it is not incumbent upon this Court to decree a specific performance in a case,
where such a circumstance as a careless valuation was likely to lead to harsh conse-
quences, upon that singular doctrine of this Court, that a husband must go to gaol,
if he cannot procure his wife to concur in the act, for which he had contracted.
The *Marquis of Townshend* v. *Stangroom* (2) also contains something relative
to this subject; and upon all the cases there is not the least pretence for saying,
this Court must either execute the agreement, or order it to be delivered up; for
the whole doctrine of the Court has gone upon the contrary of that. Lord *Thurlow*
used to refer this doctrine of [306] specific performance to this; that it is scarcely
possible, that there may not be some small mistake or inaccuracy; as that a lease-
hold interest, represented to be for 21 years, may be for 20 years and nine months:
some of those little circumstances, that would defeat an action at Law; and yet
lie so clearly in compensation, that they ought not to prevent the execution of the
contract.(3) But that has been extended to a great length in this Court. The
rule is clear enough: but the application in each particular case must depend upon
the discretion of the Judge. It is like the case of fraud. The rule is, that this
Court will set aside a bargain for fraud: but the Court has never ventured to lay
down, as a general proposition, what shall constitute fraud.

The *Solicitor General*, in Reply.

The well known distinction between decrees to rescind and to enforce contracts
does not apply to a case like this; which rests upon inadequacy alone. *White* v.
*Damon* contained many other circumstances: the distress of the vendor, the time
and place of sale, notice to the vendor, but no consent by him. The other authorities
referred to are also inapplicable, amounting only to this; that a person, coming
with an equitable title, must shew, that it has been fairly obtained; and the descrip-
tion of the contract, as hard, unreasonable, and unconscientious, is referred to the
conduct of the person seeking relief. In *Day* v. *Newman* there must have been more
than mere inadequacy of price; and the cases, referred to by Lord *Alvanley*, of an
unconscientious bargain with an expectant heir, are upon a different principle. The
case in the Court of Exchequer was upon an agreement as to stock; which does not
stand upon the same ground as Land. The MSS. [307] Table, attributed to Lord

LLMC DIGITAL

*Harcourt*, are not entitled to any credit. (2 *Ves. jun.* 159 ; 3 *Ves.* 627.) None of the circumstances, upon which the relief of specific performance has been denied, affect this Plaintiff. No misrepresentation, no oppression, can be imputed to him. This Defendant had all means and opportunity of information as to the value. In such a case there can be no reason for the exercise of that discretion, that must be resorted to upon subjects of an uncertain nature ; as costs ; which are necessarily so from the number of parties, and the variety of interests ; which not being the subject of contract, do not admit an absolute rule, depending upon a known and fixed principle. In the cases of annuities the nature of the transaction, generally with distressed persons, induces the Court to investigate it with great strictness. *Emery* v. *Wase* was the case of married women ; and had another peculiar circumstance, that the value was to be ascertained by an arbitrator ; who was the agent for both parties. The principle, admitted by your Lordship upon the appeal, is sufficient for this case. As to the objection upon the Statute of Frauds, the case is put by the supplemental bill as the contract of Mr. *Buller* ; and there is no doubt, that the agent was authorised by him. There was nothing to suggest to the Plaintiff, that the property was settled, until the objection made by the trustees to execute the conveyance. Mrs. *Buller* having made this contract, cannot avail himself of arguments, that would have been competent to the trustees ; that there was not sufficient authority ; and that it would have been a breach of trust.

The *Lord Chancellor* [Eldon]. This case is extremely important, not only to the parties, but also to the general interests of justice, as **[308]** administered in this Court. There is nothing in the circumstances, that could induce me to think, the Plaintiff could be restrained from using all the remedies he might have at Law ; if a bill had been filed to have the contract delivered up. It is much too late to discuss now, whether this Court ought to order a contract, that it would not specifically perform to be delivered up, and to decree the performance of a contract, which it would not order to be delivered up ; for the distinction is always laid down, that there are many cases, in which the party has obtained a right to sue upon the contract at Law, and under such circumstances, that his conscience cannot be affected here, so as to deprive him of that remedy ; and yet, on the other hand the Court, declaring, he ought to be at liberty to proceed at Law, will not actively interpose to aid him, and specifically perform the contract. *Twining* v. *Morrice*, and many other cases, are of that sort.

It is necessary to advert very particularly to the circumstances of this case. In a trust of this nature, the most improvident course, that can be adopted, is to entrust the tenant for life with the execution of such a power as this ; for it is generally the interest of the tenant for life to convert the estate absolutely into money, either with a view to sell another estate to his family, or for the ordinary purpose of getting a better income during his life. The mode of settlement therefore in such a case is, that the trustees are to sell ; but not without calling to their aid all fair attention to the nature of the subject, and the convenience of the family. They are to sell therefore with the consent of the husband and wife ; and, as she is a purchaser for her future family, the providence of the settlement farther requires, that the fact of her consent and approbation shall be evidenced by deed with two witnesses. With **[309]** that consent and approbation, necessary to protect the interest of the tenant for life, the trustees, bound to a due attention to the interests of the children, have the power of selling for such price as shall appear to them to be reasonable. That expression must be construed, at least in a question between the trustees and the *Cestuis que Trust*, after they have with due diligence examined. The object of the sale must be to invest the money in the purchase of another estate, to be settled to the same uses ; and they are not to be satisfied with probability upon that ; but it ought to be with reference to an object, at that time supposed practicable : or, at least, this Court would expect some strong purpose of family prudence, justifying the conversion, if it is likely to continue money. The character of the parties to this transaction is quite unimpeached. All the trustees, meaning to act properly, make Mr. *Buller* their agent : but, the trustees being interposed to guard against what the tenant for life may propose, he ought not to have been agent for them. The conduct of the agent, to whom the trustees apply, through the medium of Mr. *Buller*, to sell by auction, unless he could sell advantageously by private contract, is most unaccountable : but certainly the Plaintiff is not concerned in that : the agent's advice, if an offer, from £24,000 to £27,000, should be made, to have a

consultation ; also recommending a survey in the mean time : a declaration there-
fore, that it would not be a provident act to carry the estate to sale without farther
examination of its value. But it does not rest there. He might afterwards have
thought, the value had been satisfactorily ascertained ; and that the trouble and ex-
pence of a farther survey was unnecessary. But that is not so. In the course of six
days transactions take place, perfectly without example even in these cases ; where
difficulties have been raised by the conduct of auctioneers. A valuation was actually
[310] made between the 6th and 9th of *September* ; and that valuation raised the
property up to £33,386. Was it not a most important part of the duty of that agent
to submit that fact to the vendors, resting upon the sanctioned opinion of the very
agent, to whose discretion and judgment they resorted, to direct the terms of the
sale ; instead of letting them judge upon the speculations of another person, what
more might be obtained ? But it does not rest there. Of the fact of the valuation
no communication was made until *January* or *February* following.

There is evidence of inquiries by the Plaintiff as to the value, from the tenants,
and all sources of information. He was at full liberty to do so ; and having by all
just means informed himself, that he could make a lucrative bargain, might honestly
contract with persons at arm's length, and dealing for themselves. But, on the
other hand, he is in the situation of a man, contenting himself with a contract,
instead of a conveyance ; and it is to be considered, whether he may have under
the circumstances, not only relief at law, but the farther relief, afforded in this Court
by a specific performance. It is clear, a Plaintiff, suing at Law for damages, or in
Equity for a specific performance, must allege a contract, binding some one ; and
where a man is imprudent enough to deal with an agent for a third person, without
taking care to see, that there is a written authority for sale, however great the hard-
ship, the answer to his demand, both in law and equity, is, that he has dealt with a
person, not legally authorised. The first consideration is, whether this was a contract
for the trustees upon any thing antecedent to the date of it : 2dly, has it become
their contract in this Court, connecting that with what passed subsequent to the date :
3dly, if it is the contract of the trustees, in either view, [311] is it possible for this
Court to execute it ? Upon the first point, in order to make it the contract of the
trustees, the Plaintiff must prove, that they did by parol authorize the agent, without
farther consultation with them, to sell this estate in this manner, and at this price.
Admitting that, if they left the price entirely to his discretion, in a question between
them and the purchaser they have given authority, I must find that authority
given specifically by all the trustees, or some one empowered expressly and clearly
to pledge their authority. If I were to hold it given in this case, I should carry
these circumstances to an extent, that would make the doctrine, that the authority
may be by parol, though the agreement must be by writing, the most mischievous
evasion of the Statute. (9 *Ves.* 250 ; 18 *Ves.* 509.) This is only a declaration of the
trustees, that they are ready to concur in Mr. *Buller's* primary object, a sale ; pro-
vided the estate should be duly and reasonably sold. It is in no way possible to say,
there was a parol authority, in the sense required by the cases, to enter into this
written agreement.

Next, are they bound by their subsequent conduct ; as if there had been ante-
cedent authority. Clearly they are not. The trustees never had the approbation
of the husband and wife. They never can be said to be bound by the drafts settled
by the solicitor ; and in the very nature of the subject of sale there was a circum-
stance, giving them *Locus Pœnitentiœ*, the moment they were informed there was
a question, whether the price was reasonable. But, supposing them bound, that
will not help the Plaintiff to the relief prayed ; for I am clearly of opinion, their
conduct was a breach of trust ; not meaning to throw any imputation upon them ;
as the transaction was very likely to happen : but their duty was not to execute
their power of selling, unless they knew, a discretion had been wisely and fully
exerted [312] upon the point of reasonable price ; unless they were satisfied, that
upon that point no reasonable objection could be made with reference to the interests
of Mr. *Buller*, Mrs. *Buller*, or the children, who might come into existence. If
the Court had been called upon in the life of Mrs. *Buller* for a specific execution,
there is so little ground for it under these circumstances, that on the contrary, at
the suit of the *Cestuis que Trust* the trustees would have been restrained from
executing. The question as to the interposition of the Court between the Plaintiff

LLMC DIGITAL

and Mr. *Buller* would have been different.  But it would be impossible to decree a specific performance, when in the very same day the Court might be compelled to say, it would be a breach of trust.

Next, this case may, I think, be determined upon the circumstances, without going very accurately into the doctrine as to inadequacy of value.  I have looked into several of the cases upon that point ; though I do not mean to decide upon it.  Cases also may arise, in which circumstances, having a different effect, and different in their nature from inadequacy, will require great consideration, upon the question of specific performance.  Lord *Rosslyn,* who had certainly great experience in this Court, in *White* v. *Damon,* if he did not put the decision upon the inadequacy of the contract, still thought, there were other circumstances, in no manner connected with the conduct of the vendee, which this Court ought to attend to upon the subject of specific performance ; and observed, that the estate, situated at *Gosport,* was sold at *Garraway's* ; at a time too, which of itself might form an objection, deserving serious consideration, if the place had been proper.  I do not go far into the discussion of the questions, the principles of that case, so put, may furnish.  But, taking Lord *Rosslyn* to have been duly of opinion, that, if an auctioneer, called [313] upon in that capacity to sell, so grossly forgot what was due to his employer, by selling at a very improper time and place, that by reason of that negligence the property sold for half its value, this Court ought not to decree a specific performance ; so, on the other hand, you must consider in every case, constituted of circumstances, furnishing similar objections, how much is due to them ; and upon the circumstances of this very case, supposing the Plaintiff could have a decree, it must be considered, whether a man is not bound by the contract of the auctioneer, made without even advertising the property. The negligence may be more or less gross.  Upon the principles, that have been ably pressed for the Plaintiff, if a person is to have a specific performance under such negligence as this, where is it to stop ?  Upon that ground simply I should hesitate long, either with reference to the trustees, or Mr. *Buller* himself, before I should state, as a clear proposition, that, where the title to a specific performance is founded in a gross breach of trust by an agent to his principal, a Court of Equity would assist the Plaintiff in the purpose of availing himself of that breach of trust ; and whether the principle would not authorise the Court to leave him to Law, and not to let him come here for a remedy beyond that.  There are *dicta* enough well to authorise that.

The case of *Twining* v. *Morrice,* before a Judge, who understood the doctrine of Courts of Equity as well as any one, is an authority, that much less would do. There is no comparison between the circumstances of that case and this.  That case was free from all imputation upon the party.  It was no more than that the vendors had employed *Blake* as their Solicitor.  When the estate had been brought to sale, he was in no sense their agent.  They had never suggested to him, nor [314] had he undertaken, to bid for them.  The Plaintiff, going into the room, bid *Blake,* as a friend and neighbour bid for him.  Lord *Kenyon* said, as his bidding might appear to the persons present a bidding for the vendors, and as that might damp the sale, that formed such an impediment to a specific performance, that the party should be left to Law.  I give no opinion upon that case : but it is infinitely short of this, which goes this length ; that the vendor has by the silence of the agent with regard to the last survey lost all opportunity of dealing with the know-ledge of that survey by the agent himself, and of the fact, excessively material, that the estate, if sold in lots, might probably produce so much more.  The vendor is in all probability full as much prejudiced, as the vendors in *Twining* v. *Morrice* were by the accidents attending that sale.  My opinion therefore is, 1st, that this was a sale, in which the trustees had not given lawful authority enough to contract on their behalf within the Statute ; and therefore are not bound : 2dly, supposing, they had given sufficient authority, still, considering the nature of their interest, this Court could not have compelled an execution against the *Cestui que trust,* if they had been living ; not stating my opinion as to any remedy the Plaintiff might in that case have against the trustees for damages.

Next, if this contract cannot be executed against the trustees, can it against Mr. *Buller* ?  First, what decree would have been made, if this cause had been heard, not under these circumstances, but, while Mrs. *Buller* was living, or

C. XII.—28

any children, if she had any ?  The supplemental bill does not vary the statement of the original bill as to the nature of the contract.   It might have been put as the contract both of the trustees and of Mr. *Buller* : but the supplemental bill was necessary, supposing the contract originally to have been [315] with the trustees only ; for it might happen, that, after the trustees in such a case had entered into a due contract, binding all parties, circumstances might arise, that might prevent them from carrying it into execution ; and that is the very point contended by this supplemental bill ; stating truly, that they had only an estate to preserve contingent remainders during the existence of the marriage ; and in the event, that has happened, Mr. *Buller's* estate for life, and his remainder in fee being brought together, in law the power of the trustees is in the language of the supplemental bill extinguished and gone.   But, though the power is gone at Law, yet, if the purchaser had entered into the contract with the trustees, with the approbation of Mr. and Mrs. *Buller,* according to the deed, that contract, once entered into, and having bound the estate, though it could not be executed by the power of sale, should be made good by those, who had got an interest, by the effect of their interest, if not by the authority of the trustees ; and that is the meaning of this bill.

I agree, if a person carries an estate to market, not having any title at the time, it is much too late to discuss the question, whether it would have been wholesome originally to have held, that he should not have a specific performance.   (*Jenkins* v. *Hiles,* 6 *Ves.* 646, and the note, 655.)   There is a difference between an estate subject to incumbrances, and the case I put ; where the vendor at the date of the contract has not a title.   Some authorities go the length of giving a specific performance, if the vendor can even by an Act of Parliament obtain a title before the report.   I also agree, if a man, having partial interests in an estate, chooses to enter into a contract, representing it, and agreeing to sell it, as his own, it is not competent to [316] him afterwards to say, though he has valuable interests, he has not the entirety ; and therefore the purchaser shall not have the benefit of his contract.   For the purpose of this jurisdiction, the person contracting under those circumstances, is bound by the assertion in his contract ; and, if the vendee chooses to take as much as he can have, he has a right to that, and to an abatement ; and the Court will not hear the objection by the vendor, that the purchaser cannot have the whole.   (1 *Swanst.* 54.)   But that always turns upon this ; that it is, and is intended to be, the contract of the vendor.   My opinion is, that this was not the contract of Mr. *Buller* ; that it was not in the contemplation of the agent, the trustees, or any one, excluding the Plaintiff, that it should be the contract of Mr. *Buller,* if it was not the contract of the trustees.

If I am wrong in this, that brings it to the effect of the agent's conduct.   The objection is taken, how does that concern the Plaintiff ?   Whether as between them it was his contract, or not, the Plaintiff conceived it to be so.   I do not enter into the question of fact ; for the answer to the Plaintiff is just as effectual, whether he conceived Mr. *Buller* to be dealing for his own estate, or not.   The Plaintiff has no contract, but a contract, signed by this agent ; and upon his evidence the trustees were his principals ; and it was not the intention of Mr. *Buller* to give any authority, binding himself, that did not bind the trustees.   It was for the sale of their inheritance, not his ; including minor interests, if not affecting their's.   It is impossible therefore to say, it was the double contract : that of the trustees ; and, if not their's, his ; and it was not his intention to part with his partial interest.   His intention was to give, not his authority, but that of the trustees, to the agent : and, if their authority was not effectually given, [317] whatever may be the remedy at law, it cannot be executed partially in equity ; and it would be strange, if that contract, which never could have been executed, unless it was the contract of the trustees, for the substitution of other lands, to be settled to the same uses, should have been executed in this Court by tearing to pieces the family property, that was the subject of the contract.

The result is, that nothing was intended to be bound but the inheritance of the trustees ; that the trustees have not given such an authority as binds them within the Statute ; that, if they had, the execution of this contract would under the circumstances have been such a breach of trust, that this Court would not have permitted them to carry it into execution : farther, that under the circumstances, if the Plaintiff cannot have a decree for the whole, he cannot for a part ; and the subsequent event

makes no alteration ; for the contract of the trustees, not of Mr. *Buller*, must have been the foundation of the decree ; and, if so, it cannot become his contract by the event of the death of Mr. *Buller* without children.   These are the grounds, upon which this case may be determined ; without saiyng more upon the inadequacy, or the retention of that important fact by the agent ; though that alone is a sufficient ground for a decree, dismissing this bill.

*Dec.* 24*th*.   The decree, drawn up by the *Lord Chancellor* himself, declared, that it appears to this Court, that at the time the alleged contract, the specific performance of which is sought in this cause, was made, the power of selling the whole inheritance of the estates in question was by the marriage settlement reserved to trustees therein named, to be executed by them for the purposes therein prescribed, at such price as should appear to them to be rea-[318]-sonable, and with such approbation and consent, and so testified, as therein-mentioned ; and that the said trustees are not bound in the event, which has happened, of the death of the late Defendant *Elizabeth Buller*, without leaving any issue of the marriage now living, and would not have been bound under the circumstances proved in this cause, if such event had not happened, by the said alleged contract to have executed such power for the purpose of specifi- cally executing such alleged contract ; and, it having been contended, that *Elizabeth*, the wife of the Defendant *John Buller*, having died without issue, and that by reason of such event the said Defendant *John Buller* having since the filing of the original bill acquired such an interest in the estate as would enable him by his own act to con- vey the inheritance in fee-simple, to the purchaser, he ought to be decreed to make such conveyance, it was farther declared, that, due and equitable regard being had to the proofs in this cause respecting the value of the premises, alleged to have been contracted to be sold for the sum of £26,500, and to the fact, that the same had been re-surveyed and re-valued on behalf of the proposed vendors and estimated upon such re-survey and re-valuation as worth the sum of £33,386 to be sold in lots, and that such re-valuation had not been disclosed, before the alleged contract was signed, to the intended vendors, or any person interested in the money to arise by sale of the premises, although made under the directions of the persons signing the said alleged contract, as authorised so to do on behalf of the vendors, and to all other the circumstances of this case, this Court ought not, if the said *Elizabeth Buller*, or any issue by her, were now living, to direct, that the said contract, which appears to this Court to have been intended to be a contract on behalf of the said trustees, acting in exercise of their power under the said settlement, for sale of the whole [319] inherit- ance of the premises settled, should be carried into execution by the said Defendant *John Buller* only, as far as his partial or particular interests in the said settled pre- mises would have enabled him in such case to execute the same ; and it was farther declared, that, such due and equitable regard being had, as aforesaid, this Court ought not, although the event has happened of the death of the said late Defendant *Elizabeth Buller* without issue of the marriage, to decree him, the said Defendant *John Buller*, to convey the enlarged estate, which by reason of such event he is enabled to convey, to the Plaintiff in the specific performance of the said alleged contract ; but that in this case the Plaintiff ought to be left to his remedy at law ; and therefore without prejudice to such remedy the original and supplemental bills are dismissed without costs.

(1) 5 *Ves.* 846 ; 8 *Ves.* 505.   See the notes, 5 *Ves.* 734, 849.
(2) 6 *Ves.* 328 ; 13 *Ves.* 135.   *Hosier* v. *Read*, 9 *Mod.* 86.   *Sugd. Law of Vend. and Pur.* 123, 5th edit.
(3) *Calcraft* v. *Roebuck*, 1 *Ves. jun.* 221.   See the note, 226.

BURGES *v.* MAWBEY.   *Oct.* 31*st*, *Dec.* 15*th*, 17*th*, 1804.

Appointment by Will among children under a Power to the father.   A share, lapsed by the death of one in his life, goes among all, as in default of appointment, not- withstanding a direction, that each, receiving a share, should release the fund. No presumption of satisfaction or purchase from another provision, being expressly in satisfaction of a different interest.

The Master's Report, under the usual decree, upon a bill by creditors on behalf of themselves and others, stated the following instruments and circumstances :

LLMC DIGITAL

**AD-7**

case, which states that they were not in fact chargeable, unless we can say that they were so in law. Although this question has never been expressly decided, I agree with the opinion delivered by Mr. J. Aston, who was particularly conversant with this branch of the law; and, notwithstanding it was extra-judicial, I cannot help paying a great respect to the opinion of so able a Judge. If the whole of a certificated family were removable because one of them only became actually chargeable, it would be attended with great inconvenience. As, for instance, if there were three or four young men in the family who were able by their industry to procure a competent maintenance, and their sister became chargeable, it would be against the spirit of the Act to make that a ground for removing them all. And I think the intent of the Act will be fully answered by determining, that when any one of the certificated family becomes chargeable, he only shall be removed: any other determination would defeat the true purposes of the Act. Then as to the pregnancy of the daughter; no case has been cited to shew that a person under such circumstances can be removed, and I think she was not removeable on that account.

