**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| META PLATFORMS, INC., | |
| Plaintiff, | Case No. 1:23-cv-03562-RDM |
| v. | Judge Randolph D. Moss |
| FEDERAL TRADE COMMISSION, *et al.*, | |
| Defendants. | |

**DEFENDANTS' REPLY IN SUPPORT OF RENEWED MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

ARGUMENT........................................................................................................................2

I.      The Seventh Amendment is not implicated. ......................................................2

II.     The Commission adjudicates public rights, consistent with Article III. ...........................6

        A.     FTC Act claims adjudicated in § 45(b) proceedings are distinct from historical claims in courts of law and equity. ........................................................7

        B.     Adjudication of modification proceedings falls within the public rights exception. .........................................................................................................9

        C.     Meta's remaining arguments are unpersuasive...................................................14

III.    Meta waived its constitutional claims...........................................................................15

CONCLUSION....................................................................................................................18

**TABLE OF AUTHORITIES**

**CASES**

*A.L.A. Schechter Poultry Corp. v. United States*,
 295 U.S. 495 (1935) .................................................................................4, 6

*Am. Fin. Servs. Ass'n v. FTC*,
 767 F.2d 957 (D.C. Cir. 1985) ...........................................................................5

*Am. Washboard Co. v. Saginaw Mfg. Co.*,
 103 F. 281 (6th Cir. 1900) ..................................................................................8

*Ark. Wholesale Grocers' Ass'n v. FTC*,
 18 F.2d 866 (8th Cir. 1927) ................................................................................6

*Atlas Roofing Co., Inc. v. Occupational Safety & Health Review Commission*,
 430 U.S. 442 (1977) ..........................................................................................15

*Block v. Hirsh*,
 256 U.S. 135 (1921) ..........................................................................................10

*Cal.. Apparel Creators v. Wieder of Calif.*,
 *Inc.*, 162 F.2d 893 (2d Cir. 1947) .......................................................................9

*City of Arlington v. FCC*,
 569 U.S. 290 (2013) ..........................................................................................13

*\*Commodity Futures Trading Comm'n v. Schor*,
 478 U.S. 833 (1986) ....................................................................................*passim*

*\*Crowell v. Benson*,
 285 U.S. 22 (1932) ..............................................................................................6

*Den ex. dem. Murray v. Hoboken Land & Improvement Co.*, ("*Murray's Lessee*")
 59 U.S. 272 (1855) ................................................................... 10, 11, 14, 15

*Dr. Pepper/Seven-Up Companies, Inc. v. FTC*,
 798 F. Supp. 762 (D.D.C. 1992),
 *rev'd in part on other grounds*, 991 F.2d 859 (D.C. Cir. 1993) .............................................16

*Elmo Co. v. FTC*,
 389 F.2d 550 (D.C. Cir. 1967) ............................................................................3

*Elmo Div. of Drive-X Co. v. Dixon*,
 348 F.2d 342 (D.C. Cir. 1965) ............................................................................3

*FTC v. A. McLean & Son,*
  84 F.2d 910 (7th Cir. 1936) ................................................................................6

*FTC v. Algoma Lumber Co.,*
  291 U.S. 67 (1934) ............................................................................................9

*FTC v. Colgate-Palmolive Co.,*
  380 U.S. 374 (1965) ........................................................................................13

*FTC v. Indiana Fed'n of Dentists,*
  476 U.S. 447 (1986) ........................................................................................13

*FTC v. Klesner,*
  280 U.S. 19 (1929) ............................................................................................8

*FTC v. R.F. Keppel & Bro.,*
  291 U.S. 304 (1934) ..........................................................................................5

*FTC v. Sperry & Hutchinson Co.,*
  405 U.S. 233 (1972) ..........................................................................................5

*Granfinanciera, S.A. v. Nordberg,*
  492 U.S. 33 (1989) ............................................................................................8

*Gulfstream Aerospace Corp. v. Mayacamas Corp.,*
  485 U.S. 271 (1988) ..........................................................................................4

*Hill v. SEC,*
  825 F.3d 1236 (11th Cir. 2016) ......................................................................16

*Holloway v. Bristol-Myers Corp.,*
  485 F.2d 986 (D.C. Cir. 1973) ................................................................5, 6, 13

*Int'l Shoe Co. v. FTC,*
  280 U.S. 291 (1930) ..........................................................................................6

*Jarkesy v. SEC,*
  803 F.3d 9 (D.C. Cir. 2015) ............................................................................16

*Joseph Forrester Trucking v. Dir., Off. of Workers' Comp. Programs,*
  987 F.3d 581 (6th Cir. 2021) ..........................................................................16

*Lucia v. SEC,*
  585 U.S. 237 (2018) ........................................................................................16

*Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.*,
  299 F.3d 643 (7th Cir. 2002) ........................................................................... 4

*\*Meta Platforms, Inc. v. FTC*,
  --- F. Supp. 3d ---, 2024 WL 1121424 n.8 (D.D.C. Mar. 15, 2024) .............................. 4, 15, 17

*\*Meta Platforms, Inc. v. FTC*,
  No. 24-5054, 2024 WL 1549732 (D.C. Cir. Mar. 29, 2024)........................................... *passim*

*Mistretta v. United States*,
  488 U.S. 361 (1989) ........................................................................................ 11

*Mosler Safe Co. v. Ely-Norris Safe Co.*,
  273 U.S. 132 (1927) ......................................................................................... 8