    Both orders quashed.

[51]   PASLEY AND ANOTHER *against* FREEMAN. 1789. A false affirmation, made by the defendant with intent to defraud the plaintiff, whereby the plaintiff receives damage, is the ground of an action upon the case in the nature of deceit. In such an action, it is not necessary that the defendant should be benefited by the deceit, or that he should collude with the person who is. [1 East, 318. 2 Ditto, 92. 3 B. & P. 367. 10 Vez. 475. 12 East, 634, (*n.*).]

[S. C. 2 Sm. L. C. 66, 11th ed. 1903. Questioned, *Evans* v. *Bicknell*, 1801, 6 Ves. 186. Approved, *Clifford* v. *Brooks*, 1806, 13 Ves. 132. Applied, *Collins* v. *Evans*, 1844, 5 Q. B. 827. Referred to, *Ex parte Oakes and Peek*, 1867, L. R. 3 Eq. 624; 2 H. L. 325; *Hyde* v. *Bulmer*, 1868, 18 L. T. 294. Discussed and applied, *Ramshire* v. *Bolton*, 1869, L. R. 8 Eq. 299. Referred to, *Schroeder* v. *Mendl*, 1877, 37 L. T. 454; *Joliffe* v. *Baker*, 1883, 11 Q. B. D. 273; *Smith* v. *Chadwick*, 1884, 9 App. Cas. 195; *Ex parte Carling*, 1887, 56 L. J. Ch. 324; *Derry* v. *Peek*, 1889, 14 App. Cas. 356; *Wilkinson* v. *Downton* [1897], 2 Q. B. 58. Dictum adopted, *Allen* v. *Flood* [1898], A. C. 73. Referred to, *Tallerman* v. *Dowsing Radiant Heat Company* [1900], 1 Ch. 5; *De Lassalle* v. *Guildford* [1901], 2 K. B. 221; *Cackett* v. *Keswick* [1902], 2 Ch. 464; *Read* v. *Friendly Society of Stonemasons* [1902], 2 K. B. 739; *Nash* v. *Calthorpe* [1905], 2 Ch. 249.]

    This was an action in the nature of a writ of deceit; to which the defendant pleaded the general issue. And after a verdict for the plaintiffs on the third count, a motion was made in arrest of judgment.

    The third count was as follows: "And whereas also the said Joseph Freeman, afterwards, to wit, on the 21st day of February in the year of our Lord 1787, at London aforesaid, in the parish and ward aforesaid, further intending to deceive and defraud the said John Pasley and Edward, did wrongfully and deceitfully encourage and persuade the said John Pasley and Edward, to sell and deliver to the said John Christopher Falch divers other goods, wares, and merchandizes, to wit, 16 other bags of cochineal of great value, to wit, of the value of 2634l. 16s. 1d. upon trust and credit; and did for that purpose then and there falsely, deceitfully, and fraudulently, assert and affirm to the said John Pasley and Edward, that the said John Christopher then and there was a person safely to be trusted and given credit to in that respect; and did thereby falsely, fraudulently, and deceitfully, cause and procure the said John Pasley and Edward to sell and deliver the said last-mentioned goods, wares, and merchandizes, upon trust and credit, to the said John Christopher; and in fact they the said John Pasley and Edward, confiding in and giving credit to the said last-mentioned assertion and affirmation of the said Joseph, and believing the same to be true, and not knowing the contrary thereof, did afterwards, to wit, on the 28th day of February in the year of our Lord 1787, at London aforesaid, in the parish and ward aforesaid, sell and deliver the said last-mentioned goods, wares, and merchandizes, upon trust and credit, to the said John Christopher; whereas in truth and in fact, at the time of the said Joseph's making his said last-mentioned assertion and affirmation, the said John Christopher was not then and there a person safely to be trusted and given credit to in that respect, and the said Joseph well knew the same, to wit, at London aforesaid, in the parish and ward aforesaid. And the said John Pasley and

Edward further say, that the said John Christopher hath not, nor hath any other person on his behalf, paid to the said John Pasley and Edward, or either of them, the said sum of 2634l. 16s. 1d. last mentioned, **[52]** or any part thereof, for the said last-mentioned goods, wares, and merchandizes; but on the contrary the said John Christopher then was, and still is, wholly unable to pay the said sum of money last mentioned, or any part thereof, to the said John Pasley and Edward, to wit, at London aforesaid, in the parish and ward aforesaid; and the said John Pasley and Edward aver that the said Joseph falsely and fraudulently deceived them in this, that at the time of his making his said last-mentioned assertion and affirmation, the said John Christopher was not a person safely to be trusted or given credit to in that respect as aforesaid, and the said Joseph then well knew the same, to wit, at London aforesaid, in the parish and ward aforesaid; by reason of which said last-mentioned false, fraudulent, and deceitful assertion and affirmation of the said Joseph, the said John Pasley and Edward have been deceived and imposed upon, and have wholly lost the said last-mentioned goods, wares, and merchandizes, and the value thereof, to wit, at London aforesaid, in the parish and ward aforesaid; to the damage," &c.

Application was first made for a new trial, which, after argument, was refused: and then this motion in arrest of judgment. Wood argued for the plaintiffs, and Russell for the defendant, in the last term: but as the Court went so fully into this subject in giving their opinions, it is unnecessary to give the arguments at the Bar.

The Court took time to consider of this matter, and now delivered their opinions seriatim.

Grose, J.—Upon the face of this count in the declaration, no privity of contract is stated between the parties. No consideration arises to the defendant; and he is in no situation in which the law considers him in any trust, or in which it demands from him any account of the credit of Falch. He appears not to be interested in any transaction between the plaintiffs and Falch, nor to have colluded with them; but he knowingly asserted a falsehood, by saying that Falch might be safely entrusted with the goods, and given credit to, for the purpose of inducing the plaintiffs to trust him with them, by which the plaintiffs lost the value of the goods. Then this is an action against the defendant for making a false affirmation, or telling a lie, respecting the credit of a third person, with intent to deceive, by which the third person was damnified; and for the damages **[53]** suffered, the plaintiffs contend that the defendant is answerable in an action upon the case. It is admitted, that the action is new in point of precedent: but it is insisted that the law recognises principles on which it may be supported. The principle on which it is contended to lie is, that wherever deceit or falsehood is practised to the detriment of another, the law will give redress. This proposition I controvert; and shall endeavour to shew, that in every case where deceit or falsehood is practised to the detriment of another, the law will not give redress; and I say that by the law, as it now stands, no action lies against any person standing in the predicament of this defendant for the false affirmation stated in the declaration. If the action can be supported, it must be upon the ground that there exists in this case, what the law deems damnum cum injuriâ. If it does, I admit that the action lies; and I admit that upon the verdict found, the plaintiffs appear to have been damnified. But whether there has been injuria, a wrong, a tort, for which an action lies, is matter of law. The tort complained of is the false affirmation made with intent to deceive; and it is said to be an action upon the case analogous to the old writ of deceit. When this was first argued at the Bar, on the motion for a new trial, I confess I thought it reasonable that the action should lie: but, on looking into the old books for cases in which the old action of deceit has been maintained upon the false affirmation of the defendant, I have changed my opinion. The cases on this head are brought together in Bro. tit. Deceit, pl. 29, & in Fitz. Abr. I have likewise looked into Danvers, Kitchins, and Comyns, and I have not met with any case of an action upon a false affirmation, except against a party to a contract, and where there is a promise, either express or implied, that the fact is true, which is misrepresented: and no other case has been cited at the Bar. Then if no such case has ever existed, it furnishes a strong objection against the action, which is brought for the first time for a supposed injury, which has been daily committed for centuries past; for I believe there has been no time when men have not been constantly damnified by the fraudulent misrepresentations of others: and if such an action would have lain, there certainly has been, and will be, a plentiful source of litigation, of

which the public are not hitherto aware. A variety of cases may be put : suppose a man recommends an estate [54] to another, as knowing it to be of greater value than it is ; when the purchaser has bought it, he discovers the defect, and sells the estate for less than he gave ; why may not an action be brought for the loss upon any principle that will support this action ? And yet such an action has never been attempted. Or, suppose a person present at the sale of an horse asserts that he was his horse, and that he knows him to be sound and sure-footed, when in fact the horse is neither the one or the other ; according to the principle contended for by the plaintiffs, an action lies against the person present as well as the seller ; and the purchaser has two securities. And even in this very case, if the action lies, the plaintiffs will stand in a peculiarly fortunate predicament, for then they will have the responsibility both of Falch and the defendant. And they will be in a better situation than they would have been if, in the conversation that passed between them and the defendant, instead of asserting that Falch might safely be trusted, the defendant had said, "If he do not pay for the goods, I will :" for then undoubtedly an action would not have lain against the defendant. Other and stronger cases may be put of actions that must necessarily spring out of any principle upon which this can be supported, and yet which were never thought of till the present action was brought. Upon what principle is this act said to be an injury ? The plaintiffs say, on the ground that, when the question was asked, the defendant was bound to tell the truth. There are cases, I admit, where a man is bound not to misrepresent, but to tell the truth : but no such case has been cited, except in the case of contracts ; and all the cases of deceit for mis-information may, it seems to be, be turned into actions of assumpsit. And so far from a person being bound in a case like the present to tell the truth, the books supply me with a variety of cases in which even the contracting party is not liable for a misrepresentation. There are cases of two sorts, in which, though a man is deceived, he can maintain no action. The first class of cases (though not analogous to the present) is, where the affirmation is that the thing sold has not a defect which is a visible one : there the imposition, the fraudulent intent, is admitted, but it is no tort. The second head of cases is, where the affirmation is (what is called in some of the books) a nude assertion ; such as the party deceived may exercise his own [55] judgment upon ; as where it is matter of opinion, where he may make inquiries into the truth of the assertion, and it becomes his own fault from laches that he is deceived. 1 Ro. Abr. 101. Yelv. 20. 1 Sid. 146. Cro. Jac. 386, *Bayly* v. *Merrel*. In *Harvey* v. *Young*, Yelv. 20, J. S., who had a term for years, affirmed to J. D. that the term was worth 150l. to be sold, upon which J. D. gave 150l. and afterwards could not get more than 100l. for it, and then brought his action : and it was alleged that this matter did not prove any fraud, for it was only a naked assertion that the term was worth so much, and it was the plaintiff's folly to give credit to such assertion. But if the defendant had warranted the term to be of such a value to be sold, and upon that the plaintiff had bought it, it would have been otherwise ; for the warranty given by the defendant is a matter to induce confidence and trust in the plaintiff. This case, and the passage in 1 Ro. Abr. 101, are recognised in 1 Sid. 146. How then are the cases ? None exist, in which such an action as the present has been brought ; none, in which any principle applicable to the present case has been laid down to prove that it will lie ; not even a dictum. But from the cases cited, some principles may be extracted to shew that it cannot be sustained : 1st, that what is fraud, which will support an action, is matter of law. 2dly, that in every case of a fraudulent misrepresentation attended with damage, an action will not lie even between contracting parties. 3dly, that if the assertion be a nude assertion, it is that sort of misrepresentation, the truth of which does not lie merely in the knowledge of the defendant, but may be inquired into, and the plaintiff is bound so to do ; and he cannot recover a damage which he has suffered by his laches. Then let us consider how far the facts of the case come within the last of these principles. The misrepresentation stated in the declaration is respecting the credit of Falch ; the defendant asserted that the plaintiffs might safely give him credit : but credit to which a man is entitled is matter of judgment and opinion, on which different men might form different opinions, and upon which the plaintiffs might form their own ; to mislead which no fact to prove the good credit of Falch is falsely asserted. It seems to me therefore that any assertion relative to credit, especially where the party making it has no interest, nor is in any collusion with the person respecting whose credit the

PASLEY *v.* FREEMAN

assertion is made, is like the case in **[56]** Yelverton respecting the value of the term. But at any rate it is not an assertion of a fact peculiarly in the knowledge of the defendant. Whether Falch deserved credit depended on the opinion of many ; for credit exists on the good opinion of many. Respecting this, the plaintiffs might have inquired of others, who knew as much as the defendant ; it was their fault that they did not, and they have suffered damage by their own laches. It was owing to their own gross negligence that they gave credence to the assertion of the defendant, without taking pains to satisfy themselves that that assertion was founded in fact, as in the case of *Bayly* v. *Merrel.* I am therefore of opinion, that this action is as novel in principle as it is in precedent, that it is against the principles to be collected from analogous cases, and consequently that it cannot be maintained.

Buller, J.—The foundation of this action is fraud and deceit in the defendant, and damage to the plaintiffs. And the question is, whether an action thus founded can be sustained in a Court of Law ? Fraud without damage, or damage without fraud, gives no cause of action ; but where these two concur, an action lies. Per Croke, J. 3 Bulst. 95. But it is contended, that this was a bare naked lie ; that, as no collusion with Falch is charged, it does not amount to a fraud : and, if there were any fraud, the nature of it is not stated. And it was supposed by the counsel who originally made the motion, that no action could be maintained, unless the defendant, who made this false assertion, had an interest in so doing. I agree that an action cannot be supported for telling a bare naked lie ; but that I define to be, saying a thing which is false, knowing or not knowing it to be so, and without any design to injure, cheat, or deceive, another person. Every deceit comprehends a lie ; but a deceit is more than a lie on account of the view with which it is practised, it's being coupled with some dealing, and the injury which it is calculated to occasion, and does occasion, to another person. Deceit is a very extensive head in the law ; and it will be proper to take a short view of some of the cases which have existed on the subject, to see how far the Courts have gone, and what are the principles upon which they have decided. I lay out of the question the case in 2 Cro. 196, and all other cases which relate to freehold interests in lands : for they go on the special reason that the seller cannot have them without title, and the buyer is at his peril to see it. But the cases cited on the part **[57]** of the defendant, deserving notice, are Yelv. 20. Carth. 90. Salk. 210. The first of these has been fully stated by my brother Grose : but it is to be observed that the book does not affect to give the reasons on which the Court delivered their judgment : but it is a case quoted by counsel at the Bar, who mentions what was alleged by counsel in the other case. If the Court went on a distinction between the words warranty and affirmation, the case is not law : for it was rightly held by Holt, C.J. in the subsequent cases, and has been uniformly adopted ever since, that an affirmation at the time of a sale is a warranty, provided it appear on evidence to have been so intended. But the true ground of that determination was, that the assertion was of mere matter of judgment and opinion ; of a matter of which the defendant had no particular knowledge, but of which many men will be of many minds, and which is often governed by whim and caprice. Judgment or opinion, in such case, implies no knowledge. And here this case differs materially from that in Yelverton : my brother Grose considers this assertion as mere matter of opinion only ; but I differ from him in that respect. For it is stated on this record, that the defendant knew that the fact was false. The case in Yelv. admits, that if there had been fraud, it would have been otherwise. The case of *Crosse* v. *Gardner*, Carth. 90, was upon an affirmation that oxen, which the defendant had in his possession, and sold to the plaintiff were his, when in truth they belonged to another person. The objection against the action was that the declaration neither stated that the defendant deceitfully sold them, or that he knew them to be the property of another person ; and a man may be mistaken in his property and right to a thing without any fraud or ill intent. Ex concessis therefore, if there were fraud or deceit the action would lie ; and knowledge of the falsehood of the thing asserted is fraud and deceit. But notwithstanding these objections, the Court held that the action lay, because the plaintiff had no means of knowing to whom the property belonged but only by the possession. And in Cro. Jac. 474, it was held, that affirming them to be his, knowing them to be a stranger's, is the offence, and cause of action. The case of *Medina* v. *Stoughton* (a), in the point of

decision, is the same as *Crosse* v. *Gardner*: but there is an obiter dictum of Holt, Ch.J., that where the seller of a personal thing is out of possession, it is otherwise, for there **[58]** may be room to question the seller's title, and caveat emptor in such case to have an express warranty, or a good title. This distinction by Holt is not mentioned by Lord Raym. 598, who reports the same case: and if an affirmation at the time of sale be a warranty, I cannot feel a distinction between the vendor's being in or out of possession. The thing is bought of him, and in consequence of his assertion: and if there be any difference, it seems to me that the case is strongest against the vendor when he is out of possession, because then the vendee has nothing but the warranty to rely on. These cases then are so far from being authorities against the present action, that they shew that, if there be fraud or deceit, the action will lie; and that knowledge of the falsehood of the thing asserted is fraud and deceit. Collusion then is not necessary to constitute fraud. In the case of a conspiracy, there must be a collusion between two or more to support an indictment: but if one man alone be guilty of an offence, which, if practised by two, would be the subject of an indictment for a conspiracy, he is civilly liable in an action for reparation of damages at the suit of the person injured. That knowledge of the falsehood of the thing asserted constitutes fraud, though there be no collusion, is further proved by the case of *Risney* v. *Selby*, Salk. 211, where, upon a treaty for the purchase of an house, the defendant fraudulently affirmed that the rent was 30l. per annum, when it was only 20l. per annum, and the plaintiff had his judgment; for the value of the rent is a matter which lies in the private knowledge of the landlord and tenant, and if they affirm the rent to be more than it is, the purchaser is cheated, and ought to have a remedy for it. No collusion was there stated, nor does it appear that the tenant was ever asked a question about the rent, and yet the purchaser might have applied to him for information; but the judgment proceeded wholly upon the ground that the defendant knew that what he asserted was false. And by the words of the book it seems that, if the tenant had said the same thing, he also would have been liable to an action. If so, that would be an answer to the objection, that the defendant in this case had no interest in the assertion which he made. But I shall not leave this point on the dictum or inference which may be collected from that case. If A. by fraud and deceit cheat B. out of 1000l., it makes no difference to B. whether A., or any other person, pockets that 1000l. He has lost his money, **[59]** and if he can fix fraud upon A., reason seems to say that he has a right to seek satisfaction against him. Authorities are not wanting on this point. 1 Roll. Abr. 91, pl. 7. If the vendor affirm that the goods are the goods of a stranger his friend, and that he had authority from him to sell them, and upon that B. buy them, when in truth they are the goods of another, yet if he sell them fraudulently and falsely on this pretence of authority, though he do not warrant them, and though it be not averred that he sold them knowing them to be the goods of the stranger, yet B. shall have an action for this deceit. It is not clear from this case, whether the fraud consisted in having no authority from his friend, or in knowing that the goods belonged to another person: what is said at the end of the case only proves that falsely and fraudulently are equivalent to knowingly. If the first were the fact in the case, namely, that he had no authority, the case does not apply to this point: but if he had an authority from his friend, whatever the goods were sold for his friend was entitled to, and he had no interest in them. But however that might be, the next case admits of no doubt. For in 1 Ro. Abr. 100, pl. 1, it was held, that if a man acknowledge a fine in my name, or acknowledge a judgment in an action in my name of my land, this shall bind me for ever; and therefore I may have a writ of deceit against him who acknowledged it. So if a man acknowledge a recognizance, statute-merchant, or staple, there is no foundation for supposing that in that case the person acknowledging the fine or judgment was the same person to whom it was so acknowledged. If that had been necessary, it would have been so stated; but if it were not so, he who acknowledged the fine had no interest in it. Again, in 1 Ro. Abr. 95, l. 25, it is said, if my servant lease my land to another for years, reserving a rent to me, and to persuade the lessee to accept it, he promise that he shall enjoy the land without incumbrances; if the land be incumbered, &c. the lessee may have an action on the case against my servant, because he made an express warranty. Here then is a case in which the party had no interest whatever. The same case is reported in Cro. Jac. 425, but no notice is taken of this point;

probably because the reporter thought it immaterial whether the warranty be by the master or servant. And if the warranty be made at the time of the sale, or before the sale, and the sale is upon the faith of the warranty, I can see no distinction be-[60]-tween the cases. The gift of the action is fraud and deceit, and if that fraud and deceit can be fixed by evidence on one who had no interest in his iniquity, it proves his malice to be the greater. But it was objected to this declaration, that if there were any fraud, the nature of it is not stated : to this the declaration itself is so direct an answer, that the case admits of no other. The fraud is, that the defendant procured the plaintiffs to sell goods on credit to one whom they would not otherwise have trusted, by asserting that which he knew to be false. Here then is the fraud, and the means by which it was committed ; and it was done with a view to enrich Falch by empoverishing the plaintiffs, or, in other words, by cheating the plaintiffs out of their goods. The cases which I have stated, and Sid. 146, and 1 Keb. 522, prove that the declaration states more than is necessary ; for fraudulenter without sciens, or sciens without fraudulenter, would be sufficient to support the action. But, as Mr. J. Twisden said in that case, the fraud must be proved. The assertion alone will not maintain the action ; but the plaintiff must go on to prove that it was false, and that the defendant knew it to be so : by what means that proof is to be made out in evidence need not be stated in the declaration. Some general arguments were urged at the Bar, to shew that mischiefs and inconveniencies would arise if this action were sustained ; for if a man, who is asked a question respecting another's responsibility, hesitate, or is silent, he blasts the character of the tradesman : and if he say that he is insolvent, he may not be able to prove it. But let us see what is contended for : it is nothing less than that a man may assert that which he knows to be false, and thereby do an everlasting injury to his neighbour, and yet not be answerable for it. This is as repugnant to law as it is to morality. Then it is said, that the plaintiffs had no right to ask the question of the defendant. But I do not agree in that ; for the plaintiffs had an interest in knowing what the credit of Falch was. It was not the inquiry of idle curiosity, but it was to govern a very extensive concern. The defendant undoubtedly had his option to give an answer to the question, or not : but if he gave none, or said he did not know, it is impossible for any Court of Justice to adopt the possible inferences of a suspicious mind as a ground for grave judgment. All that is required of a person in the defendant's situation is, that he shall give no answer, or that if he do, he shall answer according to the truth as [61] far as he knows. The reasoning in the case of *Coggs* v. *Barnard* which was cited by the plaintiff's counsel, is I think very applicable to this part of the case. If the answer import insolvency, it is not necessary that the defendant should be able to prove that insolvency to a jury ; for the law protects a man in giving that answer, if he does it in confidence and without malice. No action can be maintained against him for giving such an answer unless express malice can be proved. From the circumstance of the law giving that protection, it seems to follow, as a necessary consequence, that the law not only gives sanction to the question, but requires that, if it be answered at all, it shall be answered honestly. There is a case in the books, which, though not much to be relied on, yet serves to shew that this kind of conduct has never been thought innocent in Westminster Hall. In *R.* v. *Gunston*, 1 Str. 583, the defendant was indicted for pretending that a person of no reputation was Sir J. Thornycraft, whereby the prosecutor was induced to trust him ; and the Court refused to grant a certiorari, unless a special ground were laid for it. If the assertion in that case had been wholly innocent, the Court would not have hesitated a moment. How indeed an indictment could be maintained for that, I do not well understand ; nor have I learnt what became of it. The objection to the indictment is, that it was merely a private injury : but that is no answer to an action. And if a man will wickedly assert that which he knows to be false, and thereby draws his neighbour into a heavy loss, even though it be under the specious pretence of serving his friend, I say ausis talibus istis non jura subserviunt.