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*,
  458 U.S. 50 (1982) .................................................................................. 12, 14, 15

*Nat'l Harness Mfrs. Ass'n v. FTC*,
  268 F. 705 (6th Cir. 1920) ............................................................................. 7, 13

*NLRB v. Jones & Laughlin Steel Corp.*,
  301 U.S. 1 (1937) .......................................................................................... 12

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,
  584 U.S. 325 (2018) ........................................................................................ 14

*Ostler Candy Co. v. FTC*,
  106 F.2d 962 (10th Cir. 1939) ............................................................................ 7

*Pan Am. World Airways v. United States*,
  371 U.S. 296 (1963) ........................................................................................ 12

*SEC v. Jarkesy*,
  144 S. Ct. 2117 (2024) ............................................................................... *passim*

*Thomas v. Union Carbide Agr. Prod. Co.*,
  473 U.S. 568 (1985) .................................................................................... 7, 10

*Tull v. United States*,
  481 U.S. 412 (1987) ......................................................................................... 6

*Union Bridge Co. v. United States*,
  204 U.S. 364 (1907) .................................................................................. 11, 14

iv

*United States v. Facebook, Inc.*,
  Civ. A. No. 19-2184 (TJK), 2023 WL 8190858 (D.D.C. Nov. 27, 2023) ...............................3

*United States v. Facebook, Inc.*,
  No. 23-5280, 2024 WL 1128083 (D.C. Cir. Mar. 12, 2024)....................................................3

## CONSTITUTION

U.S. Const. art. II, § 1, cl. 1 .....................................................................................................13

## STATUTES

15 U.S.C. § 45.............................................................................................................................8

15 U.S.C. § 45(b) ...............................................................................................................*passim*

15 U.S.C. § 45(*l*) ....................................................................................................................2, 12

15 U.S.C. § 56(a)(1) ...................................................................................................................2

15 U.S.C. § 57b(b) ...................................................................................................................12

## LEGISLATIVE HISTORIES

S. Rep. No. 75-221 (1937)..........................................................................................................5

## REGULATIONS

16 C.F.R. § 2.32 .......................................................................................................................16

16 C.F.R. § 2.32(c)...............................................................................................................16, 17

16 C.F.R. § 3.72(b) ..................................................................................................................17

## OTHER AUTHORITIES

1 *Callmann on Unfair Competition, Trademarks and Monopolies* § 5:9 (4th ed.) ........................4

Gillian E. Metzger, *Foreword: 1930s Redux: The Administrative State Under Siege*,
  131 Harv. L. Rev. 1 (2017)....................................................................................................16

## INTRODUCTION

Defendants' opening brief explained why the Court should reject Meta's attempt to avoid facing the alleged problems with its privacy program in the FTC's modification proceeding, and why the Supreme Court's decision in *SEC v. Jarkesy*, 144 S. Ct. 2117 (2024), does not alter the bottom line as to Meta's claims under the Seventh Amendment and Article III. Meta's response offers no persuasive argument to the contrary.

First, the Seventh Amendment simply is not implicated where, as here, the only remedy sought in the administrative proceeding is a cease-and-desist order, and Meta has not identified any viable analogy to a legal remedy that might implicate the right to a jury.

Second, Meta's Article III claim fails because, as many courts have held, the FTC's administrative adjudications under 15 U.S.C. § 45(b) do not violate the separation of powers. The FTC Act carefully limits the Commission's role and reserves for the courts essential attributes of judicial power, including having the final word on the meaning of the statute, the ability to enforce cease-and-desist orders through monetary penalties, and the ability to grant monetary redress to consumers. The requirement that the Commission act in the public interest further differentiates the Commission from historic courts of equity, which were focused on the private rights before them and could not issue injunctions for the objective of protecting the public from deception.

Fundamentally, *Jarkesy* addressed a narrow question regarding the SEC's ability to adjudicate civil penalties under certain federal securities statutes. It did not purport to address what other agencies operating under other statutes can do in cases involving only a cease-and-desist order. Meta provides no good reason why this Court should adopt its overly broad reading of *Jarkesy* and upend the FTC's long history of adjudicating matters under 15 U.S.C. § 45(b). The Court should decline to do so.

1

## ARGUMENT

### I.      The Seventh Amendment is not implicated.

Meta's Seventh Amendment claim (Count V) fails because the remedy sought in the modification proceeding—the more important factor in determining whether the "suit at common law" criterion is met—is injunctive, not legal, in nature. *See* Defs.' Renewed Mot. to Dismiss, Dkt. 38 at 14-15. Meta's sole argument regarding the remedy factor is that entry of a Commission order could eventually lead to "future imposition of civil penalties" under 15 U.S.C. § 45(*l*). Pl's. Memo. in Opp'n to Def's Mot., Dkt. 41 at 35. As Defendants explained earlier in this case, under § 45(*l*), *if* the Commission decides to modify the 2020 Order, *if* Meta one day were to violate the modified order, *if* the Commission referred the matter to the Department of Justice, and *if* a complaint was filed in district court seeking civil penalties,[1] *then* civil penalties could potentially be recovered from Meta. *See* 15 U.S.C. § 45(*l*); Defs. Opp'n to Pl's. Mot. for Prelim. Inj., Dkt. 18 at 28. Meta cites no authority for the proposition that jury trial rights attach based on speculation about remedies that might or might not be sought in a future proceeding, based on future violations that Meta may or may not commit, of a modification order that may or may not be issued. *See* Dkt. 41 at 28. The only remedy being sought in the modification proceeding is a cease-and-desist order. The Seventh Amendment simply is not implicated here. *See Meta Platforms, Inc. v. FTC*, No. 24-5054, 2024 WL 1549732, at *3 (D.C. Cir. Mar. 29, 2024) (per curiam) (rejecting Seventh Amendment claim where "[t]he Commission is not seeking penalties or any form of relief arguably analogous to damages or other relief available at law").