Ashhurst, J.—The objection in this case, which is to the third count in the declaration, is, that it contains only a bare assertion, and does not state that the defendant had any interest, or that he colluded with the other party who had. But I am of opinion that the action lies notwithstanding this objection. It seems to me that the rule laid down by Croke, J. in *Baily* v. *Merrell* (a), is a sound and solid

**PASLEY *v.* FREEMAN**

principle, namely, that fraud without damage, or damage without fraud, will not found an action; but where both concur, an action will lie. The principle is not denied by the other Judges, but only the application of it, because the party injured there, who was the carrier, had **[62]** the means of attaining certain knowledge in his own power, namely, by weighing the goods; and therefore it was a foolish credulity against which the law will not relieve. But that is not the case here, for it is expressly charged that the defendant knew the falsity of the allegation, and which the jury have found to be true; but non constat that the plaintiffs knew it, or had any means of knowing it, but trusted to the veracity of the defendant. And many reasons may occur why the defendant might know that fact better than the plaintiffs; as if there had before this event subsisted a partnership between him and Falch, which had been dissolved: but at any rate it is stated as a fact that he knew it. It is admitted that a fraudulent affirmation, when the party making it has an interest, is a ground of action; as in *Risney* v. *Selby* (a), which was a false affirmation made to a purchaser as to the rent of a farm which the defendant was in treaty to sell to him. But it was argued that the action lies not unless where the party making it has an interest, or colludes with one who has. I do not recollect that any case was cited which proves such a position; but if there were any such to be found, I should not hesitate to say that it could not be law; for I have so great a veneration for the law as to suppose that nothing can be law which is not founded in common sense or common honesty. For the gift of the action is the injury done to the plaintiff, and not whether the defendant meant to be a gainer by it: what is it to the plaintiff whether the defendant was or was not to gain by it; the injury to him is the same. And it should seem that it ought more emphatically to lie against him, as the malice is more diabolical, if he had not the temptation of gain. For the same reason, it cannot be necessary that the defendant should collude with one who has an interest. But if collusion were necessary, there seems all the reason in the world to suppose both interest and collusion from the nature of the act; for it is to be hoped that there is not to be found a disposition so diabolical as to prompt any man to injure another without benefiting himself. But it is said, that if this be determined to be law, any man may have an action brought against him for telling a lie, by the crediting of which another happens eventually to be injured. But this consequence by no means follows; for in order to make it actionable, it must be accompanied with the circumstances averred in this count, namely, that the defendant, "in-**[63]**-tending to deceive and defraud the plaintiffs, did deceitfully encourage and persuade them to do the act, and for that purpose made the false affirmation, in consequence of which they did the act." Any lie accompanied with those circumstances I should clearly hold to be the subject of an action: but not a mere lie thrown out at random without any intention of hurting any body, but which some person was foolish enough to act upon; for the quo animo is a great part of the gift of the action. Another argument which has been made use of is, that this is a new case, and that there is no precedent of such an action. Where cases are new in their principle, there I admit that it is necessary to have recourse to legislative interposition in order to remedy the grievance: but where the case is only new in the instance, and the only question is upon the application of a principle recognized in the law to such new case, it will be just as competent to Courts of Justice to apply the principle to any case which may arise two centuries hence as it was two centuries ago; if it were not, we ought to blot out of our law books one fourth part of the cases that are to be found in them. The same objection might in my opinion have been made with much greater reason in the case of *Coggs* v. *Barnard;* for there the defendant, so far from meaning an injury, meant a kindness, though he was not so careful as he should have been in the execution of what he undertook. And indeed the principle of the case does not, in my opinion, seem so clear as that of the case now before us, and yet that case has always been received as law. Indeed one great reason perhaps why this action has never occurred may be that it is not likely that such a species of fraud should be practised unless the party is in some way interested. Therefore I think the rule for arresting the judgment ought to be discharged.

Lord Kenyon, Ch.J.—I am not desirous of entering very fully into the discussion of this subject, as the argument comes to me quite exhausted by what has been said

---

(a) Salk. 211.

by my brothers.  But still I will say a few words as to the grounds upon which my opinion is formed.  All laws stand on the best and broadest basis which go to enforce moral and social duties.  Though indeed it is not every moral and social duty the neglect of which is the ground of an action.  For there are, which are called in the civil law, duties of imperfect obligation, for the enforcing of which no action lies. There are many cases where **[64]** the pure effusion of a good mind may induce the performance of particular duties, which yet cannot be enforced by municipal laws. But there are certain duties, the non-performance of which the jurisprudence of this country has made the subject of a civil action.  And I find it laid down by the Lord Ch. B. Comyns (*a*), that "an action upon the case for a deceit lies when a man does any deceit to the damage of another."  He has not, indeed, cited any authority for this opinion; but his opinion alone is of great authority; since he was considered by his cotemporaries as the most able lawyer in Westminster Hall.   Let us, however, consider whether that proposition is not supported by the invariable principle in all the cases on this subject.   In 3 Bulstr. 95, it was held by Croke, J. that "fraud without damage, or damage without fraud, gives no cause of action: but where these two do concur, there an action lieth."  It is true, as has been already observed, that the Judges were of opinion in that case that the action did not lie on other grounds.   But consider what those grounds were.   Dodderidge, J. said " If we shall give way to this, then every carrier would have an action upon the case : but he shall not have any action for this, because it is merely his own default that he did not weigh it."   Undoubtedly where the common prudence and caution of man are sufficient to guard him, the law will not protect him in his negligence.   And in that case, as reported in Cro. Jac. 386, the negligence of the plaintiff himself was the cause for which the Court held that the action was not maintainable.   Then how does the principle of that case apply to the present?  There are many situations in life, and particularly in the commercial world, where a man cannot by any diligence inform himself of the degree of credit which ought to be given to the persons with whom he deals; in which cases he must apply to those whose sources of intelligence enable them to give that information.   The law of prudence leads him to apply to them, and the law of morality ought to induce them to give the information required.   In the case of Bulstrode the carrier might have weighed the goods himself : but in this case the plaintiffs had no means of knowing the state of Falch's credit but by an application to his neighbours.   The same observation may be made to the cases cited by the defendant's counsel respecting titles to real property.   For a person does not have recourse to common conversations to know **[65]** the title of an estate which he is about to purchase : but he may inspect the title deeds; and he does not use common prudence if he rely on any other security.   In the case in Bulstrode the Court seemed to consider that damnum and injuria are the grounds of this action ; and they all admitted that, if they had existed in that case, the action would have lain there; for the rest of the Judges did not controvert the opinion of Croke J. but denied the application of it to that particular case.   Then it was contended here that the action cannot be maintained for telling a naked lie : but that proposition is to be taken sub modo.  If, indeed, no injury is occasioned by the lie, it is not actionable : but if it be attended with a damage, it then becomes the subject of an action.  As calling a woman a whore, if she sustain no damage by it, is not actionable ; but if she loses her marriage by it, then she may recover satisfaction in damages.  But in this case the two grounds of the action concur : here are both the damnum et injuria.   The plaintiffs applied to the defendant telling him that they were going to deal with Falch, and desiring to be informed of his credit, when the defendant fraudulently, and knowing it to be otherwise, and with a design to deceive the plaintiffs, made the false affirmation which is stated on the record, by which they sustained a considerable damage.   Then can a doubt be entertained for a moment but that this is injurious to the plaintiffs?  If this be not an injury, I do not know how to define the word.  Then as to the loss, this is stated in the declaration, and found by the verdict.  Several of the words stated in this declaration, and particularly "fraudulenter," did not occur in several of the cases cited.   It is admitted that the defendant's conduct was highly immoral, and detrimental to society.  And I am

---

(*a*) Com. Dig. tit. " Action upon the Case for a Deceit," A, 1.

of opinion that the action is maintainable on the grounds of deceit in the defendant, and injury and loss to the plaintiffs.

Rule for arresting the judgment discharged.

SYMMONS *against* KNOX. Tuesday, Feb. 4th, 1789.   In an action on a bond, the defendant must set forth in the plea what is really due on the bond, before he is intitled to set off any cross demand under 8 Geo. 2, c. 24, s. 5, and such averment is traversable (*a*).   [Willes, 263.   6 East, 437.]

Debt on bond in 11,619l. 13s. 4d. dated the 14th July 1784.   The defendant (after praying oyer of the bond and of the condition, which was that the bond should be void [66] on payment of 5809l. 11s. 8d. with lawful interest on the 25th of March then next) pleaded as follows : that at the time of exhibiting the bill of the said John there was justly and truly due and owing to the said John, on the condition of the said writing obligatory, for principal and interest, the sum of 5809l. 11s. 8d., and no more, to wit, at Westminster aforesaid in the county aforesaid ; and that the said John now is, and on the day of exhibiting the bill of the said John was, indebted to the said William in more money than is remaining due to the said John by virtue of the said writing obligatory ; and concluded with a set-off in the common form.   The plaintiff replied that at the time of exhibiting the bill of the said John there was and yet is justly and truly due and owing to the said John from the said William, upon and by virtue of the said writing obligatory and the condition thereof, for principal and interest, a larger sum of money than the said sum of 5809l. 11s. 8d. in the said plea mentioned, to wit the sum of 6930l. 3s. 9d.; concluding to the country.

To this replication the defendant demurred : and shewed for cause that the plaintiff in and by his replication attempted to put in issue a matter wholly immaterial, and therein traversed a fact, whereon no certain or material issue could be taken ; and hath not in and by his replication traversed, or denied, or confessed, the only fact in the plea, whereon a certain or proper issue could be taken ; and because the replication was in various other respects defective, informal, &c.

Baldwin, in support of the demurrer. This question arises on the 8 Geo. 2, c. 24, s. 5, which gives the plea of set-off, where the demand on either side accrues by bond ; and which directs that judgment shall be entered for no more than shall appear to be due to the plaintiff after one debt is set against the other.   The material issue, therefore, to be tried is, whether the plaintiff's demand on the defendant exceeds that which the defendant has on him : and it is immaterial to take issue on the exact sum due from the defendant to the plaintiff.   For if the parties were to go to trial on such an issue, and the plaintiff proved that only one shilling more was due to him, the defendant would be deprived of the benefit of the statute, even though his demand exceeded that of the plaintiff.   And no inconvenience can arise from this practice, because the Act directs that judgment shall only be entered up for so much as is really and justly due.

[67] Dampier, contra. The statute expressly requires that the sum which is justly and truly due shall be pleaded in bar, in which plea shall be shewn how much is truly and justly due on either side.   If then it be necessary to aver that something is due on the bond, the particulars of that averment are necessary.   And the meaning of the statute is that, in case the defendant sets off a bond debt, the plaintiff may know the amount of the defendant's claim ; or that, in case the defendant sets off to a debt due to the plaintiff arising on a bond, he may know how much the defendant admits.   If the defendant were not to set forth the true sum, the plaintiff would go to trial ignorant of what was to be proved by the defendant, which was the very thing against which the statute meant to provide.   Then if this be a material averment, it is traversable ; for if the plaintiff were not to traverse it in his replication, he would be taken to have admitted it.   And it is so material, that, unless the defendant avers what is truly and justly due, he is not intitled under the statute to set off at all.   But whatever may be the general construction of this statute, the particular manner of pleading this plea has made the averment material, and consequently traversable.   The plea states that the defendant was indebted to the plaintiff, on the bond, in 5809l.

---

(*a*) It is traversable, though laid under a videlicet. *Grimwood* v. *Barrit*, post, 6 vol. 460.

# AD-8

And it sets forth the affidavit; but there is instead of the word "understood" undertood, that he the defendant swore he undertood that, &c. whereas in truth and in fact, &c.

They came after verdict to quash the indictment, and set aside the verdict upon this exception.

It was argued, 1st. That this was a flaw in the indictment, in the material part of the charge in the assignment itself of the perjury, and therefore fatal in an indictment.

2dly. That a verdict would not help it; for though for the sake of settling civil property, the law had permitted such faults to be cured by a verdict; yet no law had ever yet been thought proper to be introduced by the Legislature to leave any thing at large, where the property, life and liberty, of the subject was concerned.

On the other side, that this "undertood" being totally insensible, was not a word, but would become a word, according to the sense and truth by restoring the *s*, which had escaped the pen; therefore, that this was no case of one word for another, or of a word too much or too little, but only of a letter omitted; by the omission of which no doubt or new sense was introduced; and cases were cited to shew the difference.

The Court took time to consider; after which the judgment of the Court was delivered by Lord Mansfield.

This is the case of an indictment for perjury, and it comes before the Court on the reading of "undertood" for "under-[786]-stood." The jury read it understood, and this comes before the Court to cure that verdict and set it aside.

Some of the cases are very nice, and to be sure there is a great deal of nicety in criminal prosecutions, and the law ought to be certain. And the case of *Hunt* is brought: but the authority of Hawkins denies that case.

And the distinction seems to be where the word is made a different word, admittat instead of amittat; there the indictment is bad. But a difference in the spelling of the word whereby no new word is produced, nor the real one possible to be mistaken, will not vitiate the indictment.

Though the criminal proceedings ought to be extremely accurate and strict; yet to set a judgment of the jury upon such a nicety would be very bad.

Rule discharged.

His Lordship cited the case of *The Queen and Drake.*


### PEREMPTORY.

Peremptory will not have effect, where without fault of the party a witness cannot be had.*

#### POPHAM *against* EYRE. CURIA CANCELLARIA.

On an appeal from the decree of Sir Thomas Sewell, now Master of the Rolls, for performance of a specific agreement.

It was on a bill brought against Mr. Popham, as heir of his father; Lord Mansfield as mortgagee of the estate, and the purchasers after the treaty was broke off between Eyre and Mr. Popham, to enable them to compell Mr. Popham the heir to a specific performance of the agreement between his father and Mr. Eyre the plaintiff. And his Honour, after several hearings, decreed a specific performance, and made directions accordingly; from this Eyre and the other parties (excepting Lord Mansfield) appealed. But Lord Mansfield was not included in the decree before the Master, they having dropt his Lordship's name before.

[787] The case stated on behalf of the appellant Eyre was this.

That his father thought himself deceived by change of the name of the purchaser, and that therefore he did not execute, and refused unless the money were paid down.

And that he cannot execute the conveyance, because already made and complete with his father.

That the defendant is son and heir to his father.

Dispute which side should begin to state.

Wherever it is an appeal from a particular part of the decree, the appellant goes on first.

---

* Lex neminem cogit ad impossibilia.

But where the bill and answer is opened, there, per Cancellarium, it should seem the plaintiff in the original cause should begin ; because he is called to shew his cause against the appeal, and the specific agreement is to be enforced on hearing all the evidence.

Argued, for the respondent, that he is heir to his father, and the estate of which his father had proposed to dispose.

That 16,500l. was the price on which they entered into treaty.

That 17,000 was the price understood.

That the agreement was declared by the plaintiff's agent in writing, to be considered by him as actually completed.

That the alteration of the name of the purchaser was made by consent of the defendant and approved.

That Mr. Popham said, the reason of his refusal to execute the agreement was, because he understood the agent meant to purchase for himself ; and he did not know whether Lord Mansfield, the mortgagee, would give up the deed, or whether the money was ready to be paid.

A very idle objection ; because the money was secured him at any rate ; and upon payment there was no reason to doubt the deeds would be delivered.

The defendant before the Master was ordered to put in an answer, and then to put in a farther answer ; and before this there came out farther evidence which made it necessary to [788] amend the bill.  The defendant, the covenantor, made a new agreement with Mr. H. for the sale at the original price proposed to the other ; there was no possibility of including this in the bill, because it was after the bill brought. The second covenantees interest depends on the indemnity given ; yet 16,500l. is to repay them, and the estate to be secured.

The objections before the Master, that this is a verbal agreement not in writing, and therefore within the Statute of Frauds.

Two letters (the second subscribed) that he would not take less than 17,000l. this underwriting, and he confesses the agreement in his.  The answer, and this would take it out of the Statute of Frauds upon a full evidence.  Though there was a verbal agreement which the Court would not have decreed, yet if the defendant admits in his answer, the Court will decree a performance.  *Groston and Laves,* Eq. Ca. Abridged, if there be a parol agreement, yet, if admitted in answer, the defendant shall be compelled to perform it, for there is no danger of perjury, which is what the statute meant to prevent.

[Lord Chancellor.—*Worsley*—4 G. 2, E. T. bill brought for specific performance of an agreement ; the defendant pleaded the Statute of Frauds and Perjuries.  It was doubted whether he ought to set out the Statute of Frauds and Perjuries, the Chancellor at first thought he should be farther heard : but afterwards that it was exceedingly improper, for then he must admit the agreement, and there would be an end of the Statute of Frauds and Perjuries.]

The argument was continued upon the objection of Mr. Popham, to inforce this agreement ; that it is a conditional agreement, because the money was to be paid at a certain day and has not been paid.

That the agreement had been varied since the writing ; that instead of 16,500l. to be paid down, 10,000l. was to be paid, and the 7000l. taken as a security on the estate.  This is by the agreement of the covenantor himself, and then, shall he set up his own act as a bar ?

He understood Mr. Baldwin was to be the purchaser, and was deceived in this, is another objection.  And that he thought Eyre could not pay the money, and then upon Mr. Baldwin's undertaking for the money he still continues the objection, though he has what he desired.

*Philips* v. *Duke of Buckingham,* 1 Ver. 227.

The case in Vernon was a treaty with the Duke of Buckingham, the treaty broke off, and Mr. Philips contrived that the secretary to Lord Chancellor Nottingham should enter into a [789] treaty with the duke and not name him ; and that Mr. Nicolls would say he was treating for Lord Nottingham, or Mr. Finch his son.  It turned out that there was no authority from Lord Nottingham or his son, and therefore the Court would not decree a performance.

There the purchase was pretended for Lord Nottingham or his son the Solicitor-General.  The duke, being willing to oblige any of that family, offered the estate at

his own price.   Afterwards he entered into a treaty, and on discovery refused to sign the articles, or make conveyance.  The Lord Keeper decreed that there had not been fairness used ; that Lord Buckingham having a great regard to Lord Nottingham and his son, declared he would sell cheaper than to any other purchaser.

But if Mr. Finch had appeared, and affirmed the purchase he would have decreed, and he might have sold the next moment to Mr. Philips.

From the defendant's answer.

The defendant acknowledges that he was informed of an intention of Mr. Eyre to purchase, and answers in that paper which he confesses writing, that he would not sell for less than 17,000l.

Mr. Eyre's agent writes in answer to this, Sir, I have communicated what you write, that you would not take less than 17,000l. and though Mr. Eyre considered the agreement as absolute for 16,500l. yet to save farther trouble he will give 17,000l. and this concludes the agreement.  However, for my satisfaction, I desire you would give me a line under your hand.

Lord Chancellor.—Read the second answer.

Objected by counsel.

Lord Chancellor.—If you read the confession of an agreement out of an answer, you must read all that is relative to the agreement.

[In the second answer—the deponent begs leave to refer to his letter.]

Mr. Baldwin complains to Mr. Popham, is surprized to find by Mr. Stokes's letter that the affair is not completed, and that he appears not apprized of the scarcity and value of money at this time.   However it is very well, as he is concluding an affair which may prove much more beneficial : if Mr. Stokes and you should after all settle, as I apprehend certainly you will, I shall be at the Crown and Anchor.

[790] Lord Chancellor.—Does any thing appear in Mr. Stokes's answer?

Letter importing Lord Mansfield's agreement to accept of 10,000l. and the estate as security for the remaining 7000l.

Reciting the contract and that it was not reduced into writing.

And he brings an action for non-performance of this very agreement.

Mr. Eyre brings an action for non-performance of this agreement.   Instead of 17,000l. the estate is sold now at last for 16,500l.

The case referred to proves the seller was imposed upon.   He meant to favour the family with whom he lived, and understood himself to be treating.   That gentleman did not claim as a purchaser, therefore no body could.   This is a sale by public auction ; he only wanted the money ; if he had the money this was enough.

Argued on the other side—that the Master of the Rolls was wrong, in decreeing the specific performance of the agreement.

The estate is like all others in the west of England, continually increasing in value, because the rents in the estate are upon lives, and considerably less than the real value ; while the agreement is in suspense the lives are wearing out.

Seven years from the treaty they come for a specific performance, on payment of 17,000l. for the estate, which they were to have paid seven years ago.   It is an application against an heir—the disadvantage would be to the heir 5000l.

It has been thrown out that we have been so foolish to sell the estate for 16,500l. the estimate made sufficiently shews, that a person who had an estate in mortgage gained by selling as early as possible ; and the person who comes for an equitable relief does not come very favourably when he objects a sale under value, to which he has driven the party against whose heir he claims.

It is stated there are certain general rules for performance of specific agreements. If the Court were to lay down general rules, without exception of circumstances, for performance of a specific agreement by which a party should be compelled, it would in truth compel to a greater hardship than those of common law.   From their generality and rigour the Court would then be a legislation superior to the common law, and much severer.   Indeed if the Court were to lay down any rules whatever in this matter then circumvention would be favoured, and the rules of the Court would be made the instrument of mere fraud.