Regarding the nature of the action, the less important factor, Meta continues to press its allegation that "the Commission is adjudicating Meta's contract rights." Dkt. 41 at 35. But again,

---

[1] The FTC may bring a civil penalty case itself if the Department of Justice declines or does not act on the FTC's referral within 45 days. 15 U.S.C. § 56(a)(1).

the breach of contract analogy is inapt because neither a contract nor a breach is necessary for the Commission to modify an order. *See* Dkt. 38 at 16. Meta cites *Elmo Div. of Drive-X Co. v. Dixon*, 348 F.2d 342, 345-46 (D.C. Cir. 1965), in arguing that the Commission cannot "unilaterally obliterate" a company's contractual rights under an agreed FTC order. Dkt. 41 at 36. To the extent Meta is trying to import an argument from parallel litigation—that the FTC is contractually prohibited from modifying the 2020 order, and only the district court that oversaw the settlement leading to the order can do so—its argument was rejected by that very district court. *United States v. Facebook, Inc.*, Civ. A. No. 19-2184 (TJK), 2023 WL 8190858, at *6 (D.D.C. Nov. 27, 2023) (Kelly, J.). The D.C. Circuit has also held that Meta is unlikely to succeed on that claim. *United States v. Facebook, Inc.*, No. 23-5280, 2024 WL 1128083, at *1 (D.C. Cir. Mar. 12, 2024) (denying motion for injunction pending appeal).[2]

In any event, *Elmo* does not help Meta. When *Elmo* later returned to the D.C. Circuit, the court affirmed the Commission's modification of the agreed FTC order because it was in the public interest to set aside a part of the agreed order "permitting" the company to claim that its products had beneficial health effects. *Elmo Co. v. FTC*, 389 F.2d 550, 551-52 (D.C. Cir. 1967). Because the agreed order allowed beneficial health claims, the company did not violate it by making such claims. Nevertheless, the Commission modified the order because evidence at the modification hearing raised "a serious question as to whether" the company's products had "any beneficial effects at all." *Id.* at 552. The case demonstrates that, even when the Commission adjudicates a modification proceeding involving an agreed order, as opposed to a fully litigated order, the Commission does not adjudicate a breach of contract claim because no "breach" of the agreed

---

[2] The D.C. Circuit is scheduled to hear oral argument in *United States v. Facebook* on November 5, 2024. Order, *United States v. Facebook*, No. 23-5280 (D.C. Cir. Sept. 20, 2024).

order is required for modification. *See* Dkt. 38 at 16.[3] Both this Court and the D.C. Circuit have already rejected Meta's "attempt to repackage the matter as involving contract law[.]" *Meta*, 2024 WL 1549732, at *4; *Meta Platforms, Inc. v. FTC*, --- F. Supp. 3d ---, 2024 WL 1121424, at *19 n.8 (D.D.C. Mar. 15, 2024) ("PI Denial Order"). Meta provides no reason for this Court to reach a different conclusion now.

Meta also continues to urge an analogy to fraud and deceit actions historically brought in courts of law and devotes much attention to a new theory that similar fraud and deceit actions were brought in courts of equity. Dkt. 41 at 14-23. As discussed in Defendants' motion, the nature and history of FTC Act claims distinguish them from common law claims. Dkt. 38 at 18. *Jarkesy* found that federal securities fraud was analogous to common law fraud for Seventh Amendment purposes because Congress used common law terms of art and incorporated prohibitions from common law fraud into federal securities law. 144 S. Ct. at 2130. In the FTC Act, however, Congress purposefully chose not to use the common law term of art "unfair competition" and instead used "unfair methods of competition," "an expression new in the law," *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 532 (1935),[4] precisely because Congress wanted to give the Commission discretion to determine what practices were unfair, without being tied to common

---

[3] Because modification does not depend on any "breach" by Meta, the Court should disregard Meta's argument that modification is akin to a declaration of contract rights. Dkt. 41 at 36. In any event, "[a]ctions for declaratory judgments are neither legal nor equitable." *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 284 (1988). "[C]asting one's suit in the form of a suit for a declaratory judgment, or adding a claim for a declaratory judgment to one's other claim or claims for relief, does not create a right to a jury trial" where the plaintiff is seeking equitable relief and not damages, even if the nature of the underlying dispute is breach of contract. *Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.*, 299 F.3d 643, 649 (7th Cir. 2002).

[4] As the Court explained in *Schechter Poultry*, the tort of unfair competition was narrowly confined to the "palming off of one's goods as those of a rival trader" and "the selling of another's goods as one's own." 295 U.S. at 532. By contrast, when a defendant "falsely inflat[ed] the virtues of its own products or services . . . the common law refused to provide a remedy." 1 *Callmann on Unfair Competition, Trademarks and Monopolies* § 5:9 (4th ed.).

law concepts. *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 243 (1972); *FTC v. R.F. Keppel & Bro.*, 291 U.S. 304, 310-12 (1934).