[791] There is a great deal of difference between an agreement which will entitle to damages at common law for non-performance, and an agreement which will be carried into execution.

Where the damages would be greater to a party by carrying an agreement into

execution, than any damages a jury would give, then equity will not decree.  This I argue with the more confidence, because your Lordship laid it down in the case of *Pope and Harris,* and it was affirmed, and taken on the same grounds by the House of Lords.

As to the remark that Courts of Equity have made rules that where an agreement is admitted, it shall be same as in writing ; equity will always take care not to supersede any object designed to be secured by an Act of Parliament.

The end of the Statute of Frauds was, that the truth of the articles should be known.

If the answer be taken as an agreement in writing, the answer of a person of a delicate conscience will make a great difference to his disadvantage, from the answer by a person of an hard and stubborn one, who would swear away the agreement. This difference a Court of Equity will not be anxious to introduce.

The terms of payment will not appear with that precision and certainty : and wherever the time would be very material (as in the case of performing an agreement to a mortgagee) your Lordship will not decree against one of the most important terms of the agreement ; since he cannot pay the mortgage, and must pay a greater interest than he shall receive rent.

Unless the answer could be so particular as to satisfy all the objects of the agreement, had it been reduced into writing, equity will not decree.  Besides it must be seen first, that this is an agreement proper ever to have been put into execution.

Very early Mr Eyre proposed, which alarmed Mr. Popham, who declared he would not deal with him or any gentleman of his profession (he was an attorney) unless the money were laid down.

Mr. Eyre prevailed upon some body of the name of Baldwin to enter into this treaty.   Mr. Popham would have been ready to enter into the treaty, provided the whole treaty had been to be performed on their part.   The whole money was to be paid at Lady-Day following.   This is the first treaty ; it was varied afterwards.   They must shew which of the specific agreements remains to be performed.

Mr. Popham, as having been disappointed of receiving the 10,000l. being obliged to pay the interest from the time in [792] which he should have paid the money, little stress is to be laid on his bringing an action.

Supposing the action (which was dropt) could have been maintained for damages, does it follow from thence that they were entitled to the specific performance of an agreement, for the non-performance of which Mr. Popham was to have had damages ? Are there any cases which say a person who has been dilatory, and exposed himself to an action by his delay, shall have a right to compel a specific performance of that agreement which was delayed by himself.

The doctrine is rather contrary to this position in *Hazes and Carrell,* Viner, title Contract, pl. 18, where a party has trifled, or shown any backwardness in performance of his part a Court will not interpose ; and especially if circumstances are altered.

Can there be a greater alteration of circumstances than an agreement for 17,000l. which would have satisfied instantly, and the same 17,000l. with the loss of all the interest to which Mr. Popham by that delay was made liable, on inability to pay off the mortgage.

The memorandum on which they say this agreement was entered into is thus ; proposal of 16,500l.  Answer.—He would not take less than 17,000l.  Had it stood there could it have been contended in this Court that this was a complete agreement according to the Statute of Frauds ?

No farther was proceeded in the agreement on one side than proposal of a sum, and on the other the sum laid down under which he would not part with the estate. Is this an agreement in writing ?  If the Statute of Frauds were to be thus contrived it would be virtually revoked.   If the hasty transactions of persons in the commencement of a treaty were to be taken as a complete agreement, the case would be worse since the statute than it ever was before.

The answer is thus—Mr. Finch has communicated the contents of what you wrote with your pencil under Mr. Baldwin's letter, that you would not take less than 17,000l. And although he considered it as an actual bargain for 16,500l. yet as he had acquainted several of his friends upon the subject, notwithstanding your refusal to take less than 17,000l. he will be ready to give that sum which concludes the agreement.

[793] "But, for my satisfaction, I desire you would give me a line under your hand." Was not this to draw him within the statute?

Mr. F. the agent for Baldwin, proposes an agreement for 17,000l. and desires him to sign a writing, which would be more to the satisfaction of Mr. Baldwin than any thing he could say.

And Mr. Popham, finding it to be insisted on as an absolute agreement, refuses, as it wanted the most important article, the time.

The agreement, says Mr. Baldwin, Mr. Eyre, and his agent, is concluded by the rules of this Court, as we are advised ; they wanted abler advisers. "The day is not at all material ; if you lose 12,000l. before the agreement should be completed it is not material ; it is a complete agreement for us. You will be to go into the Exchequer ; we shall have an opportunity of getting rid of the estate in parcels, which, I tell you, is a very good bargain ; and therefore we are both tied, but we with a looser chain ; and you will have to run through a Court of Equity before we are obliged to pay the money. And if you sell it to any person else we will make you hear of it in the Court of Chancery." This is the kind of language spoken by the conduct of these gentlemen who come for a specific performance.

The agreement was ready for Lord Mansfield's acceptance ; Lord Mansfield accepted ; Mr. Popham was ready ; they were not ready at the first day ; nor on the 22d of June, which last day is subsequent to all the evidence they read in the case.

They proposed the conveyance on the 28th of June, with Mr. Eyre's name, but not the money. And then he might well say, "If I am to be driven to an agreement with Mr. Eyre, with whom I have declared I would not treat, instead of Mr. B. with whom I had declared I would treat, I will not go farther."

This case is said to be distinguished from the case of *The Duke of Buckingham.* The dispute there was not whether the whole value had been offered ; and I refer your Lordship to the report of the case, where the parties would not go into the question of the value.

And the Court determined they would leave the election to the vendor, and he would enter into an agreement with a person in whom he had a confidence, and not another, with whom he had not ; which is the very determination the heir of the vendor now prays and expects.

[794] It cannot consist either with that common sense to which, in an idle way, we are accustomed to appeal, or with the more circumstantial and certain rules of equity and justice, that an executory agreement with the one should be the same as with the other. And there is here this farther difference between an instant agreement, which he, the defendant, expected in this case, and which was necessary for his circumstances, and an executory agreement, which in his circumstances was ruinous.

They have not stated any one certain settled explicit agreement, like that which the statute ever expected to see in writing ; like that which this Court will expect to see some way, in order to entitle to a specific agreement.

And if the statute is to be construed liberally (this is the only rule by which parties are to be bound, if they are to be bound, in equity) they are not to be in a worse condition than if bound in law. What is the agreement by which they are to shew title to a specific performance?

Mr. Eyre had said he wanted to buy the estate to sell again to advantage. This in the outset of the affair : and it was a pretty strong objection, especially when he did not pretend to have more than 6000l. to pay for it.

Mr. F. to enquire whether Mr. B.'s purchase was completed, and if not, to know what obstructed it.

March 17.

Application to Mr. B. when he would complete, and to fix a day, as the estate was offered a thousand pounds cheaper than it would have been to any other person, on account of prompt payment.

"Mr. Popham, thinking himself bound in honour to discharge his debt to Lord Mansfield, if you do not give a peremptory answer, he shall think himself at liberty to treat with another purchaser."

Treaty respecting the sale was in substance this : it was offered at 18000l. at Michaelmas, 1766. Offer to Mr. B. without any other than a verbal agreement, March, 1767, for 17000l.

The agreement which the Court would enforce must fully, exactly and completely

appear : and not only this, but it must be such as the Court will decree a specific per-[795]-formance, from the reasonableness and fairness of it, both at the time of agreeing and when it is prayed to be enforced.

There must be full evidence, and the Court may exercise their jurisdiction as a Court of Conscience, as in case of an additional remedy beyond what the parties can have at law.  If the agreement not complete ; if fraud intended, with respect to purchasors ; or circumstances or estate altered ; or the agreement, though equal at first, is such as would be injurious by a subsequent event ; the Court will not decree.

Mr. Baldwin does not understand it a complete agreement ; for after this writing he writes and asks whether it's settled ?

He talks of a more advantageous treaty.  The agreement drops.

Mr. Popham says he would not take less than 17000l. he does not say what he will take.

1 Equity Cases abridged, 27.*  On a marriage treaty the lady's father agreed to give 4500l. portion, the settlement to be made four or five hundred pounds per annum ; the proper heads set down by a clerk.  The father fell sick and died ; the match completed ; and then the performance of the agreement was insisted.  Lord Chancellor said he never knew an instance in which it had been decreed an agreement should bind where nothing had been done by the parties signing, or in part executing though wrote by their orders.  They were only heads set down, which might have been altered or rejected.

Mr. Popham's agent, Mr. Stokes, has done nothing to approve of Mr. Eyre.  Whatever the motive, a Court of Equity will not decree for Mr. Eyre a specific performance of an underhand agreement, carried on in the name of another person.

This Court has been so jealous of giving a specific performance of agreement as an additional remedy to what they might have had at law, that they have declared they would not carry them into execution, where there appeared to be fraud, trifling, or improper conduct.

In the case of *The Duke of Buckingham* they were stamped and inrolled, and yet the Court would not execute them.  It appears in this case there was a transaction in favour of a party all along with whom Mr. Popham had declared he would not treat.  This will, therefore, take it out of the benefit of an equitable construction of the Statute of Frauds ; especially where there are subsequent circumstances, which render the specific performance extremely hard and unjust, and perhaps impossible.

[796] If a party making an agreement may be delayed for a day more than the time on which he insisted in the agreement, he may be delayed a year, or for ever.  The party on the other side may pay when he pleases, and inforce the agreement when he pleases, in spite of justice, equity, and the true understanding and object of the contract.

Wherever the time is material to the party it is an essential part of the agreement, and must be observed.  Vide Hayes——

Raym.  Agreement to convey over if the title be approved by defendant or defendant's counsel at a time.  The time material.

Gilb. 15.  Covenant to make a good estate on a day certain.  Decree in the Exchequer for a specific performance of the agreement, but refused in the House of Lords, the party applying not having proved that he tendered a title at the time stated, which was material, with respect to performance of the agreement.

It does not appear he was even on the 30th of June, even then ready.  Therefore he is left to such remedy, if any, as he may have at common law : having delayed Mr. Popham, who did not intend him to be the purchasor, and having not complied with his agreement to pay the money, which was necessary for Mr. Popham.

There was as much occasion to include Lord Mansfield, that he would accept the money.

To consider it now as it would have stood independent of the Statute of Frauds.

Before the statute the Court would not execute if not signed by one party, or in part executed.

But if drawn up in writing, signed and sealed, they would.  *Marquis of Normandy*

---

* *Bawdes and Amhurst.*

against *Duke of Devonshire.* Execution of agreement by one of the parties should bind both.

In this case there was no time where agreement was complete, nor was it signed by either party.

The party who applies for a specific remedy has not conducted himself with that fairness and candour which the Court expects.

When Mr. Popham disposed of the estate he was to put nothing in his pocket, but merely to have money to pay off the mortgage: therefore he refused Mr. Eyre, as not a ready money bargain.

[797] After the distance and delays in Chancery he would be to lose, even if interest were given him.

Sometimes a specific performance has been decreed making a compensation; but how is this to be made? There is not merely the loss of interest, the sale is hindered: the mortgagee holds. There is every delay and every inconvenience.

If you did not keep the proposals the Court will say you shall have no advantage.

The interest the Court will give him after seven years is four per cent. against five, which is to pay the mortgagee on failure of payment on the day incurred by the fault of those who come for a specific performance.

This case depends much more upon facts than any reasoning or nice points of law.

If this be to be taken as an absolute agreement what will be the fate of proposals from henceforth in the way of treaty? No person will say what he meant to sell his estate for, as thereby the bargain shall be concluded at once.

Where the articles were stamped, drawn out, deliberately examined, the Court would not suffer a person to come in who was not the intended purchasor, but left him to his remedy at law.

The case of *The Duke of Buckingham* goes upon the deceit; the parties would not go to settle the value. The only difficulty was the rescinding of a solemn deliberate legal act, which yet was rescinded for the fraud; just such a kind of fraud as in this case.

*Scott and Langstaffe,* before Lord Camden, was to rescind the agreement. Lord Camden thought fit to oblige Langstaffe to pay the costs. A bill brought to give up a lease on the hands of Langstaffe, as obtained by fraud.

Lord Camden.—The principle in equity is clear: but upon the evidence of the case the question is somewhat nice. Scott, an illiterate gardener, having purchased an house of Mr. P. next to one in which Mr. P. intended Mr. Garrick should succeed, and Mr. P. being unwilling Mr. Garrick should have a disagreeable neighbour, it is agreed between them, but not made part of the contract, that Scott should not grant a lease of the house to any body not agreeable to Mr. P. or Mr. Garrick afterwards, if he should succeed, to [798] prevent Mr. Garrick having a disagreeable neighbour. Scott was applied to by one Langstaffe for a lease, but refused, unless Langstaffe, who applied, had P.'s consent. Langstaffe said he knew him intimately, and that there would be no objection. P. in fact disapproved, and had never consented to his being tenant, and, so far from knowing him intimately, he had only seen him at a tavern.

Lord Camden says, "Langstaffe, a knowing attorney, has been mistaken in his ideas of fraud: because Scott did not say he was bound, and he, Langstaffe, did not say he had P.'s consent; that therefore there is no fraud. Scott, it is true, did not' say he was bound (he was engaged in honour), and Langstaffe did not say he had P.'s consent; but he said (which was a deceit, that he knew him intimately, when he had only seen him once at a tavern.

"Scott, a gardener, afraid of a suit with Langstaffe, a substantial attorney, is very uneasy. He delays the sale till he has an indemnity from Garrick, then he joins. This is the case of *Philips and the Duke of Buckingham.* No body who has read that case can easily forget it. Let the agreement be set aside with costs."

What would have been the situation of Mr. Popham if no body would have bid upon the bill brought? He must have paid interest upon 17,000l. and received but 40l. rents for seven years, till the suit in Chancery should be ended. He was content, the strongest proof of the hardship, to sit down with the loss of seven hundred pounds.

If no positive law had ever been made, and the case had stood without it, a Court of Equity would have said it is impossible to assist this contract, obtained by deceit against a person in difficulty and necessity.

Considering it upon the Statute of Frauds, where is the agreement signed by the party? Is it the writing with the pencil? Is it a writing not offering any general sum, but telling him Mr. Baldwin would be at the Crown and Anchor? This the consideration for Mr. Popham's taking 17,000l. !

But the agreement is confessed in the answer.

The only ground of this being a general rule is in Equity Cases Abridged.

But it must be an agreement set forth in the bill, confessed and plainly appearing; and the statute not insisted upon.

[799] What is the confessed agreement? Not to take 17,000l. at any time, but a certain day. It is not executed, nor can now, nor a compensation be given.

The unexpected and surprizing event in their favour may save the dismission of the bill with costs, which is all they can expect.

*Wales and Baynall.*

Mr. B. could not have been compelled. Mr. F. is a subscriber to this pencil; he does not call himself a witness to it: it does not appear by what authority he subscribed, though it may pretty clearly be guessed with what meaning. Six days after the last day, 30th of June, the deeds are delivered to be executed by Mr. Popham, who says he will have nothing to do with it.

The contract with the purchasors for 16,500l. was with honour, and the indemnity open, and with candour, to secure them at all events.

The substantial party is considered to be Eyre; so he was all along in effect.

Eyre is rejected in November, 1766.

The agreement offered to be signed proves they thought it not executed.

Case where the want of candour and fairness, and not dealing with honest methods, occasioned the Court to refuse enforcing an agreement.

*Barebone and Barnes,* 2 Chancery Cases, 121.

B. possessed and interested in lands for a term of sixty years, paying 5l. per annum, and indebted and in danger of an arrest, by articles sealed, assigned his estate to the plaintiff for 290l. and his tools and utensils on the premisses, then employed in making brick. Articles dated 16th of March.—Proviso to be void if money not paid in five days. Articles not performed, nor money tendered; but there being no proviso in the articles for discharge of defendant, Barnes, for the rent in future, agreed, on advice, that Mr. Barebone should purchase the inheritance, or procure a sufficient person to take the assignment from Barnes, and secure him, and to that end fourteen days farther time. Barebone treated with the reversioners, but they would have nothing to say to him. However, he entered; when does not appear, but it seemed within the fourteen days. On [800] the fourteenth day Price, a hawker came, and brought 290l. no writing was offered or prepared.

One went, treats for the estate, but would not discover the name of the intended purchasor, but carried on the treaty as for himself; but the articles were filled up with the name of Barebone. Barnes sells to Price for 290l. and on Barebone's bringing a bill to have an assignment, it was dismissed.

Though equity will relieve on account of fraud, yet not him who is particeps criminis; still less him on whose side the whole of the fraud lies, and against an innocent person.

Lord Chancellor.—Mr. Ambler, your client is in possession of a decree of the Master of the Rolls. I shall always pay great attention to any solemn determination of his and therefore, at I confess myself shaken by the arguments so very forcibly urged against the decree, I would like to have a little time to recollect the arguments; and I will give you till Saturday.

I will throw out a few hints how it strikes me, as a question of equity, not only important to the parties in this cause, but as a precedent: though, probably, it would go on, and then be a precedent.

This is a bill brought for the specific performance of an agreement. Let us first see whether there be any agreement in writing within the Statute of Frauds.

It is a wise and beneficial statute, and I adopt Lord Nottingham's opinion, that it is so wise and beneficial to the public that it deserved a subsidy, as was the language of those times.

I will adopt the proposition of Lord Hardwicke, that this Court can't repeal an Act of Parliament.

Fraud is a cause on which this Court would interpose to set aside a contract; as

in *Scott and Langstaffe*, and many others.   I don't mean fraud that would make the party liable to an indictment.

I wish you would see, notwithstanding what Mr. Bacon has so widely laid down, whether there is any precedent of the Court enforcing execution of an agreement, under circumstances like this.

*Lord Middleton* against *Wilson and Others.*

1741.   Lord Hardwicke said he thought the Court had already gone too far, in taking agreements out of the Statute [801] of Frauds, and therefore he would never go a step farther, unless warranted by authorities.   I wish, therefore, Mr. Ambler would shew me I am warranted by authorities in confirming this decree.

(A letter has been an agreement; and any writing almost may be an agreement, upon circumstances.)

In the case alluded to by my Lord Hardwicke, *Marquis of Normandy and Duke of Devonshire*, I took a note of Lord Hardwicke's decree, and had an opportunity of looking into Lord Hardwicke's book, and am glad to find my note agree with it in most circumstances.

Lord Hardwicke makes Lord Somers say, "It is very true that the Court has frequently inforced the execution of an agreement on notes and letters, as in the case upon a memorandum, but it is where the agreement is full and complete, and the time fixed.   If not fully and completely set forth this Court will not decree."   *Coles and Masters.*

Treaty of Lord Middleton with Mr. Wilson.   Agreed to give ten years purchase for the land.   And for the house—there were rents upon five cow gates, doubtful whether they were five shillings or one.   3600*l.* and there was an offer on payment of 4000*l.*

It was upon the letter they principally founded themselves; the agreement appeared, and nothing seemed doubtful but this cow gate.   Lord Hardwicke decreed that something being left behind it is not settled, and he decided for a specific performance for Mr. Wilson, against the prior purchaser.

I ought not, therefore, to go farther than the authorities will warrant me to go. I think this Court is not authorised to repeal an Act of Parliament in this or any other case; but they may relieve against fraud, because the statute was made against it.   As when a father charges his son with 1000*l.* for his daughter, the son says you need not charge, I will pay; he shall not avail himself of the statute against frauds to withhold payment.   Mr. Baldwin is not in the circumstances.

Shew me the statute, shew me the precise agreement which he has a right to demand.   Mr. Popham has all along acted with the greatest honour, candour, and fairness.

I should be ready to affirm any decree of his Honour's that I could.   He has acted with great ability in a Court of Equity.   But if I should be persuaded I am to decree a specific performance, there is another point; here is a conveyance to be [802] made, on payment of 17000*l.*   The Court always effectuates payments as if it was at the instant; and this is the reason why the Court is said not always to consider time, because they can make a compensation.   It is to be considered what is to be made.

I should be very sorry to decree in such a case before I had thoroughly considered, and before every thing had been argued, as well for the appellant as in support of the decree; I therefore give till Saturday.

Farther adjourned, on account, I believe, of Mr. Ambler's indisposition, till the first day after the first seal.

5 December, 1774.   At Lincoln's Inn.

Mr. Ambler, in support of the decree.—It is argued that this decree is wrong, because not warranted by precedents.

Because Lord Mansfield named as a party.

It was very proper to make Lord Mansfield at first a party; very improper afterward: because it was not known Lord Mansfield had made an actual conveyance, and the bill must have been dismissed as to him.

Coming too late for a specific performance is objected.

Coming too soon is objected; a very inconsistent objection.   But this could not be when a specific performance had been refused; and the objection would have been very strong if the specific performance had not been demanded early.

Objected, that the Master of the Rolls ought not to have decreed a specific performance.

If it had been right to decree a specific performance, yet that a compensation should have been decreed to Mr. Popham.

It is said that decreeing a specific performance is discretionary in the Court. Stating properly, I admit it, that it is not a thing of course. Discretion in common conversation and in a Court of Justice are very different: for if the party makes a proper title, it is no more discretionary. In a common sense the Court must do it, which is the legal sense to do whatever they shall discern to be just.

Not within the Statute of Frauds is one objection.

[803] Not complete, another.

Not fair, a third.

It is proper first to consider the true ground of the Statute of Frauds; and what was the law before; and how this case can be affected.

Before the statute parol agreements were executed by this Court; but to avoid fraud writing was required.

In conformity to the reason for which writing was required, equity has formed several rules.

The Court will decree performance of an agreement in writing, though not formally drawn.

1st. The Court will decree agreements collected from letters. *More and Hart*, Ch. Rep. 284.

2d. The Court will decree performance of an agreement signed by one only; nothing more common than to see a lease signed by one only, and performance decreed.

3d. The Court will decree if agreement not put into writing at that time, but agreed to be put into writing.

*Leake and Morris*, 2 Ch. R. 135.