As the Supreme Court discussed in *Sperry*, the prohibition against "unfair" and "deceptive" acts or practices, formally added to the statute in 1938, grew out of Supreme Court precedent that interpreted "unfair methods of competition" as covering "unfair practices in commerce" beyond the reach of the common law and antitrust statutes. 405 U.S. at 243-44; *see also* S. Rep. No. 75-221, at 2 (1937) ("[T]he sole purpose and effect of [the 1938] chief amendment to section 5" was to stop such acts or practices "regardless of their effect [on] competitors"). Indeed, *Sperry* specifically held that when the Commission administers this new standard, it "does not arrogate excessive power to itself if . . . it, like a court of equity, considers public values beyond simply those enshrined in the letter or encompassed in the spirit of the antitrust laws." 405 U.S. at 244. Likewise, the D.C. Circuit has described the consumer unfairness doctrine developed by the FTC as "not moored in the traditional rationales of anticompetitiveness or deception." *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 971 (D.C. Cir. 1985).

Meta repeats six times that Congress "superimposed a structure of Federal law upon the existing system of common law remedies for fraud and deceit," quoting from an earlier D.C. Circuit case, *Holloway v. Bristol-Myers Corp.*, 485 F.2d 986, 989 (D.C. Cir. 1973). Dkt. 41 at 9, 17, 21, 23, 24, 31. But each time it does so, Meta leaves out the remainder of the sentence: " . . . . Congress has superimposed a structure of Federal law upon the existing system of common law remedies for fraud and deceit *without preempting or superseding the latter*." *Holloway*, 485 F.2d at 989 (emphasis added). Read in context, this line just explains that the substantive prohibitions in the FTC Act coexist with common law remedies. Indeed, the court went on to distinguish the FTC Act from the common law: the Commission does not "serve as a vehicle for redressing

essentially private grievances," nor does the Act "purport to affect a consumer's right to obtain damages in a common law action sounding in fraud or deceit." *Id.* at 999-1000.[5]

As for Meta's analogy to equitable causes of action, even if credited, such an analogy only undermines its Seventh Amendment claim. When the nature of the action could sound in either law or equity, courts look to the remedy, the more important factor. *Tull v. United States*, 481 U.S. 412, 421 (1987). A cease-and-desist order is more similar to an injunction than to any legal remedy Meta has offered. Thus, the Seventh Amendment is not implicated.

Meta's Seventh Amendment claim should be dismissed.

## II. The Commission adjudicates public rights, consistent with Article III.

Meta's Article III claim should also be dismissed. The Supreme Court has held up an FTC adjudication as an example of constitutionally permissible agency adjudication. *Crowell v. Benson*, 285 U.S. 22, 50-51 & n.13 (1932) (citing *Int'l Shoe Co. v. FTC*, 280 U.S. 291, 297 (1930)); *cf. Schechter Poultry*, 295 U.S. at 533 (distinguishing FTC Act from statute that violated separation of powers in part because the FTC Act provides for case-by-case determinations by the Commission and judicial review of the Commission's actions). And courts of appeals have repeatedly rejected Article III challenges to the FTC Act. *See, e.g.*, *FTC v. A. McLean & Son*, 84 F.2d 910, 912 (7th Cir. 1936) (finding "no merit" to a separation of powers challenge to section 5 of the FTC Act, and collecting cases); *Ark. Wholesale Grocers' Ass'n v. FTC*, 18 F.2d 866, 870 (8th Cir. 1927) ("It has been authoritatively held that it is within the power of Congress to delegate

---

[5] The rest of the opinion, which held that the FTC Act did not provide a private right of action, emphasized the "interwoven" nature of the statute's substantive prohibitions and the unique, specialized role of the expert agency. *Holloway*, 485 F.2d at 997-98. It expressed hesitation about courts disrupting the "balance" of policy objectives struck by Congress in designing the FTC Act and "inject[ing]" themselves "into the pertinent subject-matter directly, without the benefit of FTC consideration." *Id.* at 989, 997-98, 1000, 1002. Meta's claims, which do not fully grapple with precedents upholding the statute's delineation of the FTC's versus the courts' roles, offer no reason to destroy the administrative structure built by Congress.

to an administrative body, or head of a department, the duty and power of finding facts upon which subsequent orders may be made and action predicated."); *Nat'l Harness Mfrs. Ass'n v. FTC*, 268 F. 705, 707 (6th Cir. 1920) (the FTC Act "delegates to the commission no judicial powers"); *see also Ostler Candy Co. v. FTC*, 106 F.2d 962, 964 (10th Cir. 1939) (rejecting claim that statutory procedures for cease-and-desist orders "vest[ed] judicial power in the Commission").

Contrary to Meta's suggestion, *Jarkesy* did not overturn this wealth of authority. *Jarkesy* addressed the narrow question of whether the SEC could adjudicate actions for civil penalties brought under certain federal securities fraud laws. *Jarkesy* did not address whether the SEC can, consistent with Article III, issue a cease-and-desist order or impose other non-punitive remedies, let alone what other agencies can do under different statutes with different histories. Given that *Jarkesy* itself acknowledged the "frequently arcane distinctions and confusing precedents" in this area and declined to definitively explain public rights, 144 S. Ct. at 2133 (quoting *Thomas v. Union Carbide Agr. Prod. Co.*, 473 U.S. 568, 583 (1985)), the Court should decline to read *Jarkesy* in a sweeping fashion. Reading *Jarkesy* to prohibit the FTC from issuing cease-and-desist orders would upend over a century of agency adjudications. Rather, the Court should continue to uphold the FTC's § 45(b) adjudications as consistent with Article III because the FTC Act does not impermissibly delegate Article III judicial power to the Commission.