1 Ver. 151.   The bill was to have execution of a parol agreement for a lease; the defendant pleaded the Statute of Frauds; the plea was allowed; but Lord Keeper held, if the plaintiff had laid in his bill that it was part of the agreement, that it should be put into writing it would alter the case.

Suppose parol agreement confessed in answer, the Court will decree as if in writing.

The Statute of Frauds was intended to prevent a particular inconvenience; if the agreement is confessed, the inconvenience can never happen which the statute meant to prevent.

The moment he confesses, the agreement is executed according to the statute.

Attorney-General Vez. May 3, 1748-9, for putting an agreement into execution; the statute requires an agreement [804] executed by the party or his agent: yet where the agreement appears, there is no danger of perjury, and it is taken out of the statute.   And, in such case, I should have no doubt to decree against the heir, though I can find no case as the reason goes throughout.

And secondly, his Lordship says, if the agreement had been in part executed.

2 Vern. 455, *Pyke* v. *Williams*.

*Wanley and Sawbridge*, Exchequer, G. 2.

Plaintiff's husband devises an annuity to his wife of 400l. a year, in case she should release jointure.

Said by all the Court except one, though you should not be compelled to confess a promise, yet it was necessary to confess things done to carry the promise into execution.   And if such a confession was required to take it out of the Statute of Frauds, much more shall a voluntary confession be effectual.

Attorney-General and *Ray, Lister and Fox.*

Lord Chancellor.—Is there any case in which there has been a decree founded upon confession? [generally without a part performance].   In some of the cases the Chancellor has been mentioned to have said it, but I never found a decree.

Mr. Ambler continued.—My Lord, I take it as a principle where there is an agreement in writing;

Agreement confessed by the answer;

Agreement in part performed;

That in any one of these three cases the Court will decree a specific performance.

That there is an agreement in writing I must resort to this letter.

Letter which Mr. Popham admits to contain an offer of 16,500l.

He wrote under with a pencil not less than 17,000l.

This is not merely enquiring about the price.

By the answer which says it concludes the bargain, it was so taken.

[805] All the letters to Lord Mansfield; the answers; the directions for conveyances; all evidence in writing.

Is this in part performed?

In case of *Lister*, tenant began to repair.

*Gulter and Halsey*, there must be some act clear, with a view to the performance of the agreement.

What is done here? Settling of the mode of payment; conveyances proffered, certainly with a view to the performance of the agreement.

There is another case where plea over-ruled, because not said whether defendant had tendered a conveyance, for this would have been a part performance.

The purchaser proceeded on his part; sold out stock.

Whether this a certain and complete agreement is to be considered.

I will not take less than 17,000l. I will give 17,000l. Many other things may be added, but more is not necessary to make a certain agreement. The letter, conveyance, draughts—is not all certain? I don't see how any of the parties can make a doubt.

The defendant Mr. Popham acted upon it as a bargain.

It is objected, performance not to be compelled, because no time fixed for the payment.

If the day had been necessary, then no agreement before a Master would ever have been executed, and the inconvenience is exceeding in fixing a day. Disputes about interest would arise; it would be said you have passed the day.

Objected, this is not the agreement originally made, the agreement was varied; therefore the Court will not decree a performance.

Suppose it sufficient as it stood originally.

The alteration is for the accommodation of parties, not material in its nature, and by the consent of the parties themselves.

If the agreement had been carried into execution by the parties themselves or the Court, and the 17,000l. never had been paid to Mr. Popham, it was not necessary he should dispose of [806] it; it was to be paid to the use of the fund, it might have been proper and sufficient to pay it to the mortgagee, to whom Mr. Popham must have paid.

Objected, that it is a conditional agreement, and condition not performed: and therefore agreement void.

How does this agree with the objection that no day fixed? I know of no case but of a creditor accepting a less sum on condition of payment at a certain day; there the Court will not decree a performance when the day is passed.

No day fixed here; but if it had, what was done by the parties?—The delay is allowed.

On account of engagement to pay Lord Mansfield, notice given. This is not the fact, and Lord Mansfield did not demand, and it is not in evidence. Mr. Popham has suffered very much by the delay, leases, improvement of the estate. This, if it be true, is another question.

Next the head of defraud and deceit. If this could have been conducted fraudulently and deceitfully no doubt it should not have availed the person guilty of fraud. But I beg permission to ask whether there has been any fraud or deceit. What is the difference? May not the person treated with convey over to the other the next day? The case of *Philips and The Duke of Buckingham* says he may.

If a party were to say, I have treated with you as a principal, I find you are agent for another, I therefore will not execute; the Court would dismiss the bill with costs.

Lord Chancellor.—Mr. Popham had expressly declared, he would not treat with them.

Mr. Ambler proceeded.—I come to that part.—Where is the fraud, when Mr. Popham had said he would not treat personally with Mr. Eyre, that he should treat with him by another person?

K. B. XXVII.—30

The only case in which a man can be said to act deceitfully is, where the purchaser shall not be bound.

The reason why Mr. Popham refused to treat with Mr. Eyre was, because Mr. Eyre had not the money ready. The money was ready. If Mr. Popham had not been too hasty, and had waited till the Tuesday, he had seen it.

The letter written by Mr. Stokes, I think, is conclusive of the affair.

[807] "When you treated for 17,000l. ready money to be paid at Lady-Day, Mr. Popham had already refused you for a purchaser. Mr. Popham therefore will not treat with you, nor any of your profession, for the professed purpose of selling out in parcels, because he foresees an inconvenience both to him and Lord Mansfield However if Mr. Baldwin will pay the money within the course of this week, with interest at four per cent. from Lady-Day, Mr. Popham will be ready to accept it."

Suppose he had waited to see.

Upon the Saturday preceding he gives the answer; if he had waited till the Tuesday, he might have made the objection if the money was not ready.

As to the cases cited, I think, that I ought not to go into them.

I know but of one upon which the gentlemen have not much relied, upon which, I beg leave to rely as a case in point for Mr. Eyre.

*Barebone and Barnes.* This was not the case of a substantial man, but a man worth nothing, and rents reserved upon the estate, which the seller would have been liable to pay if the other could not.

*Mr. Garrick's case.* A particular person whom the person treating with, would not turn out this not in writing, the purchaser said that he had talked with the person and no objection. Here was a direct fraud, not merely a treaty without saying for whom, which neither Mr. Baldwin nor his agent were obliged to do.

*Philips and Duke of Buckingham,* a case which does not apply : for neither one nor the other of the parties allowed the contract. But if the person whose name was used had taken up the case, and said that he meant it to be purchased in his name, and he would have it the Court would have decreed. If Mr. Eyre says Baldwin treated for him, this is the very case. The bill is brought in the name of Mr. Eyre and Mr. Baldwin. If Mr. Baldwin declares he will pay he has a right to insist for himself.

Next, suppose the decree of a specific performance whether any, and what compensation to Mr. Popham? I wish he would have said what kind of compensation.

A Court has never said, the seller shall take the rents and profits, and interest for his money.

[808] When a man is let into possession, he often pays the rent from the last pay day, and the Court often divides.

It is suggested the estate is greatly improved; lives are dropt; Mr. Eyre will be a gainer; Mr. Popham ought to have something for the loss;—no evidence of any great loss. He pays interest to his mortgagee, this is his own fault; he keeps the rents and profits of his estate. In what manner or what kind of compensation shall he have?

He sells at 500l. loss, then how can he gain? He is rather interested that Mr. Eyre should be purchaser.

Lord Chancellor.—This is a bill brought by Eyre and Baldwin against Mr. Popham, in order to prevail on this Court to decree a specific performance of the agreement, which it is said Mr. Popham has entered into with the plaintiff Baldwin, for the sale of an estate for the sum of 17,000l.

The first question in this cause will be, what was that agreement which is now prayed to be specifically performed. And I was in hopes the counsel for the plaintiff would have stated specially what this agreement was.

Next, supposing there was such an agreement whether it ought to be performed?

As to the first, I examined the answer and depositions, and if there was an agreement it was on the 30th of June, that in consideration of 17,000l. to be paid 10,000l. to Lord Mansfield, (and which Lord Mansfield accepted) and 7000l. to be left as a security upon the estate, the defendant should convey to Eyre: and they aver on their part, that the deed was tendered to Lord Mansfield who accepted.

This is not an agreement in writing upon the Statute of Frauds; but the question is, whether it is an agreement which so appears as that the Court will decree a performance. It has been said that it is a known rule in this Court that where an

agreement appears confessed, the Court will decree a performance, though no part has been performed; some dictums there have been: but Mr. Ambler confesses that, he has found no decree.—That where the substance clearly appears though in parol without any part performed this Court will decree an agreement to be executed. I think it cannot be possible; this Court cannot repeal the Statute of Frauds nor any statute. The King has no such power by the constitution entrusted in him; and therefore, there can be no such power in his delegates.

[809] The only case I know that takes a contract out of the statute is of fraud. And the jurisdiction of this Court is principally intended to prevent fraud and deceit; where a party has given ground to another to think he had a title secured, the Court will secure it to him.

The ground therefore in making or refusing decrees has been fraud. It can never have been laid down by the Court that where the substance appears, it shall be executed. It would not have been so at common law.

In reading of Bracton, about forty years ago I made a selection; of which the following is a part.

De acquirendo rerum dominio, l. 2, cap. 27.

Emptio vero et venditio contrahitur cum de pretio convenerit inter contrahentes; dum tamen a venditore arrarum nomine aliquid receptum fuerit: quia quod arrarum nomine datum est argumentum est emptionis et venditionis contractæ. Et in scriptura intervenire debeat non erit perfecta emptio et venditio nisi cum fuerit partibus tradita et absoluta. Et cum arrae non intervenerint vel scriptura, nec traditio fuerit subsequuta, locus erit pœnitentiæ et impune recedere possunt partes contrahentes a contractu sed si pretium solutum fuerit vel ejus pars, et traditio subsequuta, perfecta est emptio et venditio; nec potest postea aliquis contrahentium a contractu resilire, prætextu pretii non soluti in parte vel in toto, sed agere poterit venditor, ad recuperandum id quod de pretio defuerit, per actionem competentem sed non ad ipsam rehabendam.*

This Court never alters the common-law; but in particular circumstances it extends relief, which the common-law its generality had not provided. But for fraud and circumvention there would have been at common-law a relief similar to that which Courts of Equity give, either by dissolving or affirming the contract as the conscience of the case requires; for at common-law a man should not take advantage of his own wrong. And common-law would have given the party injured by such contract damages at least; equity restores him to that state in which he would have been if no unfair practices had been used. Common-law in many instances considers a fraudulent contract absolutely void; except as against the author of the fraud, or those who knowingly contributed to it: but as against such persons valid. And equity in this Court [810] has peculiar means and rules for the purpose of this relief, and to guide the Court in extending or withholding it.

Let us see how far the Court has gone.—Where there has been a contract clear though not in writing, yet if afterwards the party has refused to execute, there if any fraud the Court have not permitted the refusal, where the agreement has been very explicit, and the other party has acted upon the faith of it.

Lord Somers is said, in the note I have out of Lord Hardwicke's note-book, to have expressed himself thus.

Lord Hardwicke stated the case of *The Marquis of Normandy*, and then cited Lord Somers. "It is true the Court has frequently and justly interposed for the execution of an agreement, though the agreement only contained in a letter. As in the case of *M. and Hart* where the plaintiff had married upon the credit of it. So where the agreement is confessed upon the defendant's answer, but such answer must contain the full and complete agreement; for if any thing remains unsettled, the Court will refuse as in the case of *Coke and Masters*, before Lord Jefferies."

Lord Somers seemed therefore to think upon the case of *M. and Hunt*, that there must be something done. The plaintiff had married upon the credit of it. In the case of *The Marquis of Normandy*, part of the money had been paid. Is this agreement

---

* These leading rules, which prevail still, were therefore received and in settled practice, as it is reasonable to collect from hence in the reign of Hen. 3, more than five hundred years ago; and the Statute of Frauds four hundred years after the times of Bracton, did, as to this part of it, little more than declare them.

complete and proved? And is it such, upon the circumstances, that the Court will execute it? Suppose there had been an agreement to pay the money, and on the other to receive; but the time did not appear. (Which is always material, but particularly in the case of a mortgagor, where the mortgagee takes four per cent. and was to take five if not paid.) This is so material that Mr. Ambler admits, if Mr. Popham had waited till Tuesday and not been paid, he would have had a right to refuse.

What performance then? If the defendant paid to Lord Mansfield 10,000l. upon the 30th of June, he would execute the conveyance, and take the security for the rest. No money upon the 30th of June.

Mr. Baldwin's agent writes, that he is surprized the treaty does not go on; but it is very well, as Mr. Baldwin is on the eve of a purchase which may be more advantageous. And that Mr. Stokes must be apprized of the scarcity and value of money. After all, if Mr. Stokes and he should agree, he will be at the Crown and Anchor. No treaty settled then, only that it was very well; if they should conclude, he should be at the Crown and Anchor. Mr. Popham writes he won't take less than 17,000l. perhaps then he will take 17,000l. if you will pay on a day mentioned; **[811]** and some time after Mr. Baldwin writes back that he will give 17,000l. " which concludes the bargain." Was this sufficient? No day. Was it an agreement complete? The distinction in the case of *Gulter and Halsey* was in this very different.

Does Mr. F. the agent for the plaintiffs, consider it as an agreement, though he says, it concludes the bargain? He wants a line for his satisfaction.

An abstract delivered; what is this? Only evidence of a treaty in contemplation which might come to be executed.

The terms are altered the 13th of May; application to Lord Mansfield. Lord Mansfield approves. Mr. Stokes hopes Mr. Baldwin's money will be ready in ten days; agrees to wait.

17th of June, Lord Mansfield's agent writes, his Lordship has appointed Monday at five in the afternoon to execute, as Mr. Stokes fixed upon that day; Mr. Popham writes that he hopes Mr. Baldwin will be punctual, as he has so often been disappointed, and that he shall think himself at liberty, and obliged to treat with another purchaser, if the money be not paid by Monday next. Here then Mr. Popham was bound to the Monday.

However they are not ready on the 28th of June. And it is said for the plaintiffs that the deeds were necessary to be transcribed, and on or about the 30th of June was appointed for executing the conveyance. Appointed; by whom? I suppose by those who thought it best the conveyance should be re-ingrossed; and this was so material, that Mr. Ambler confesses, if they had not paid on the 30th of June, this would have been sufficient to have put it off.

Mr. Stokes writes.—As Mr. Popham agreed to defer for your accommodation, if the money be not paid immediately, Mr. Popham will take such measures as he shall be advised.

Mr. Ambler, though he admits Mr. Popham would have been at liberty, if payment were not made on the 30th of June, yet in another place says the time of payment is not material; it was very material when five per cent. interest was to be paid if the mortgage not discharged. It is always material.

The 22d of June is the last day·that appears. But something afterwards was done. They went and caused the conveyance to be re-ingrossed. Mr. Stokes, the person who engrossed for the plaintiffs, has done what I am sorry to say all the parties applying for a specific agreement and their agents have done, endeavoured to impose on the Court. One would understand that the engrossment was **[812]** offered with the name of Eyre instead of Baldwin. It cannot be; because the very purpose of the re-ingrossment was to change the names, and put Eyre instead of Baldwin. It is denied by Stokes, and not sworn by S.

He says that, according to the best of his remembrance and belief, the deeds were ready the 21st of June for execution by Mr. Popham, who wanted to go out of town directly. And the deeds were re-ingrossed for the purpose of putting in Eyre's name instead of B. and there were several blanks in the said re-ingrossments.

Mr. Stokes helped to fill up the blanks in the re-ingrossments with the name of the said F. Eyre, instead of Baldwin. As I read it you would think it was, helped to fill up the blanks with the name; but it is to be read, helped to fill up the blanks of

date and sums in the re-ingrossments; which re-ingrossments had the name of Eyre
instead of B. (that is) afterwards inserted. It is not possible, in the sense in which it was
meant to be taken; if it had they should have produced the re-ingrossments, and
shewn that Mr. Stokes was capable of swearing to deny his own hand.

It is a most scandalous effort to impose upon the Court.

Mr. Eyre's clerk swears in the same manner.

Mr. Eyre swears he has 4000l. in his banker's hands, exclusive of 3000l. The
proper manner would have been, if this could have been sworn, to say that he had
7000l. in the banker's hands; but it does not appear where the 3000l. were. It
cannot be in his banker's hands, because the notes in his own hands were certainly
not with his banker. And he adds, and of bills and notes in his own possession.

And this is very material, with regard to what I shall add. I said they were all
in the same evasive manner. The agent for the plaintiff swears he had instructions
from the complainants, or one of them, to treat for the purchase. He might never
have a single instruction from Baldwin, and yet this be true.

Exclusive of 3000l. the produce of stock sold out—this money was borrowed, and
it was not his own. And yet who would not have taken, from the swearing, that it
was his own?

But the material thing is, the 30th of June was not the day agreed upon between
the parties; the 22d of June was the last day.

What are the circumstances, from beginning to end, to make a Court of Equity
compel an agreement, upon considerations of equity not within the statute?

[813] What are offered are these. Part performed, because the abstract was
delivered, conveyances drawn, and money borrowed. This was never the meaning; it
is where the party does something as owner.

Mr. Popham, very much indebted, wants to sell his estate, in order to lessen his
debt. Lord Mansfield agrees to take as much as this estate will sell for, in order to
lessen the debt. Eyre proposed; Stokes writes. Eyre says he has not ready money
sufficient. This will not answer Mr. Popham's purpose; he will have nothing to do
with him. Then he acts behind the curtain: he treats in Mr. Baldwin's name. There
is an evasion. This agent said he had orders from the complainants, or one of them,
it might be from Eyre. And he makes Baldwin write a letter. Is this generous?

But it goes farther, the agent for the plaintiff, writes a letter.

He goes away to Mr. Popham (I can't help using an hard expression) in order to
draw him in. He carries the letter; he furnishes the pencil; Popham says I will not
take less than 17,000l. He then writes back that Mr. Baldwin will give that price;
so now the bargain is concluded. A short conclusion.

"But pray, sir, for my sake, only write a line." No circumvention, no design, to
enable counsel to say it's in writing, it's an agreement within the statute.

Two days after the agent goes, with a writing ready signed, and proffers it. Mr.
Popham says, "I will do nothing till I see Mr. Stokes." Was this fair? A country
gentleman, unacquainted with law, to get him to sign by himself, in the absence of his
attorney, a writing with no specified time of payment? Is it candour to entitle to a
relief in a Court of Equity? However, Mr. Popham wanted his money; he sends his
abstract; the time is put off, not by Mr. Popham. On the fourth of March the
money to be paid; on the 25th of March not paid; then they enter into a new
bargain. Now, therefore, it was all in treaty: and this was that the money should
be paid 22d June, 10,000l. to Lord Mansfield.

Deed carried to Mr. Stokes, with the names, that is as already explained. After
this Mr. Popham sees it; he is thunderstruck to discover he has been treating all the
while with Mr. Eyre, in the name of Baldwin.

Has Mr. Popham been guilty of any fraud or circumvention? Has he not suffered
most materially, by paying interest at five per cent. from the 25th of March? Was
he not forced to sell, with 500l. loss?

[814] The bill was brought immediately, but it was dismissed two or three times,
and made as late as it could, by the delay of the plaintiffs. And this is extremely
material, when a specific agreement is insisted on, and the party to be compelled to
suffer all the while for the delay.

It is incredible what Mr. Popham must suffer; he must pay all the money back,
with interest. On the part of the purchasors he has engaged with them, and bound

himself to pay back, and given security, and he must pay five per cent. from 1767, to the mortgagee.

I am sorry to have said so much. The Master, I have no doubt, thought himself bound by the rules: there can be no other reason. I see the rules in another light. And the Court has never compelled an agreement but upon the case of fraud, to take it out of the Statute of Frauds, where no part has been performed; unless it has been clearly proved in writing subsequent, either by answer or otherwise.

But here the most material part has not been proved, which is the time; which is necessary to be proved whenever the parol agreement is to be executed.

The next material thing, that he had the money ready, is not proved; but the reverse is proved. There is no fraud in the defendant; nor is it such an agreement, taking this as proved, which the Court would execute.

I am, therefore, of opinion, that the decree of the Master ought to be reversed.

My only doubt—indeed the only hesitation that I have, is upon the manner of swearing to the filling up the blanks; the swearing to the money, and the other evasive circumstances, whether I ought not to reverse the costs.

The only reason that induces me not to do it is this, I should be very sorry to add costs which could not afterwards be discharged, where they have had a decree.

If it had regularly come before me I would have dismissed it with costs: and, as I differ from the Master, I wish they may appeal; because I think there is a judicature which can dismiss it with costs.

Bill dismissed.

**AD-9**

A

# TREATISE

### OF

# EQUITY.

A

# T R E A T I S E

OF

# E. Q U I T Y.

WITH THE ADDITION OF

MARGINAL REFERENCES AND NOTES;

By JOHN FONBLANQUE, Esq.

BARRISTER AT LAW.

## VOLUME THE FIRST.

D U B L I N:

PRINTED FOR MESSRS. BYRNE, J. MOORE, W. JONES,
E. LYNCH, AND H. WATTS.

1793.



# A
# T A B L E

OF THE

## CONTENTS OF THE FIRST VOLUME.

## B O O K  I.

*Of the Nature of Equity, and of Agreements in general.*

### C H A P  I.

Of the Nature of Equity.

Sect. *OF law and juſtice diſtributive and commutative.*
Page 1.

2. *The ſubject of the preſent Treatiſe, voluntary contracts only.* 4

3. *Of the nature of equity.* 9

4. *Contracts to be performed* in ſpecie. 24

5. *The law of* England *defective in this point.* 27

6. *The reaſons in ſupport of it anſwered.* 31

7. *Any agreement to be decreed in equity.* 34

8. *Though not ſpecifick,* &c. 38

CHAP.

viii          .          A TABLE of the CONTENTS.

/

# C H A P  II.

Of the Assent required in Agreements.