### A.    FTC Act claims adjudicated in § 45(b) proceedings are distinct from historical claims in courts of law and equity.

Meta contends that, under *Jarkesy*, the modification proceeding must be adjudicated by an Article III court because courts of law and equity historically adjudicated fraud claims. Dkt. 41 at 18. Meta's contentions are incorrect.

First, for the reasons discussed above and in Defendants' opening brief, FTC Act claims are not analogous to common law claims. *Supra* at 4-5; Dkt. 38 at 18.

Second, the nature of FTC Act claims is distinct from that of equitable claims. The objectives of the two types of actions are different: Suits in equity protect the plaintiff's property rights; the FTC Act protects the public interest. "Courts of equity" were "concerned with the property rights of complainant," and thus "the sale of spurious goods . . . [did] not give rise to a private right of action unless the property rights of the plaintiff [were] thereby invaded." *Am. Washboard Co. v. Saginaw Mfg. Co.*, 103 F. 281, 285 (6th Cir. 1900).[6] "The private action [was] given, not for the benefit of the public, although that may be its incidental effect, but because of the invasion by defendant of that which is the exclusive property of complainant." *Id.* at 284. Courts of equity thus only granted injunctive relief for misrepresentation when the plaintiff could "show that customers had they known the facts would have gone to the plaintiff rather than to other competitors in the market." *Mosler Safe Co. v. Ely-Norris Safe Co.*, 273 U.S. 132, 134 (1927). Only "the legislature" could grant a remedy for "morally wrong and improper" practices that deceive the public. *Am. Washboard*, 103 F. at 285.

Because "traditional rights and remedies were inadequate to cope with a manifest public problem," *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 60 (1989), Congress enacted Section 5 of the FTC, 15 U.S.C. § 45, to allow the Commission to adjudicate claims under a public-interest standard to protect consumers and fair competition. "[T]o justify the Commission in filing a complaint under section 5, the purpose must be protection of the public. The protection thereby afforded to private persons is the incident. Public interest may exist although the practice deemed unfair does not violate any private right." *FTC v. Klesner*, 280 U.S. 19, 27 (1929) (footnote omitted). Unlike traditional courts, the Commission cannot address merely private wrongs. *See id.*

---

[6] *American Washboard* was decided by a panel of three future Supreme Court justices: Taft, Lurton, and Day.

at 28-30 (refusing to enforce FTC order because the Commission did not act in the public interest when authorizing a complaint involving a dispute between two local window shade shops that was "essentially private in its nature").

Meta quotes a line from *FTC v. Algoma Lumber Co.*, 291 U.S. 67 (1934), stating that "there is a kind of fraud, as courts of equity have long perceived, in clinging to a benefit which is the product of misrepresentation, however innocently made." Dkt. 41 at 16, 21 (quoting *Algoma Lumber*, 291 U.S. at 81). But in the same section of the opinion, *Algoma Lumber* explained that, before the FTC Act was enacted in 1914, complaints that "white pine" products were not actually made of white pine would have been "few and inarticulate at a time when there was no supervisory body to hold business to its duty" and when "many competitive practices that today may be suppressed . . . were not actionable wrongs, the damage to the complainants being classified often as collateral and remote." 291 U.S. at 79. The Court described the FTC as the "champion at hand to put an end to the abuse" and sustained the FTC's cease-and-desist order. *Id.* at 80-82.[7] *Algoma Lumber* thus understood the FTC Act to create something new and different.

### B. Adjudication of modification proceedings falls within the public rights exception.

In any event, that a historical analog of a statutory claim *could* have been adjudicated by a court of law or equity does not necessarily mean that a claim can *only* be adjudicated in an Article III court. If the matter involves public rights, Congress may nevertheless assign the initial adjudication of such a claim to an agency without offending the separation of powers. *See, e.g.*, *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 852 (1986) (upholding agency

---

[7] *See also Cal. Apparel Creators v. Wieder of Cal., Inc.*, 162 F.2d 893, 896, 900-01 & nn. 2 & 11 (2d Cir. 1947) (describing FTC as a "vicarious avenger of the public," in contrast to historical courts of equity, which required proof that misleading practices resulted in "specific customers diverted from specific plaintiffs").

adjudication of "common law counterclaims"); *Thomas*, 473 U.S. at 587 (noting that *Crowell* upheld agency adjudication of statutory claims that "displaced a traditional cause of action and affected a pre-existing relationship based on a common-law contract for hire"); *Block v. Hirsh*, 256 U.S. 135, 158 (1921) (upholding agency adjudication of landlord-tenant disputes).

Meta reads *Jarkesy* as strictly limiting the public rights exception to certain categories of cases such as immigration and taxation or, alternatively, to specific areas where "centuries-old rules" support administrative adjudication. Dkt. 41 at 9, 31 (citing *Jarkesy*, 144 S. Ct. at 2132-34). But *Jarkesy* never claimed that it was exhaustively cataloguing all types of public rights matters. Indeed, *Jarkesy* expressly *dis*claimed that it was definitively explaining the distinction between public and private rights. *Jarkesy*, 144 S. Ct. at 2133. Consistent with this disclaimer, *Jarkesy* cited *Murray's Lessee*'s discussion of historical revenue collection practices only as an "example" of a justification for the application of the doctrine. *Id.* at 2133-34 (citing *Den ex dem. Murray v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 281-85 (1855)) ("*Murray's Lessee*").