Sect.  1. *The contracts of ideots and madmen bind them-*
          *selves at law.*                    Page  40
       2. *But may be avoided in equity.*            47
       3. *This not extended to persons of a weak under-*
          *standing.*                               56
       4. *Infants disabled to contract, except for necessaries.*
                                                    67
       5. *Where they are bound by their acts*      76
       6. *Of the acts of feme coverts.*            84
       7. *Where ignorance or error shall invalidate the*
          *contract.*                               76
       8. *of fraud and surprize.*                  111
       9 ⎫
          ⎬ *Of the equality required in contracts.* 116. 118
       10. ⎭
       11. *This not extended to hazardous bargains.*  121
       12. *But unconscionable bargains with young heirs set*
          *aside in equity.*                        123
       13. *How far these contracts are binding.*   128
       14. *Where they may be confirmed afterwards*  131

# C H A P.  III.

Of the Want of Testimony of the Assent.

Sect.  1. *Any word that shews the intent sufficient.*   134
       2. *The addition of a bond or penalty does not alter*
          *the case.*                               141
       3. *Where equity will give another remedy than the*
          *party has provided.*                     144

A TABLE OF THE CONTENTS.                    ix

Sect. 4. *An affent implied, fufficient.*          Page 151
     5. *But equity will not decree a performance where
         the intent was only to give damages.*     156
     6. *Or where the agreement was incomplete and im-
         perfect.*                                 158
     7. *Or incertain and wavering.*               161
     8. *Of the ceremonies required in agreements for lands
         by the* 29 Car. 2. cap. 3.                164
     9. *Where equity will relieve notwithftanding that
         ftatute.*                                 176
    10. *Of other branches of that ftatute that relate to
         marriage-agreements and wills.*           179
    11. *Where an agreement by deed may be fupplied by
         averment.*                                188
    12. *Of the affent of the perfon that takes.*  193

## C H A P.  IV.

### Of the Subject Matter of Covenants.

Sect. 1. *Agreements receive all their force from the abi-
         lities of the parties.*                   197
         2. *Yet*

Sect. 2. *Yet a man may bina himself to any thing not in itself impossible.* Page 201

3. *And even at law, a man is buund to do all that lies in his power.* 209

4. *But to make an agreement good, he must have both a natural and a moral power.* 212

5. *Nor will the law give any countenance to an illegal act.* 220

6. *Of gaming debts.* 222

7. *Of usurious contracts.* 226

8. *Of insurances.* 236

9. *Of bottomry, or Fœnus Nauticum.* 241

10. *Of the rule,* Quod matrimonium debet esse liberum. 245

11. *Of secret and underhand agreements.* 256

12. *Of fraudulent agreeements within* 13 Eliz. 260

13. *Of fraudulent conveyances by* 27 Eliz. 267

14. *Of the statute of fraudulent devises,* 4 & 5 W. & M. 273

15. *Of fraud against the custom of London.* 276

16. *Where equity will give relief.* 278

17. *No man can bind the interest of another.* 282

18. *Of contracts made for a third person.* 285

19. *Of the power of tenant in tail of a legal estate.* 288

20. *Of tenant in tail of a trust or equitable interest.* 293.

21. *Of the acts of corporations or bodies politic.* 295

22. *In what capacity they shall be taken.* 297

23. *Of the power of a feme covert over her inheritance.* 300

24. *Where equity will take away the benefit of survivor from her.* 304

25. *Of*

A TABLE of the CONTENTS.                    xi

Sect. 25. *Of priority of conveyance and powers of revo-*
          *cation.*                              Page 310
      26. *Of unreasonable agreements.*              318
      27. *Of dormant rights.*                       319

## C H A P.  V.

What a sufficient Consideration to make an Agreement binding.

Sect. 1. *At law.*                                   326
      2. *In equity.*                                339
      3. *It must be a stronger than there is on the other*
          *side.*                                    342
      4. *Purchasers bound only by covenants as at law.*  344
      5. *Unless particular equitable circumstances.*   347
      6. *Or in case of fraud.*                       350
      7. *Where a general covenant to settle lands shall bind*
          *a purchaser without notice.*              355
      8. *Where the ceasing of the consideration avoids the*
          *agreement.*                               361
      9. *Of the apportionment of rents.*            375

## C H A P.  VI.

Of the execution of the Agreement.

Sect. 1 *The heads of a contract are so many conditions.*
                                                     380
        2. *The*

Sect. 2. *The plaintiff therefore is first to perform all on his part.*                                Page 383

3. *But if he has performed part, and is in no default, he shall have an execution of the agreement.*                                      385.

4. *Where equity will relieve the want of performance of a condition.*                          387

5. *Where not.*                                          391

6. *As to the manner of the execution there are some rules peculiar to equity, as the difference between gainful and chargeable contracts.*          393

7. *So in the limitation of the estates, where there is a valuable consideration, equity will supply words of art.*                                     395

8. *But not in case of a bare volunteer.*           399

9. *So equity looks upon a thing agreed to be done, as actually performed.*                         413

10. *Where not.*                                         416

11. *Of the rules of the municipal law, 1st, Words to be taken in the common acceptation.*      419

12. *The time as well as place to be considered.*   424

13. *But all the clauses in covenants to be interpreted by one another.*                             427

14. *And several deeds made together are to be taken as one assurance.*                              430

15. *The chief and governing rule of construction is drawn from the end or cause.*                432

16. *So words to be construed* secundum subjectam materiam.                                          434

17. *Yet equity will sometimes carry the conveyance beyond the intent.*                              437

18. Ne

A TABLE of the CONTENTS.                    xiii

Sect. 18. Ne res pereat, *the deed may be taken in the most*
      *extensive sense.*                    Page 438
   19. *Of the difference between testaments and deeds.*
                                    442
   20. *Of the implied intent.*                    447

A  T R E A-

'for which he bargained; for then the bufinefs is null in itfelf, by the general rules of contracting, inafmuch as in all bargains, the matter about which they are concerned, and all the qualities of it, ought to be clearly underftood, and without fuch diftinct knowledge, the parties cannot be fuppofed to yield a full confent (x).

(x) The writers upon natural law maintain, that an error about a thing, or about its quality, upon profpect of which a man is induced to come to any agreement, renders the agreement or bargain void; for in fuch cafe, a man is not conceived to have agreed abfolutely, but upon fuppofal of the prefence of fuch a thing or quality, on which, as on a neceffary condition, his confent was founded, and therefore, the thing or quality not appearing, the confent is underftood to be null and in effectual, Puffendorff's Law of Nature and Nations, b. 1. c. 3. f. 12.; and the civil law feems, upon this principle, to have required the feller, in fome cafes, to declare the defects of the things fold, Dig. lib. 21. tit. 1. l. 1. f. 1. Domat's Civil Law, book 1 tit. 2. f. 11. See Cicero de Officiis, lib. 3. c 12, 13, 14. where this matter is very elaborately difcuffed. But the general rule of the common law of England is caveat emptor, upon which rule it feems, that the vendor, without an exprefs warranty, merely undertakes to make a good title to the vendee; to fhew, that the goods delivered are fuch as were contracted for, and that no deceit was practifed to difguife their
defects;

• A TREATISE

defects ; and if provifions, that they were wholefome at the time of the delivery, 3 Bla. Com, 164, 165. If the warranty be exprefs, an action will lie upon it to recover damages, unlefs the defect was apparent, and fuch as a common purchafer might have difcovered at the time of the fale, ibid. It may be proper, however, to obferve, that it is not every affirmation on the part of the vendor, that will amount to a warranty ; for though falfely affirming the goods to be his own, he being in poffeffion of them, when they were the goods of another, will fubject the vendor to an action upon the cafe, without charging him with knowingly having fo falfely affirmed, Croffe v. Gardner, Carthew, 90. Medina v. Stoughton, 1 Salk 210. yet if he affirm falfely of his right, when another has the poffeffion of the fubject, an action will not lie, Rofwell v. Vaughan, Cro. Jac. 196.; neither will an action lie upon a mere affirmation, if the vendor knew not of the defect at the time of the fale, 1 Comyns's Dig. 184. ; or that the quality of the thing was different from what he affirmed, Chandler v. Lopus, Cro. Jac. 4. See c. 5. f. 8. p. 364. note (g). p. 371. note (h).

**AD-10**

THE

# LAW OF FRAUD

AND THE

## PROCEDURE

PERTAINING TO THE REDRESS THEREOF

BY

MELVILLE M. BIGELOW

AUTHOR OF "THE LAW OF ESTOPPEL," ETC.

BOSTON

LITTLE, BROWN, AND COMPANY

1877

*A 18899*

*6D10*

*B41646  C. 2*

Entered according to Act of Congress, in the year 1877, by

MELVILLE M. BIGELOW,

In the Office of the Librarian of Congress, at Washington.

*Cambridge:*
*Press of John Wilson & Son.*

# CONTENTS.

PAGE

CASES CITED . . . . . . . . . . . . . . . . . xvii
INTRODUCTION . . . . . . . . . . . . . . .. . . . lvii

## PART I.

### SUBSTANTIVE LAW OF FRAUD.

#### I. ACTUAL FRAUD.

##### CHAPTER I.

DECEIT . . . . . . . . . . . . . . . . . . . . .   3
 § 1. Introductory . . . . . . . . . . . . . . . .   3
 § 2. Of the Nature of the Representation, including Conceal-
        ment . . . . . . . . . . . . . . . . . . .   4
 § 3. Of the Wrongdoer's Knowledge of the Falsity of the
        Representation . . . . . . . . . . . . . .  56
 § 4. Of the Ignorance of the Complaining Party, and his Belief
        in the Truth of the Representation . . . . . . .  64
 § 5. Of the Intention that the Representation should be Acted
        upon . . . . . . . . . . . . . . . . . . .  82
 § 6. Of Acting upon the Representation . . . . . . .  85

##### CHAPTER II.

SPECIAL FRAUDS IN PAIS . . . . . . . . . . . . .  92
 § 1. Introductory . . . . . . . . . . . . . . . .  92
 § 2. Of Frauds between Husband and Wife . . . . . .  92
 § 3. Of Confusion of Goods . . . . . . . . . . . .  97

|                                                                        | PAGE |
| --- | --- |
| § 4. Of Alteration of Written Instruments | 98 |
| § 5. Of Resulting Trusts | 107 |
| § 6. Of Wills | 120 |
| § 7. Of Bills and Notes | 128 |
| § 8. Of Fraud on Powers | 132 |
| § 9. Of Inadequacy of Consideration | 136 |
| § 10. Of Public Sales | 141 |
| § 11. Of Partnership | 146 |
| § 12. Of Sureties | 150 |
| § 13. Of Corporations | 151 |
| § 14. Of Illiterate, Weak-minded, and Drunken Persons | 155 |
| § 15. Of Delivery of Deeds | 156 |
| § 16. Of Possession of Title-Deeds | 157 |
| § 17. Of Lien of Innkeeper or Carrier | 158 |
| § 18. Of Suppression or Destruction of Writings | 158 |
| § 19. Of Releasing Judgment | 159 |
| § 20. Of Repeal of Usury Laws | 159 |
| § 21. Of Surprise | 160 |
| § 22. Of Acts of Third Persons | 161 |

## CHAPTER III.

| FRAUDS ON THE ADMINISTRATION OF THE LAW | 165 |
| --- | --- |
| § 1. Of Attachments, Abuse of Process, &c. | 165 |
| § 2. Of Domicil | 168 |
| § 3. Of Sales and Knowledge of Intended Fraud | 169 |
| § 4. Of Judgments and Awards | 170 |

## CHAPTER IV.

| WAIVER AND CONFIRMATION | 184 |
| --- | --- |

---

## II. PRESUMPTIVE OR CONSTRUCTIVE FRAUD.

## CHAPTER V.

| CONFIDENTIAL RELATIONS AND THE LIKE | 190 |
| --- | --- |
| § 1. Introductory | 190 |
| § 2. Of Attorney and Client | 192 |
| § 3. Of Principal and Agent | 222 |

CONTENTS.                                xi

|                                                                        | PAGE |
| § 4. Of Partners | 232 |
| § 5. Of Trustees | 236 |
| § 6. Of Guardian and Ward | 250 |
| § 7. Of Executors and Administrators | 254 |
| § 8. Of Mortgagor and Mortgagee | 259 |
| § 9. Of Parent and Child | 261 |
| § 10. Of Physician and Patient | 266 |
| § 11. Of Draftsman of Will taking Benefit | 267 |
| § 12. Of Engagement to Marry | 271 |
| § 13. Of Illegal Marriages or Relations | 271 |
| § 14. Of Spiritual Advisers | 272 |
| § 15. Of Volunteers | 272 |
| § 16. Of Cotenants.  Tenants for Life | 273 |
| § 17. Of Joint Purchasers | 274 |
| § 18. Of Expectant Heirs | 274 |
| § 19. Of Sailors | 278 |
| § 20. Of Aged Persons | 278 |
| § 21. Of Illiterate, Weak-minded, and Drunken Persons | 279 |

CHAPTER VI.

| NOTICE | 288 |
| § 1. Of Putting One on Inquiry | 288 |
| § 2. Of Lis Pendens | 300 |
| § 3. Of Registration of Instruments | 302 |
| § 4. Of Purchasers without Value | 307 |
| § 5. Of Principal and Agent, Client and Attorney, &c. | 315 |

PART  II.

ADJECTIVE  LAW  OF  FRAUD.

PROCEDURE  AND  INCIDENTS  THEREOF.

CHAPTER  VII.

| JURISDICTION | 321 |

## CHAPTER VIII.

PAGE

WHO MAY ALLEGE FRAUD . . . . . . . . . . . . 336
  § 1. Introductory . . . . . . . . . . . . . . 336
  § 2. Of Damage to Person not Intended . . . . . . . 336
  § 3. Of being *Particeps Criminis* . . . . . . . . . 337
  § 4. Of the Personal Nature of Fraud . . . . . . . 346
  § 5. Of Suits by Personal Representatives . . . . . . 349
  § 6. Of Suits by Distributees. . . . . . . . . . . 351
  § 7. Of Suits by Assignees . . . . . . . . . . . 351
  § 8. Of Suits by Stockholders on Behalf of Corporations . 351.
  § 9. Of Suits by Partners and Joint Contractors . . . . 352
  § 10. Of Contribution . . . . . . . . . . . . . 353
  § 11. Of Infant's Suit by Next Friend . . . . . . . . 353

## CHAPTER IX.

AGAINST WHOM FRAUD MAY BE ALLEGED . . . . . . 355
  § 1. Of the Wrongdoer. . . . . . . . . . . . . 355
  § 2. Of Infants . . . . . . . . . . . . . . . 355
  § 3. Of Married Women . . . . . . . . . . . . 358
  § 4. Of Agency . . . . . . . . . . . . . . . 361
  § 5. Of Partners. . . . . . . . . . . . . . . 371
  § 6. Of Conspirators and the Like . . . . . . . . . 378
  § 7. Of Cotrustees . . . . . . . . . . . . . . 379
  § 8. Of Coexecutors or Administrators . . . . . . . 379
  § 9. Of Codistributees . . . . . . . . . . . . . 383

## CHAPTER X.

DEFENCES TO SPECIFIC PERFORMANCE . . . . . . . . 384
  § 1. Introductory . . . . . . . . . . . . . . 384
  § 2. Of the Statute of Frauds. Parol Agreements. Part
       Performance . . . . . . . . . . . . . . 385
  § 3. Of Terms of Decree. Discretion of Court . . . . 390
  § 4. Of Wills. Promise to Testator as to Disposition of
       Property . . . . . . . . . . . . . . . 392
  § 5. Of Taking Advantage of Weak-minded or Illiterate
       Persons . . . . . . . . . . . . . . . 392
  § 6. Of Inadequacy or Over-valuation . . . . . . . 393
  § 7. Of Family Arrangements . . . . . . . . . . 395

PAGE

§ 8. Of Innocent Lessees . . . . . . . . . . . . 395
§ 9. Of Mistake . . . . . . . . . . . . . . . . 396
§ 10. Of the Illegality of Contracts . . . . . . . . 397
§ 11. Of Direct Fraud . . . . . . . . . . . . . 397
§ 12. Of Acts of Agents . . . . . . . . . . . . 398

CHAPTER XI.

RESCISSION . . . . . . . . . . . . . . . . . . 400
§ 1. Introductory . . . . . . . . . . . . . . . 400
§ 2. Of Damage . . . . . . . . . . . . . . . 400
§ 3. How and for what Rescission is allowed . . . . . 401
§ 4. Of Compensation instead of Rescission . . . . . 407
§ 5. Of Tender of Performance or Return of Consideration, 408
§ 6. Of Waiver of Right to Rescind . . . . . . . . 424

CHAPTER XII.

CROSS-ACTIONS AND NEW TRIALS . . . . . . . . . 428

CHAPTER XIII.

ESTOPPEL IN PAIS . . . . . . . . . . . . . . . 438

CHAPTER XIV.

LACHES AND STATUTES OF LIMITATION . . . . . . . 441

CHAPTER XV.

PLEADING . . . . . . . . . . . . . . . . . . 450
§ 1. Of the Allegation of Fraud . . . . . . . . . 450
§ 2. Of the Denial of Fraud . . . . . . . . . . . 454
§ 3. Of Demurrer . . . . . . . . . . . . . . . 456

CHAPTER XVI.

PRACTICE . . . . . . . . . . . . . . . . . . 458
§ 1. Of Parties . . . . . . . . . . . . . . . . 458
§ 2. Of the Form of Remedy . . . . . . . . . . 460
§ 3. Of Discovery . . . . . . . . . . . . . . . 464
§ 4. Of Charges of Actual Fraud . . . . . . . . . 465

xiv                                    CONTENTS.

                                                                PAGE
§ 5. Of the Denial of Fraud . . . . . . . . . . . 467
§ 6. Of Amendment . . . . . . . . . . . . . 467
§ 7. Of Law and Fact . . . . . . . . . . . . . 468
§ 8. Of Verdicts Contrary to Evidence . . . . . . . 470
§ 9. Of Fraud on Dower Rights . . . . . . . . . 470
§ 10. Of Survivorship of Actions . . . . . . . . . . 471
§ 11. Of Submission to Judgment . . . . . . . . . 471

## CHAPTER XVII.

EVIDENCE . . . . . . . . . . . . . . . . . . . . . 472
§ 1. Of Courts of Law and Courts of Equity . . . . . 472
§ 2. Of Fraud in Law and Fraud in Fact . . . . . . 474
§ 3. Of Preponderating Evidence . . . . . . . . . 474
§ 4. Of Circumstantial Evidence . . . . . . . . . 476
§ 5. Of Evidence of Other Frauds . . . . . . . . . 478
§ 6. Of Evidence of Conspirators and Joint Trespassers . 483
§ 7. Of Declarations of Defendant or his Predecessor . . 485
§ 8. Of Parol Evidence . . . . . . . . . . . . 487
§ 9. Of Variance. *Allegata et Probata* . . . . . . . 490
§ 10. Of the Burden of Proof . . . . . . . . . . . 493
§ 11. Of Evidence in Rebuttal . . . . . . . . . . 497
§ 12. Of Criminating One's Self . . . . . . . . . . 498
§ 13. Of Privileged Communications . . . . . . . . 499
§ 14. Of Failure of Proof of Fraud . . . . . . . . 500
§ 15. Of Fraud on Testators . . . . . . . . . . . 500

## CHAPTER XVIII.

DAMAGES . . . . . . . . . . . . . . . . . . . . . 506

# STATUTES.

## FRAUD ON CREDITORS AND PURCHASERS.

ENGLAND . . . . . . . . . . . . . . . . . . . . 517
UNITED STATES . . . . . . . . . . . . . . . . . 529
ALABAMA . . . . . . . . . . . . . . . . . . . . 535

CONTENTS.

|                                    | PAGE |
| ---------------------------------- | ---- |
| ARKANSAS                           | 537  |
| CALIFORNIA                         | 539  |
| COLORADO                           | 543  |
| CONNECTICUT                        | 546  |
| DELAWARE                           | 547  |
| FLORIDA                            | 549  |
| GEORGIA                            | 553  |
| ILLINOIS                           | 556  |
| INDIANA                            | 559  |
| KENTUCKY                           | 563  |
| MAINE                              | 565  |
| MARYLAND                           | 567  |
| MASSACHUSETTS                      | 569  |
| MICHIGAN                           | 576  |
| MINNESOTA                          | 582  |
| MISSISSIPPI                        | 587  |
| MISSOURI                           | 589  |
| NEBRASKA                           | 594  |
| NEW JERSEY                         | 598  |
| NEW YORK                           | 601  |
| NORTH CAROLINA                     | 607  |
| OHIO                               | 610  |
| OREGON                             | 613  |
| PENNSYLVANIA                       | 616  |
| RHODE ISLAND                       | 619  |
| SOUTH CAROLINA                     | 620  |
| TENNESSEE                          | 623  |
| TEXAS                              | 626  |
| VERMONT                            | 628  |
| VIRGINIA AND WEST VIRGINIA         | 629  |
| WISCONSIN                          | 632  |
|                                    |      |
| INDEX                              | 639  |

ticularly in matters of fraud. Fraud is so multiform as
to admit of no such rules or definitions ; and hence equity
leaves the way open to punish frauds, and redress wrongs
perpetrated by means of them, in whatever form they
may appear. A misrepresentation producing confusion and
terror of mind, unsettling the judgment, and depriving the
party of the reasoning faculty, so that he cannot think or act
deliberately or with knowledge and calmness ; a misrepre-
sentation made to produce such an effect on the mind, with
intent to take advantage thereby, is one which equity will
consider and redress in a suit to set aside a conveyance.[1]

Representations made by an agent of a railroad company
in regard to the value of a donation of land made to the com-
pany, and in regard to the amount of assets of the company,
and their ability to complete the road within a specified
time, and the probable cost and profits of the road, though
false and exaggerated, and intended to induce persons to
subscribe for stock in the company, are but expressions of
opinion. Subscribers for stock have no right to rely upon
them ; and, if they do, they cannot set them up as ground
for avoiding the contract of subscription.[2] So, too, advertise-
ments of the sale of town lots, in which the prospective
and present advantages of the town are set forth, and vague,
general representations in relation to the value of the lots,
will not, though false, be deemed fraudulent, so as to jus-
tify a court in granting rescission of contracts of sale made
by reason of such representations.[3]

A bill was filed in a recent case[4] to set aside the pur-
chase of an interest in a certain mine in Utah, and for
the cancellation of a note given for the price, on the
ground of fraudulent misrepresentations of the quality and

[1] Knelkamp *v.* Hidding, 31 Wis. 503, Dixon, C. J.
[2] Walker *v.* Mobile & O. R. Co., 34 Miss. 245.
[3] Anderson *v.* Hill, 12 Smedes & M. 679.
[4] Tuck *v.* Downing, 76 Ill. 71.

neglect, is defrauded, redress will not be denied.[1]  Nor is the
rule different where the vendor suggests examination to the
purchaser, but in such a way as to indicate that such a step
would be quite unnecessary. If, for example, the vendor
should suggest that the purchaser should go and look at the
property, " as their judgments might not agree, and if not
satisfied the vendor would pay his expenses, but if satisfied
the purchaser should himself pay them," it is held that such
a proposal asserts by implication the exercise by the vendor
of an intelligent judgment upon the subject, tends to dissuade
from inquiry, and renders him liable, if the statements prove
false, even though he believed them to be true.[2]  So, too,
though a purchaser may on close inspection detect a vice in
the property sold, still, if the vendor make representations
upon which the purchaser relies, refraining for this reason
from close inspection, the sale may be avoided.[3]  So, if a
party make a false and fraudulent explanation of a visible
defect in property to be sold by him, he is liable as well as if
he had made a false and fraudulent statement concerning the
latent condition of the property.[4]  And the same principle
prevails, though the party making the false explanation was
ignorant of its falsity, if he assumed to know the nature of the
defects.[5]  And in general, where a party put upon notice is
actually misled and induced not to prosecute investigation by
the opposite party, he will be entitled to relief.[6]  The maxim
*caveat emptor* does not apply when the vendor of prop-

[1] Swimm *v.* Bush, 23 Mich. 99; Starkweather *v.* Benjamin, 32 Mich.
305; Oswald *v.* McGehee, 28 Miss. 340; Roseman *v.* Canovan, 43 Cal. 111.