More careful analysis of the Supreme Court's precedent in this area shows that, in determining whether a particular agency adjudicatory scheme violates Article III, the Court is concerned with whether such a scheme "impermissibly threatens the institutional integrity of the Judicial Branch." *Schor*, 478 U.S. at 851. In making that determination, "the Court has declined to adopt formalistic and unbending rules." *Id.* Rather, it has tended to "weigh[] a number of factors, none of which has been deemed determinative . . . ." *Id.*; *see also Jarkesy*, 144 S. Ct. at 2134, 2136 (treating various considerations as not dispositive or not sufficient on their own). "[T]he origins . . . of the right[s] to be adjudicated" is just one factor. *Schor*, 478 U.S. at 851. Other considerations include "the extent to which the 'essential attributes of judicial power' are reserved to Article III courts," "the extent to which the non-Article III forum exercises the range of jurisdiction and

10

powers normally vested only in Article III courts," and "the concerns that drove Congress to depart from the requirements of Article III." *Id.*

This approach reflects the Court's understanding that, although Article III "judicial Power" "cannot be shared with the other branches," *Jarkesy*, 144 S. Ct. at 2131, the separation of powers principle does not require "hermetic division among the Branches." *Mistretta v. United States*, 488 U.S. 361, 381 (1989). Just as the Judicial Branch can engage in rulemaking or "other nonadjudicatory activities"—so long as Congress's delegation of these functions "do[es] not trench upon the prerogatives of another Branch and . . . are appropriate to the central mission of the Judiciary," *id.* at 388 (upholding placement of Sentencing Commission in the Judicial Branch)—so too can agencies engage in adjudication without intruding on the Judicial Branch. As the Supreme Court established long ago, Congress may enact laws setting forth general rules while delegating to an agency "the duty of ascertaining what particular cases c[o]me within the rule" and "the duty of enforcing the rule in such cases." *Union Bridge Co. v. United States*, 204 U.S. 364, 386 (1907). In performing these duties, the agency "only execute[s] the clearly-expressed will of Congress" and does not, "in any true sense, exert legislative or judicial power." *Id.* If the Constitution denied Congress the right "to delegate the power to determine some fact or the state of things upon which the enforcement of its enactment depends," the effect "would be 'to stop the wheels of government' and bring about confusion, if not paralysis, in the conduct of the public business." *Id.* at 387. Consistent with this understanding, the Court has long recognized that agencies do not violate Article III when they adjudicate "public rights" matters that "historically could have been determined exclusively by the executive and legislative branches even when they were presented in such form that the judicial power was capable of acting on them." *Jarkesy*, 144 S. Ct. at 2132 (cleaned up); *Murray's Lessee*, 59 U.S. at 284.

11

Here, § 45(b) modification matters involve public rights because the Commission does not "exercise[] the range of jurisdiction and powers normally vested only in Article III courts." *Schor*, 478 U.S. at 851. Rather, the FTC Act reserves the "essential attributes of judicial power" to Article III courts, authorizing the Commission to perform only functions that could also be performed by Congress or the Executive Branch. *Id.* As discussed above, the Commission can act under § 45(b) only in the public interest, with any effect on private interests being incidental to the public interest. In contrast, courts of equity could act only if the plaintiff before the court was harmed, and any effect on the public interest was incidental to the court's ability to hear the case. *Supra* at 8.

The Commission's remedial and enforcement powers are also limited. The Commission cannot order a company to pay monetary redress to consumers; only a court can. *See* 15 U.S.C. § 57b(b). Although the Commission can issue cease-and-desist orders, which share similarities with court-issued injunctions,[8] unlike a court, the Commission cannot enforce its orders by imposing monetary penalties. *See* 15 U.S.C. § 45(*l*); *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 84-85 (1982) (plurality) (describing district court-like power to enforce orders as an "essential attribute[] of judicial power").

---

[8] Similarity between an agency's order and a court-issued injunction does not foreclose application of the public rights exception. In *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937), the Supreme Court upheld the NLRB's order to reinstate employees fired for union-related activity, which the Court described as "equitable relief" and compared to a similar reinstatement order imposed by a court. *Id.* at 47-48. "The fact that in the one case it was a judicial sanction, and in the other a legislative one," the Court noted, "is not an essential difference in determining its propriety." *Id.* at 48. The Court "[did] not doubt that Congress could impose a like sanction for the enforcement of its valid regulation." *Id.* Similarly, the FTC may determine in the first instance that a company must prospectively cease and desist from unfair or deceptive acts and issue an order to that effect, even though a court could do something similar, if granted jurisdiction by Congress. *See Pan Am. World Airways v. United States*, 371 U.S. 296, 312 n.17 (1963) (explaining that FTC's "[a]uthority to mold administrative decrees is indeed like the authority of courts to frame injunctive decrees").