[2] Webster *v.* Bailey, 31 Mich. 36.

[3] Oswald *v.* McGehee, 28 Miss. 340; Baker *v.* Seahorn, 1 Swan, 54.
It was said in Baker *v.* Seahorn that if the vendor of a horse merely
suggest a doubt as to the goodness of the animal's eyes, knowing that
they are defective, this is as much a fraud as if he had been silent.

[4] Gant *v.* Shelton, 3 B. Mon. 423.

[5] Phelps *v.* Quinn, 1 Bush, 375; Robertson *v.* Clarkson, 9 B. Mon. 507.

[6] Roseman *v.* Canovan, 43 Cal. 111.

none1:23-cv-03562-RDM   Document 41-1   Filed 09/13/24   Page 143 c

erty resorts to any artifice to put the purchaser off his guard.[1]

Accepting and paying for goods upon delivery will not bar the purchaser from relief, though the goods were open to his inspection at the time, if such acceptance and payment were procured by fraudulent artifices on the part of the vendor. Thus, where the defendants, manufacturers and vendors of tobacco, had fraudulently used damaged tobacco in the manufacture, and had fraudulently used boxes of green lumber, and while the tobacco was being manufactured they exhibited to the plaintiff from time to time, in order to mislead him, specimens of tobacco as of the kind they were supplying him, when in fact they were making a different and inferior kind, it was held, notwithstanding acceptance and payment, the plaintiff was entitled to recover damages for the loss sustained.[2]

However, if a party assert that he relied upon the statement of another, instead of using the means of information at his hands, the burden of proof is upon him to establish the statement. For, where persons can see for themselves if they choose to look, it is a presumption of law that they do look and ascertain the fact for themselves; and this presumption must be overcome, if they would prevail. But proof that a party is diverted from looking for himself, by the intentional act or conduct of the opposite party, will rebut the presumption; for how, it has well been asked, can one who has been diverted from looking for himself be said to refuse to look?[3]

Even though a party sell at the risk of the purchaser, he will not be permitted to practise fraud upon him. Thus, it has been held that where a party, during a negotiation for the sale of property, stated that the other contracting party must take the property at his own risk, such statement would not

[1] Biggs v. Perkins, 75 N. C. 397; Baker v. Seahorn, 1 Swan, 54.

[2] McAvoy v. Wright, 25 Ind. 22.

[3] Wilder v. De Cou, 18 Minn. 470, 480; Bailey v. Smock, 61 Mo. 213.

an independent relation, would impeach a sale for fraud, must establish the fact that the transaction is invalidated by some of the elements, the presence of which renders what is in form a contract inoperative in equity. The term "fraud," however, in such case, is not to be understood in its popular sense. In the sense in which it is understood in equity, it comprises the use of undue influence and unfair means. But while inadequacy of consideration and the absence of professional advice, added to the presence of distress, do not come within this extended signification of fraud, they are all material facts, and may exist to such an extent in connection with other facts as to be proof of fraud.[1]  In the case cited, a purchase deed was set aside under the following circumstances : The vendor received as a consideration for the sale less than half the value of the property. He was a person of reckless and improvident habits, greatly embarrassed, indebted to the purchaser, and to some extent dependent upon him. He had acted without professional advice ; and there was evidence of management and contrivance on the part of the purchaser in procuring the vendor's signature to the contract of sale, and of his having depreciated the title and having deterred others from purchasing, though he was himself aware of counsel's favorable opinion as to the title, and did not inform the vendor of the fact.

If there be such inadequacy as to show that the person whom it affects did not understand the bargain he was making, or was so oppressed that he was glad to make it, knowing its inadequacy, this will show a command over him which may amount to fraud.[2]

It is held in Pennsylvania that gross inadequacy, though sufficient to shock the judgment of the court, is insufficient

Knight *v.* Majoribanks, 11 Beav. 322; s. c. 11 Macn. & G. 10; Butler *v.* Miller, Law R. 1 Irish Eq. 195, 210.

[1] Butler *v.* Miller, Law R. 1 Irish Eq. 195, 210.

[2] Heathcote *v.* Paignon, 2 Brown, C. C. 167.

1:23-cv-03562-RDM Document 41-1 Filed 09/13/24 Page 145 o

received to prove a disposition to commit fraud, and thus to render the commission of the particular fraud in suit probable.[1]

Fraud may be proved either by intrinsic evidence of unfairness in the transaction itself, or by evidence of facts and circumstances attending it, which by the ordinary tests by which we judge of the motives to action appear inconsistent with an honest purpose.[2] When therefore it is said that in ordinary cases fraud cannot be presumed, it is not meant that the presumption of fraud may not arise and be legitimately deduced from such evidence, but only that it is not to be assumed of a transaction that it is fraudulent in the absence of proof afforded by intrinsic unfairness in the transaction itself, or by extrinsic facts and circumstances leading to that conclusion.[3] It has well been said that there is reason to apprehend that jurors are not infrequently misled in cases of this character by being told that fraud cannot be presumed, but must be proved; thereby inducing the belief that fraud is a thing which has material existence, and is tangible, and cannot be proved otherwise than by evidence direct and positive. Such, it need hardly be said, is not its nature: it is not a thing susceptible of ocular observation or physical demonstration. Yet its existence in a given case may be sufficiently demonstrated for judicial purposes, and to warrant judicial action, by evidence of facts either intrinsic or extrinsic to the transaction impeached. Thus, inadequacy of consideration, though in general not affording ground for annulling a transaction, may be so very great as to shock the conscience; and, when this is the case, fraud may well be inferred.[4] So, too, where a party is prevented from performing a condition precedent by the promises and assurances of another who is to

[1] Edwards *v.* Warner, 35 Conn. 517; Gardner *v.* Preston, 2 Day, 205.

[2] Burch *v.* Smith, 15 Tex. 219.

[3] Ib.

[4] Ib., *per* Wheeler, J., in an opinion replete with good sense and sound law. See 1 Story, Equity, § 246.

**AD-11**

# COMMENTARIES

## ON THE

# L A W S

### OF

# E N G L A N D.

## BOOK THE THIRD.

### BY

## WILLIAM BLACKSTONE, Esq.

### SOLICITOR GENERAL TO HER MAJESTY.

### O X F O R D,

PRINTED AT THE CLARENDON PRESS.

M. DCC. LXVIII.

# CONTENTS.

## BOOK III.

## *Of* PRIVATE WRONGS.

### CHAP. I.

*Of the* REDRESS *of* PRIVATE WRONGS *by the mere act of the* PARTIES.        Page 1.

### CHAP. II.

*Of* REDRESS *by the mere operation of* LAW.    18.

### CHAP. III.

*Of* COURTS *in general.*        22.

### CHAP. IV.

*Of the* PUBLIC COURTS *of* COMMON LAW *and* EQUITY.        30.

### CHAP. V.

*Of* COURTS ECCLESIASTICAL, MILITARY, *and* MARITIME.        61.

a 2                    CHAP.

# CONTENTS.

## CHAP. VI.

*Of* COURTS *of a* SPECIAL JURISDICTION.  71.

## CHAP. VII.

*Of the* COGNIZANCE *of* PRIVATE WRONGS.  86.

## CHAP. VIII.

*Of* WRONGS, *and their* REMEDIES, *respecting*
the RIGHTS *of* PERSONS.          115.

## CHAP. IX.

*Of* INJURIES *to* PERSONAL PROPERTY.  144.

## CHAP. X.

*Of* INJURIES *to* REAL PROPERTY, *and first of*
DISPOSSESSION, *or* OUSTER, *of the* FREEHOLD.  167.

## CHAP. XI.

*Of* DISPOSSESSION, *or* OUSTER, *of* CHATTELS
REAL.          198.

## CHAP. XII.

*Of* TRESPASS.          208.

## CHAP. XIII.

*Of* NUSANCE.          216.

CHAP.

# CONTENTS.

CHAP. XIV.

*Of* WASTE.                              223.

CHAP. XV.

*Of* SUBTRACTION.                230.

CHAP. XVI.

*Of* DISTURBANCE.               236.

CHAP. XVII.

*Of* INJURIES *proceeding from, or affecting, the*
CROWN.                                    254.

CHAP. XVIII.

*Of the* PURSUIT *of* REMEDIES *by* ACTION;
*and, firſt, of the* ORIGINAL WRIT.     270.

CHAP. XIX.

*Of* PROCESS.                          279.

CHAP. XX.

*Of* PLEADING.                       293.

CHAP. XXI.

*Of* ISSUE *and* DEMURRER.        314.

CHAP.

# CONTENTS.

CHAP.  XXII.

*Of the several* SPECIES *of* TRIAL.     325.

CHAP.  XXIII.

*Of the* TRIAL *by* JURY.     349.

CHAP.  XXIV.

*Of* JUDGMENT, *and it's* INCIDENTS.   386.

CHAP.  XXV.

*Of* PROCEEDINGS, *in the nature of* APPEALS. 402.

CHAP.  XXVI.

*Of* EXECUTION.     412.

CHAP.  XXVII.

*Of* PROCEEDINGS *in the* COURTS *of* EQUITY. 426.

APPEN-

# CONTENTS.

# APPENDIX.

Nº. I. *Proceedings on a Writ of* RIGHT *Patent.* Page i.

 §. 1. *Writ of* RIGHT *patent in the* COURT BARON. ibid.
 §. 2. *Writ of* TOLT, *to remove it into the* COUNTY COURT. ibid.
 §. 3. *Writ of* PONE, *to remove it into the Court of* COMMON
   PLEAS. ii.
 §. 4. *Writ of* RIGHT, quia Dominus remifit Curiam. ibid.
 §. 5. *The Record, with award of Battel.* iii.
 §. 6. *Trial by the grand Affife.* v.

Nº. II. *Proceedings on an Action of Trefpafs in* EJECTMENT,
*by Original, in the* King's Bench. vii.

 §. 1. *The Original Writ.* ibid.
 §. 2. *Copy of the Declaration againft the cafual Ejector; who
   gives Notice thereupon to the Tenant in Poffeffion.* ibid.
 §. 3. *The Rule of Court.* ix.
 §. 4. *The Record.* ibid.

Nº. III. *Proceedings on an Action of* DEBT, *in the Court of*
common Pleas; *removed into the* King's Bench *by Writ
of* ERROR. xiii.

 §. 1. *Original.* ibid.
 §. 2. *Procefs.* ibid.
 §. 3. *Bill of* Middlefex, *and* Latitat *thereupon, in the Court
   of* King's Bench. xviii.
 §. 4. *Writ of* Quo minus *in the* Exchequer. xix.
 §. 5. *Special Bail; on the Arreft of the Defendant, purfuant to
   the* Teftatum Capias, *in page* xiv. ibid.
 §. 6. *The Record, as removed by Writ of* ERROR. xxi.
 §. 7. *Procefs of Execution.* xxvi.

liable to an action *on the cafe* [p]. But if after judgment, a gaoler or a sheriff permits a debtor to escape, who is charged in execution for a certain sum; the debt immediately becomes his own, and he is compellable by action of *debt*, being for a sum liquidated and ascertained, to satisfy the creditor his whole demand: which doctrine is grounded [q] on the equity of the statutes of Westm. 2. 13 Edw. I. c. 11. and 1 Ric. II. c. 12. An advocate or attorney that betray the cause of their client, or, being retained, neglect to appear at the trial, by which the cause miscarries, are liable to an action on the cafe, for a reparation to their injured client [r]. There is also in law always an implied contract with a common inn-keeper, to secure his guest's goods in his inn; with a common carrier or bargemaster, to be answerable for the goods he carries; with a common farrier, that he shoes a horse well, without laming him; with a common taylor, or other workman, that he performs his business in a workmanlike manner: in which if they fail, an action on the cafe lies to recover damages for such breach of their general undertaking [s]. But if I employ a person to transact any of these concerns, whose common profession and business it is not, the law implies no such *general* undertaking; but in order to charge him with damages, a *special* agreement is required. Also if an inn-keeper, or other victualler, hangs out a sign and opens his house for travellers, it is an implied engagement to entertain all persons who travel that way; and upon this universal *assumpsit* an action on the cafe will lie against him for damages, if he without good reason refuses to admit a traveller [t]. If any one cheats me with false cards or dice, or by false weights and measures, or by selling me one commodity for another, an action on the cafe also lies against him for damages, upon the contract which the law always implies, that every transaction is fair and honest [u]. In contracts likewise for sales, it is constantly understood that the seller undertakes that the commodity he sells is his own; and if it proves otherwise,

[p] Cro. Eliz. 625. Comb. 69.
[q] Bro. *Abr. t. parliament*. 19. 2 Inst. 382.
[r] Finch. L. 188.
[s] 11 Rep. 54. 1 Saund. 324.
[t] 1 Ventr. 333.
[u] 10 Rep. 56.

an

Case 1:23-cv-03562-RDM   Document 41-1   Filed 09/13/24   Page 154 of 176

fome will arife that will fall within the meaning, though. not within the words, of the legiflator; and others, which may fall within the letter, may be contrary to his meaning, though not exprefsly excepted. Thefe cafes, thus out of the letter, are often faid to be within the equity, of an act of parliament; and fo, cafes within the letter are frequently out of the equity. Here by *equity* we mean nothing but the found interpretation of the law; though the words of the law itfelf may be too general, too. fpecial, or otherwife inaccurate or defective. Thefe then are the cafes which, as Grotius [t] fays, " *lex non exacte definit, fed arbitrio* " *boni viri permittit* ;" in order to find out the true fenfe and meaning of the lawgiver, from every other topic of conftruction. But there is not a fingle rule of interpreting laws, whether equitably or ftrictly, that is not equally ufed by the judges in the courts both of law and equity: the conftruction muft in both be the fame; or, if they differ, it is only as one court of law may alfo happen to differ from another. Each endeavours to fix and adopt the true fenfe of the law in queftion; neither can enlarge, diminifh, or alter, that fenfe in a fingle tittle.

3. A G A I N, it hath been faid [u], that *fraud, accident,* and *truft* are the proper and peculiar objects of a court of equity. But every kind of *fraud* is equally cognizable, and equally adverted to, in a court of law: and fome frauds are only cognizable there, as fraud in obtaining a devife of lands, which is always fent out of the equity courts to be there determined. Many *accidents* are alfo fupplied in a court of law; as, lofs of deeds, miftakes in receipts or accounts, wrong payments, deaths which make it impoffible to perform a condition literally, and a multitude of other contingencies: and many cannot be relieved even in a court of equity; as, if by accident a recovery is ill fuffered, a devife ill executed, a contingent remainder deftroyed, or a power of leafing omitted in a family fettlement. A technical *truft* indeed, created by the limitation of a fecond ufe, was forced into

t *de aequitate.* §. 3.          u 1 Roll. Abr. 374. 4 Inft. 84. 10 Mod. 1.

a court

**AD-12**

Law

02385C.2

THE

# COMMON LAW

## OF ENGLAND.

BY

### W. BLAKE ODGERS, M.A., LL.D., K.C.,

DIRECTOR OF LEGAL STUDIES AT THE INNS OF COURT, GRESHAM
PROFESSOR OF LAW, AND RECORDER OF BRISTOL,

AND

### WALTER BLAKE ODGERS, M.A.,

OF BALLIOL COLLEGE, OXFORD, THE MIDDLE TEMPLE AND THE
WESTERN CIRCUIT, BARRISTER-AT-LAW.

SECOND EDITION.

*IN TWO VOLUMES.*   186102

## VOL. II.   18.12.23.

SWEET AND MAXWELL, LIMITED,
3, CHANCERY LANE, LONDON, W.C.
1920.

Digitized by the Internet Archive
in 2008 with funding from
Microsoft Corporation

http://www.archive.org/details/commonlawofengla02odgeuoft

# TABLE OF CONTENTS

OF

# VOLUME II.

## BOOK IV.

### CONTRACTS.

#### CHAPTER I.

PAGE

INTRODUCTORY . . . . . . . . . 659—667

#### CHAPTER II.

CONTRACTS OF RECORD AND UNDER SEAL . . . . 668—681

#### CHAPTER III.

SIMPLE CONTRACTS . . . . . . . . 682—694

#### CHAPTER IV.

CONTRACTS REQUIRED BY LAW TO BE IN WRITING . . 695—715

#### CHAPTER V.

VOID AND VOIDABLE CONTRACTS . . . . . 716—728

#### CHAPTER VI.

ILLEGAL CONTRACTS . . . . . . . . 729—742

#### CHAPTER VII.

BREACHES OF CONTRACT: PERFORMANCE AND DISCHARGE . 743—764

#### CHAPTER VIII.

ASSIGNMENT OF CONTRACTS AND OTHER CHOSES IN ACTION . 765—789

#### CHAPTER IX.

CONTRACTS FOR THE SALE OF GOODS . . . . . 790—808

#### CHAPTER X.

NEGOTIABLE INSTRUMENTS . . . . . . . 809—839

CHAPTER XI.

PAGE

PRINCIPAL AND AGENT : PARTNERSHIP    .    .    .    .    840—860

CHAPTER XII.    .

MASTER AND SERVANT    .    .    .    .    .    .    .    861—874

CHAPTER XIII.

LANDLORD AND TENANT    .    .    .    .    .    .    .    875—909

CHAPTER XIV.

CARRIAGE OF GOODS BY SEA    .    .    .    .    .    .    910—919

CHAPTER XV.

CONTRACTS OF ASSURANCE .    .    .    .    .    .    .    920—946

CHAPTER XVI.

IMPLIED CONTRACTS AND QUASI-CONTRACTS    .    .    .    947—958

---

# BOOK V.

## ADJECTIVE LAW.

### PART I.

#### THE COURTS OF LAW.

CHAPTER I.

RELIEF    .    .    .    .    .    .    .    .    .    .    959—970

CHAPTER II.

HISTORY OF THE COURTS OF LAW    .    .    .    .    .    971—984

CHAPTER III.

CRIMINAL COURTS    .    .    .    .    .    .    .    .    985—999

CHAPTER IV.

SUPERIOR CIVIL COURTS    .    .    .    .    .    .    1000—1027

CHAPTER V.

INFERIOR CIVIL COURTS    .    .    .    .    .    .    1028—1043

## PART II.

### PROCEDURE IN CRIMINAL CASES.

#### CHAPTER VI.

PAGE

COMMENCEMENT OF CRIMINAL PROCEEDINGS . . 1044—1059

#### CHAPTER VII.

INDICTMENTS AND CRIMINAL INFORMATIONS . . 1060—1070

#### CHAPTER VIII.

THE TRIAL OF AN INDICTMENT . . . . . 1071—1085

#### CHAPTER IX.

EVIDENCE . . . . . . . . . 1086—1114

#### CHAPTER X.

PROCEEDINGS AFTER VERDICT . . . . . 1115—1128

## PART III.

### CIVIL PROCEDURE.

#### CHAPTER XI.

COMMENCEMENT OF CIVIL PROCEEDINGS . . . 1129—1148

#### CHAPTER XII.

ORDINARY REMEDIES . . . . . . . 1149—1172

#### CHAPTER XIII.

EXTRAORDINARY REMEDIES . . . . . 1173—1185

#### CHAPTER XIV.

THE WRIT OF SUMMONS . . . . . . 1186—1195

#### CHAPTER XV.

PROCEDURE WHERE THE WRIT IS GENERALLY INDORSED 1196—1201

#### CHAPTER XVI.

PROCEDURE WHERE THE WRIT IS SPECIALLY INDORSED . 1202—1210

#### CHAPTER XVII.

PLEADINGS . . . . . . . . . 1211—1235

### CHAPTER XVIII.

PAGE

PREPARING FOR TRIAL . . . . . . . 1236—1253

### CHAPTER XIX.

PROCEEDINGS IN AN ACTION FOR THE RECOVERY OF LAND 1254—1271

### CHAPTER XX.

TRIAL OF AN ACTION . . . . . . . 1272—1280

### CHAPTER XXI.

DAMAGES AND THE MEASURE OF DAMAGES . . 1281—1322

### CHAPTER XXII.

PROCEEDINGS AFTER JUDGMENT . . . . 1322—1336

### CHAPTER XXIII.

PROCEDURE IN THE COUNTY COURT . . . . 1337—1350

# BOOK VI.

## THE LAW OF PERSONS.

### CHAPTER I.

HUSBAND AND WIFE . . . . . . . 1352—1366

### CHAPTER II.

INFANTS . . . . . . . . . 1367—1378

### CHAPTER III.

LUNATICS . . . . . . . . . 1379—1390

### CHAPTER IV.

EXECUTORS AND ADMINISTRATORS . . . . 1391—1398

### CHAPTER V.

BANKRUPTS . . . . . . . . . 1399—1408

### CHAPTER VI.

CORPORATIONS . . . . . . . . 1409—1424

CHAPTER VII.