Moreover, a cease-and-desist order issued by the Commission is subject to judicial review and it is the courts, not the Commission, that ultimately determine as a matter of law whether certain types of conduct are unfair or deceptive within the meaning of the FTC Act. *See FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 454 (1986); *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 385 (1965); *Nat'l Harness*, 268 F. at 707; *see also Schor*, 478 U.S. at 853 (upholding CFTC adjudication of common law counterclaims in part because agency did not exercise all the ordinary powers of district courts, and its orders are enforceable only by courts and are subject to judicial review). The Commission's initial adjudication does not usurp any judicial role, but rather is designed to give courts the benefit of the FTC's expertise and inquiry into what is in the public interest when they review cease-and-desist orders. *See Colgate-Palmolive*, 380 U.S. at 385 ("This Court has frequently stated that the Commission's judgment is to be given great weight by reviewing courts. This admonition is especially true with respect to allegedly deceptive advertising since the finding of a § 5 violation in this field rests so heavily on inference and pragmatic judgment."); *cf. Holloway*, 485 F.2d at 998.

While adjudication under § 45(b) takes a "'judicial' form[]" in the sense that the Commission makes case-by-case determinations using adjudicatory procedures, in substance it is an exercise of "executive Power," not judicial power, *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (quoting U.S. Const. art. II, § 1, cl. 1), because the Commission makes only determinations that could be exclusively made by Congress or the Executive Branch. The Commission determines whether particular types of conduct are unfair or deceptive and, if so (and if in the public interest), it issues an order to cease and desist such conduct in the future. Congress could similarly define on its own what acts are unfair or deceptive. Congress could also enact legislation to prospectively prohibit certain types of conduct or require businesses to take

13

prophylactic measures to prevent potential harm to the public. Because Congress itself possesses all of these powers, it did not exceed its authority when delegating to the Commission the power to decide what remedies are appropriate on a case-by-case basis. S*ee Union Bridge*, 204 U.S. at 386 (explaining that, because Congress could have conducted an investigation and "determined for itself" that particular bridges unreasonably interfered with free navigation, it could delegate to the Secretary of War the power to decide the same). To be sure, courts can perform somewhat similar tasks in deciding cases and issuing injunctions. But while these activities involve "inquiry into the existence of facts and the application to them of rules of law," "the exercise of judgment upon law and fact" "is not sufficient to bring such matters under the judicial power." *Murray's Lessee*, 59 U.S. at 280; *cf. Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 343 (2018) ("[The Supreme] Court has never adopted a 'looks like' test to determine if an adjudication has improperly occurred outside of an Article III court.").

Because FTC Act § 45(b) adjudications do not involve the exercise of Article III judicial power, Meta's Article III claim should be dismissed.

### C.   Meta's remaining arguments are unpersuasive.

Meta's other arguments regarding the public rights doctrine are unavailing. Meta asserts that "*Jarkesy* established a 'presumption' that even public rights should be adjudicated by Article III courts," Dkt. 41 at 13, repeatedly quoting the following line from *Jarkesy*: "'[E]ven with respect to matters that arguably fall within the scope of the 'public rights' doctrine, the presumption is in favor of Article III courts,'" *id.* at 9, 13, 28, 31 (quoting *Jarkesy*, 144 S. Ct. at 2134 (quoting *N. Pipeline*, 458 U.S. at 69 n.23)). But *Jarkesy* did not create any new rule. *Jarkesy* quoted *Northern Pipeline* in support of the general observation that the public rights doctrine is an exception to the general rule that Congress cannot "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." *Jarkesy*, 144 S. Ct.

14

at 2134 (quoting *Murray's Lessee*, 59 U.S. at 284). That unremarkable concept dates back to *Murray's Lessee*, an 1855 decision, and it also appears in *Northern Pipeline*, a 1982 opinion. *See N. Pipeline*, 458 U.S. at 70; *Murray's Lessee*, 59 U.S. at 284. Meta's repeated quotation of the line from *Northern Pipeline* does not clarify what makes a matter a "public rights" matter that can be adjudicated by an agency.

Finally, Meta argues that the FTC regulates transactions between private market participants. Dkt. 41 at 30, 35. But this is just a variation on Meta's previous failed argument that a matter implicating private property rights necessarily requires an Article III adjudicator. *See* PI Denial Order, 2024 WL 1121424, at *19 n.7. Many of the Supreme Court's public rights cases have involved private market participants, such as the private employers and employees in *Crowell* and *Jones & Laughlin*, the landlord and tenant in *Block*, and the commodities broker and customer in *Schor*. None of these precedents were disturbed by *Jarkesy*.[9] While *Jarkesy* noted that the SEC action there was meant to regulate private market transactions, that was in the context of explaining that the claims at issue were "modeled on common law fraud" and "provide[d] a type of remedy available only in law courts." 144 S. Ct. at 2136. Neither of those factors applies here.

Accordingly, this Court should dismiss Meta's Article III claim.

### III.    Meta waived its constitutional claims.

Meta's claims should also be dismissed because it consented to administrative modification. Meta argues that its waiver should be excused because *Jarkesy* is an intervening change in the law. Dkt. 41 at 36-37. However, *Jarkesy* simply applied *Granfinanciera*, a 1989

---

[9] *Atlas Roofing Co., Inc. v. Occupational Safety & Health Review Commission*, 430 U.S. 442 (1977), also involved private employers and employees. While *Jarkesy* criticized *Atlas Roofing*, it did not overrule *Atlas Roofing* and explicitly declined to state that it had already been overruled. *Jarkesy*, 144 S. Ct. at 2137 (not "reach[ing] the suggestion made by Jarkesy and Patriot28 that *Tull* and *Granfinanciera* effectively overruled *Atlas Roofing*"). Following still-extant Supreme Court precedent is not "error." *See* Dkt. 41 at 30.