PAGE

THE KING, HIS OFFICERS, AND HIS SUBJECTS   .    .   1425—1435

CHAPTER VIII.

THE LEGAL PROFESSION   .    .    .    .    .    .   1436—1460

CHAPTER IX.

THE PRESENT CONDITION OF THE LAW OF ENGLAND .   1461—1467

APPENDIX OF PRECEDENTS OF INDICTMENTS .    .    .   1468—1480

GENERAL INDEX.

a good title.[1]   Or if a man be induced by fraud to take shares in a
company, and the company is wound up before he can disaffirm the con-
tract, he loses his right to rescind, for the position of the parties has been
altered.[2]   " Where one of two innocent parties must suffer from the fraud
of a third, the loss should fall on the one who enabled the third party to
commit the fraud."[3]

It is also a defence to any action brought on a contract
that the plaintiff was guilty of fraud in procuring the defen-
dant to enter into the contract. But it is no defence that
the defendant was induced to enter into it by the fraud of
some third person, if the plaintiff be innocent of all know-
ledge of or complicity in the fraud, and has obtained no
benefit thereby, and is neither the principal nor the agent of
the fraudulent person.

Thus, where a defendant was induced by the fraud of a solicitor to execute
a mortgage deed containing the usual covenants, and an action was sub-
sequently brought against him on those covenants by a transferee of the
mortgage, it was held that he could not successfully plead either the fraud
of the solicitor, or that the deed was not his deed.[4]

In order to establish fraud, it must be shown—

(i.) that a material misrepresentation was made which was
false to the knowledge of the man who made it;

(ii.) that it was intended to induce the person to whom it
was addressed to act in some way;

(iii.) that the latter was thereby deceived, and induced so
to act; and

(iv.) that he in consequence suffered damage.

The fraudulent misrepresentation may be either by words
or by conduct. It must have been made either with know-
ledge of its falsehood,[5] or with such reckless disregard as to
its truth or falsity that the law holds the speaker to be as
responsible as if he had asserted what he knew to be untrue.[6]

[1] *Babcock* v. *Lawson* (1879), 4 Q. B. D. 394 ;  (1880), 5 Q. B. D. 284 ; see Sale
of Goods Act, 1893 (56 & 57 Vict. c. 71), s. 24 (2), *post*, p. 799.
[2] *Oakes* v. *Turquand* (1867), L. R. 2 H. L. 325 ; and see *In re General Railway
Syndicate*, [1900] 1 Ch. 365.
[3] *Per cur.* in *Babcock* v. *Lawson* (1879), 4 Q. B. D. at p. 401 ; cf. the remarks
of Ashurst, J., in *Lickbarrow* v. *Mason* (1794), 1 Smith, L. C., 12th ed., at pp. 734,
735.  But the rule is not universal : see the remarks of Vaughan Williams, L. J.,
in *Farquharson* v. *King*, [1901] 2 K. B. at p. 712.
[4] *Howatson* v. *Webb*, [1907] 1 Ch. 537 ;  [1908] 1 Ch. 1.
[5] *Dickson* v. *Reuter's Telegraph Co.* (1877), 3 C. P. D. 1 ; *Derry* v. *Peek* (1889),
14 App. Cas. 337.
[6] *Reese River Mining Co.* v. *Smith* (1869), L. R. 4 H. L. 79 ; and see *Evans* v.
*Edmonds* (1853), 13 C. B. at p. 786.

**AD-13**

# COMMENTARIES

### ON

# EQUITY JURISPRUDENCE,

### AS ADMINISTERED

### IN

# ENGLAND AND AMERICA.

## By JOSEPH STORY, LL. D.,

DANE PROFESSOR OF LAW IN HARVARD UNIVERSITY.

"Chancery is ordained to supply the Law, not to subvert the Law." LORD BACON.

"His ergo ex partibus juris, quidquid aut ex ipsâ re, aut ex simili, aut ex majore, minoreve, nasci videbitur, attendere, atque elicere, pertentando unamquamque partem juris, oportebit." CIC. De Invent. Lib. 2. cap. 22.

### IN TWO VOLUMES.

VOLUME I.

## BOSTON:

HILLIARD, GRAY & COMPANY.

M DCCC XXXVI.

Entered according to Act of Congress, in the year 1835,

BY JOSEPH STORY,

in the Clerk's Office of the District Court of the District of Massachusetts.

CAMBRIDGE PRESS:

METCALF, TORRY, AND BALLOU.

# CONTENTS.

|                                         | Page |
|-----------------------------------------|------|
| INDEX TO CASES CITED . . . . . . . | xi   |

### CHAPTER I.

The true Nature and Character of Equity Jurisprudence    1–38

### CHAPTER II.

The Origin and History of Equity Jurisprudence    .    38–66

### CHAPTER III.

General View of Equity Jurisprudence    .    .    .    67–91

### CHAPTER IV.

Concurrent Jurisdiction of Equity — Accident    .    .    92–120

### CHAPTER V.

Mistake .   .   .   .   .   .   .   .   .   121–193

### CHAPTER VI.

Actual or Positive Fraud .   .   .   .   .   .   194–260

### CHAPTER VII.

Constructive Fraud .   .   .   .   .   .   261–422

### CHAPTER VIII.

Account .   .   .   .   .   .   .   .   423–504

### CHAPTER IX.

Administration .   .   .   .   .   .   .   505–552

*Eq.*           *b*

X                          CONTENTS.

Page

CHAPTER X.

Legacies  .    .    .    .    .    .    .    .    .  553–564

CHAPTER XI.

Confusion of Boundaries  .    .    .    .    .    .  565–575

CHAPTER XII.

Dower  .    .    .    .    .    .    .    .    .  576–587

CHAPTER XIII.

Marshalling of Securities  .    .    .    .    .    .  588–598

CHAPTER XIV.

Partition  .    .    .    .    .    .    .    .    .  599–611

CHAPTER XV.

Partnership  .    .    .    .    .    .    .    .  612–633

CHAPTER XVI.

Matters of Rent  .    .    .    .    .    .    .  634–637

cases, in which fraud is utterly irremediable at law;
and Courts of Equity, in relieving against it, often
go, not only beyond, but even contrary to the rules
of law.[1]   And with the exception of wills, as above
stated, the Courts of Equity may be said to possess
a general, and perhaps a universal, concurrent juris-
diction with Courts of Law in cases of frauds cogniza-
ble in the latter; and exclusive jurisdiction in cases
of frauds beyond the reach of the Courts of Law.[2]

§ 185. The jurisdiction in matters of fraud is
probably coëval with the existence of the Court of
Chancery; and it is equally probable, that, in the
early history of the Court, it was principally exer-
cised in matters of fraud, not remediable at law.[3]

---

is a well settled rule of law, that wherever a matter respects per-
sonal chattels, and lies merely in damages, the remedy is at law
only, and for these reasons; 1st. because Courts of law, are as ade-
quate, as a Court of Chancery, to grant complete and effectual
reparation to the party injured; 2d. because the ascertainment of
damages is peculiarly the province of a jury." And the Court
farther suggested, that the same principle applied to a rateable
deduction for fraud in like cases. But, that a Court of Equity
might properly interfere in such cases, to set aside and vacate the
*whole* contract, at the instance of a party injured, in a case of sup-
pressio veri, or suggestio falsi; not entering into the point of dama-
ges.   Waters v. Mattinglay, 1 Bibb. R. 244.

[1] Garth v. Cotton, 3 Atk. 755; Man v. Ward, 2 Atk. 229; Trench-
ard v. Wanley, 2 P. Will. 167.

[2] Colt v. Wollaston, 2 P. Will. 156; Stent v. Bailis, 2 P. Will.
220; Bright v. Eynon, 1 Burr. 396; Chesterfield v. Janssen, 2 Ves.
155; Evans v. Bicknell, 6 Ves. 132.—The jurisdiction of the
Courts of Equity, in regard to the frauds in obtaining wills, was
formerly subject to much doubt, the Court sometimes asserting the
jurisdiction; at other times disclaiming it; and at other times
adopting an intermediate course; holding the will good; but de-
claring the party, who practised the fraud, a Trustee for the party
prejudiced.   Mr. Fonblanque, (on Eq. B. 1, ch. 2, § 3, note (*u*),)
has collected and arranged the cases and stated the result, which
is now decidedly settled against the jurisdiction.

[3] 4 Inst. 84.

Its present active jurisdiction took its rise in a great measure from the abolition of the Court of Star Chamber, in the reign of Charles the First,[1] in which Court the plaintiff was not only relieved, but the defendant was punished for his fraudulent conduct. So that the interposition of Chancery before that period was generally unnecessary.[2]

§ 186. It is not easy to give a definition of fraud in the extensive signification, in which that term is used in Courts of Equity ; and it has been said, that these Courts have, very wisely, never laid down, as a general proposition, what shall constitute fraud,[3] or any general rule, beyond which they will not go upon the ground of fraud, lest other means of avoiding the Equity of the Courts should be found out.[4]   Fraud is even more odious than force ; and Cicero has well remarked, *Cum autem duobus modis, id est, aut vi aut fraude fiat injuria ; fraus quasi vulpeculæ, vis, leonis videtur.  Utrum homine alienissimum ; sed fraus odio digna majore.*[5]   Pothier says, that the term, *fraud,* is applied to every artifice made use of by one person, for the purpose of deceiving another.[6]   *On appelle Dol toute espèce d'artifice,*

---

[1] 16 Car. I, ch. 10.

[2] Fonbl. Eq. B. 1, ch. 2, § 12 ; 1 Madd. Ch. Pr. 89.

[3] Mortlock *v.* Buller, 10 Ves. 306.

[4] Lawley *v.* Hooper, 3 Atk. 279. — Lord Hardwicke, in his Letter to Lord Kaimes, of the 30th of June, 1759, (Parke's Hist. of Chan. p. 508,) says, "As to relief against frauds no invariable rules can be established.   Fraud is infinite ; and were a Court of Equity once to lay down rules how far they would go, and no farther, in extending their relief against it, or to define strictly the species or evidence of it, the jurisdiction would be cramped, and perpetually eluded by new schemes, which the fertility of man's invention would contrive."   See also 1 Domat, Civil Law, B. 1, tit. 18, § 3, art. 1.

[5] Cic. de Offic. Lib. 1, ch. 13.

[6] 1 Pothier on Oblig. by Evans, Pt. 1, ch. 1, § 1, art. 3, n. 28, p. 19.

*dont quelquún se sert pour en tromper un autre.*[1] Servius, in the Roman Law, defined it thus, *Dolum malum machinationem quandam alterius decipiendi, cum aliud simulatur, et aliud agitur.*  To this definition Labeo justly took exception, because a party might be circumvented by a thing done without simulation ; and, on the other hand, without fraud, one thing might be done and another thing be pretended.  And therefore he defined *Fraud* to be any cunning, deception, or artifice, used to circumvent, cheat, or deceive another.  *Dolum malum esse omnem calliditatem, fallaciam, machinationem ad circumveniendum, fallendum, decipiendum alterum adhibitam.*  And this is pronounced in the Digest to be the true definition.  *Labeonis Definitio vera est.*[2]

§ 187. This definition is beyond doubt sufficiently descriptive of what may be called positive, actual fraud, where there is an intention to commit a cheat or deceit upon another to his injury.[3]  But it can hardly be said to include the large class of implied or constructive frauds, which are within the remedial jurisdiction of a Court of Equity.  Fraud, indeed, in the sense of a Court of Equity, properly includes all acts, omissions, and concealments, which involve a breach of legal or equitable duty, trust, or confidence, justly reposed, and are injurious to another, or by which an undue and unconscientious advantage

---

[1] Pothier, Traité Des Oblig. Pt. 1, ch. 1, n. 28.

[2] Dig. Lib. 4, tit. 3, l. 1, § 2 ; Id. Lib. 2, tit. 14, l. 7, § 9.   See also 1 Domat, Civ. Law, B. 1, tit. 18, § 3, n. 1.   See also 1 Bell, Comm. B. 2, ch. 7, § 2, art. 173 ; Le Neve *v.* Le Neve, 3 Atk. 654 ; S. C. 1 Ves. 64 ; Ambler, 446.

[3] Mr. Jeremy has defined fraud to be a device, by means of which one party has taken an unconscientious advantage of the other. Jeremy on Eq. Jurisd. B. 3, Pt. 2, p. 358.

**198**     EQUITY JURISPRUDENCE.     [CH. VI.

is taken of another.[1]   And Courts of Equity will
not only interfere in cases of fraud to set aside acts
done ; but will also, if by fraud acts have been pre-
vented from being done by the parties, interfere, and
treat the case exactly, as if the acts had been
done.[2]

§ 188. Lord Hardwicke, in a celebrated case,[3]
after remarking, that a Court of Equity has an un-
doubted jurisdiction to relieve against every spe-
cies of fraud, proceeded to give the following enume-
ration of frauds.   First. Fraud, which is *dolus malus*,
may be actual, arising from facts and circumstances
of imposition, which is the plainest case.   Secondly.
It may be apparent from the intrinsic nature and
subject of the bargain itself ; such as no man in his
senses, and not under delusion, would make on the
one hand, and as no honest and fair man would
accept on the other ; which are inequitable and
unconscientious bargains, and of such even the
Common Law has taken notice.[4]   Thirdly. Fraud,
which may be presumed from the circumstances and
condition of the parties contracting ; and this goes
farther than the rule of law, which is, that it must
be proved, not presumed.   But it is wisely estab-
lished in the Court of Chancery, to prevent taking
surreptitious advantage of the weakness or neces-
sity of another, which knowingly to do is equally
against conscience, as to take advantage of his igno-
rance.   Fourthly. Fraud, which may be collected

---

[1] See 1 Fonbl. Eq. B. 1, ch. 2, § 3, note (*r*) ; Chesterfield *v.*
Janssen, 2 Ves. 155, 156.

[2] Middleton *v.* Middleton, 1 Jac. & Walk. 96 ; Lord Waltham's
case, cited 11 Ves. 638.

[3] Chesterfield *v.* Janssen, 2 Ves. 155.

[4] See James *v.* Morgan, 1 Lev. 111.

and inferred in the consideration of a Court of Equity, from the nature and circumstances of the transaction, as being an imposition and deceit on other persons, not parties to the fraudulent agreement. Fifthly. Fraud in what are called catching bargains with heirs, reversioners, or expectants in the life of the parents, which indeed seems to fall under one or more of the preceding heads.

§ 189. Fraud, then, being so various in its nature, and so extensive in its application to human concerns, it would be difficult to enumerate all the instances, in which Courts of Equity grant relief under this head. It will be sufficient, if we here collect some of the more marked classes of cases, in which the principles, which regulate the action of Courts of Equity, are fully developed, and from which analogies may be drawn to guide us in the investigation of other and novel circumstances.

§ 190. Before, however, proceeding to these subjects, it may be proper to observe, that Courts of Equity do not restrict themselves by the same rigid rules, as Courts of Law do, in the investigation of fraud, and the evidence and proofs required to establish it. It is equally a rule in Courts of Law and Equity, that fraud is not to be presumed; but it must be established by proofs.[1] Circumstances of mere suspicion, leading to no certain results, will not, in either of these Courts, be deemed sufficient

---

[1] In 10 Coke, R. 56, it is laid down, that covin shall never be intended or presumed at law, if it be not expressly averred, Quia odiosa et inhonesta non sunt in lege præsumenda, et, in facto, quod in se habet ad bonum et malum, magis de bono quam de malo præsumendum est. And this is in conformity to the rule of the civil law. Dolum ex indiciis perspicuis probari convenit. Cod. Lib. 2, tit. 21, l. 6.

ground to establish fraud.[1]   But, on the other hand, neither of the Courts insists upon positive and express proofs of fraud; but deduces them from circumstances affording strong presumptions.   But Courts of Equity will act upon circumstances, as presumptions of fraud, where Courts of Law would not deem them satisfactory proofs.   In other words, Courts of Equity will grant relief upon the ground of fraud, established by presumptive evidence, which evidence Courts of Law would not always deem sufficient proofs to justify a verdict at law.   It is in this sense, that the remark of Lord Hardwicke is to be understood, when he said, that "fraud may be presumed from the circumstances and condition of the parties contracting; and this goes farther than the rule of law, which is, that fraud must be *proved*, not *presumed*." [2]   And Lord Eldon has illustrated the same proposition by remarking, that a Court of Equity will, as it ought, in many cases order an instrument to be delivered up, as unduly obtained, that a jury would not be justified in impeaching by the rules of law, which require fraud to be proved, and are not satisfied, though it may be strongly presumed.[3]

§ 191. One of the largest classes of cases, in which Courts of Equity are accustomed to grant relief, is where there has been a misrepresentation, or *suggestio falsi*.[4]   It is said, indeed, to be a very

---

[1] Trenchard *v.* Wanley, 2 P. Will. 166; Townsend *v.* Lowfield, 1 Ves. 35; 3 Atk. 534; Walker *v.* Symonds, 3 Swanst. R. 61; Bath & Montague's Case, 3 Ch. Cas. 85; 1 Madd. Ch. Pr. 208; 1 Fonbl. Eq. B. 1, ch. 11, § S.

[2] Chesterfield *v.* Janssen, 2 Ves. 155, 156.

[3] Fullager *v.* Clark, 18 Ves. 483.

[4] Broderick *v.* Broderick, 1 P. Will. 240; Jarvis *v.* Duke, 1 Vern. 20; Evans *v.* Bicknell, 6 Ves. 173, 182.

old head of Equity, that, if a representation is made to another person, going to deal in a matter of interest, upon the faith of that representation, the former shall make that representation good, if he knows it to be false.[1]  To justify, however, an interposition in such cases, it is not only necessary to establish the fact of misrepresentation ; but that it is in a matter of substance, or important to the interests of the other party, and that it actually does mislead him.[2]   For, if the misrepresentation was of a trifling or immaterial thing ; or if the other party did not trust to it, or was not misled by it ; or if it was vague and inconclusive in its own nature ; or was upon a matter of opinion or fact, equally open to the inquiries of both parties, and in regard to which neither could be presumed to trust the other ; in these and the like cases there is no reason for a Court of Equity to interfere to grant relief, upon the ground of fraud.[3]

§ 192. Where the party intentionally, or by design, misrepresents a material fact, or produces a false impression,[4] in order to mislead another, or to entrap or cheat him, or to obtain an undue advantage of him ; in every such case there is a positive fraud in the truest sense of the terms ; there is an evil act with an evil intent ; *dolum malum ad circumveniendum.*   And the misrepresentation may be as well by deeds or acts, as by words ; by artifices to

---

[1] Evans *v.* Bicknell, 6 Ves. 173, 182.

[2] Neville *v.* Wilkinson, 1 Bro. Ch. R. 546 ; Turner *v.* Harvey, Jacob, Rep. 178 ; 1 Fonbl. Eq. B. 1, ch. 2, § 8.

[3] See 1 Domat, B. 1, tit. 18, § 3, art. 2 ; Trower *v.* Newcome, 3 Meriv. R. 704 ; 2 Kent, Comm. Lect. 39, p. 484, (2d edit.)

[4] See Laidlaw *v.* Organ, 2 Wheaton, R. 178, 195 ; Pidlock *v.* Bishop, 3 B. & Cresw. 605 ; Smith *v.* The Bank of Scotland, 1 Dow, Parl. R. 272 ; Evans *v.* Bicknell, 6 Ves. 173, 182.

*Eq.*          26

to a redhibition or a recision of the contract ; but all other defects, which the other party was interested in knowing.[1]

§ 212. In regard to intrinsic circumstances, the Common Law, however, has, in many cases, adopted a rule, very different from that of the Civil Law ; and especially in cases of sales of goods.  In such cases, the maxim, *caveat emptor*, is applied ; and unless there be some misrepresentation, or artifice to disguise the thing sold, or some warranty, as to its character or quality, the vendee is understood to be bound by the sale, notwithstanding there may be intrinsic defects and vices in it, known to the vendor, and unknown to the vendee, materially affecting its value.  However questionable such a doctrine may be in its origin in point of morals or general convenience, (upon which many learned doubts have, at various times, been expressed,) it is too firmly established to be now open to legal controversy.[2] And Courts of Equity, as well as Courts of Law, abstain from any interference with it.

§ 213. In regard to extrinsic circumstances generally, Courts of Equity, as well as Courts of Law, seem to adopt the same maxim to a large extent ; and relax its application, only when there are circumstances of peculiar trust and confidence, or relation between the parties.[3]

---

[1] Pothier de Vente, n. 235.

[2] See 2 Kent, Com. Lect. 39, p. 478, 479, (2d edit.); 2 Black. Com. 451.

[3] The case of Martin *v.* Morgan, 1 Brod. & Bing. R. 289, is a strong application of the doctrine of concealment, avoiding a payment.  In that case there was no special confidence between the parties ; but a postdated check being paid to the holder by a banker, at a time when the latter had no funds of the drawer, and