decision, to decide a case based on similar facts. *Jarkesy*, 144 S. Ct. at 2135 ("*Granfinanciera* effectively decides this case."). Further, litigants have been raising challenges to agency adjudication similar to the ones Meta raises here for years before the Supreme Court decided *Jarkesy*. *See, e.g.*, *Hill v. SEC*, 825 F.3d 1236, 1239 (11th Cir. 2016) (raising Seventh Amendment challenge in 2015); *Jarkesy v. SEC*, 803 F.3d 9, 14 (D.C. Cir. 2015) (same in 2014); Gillian E. Metzger, *Foreword: 1930s Redux: The Administrative State Under Siege*, 131 Harv. L. Rev. 1, 21 & n.104 (2017) (in 2017, describing numerous constitutional challenges brought to agency adjudications in recent years). Thus, Meta's waiver—reflected in its conduct from 2011 through 2020—should not be excused. *Cf. Joseph Forrester Trucking v. Dir., Off. of Workers' Comp. Programs*, 987 F.3d 581, 592 (6th Cir. 2021) (refusing to excuse forfeiture based on intervening change in law where Appointments Clause challenges were available before *Lucia v. SEC*, 585 U.S. 237 (2018), and *Lucia* was decided based on prior Supreme Court precedent).

Meta also takes issue with the D.C. Circuit's reliance on 16 C.F.R. § 2.32(c)[10] in determining that Meta waived its constitutional challenges. Dkt. 41 at 37 n.15. But Meta's hyperfocus on § 2.32(c) misses the forest for the trees. The D.C. Circuit's point was that "this is the third round in a long-running interchange involving consent orders agreed to by Meta and the Commission that address Meta's privacy policies." *Meta*, 2024 WL 1549732, at *2. Meta has been aware for many years that consent orders issued by the Commission are subject to modification by

---

[10] 16 C.F.R. § 2.32 "prescribe[s] the form and much of the content" of "agreement[s] in settlement of a Commission complaint." *Dr. Pepper/Seven-Up Companies, Inc. v. FTC*, 798 F. Supp. 762, 770 (D.D.C. 1992), *rev'd in part on other grounds*, 991 F.2d 859 (D.C. Cir. 1993). Under subsection (c), every such agreement "shall provide that" the proposed consent order "will have the same force and effect and may be altered, modified or set aside in the same manner provided by statute for Commission orders issued on a litigated or stipulated record."

the Commission through administrative proceedings, and it has nevertheless agreed to those consent orders, and thus to the FTC's administrative modification procedures. *Id.*

As discussed in the D.C. Circuit's order, in 2011, Meta settled an administrative complaint and agreed that the Commission would issue a consent order against it, which the Commission did in 2012. Defs. Opp'n to Pl's. Mot. for Prelim. Inj., Ex. B, Dkt. 18-3; *id.* Ex. C, Dkt. 18-4. As required by § 2.32(c), the agreement stated that the consent order "shall have the same force and effect and may be altered, modified or set aside in the same manner provided by statute for other orders." *Compare* Dkt. 18-3 at 3, *with* 16 C.F.R. § 2.32(c). In the 2011 agreement, Meta also "waived 'any further procedural steps' and 'all rights to seek judicial review or otherwise to challenge or contest the validity of the order." *Meta*, 2024 WL 1549732, at *2 (quoting Dkt. 18-3 at 2). In 2020, the government and Meta reached another agreement to settle a district court Department of Justice complaint seeking civil penalties due to Meta's violation of the 2012 administrative order. In that agreement, Meta consented to the Commission modifying the 2012 order, which resulted in the Commission issuing its 2020 order. PI Denial Order, 2024 WL 1121424, at *5. Because § 2.32(c) applies only to settlements "of a Commission complaint," not to settlements of district court complaints, the language of § 2.32(c) was not required in the 2020 settlement. However, in 2020, Meta consented to the Commission's modification of the 2012 order and waived its rights to an administrative show-cause procedure, which Meta otherwise would have been entitled to prior to modification. Defs. Opp'n to Pl's. Mot. for Prelim. Inj., Ex. F, Dkt. 18-7 at 2 (citing 16 C.F.R. § 3.72(b), which implements the procedural requirements for modification in 15 U.S.C. § 45(b)). Meta also again waived its rights to appeal or challenge the validity of the modified administrative order. Dkt. 18-7 at 2-3. This course of events shows that, "when Meta consented to the Commission's 2020 order, it seems it also may have consented to

17

the established procedures for modifying that order, including the order to show cause that it asks this court to enjoin." *Meta*, 2024 WL 1549732, at *2. Meta's consent thus provides another reason to dismiss its claims.

## CONCLUSION

For these reasons, the Court should grant Defendants' motion and dismiss Meta's Complaint with prejudice.

Dated: October 18, 2024                    Respectfully submitted,

                                           BRIAN M. BOYNTON
                                           Principal Deputy Assistant Attorney General

                                           CHRISTOPHER HALL
                                           Assistant Branch Director

                                           */s/ Cynthia Liao*
                                           CYNTHIA LIAO (CA Bar No. 301818)
                                           Trial Attorney
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           1100 L St. N.W.
                                           Washington, DC 20005
                                           Tel: (202) 531-1325
                                           Fax: (202) 616-8470
                                           cynthia.f.liao@usdoj.gov

                                           *Counsel for Defendants*